# EXHIBIT "E"

# VITRO SAB DE CV

## T–3

Initial application for qualification of trust indentures
Filed on 11/1/2010

 

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

# FORM T−3
## FOR APPLICATIONS FOR QUALIFICATION OF INDENTURES
## UNDER THE TRUST INDENTURE ACT OF 1939

# Vitro, S.A.B. de C.V.
(Name of Applicant)
Ave. Ricardo Margáin 400
Col. Valle del Campestre
San Pedro Garza García, Nuevo León, 66265
United Mexican States ("Mexico")
(Address of Principal Executive Offices)
Securities to be Issued Under the Indentures to be Qualified

| Title of Class | Amount |
|---|---|
| 8.0% Notes due 2019 | $850 million in aggregate principal amount |
| Mandatory Convertible Debentures | $100.0 million in aggregate principal amount, subject to adjustment |

Approximate date of proposed public offering:
As promptly as practicable after the date of this Application for Qualification
Name and Address of Agent for Service:
Puglisi & Associates
850 Library Avenue, Suite 204
Newark, Delaware 19711
(302) 738−6680
With copies to:

Joy K. Gallup, Esq.
Milbank, Tweed, Hadley & McCloy LLP
1 Chase Manhattan Plaza
New York, NY 10005
(212) 530−5000

Alejandro Sanchez Mujica
General Counsel
Ave. Ricardo Margain Zozaya #400
Col. Valle del Campestre
San Pedro Garza Garcia
Nuevo Leon, 66265 Mexico
+52 (81) 8863−1200

## THE GUARANTORS LISTED ON SCHEDULE A HERETO

The Applicant hereby amends this application for qualification on such date or dates as may be necessary to delay its effectiveness until (i) the 20th day after the filing of a further amendment which specifically states that it shall supersede this amendment, or (ii) such date as the SEC, acting pursuant to Section 307(c) of the Act, may determine upon the written request of the Applicant.

## SCHEDULE A
### OTHER REGISTRANTS—SUBSIDIARY GUARANTORS

| Name | Address | Jurisdiction of Incorporation |
|------|---------|-------------------------------|
| Viméxico, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |
| Vitro Envases Noréamerica, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |
| Comercializadora Álcali, S.A. de C.V. (formerly Vitro Corporativo, S.A. de C.V.) | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |
| FIC Regiomontano, S.A.P.I. de C.V. (formerly Servicios Corporativos de Edificaciones, S.A. de C.V.) | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |
| V–MX Holdings, LLC (formerly Crisa Holding Co.) | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Delaware, USA |
| Vitro Packaging de México, S.A. de C.V. (formerly Inmobiliaria Loma del Toro, S.A. de C.V.) | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |
| Vidriera Monterrey, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |
| Vidriera los Reyes, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |
| Vidriera Guadalajara, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |
| Vidriera Querétaro, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |
| Vidriera Toluca, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |
| Compañía Vidriera, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |
| Fabricación de Máquinas, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |
| Servicios Integrales de Acabados, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |
| Vidrio Plano, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |
| Industria del Álcali, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |
| Distribuidora de Vidrio y Cristal, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |

2

| Name | Address | Jurisdiction of Incorporation |
|------|---------|-------------------------------|
| Vidrio Lux, S.A. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Bolivian |
| Vitro Packaging, LLC | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Delaware, USA |
| Vidrio Plano de Mexicali, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |
| Vitro Europa, Ltd. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Swiss |
| Vitro Asset Corp. (formerly American Asset Holdings Corp.) | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Texas, USA |
| Vitro Venezuela, S.A. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Venezuelan |
| Binswanger Glass Company (formerly Troper, Inc.) | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Delaware, USA |
| Vitro Panamá, S.A. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Panamanian |
| Troper Services, Inc. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Ecuatorian |
| Vitemco Ecuador, S.A. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Delaware, USA |
| Amsilco Holdings, Inc. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Delaware, USA |
| B.B.O. Holdings, Inc. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Delaware, USA |
| Crisa Corporation | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Delaware, USA |
| Vitro Automotriz, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |
| Vitro Flex, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |
| Vitro Vidrio y Cristal, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |
| Vitro Flotado Cubiertas, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |
| Distribuidor Vidriero LAN, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |

3

| Name | Address | Jurisdiction of Incorporation |
|---|---|---|
| Vitrocar, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |
| Cristales Inastillables de México, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |
| Vidrio Plano de México, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |
| VVP Holdings, LLC. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Delaware, USA |
| VVP Auto Glass, Inc. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Delaware, USA |
| Vitro America, LLC. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Delaware, USA |
| Super Sky Products, Inc. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Delaware, USA |
| Super Sky International, Inc. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Delaware, USA |
| VVP Finance Corporation | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Delaware, USA |
| Vitro Colombia, S.A. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Colombian |
| VVP Europa Holdings, B.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | The Netherlands |
| Vitro do Brasil Indústria e Comércio, Ltda. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Brazilian |
| Vitro Chemicals, Fibers and Mining, LLC. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Texas, USA |
| Vitro Global, Ltd. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Swiss |
| Vidrio y Cristal del Noroeste, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |
| Servicios Vidriera Guadalajara, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |
| Servicios Vidriera Toluca, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |
| Servicios Vitro Cosmos, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |

4

| Name | Address | Jurisdiction of Incorporation |
|---|---|---|
| Servicios Vidriera Querétaro, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |
| Servicios Vidriera Los Reyes, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |
| Inmobiliaria Vitalc, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |
| Viqueretanos, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |
| VAU, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |
| Vitro Car Colombia, S.A.S | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Colombian |
| Vitro Cristalglass, S.L. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Spanish |

The name and address, including zip code, telephone number and area code, of the above listed registrants' agent for service of process is Puglisi & Associates, 850 Library Avenue, Suite 204, Newark, Delaware 19711, (302) 738–6680.

## GENERAL

**1. GENERAL INFORMATION.**

(a) *Form of organization*: the issuer of the Notes (as defined below) is Vitro, S.A.B. de C.V. (the "Company" or "Vitro"), which is a corporation with variable capital (*sociedad anónima bursátil de capital variable*).

(b) *State or other sovereign power under which organized*: the Company is organized under the laws of Mexico.

**2. SECURITIES ACT EXEMPTION APPLICABLE.**

The Company (1) is proposing an exchange offer and soliciting consents ("Exchange Offer and Consent Solicitation") to an in-court restructuring through a plan or agreement ("*Concurso* Plan") under the *Ley de Concursos Mercantiles*, or bankruptcy law, of Mexico, and (2) together with Administración de Inmuebles Vitro, S.A. de C.V. ("AIV"), a wholly-owned subsidiary of Vitro, are offering to purchase for cash (the "Tender Offer" and together with the Exchange Offer and Consent Solicitation, the "Tender Offer and Exchange Offer and Consent Solicitation") the Old Notes (as defined below). Holders may tender their Old Notes in either the Tender Offer or the Exchange Offer and Consent Solicitation. Because the size of the Tender Offer is limited, holders that tender Old Notes in the Tender Offer will be required to specify whether, if their Old Notes are not accepted in the Tender Offer, they elect to tender them into the Exchange Offer and Consent Solicitation instead.

*The Exchange Offer and Consent Solicitation*

Pursuant to the *Concurso* Plan, the Company would exchange all of its outstanding 8.625% Senior Notes due 2012, referred to as the "2012 Notes," 11.75% Senior Notes due 2013, referred to as the "2013 Notes," and 9.125% Senior Notes due 2017, referred to as the "2017 Notes" (together with the 2012 Notes and 2013 Notes, the "Old Notes") and the DFI Claims and Other Debt (each as defined below) for the following consideration on a pro rata basis:

- $850 million in aggregate principal amount of new notes (the "New 2019 Notes") issued at par value to the Restructured Debt;

- $100 million in aggregate principal amount (plus the Issue Date Adjustment as defined in the Tender Offer and Exchange Offer and Consent Solicitation) of newly issued mandatory convertible debentures (the "New MCDs" and, together with the 2019, the "New Notes"), which will mandatorily convert into 15.0% of the Company's equity if not paid in full at maturity;

- a cash payment of the amount remaining, out of $75 million deposited in a Mexican trust, after making a consent payment as described further in the Company's Tender Offer and Exchange Offer and Consent Solicitation Statement filed as Exhibit T3E.1 hereto, which will be paid to all holders of the Old Notes and all holders of claims relating to the Company's derivative financial instruments ("DFI Claims") and the other debt (the "Other Debt"), on a pro rata basis; and

- a restructuring fee, in cash, based on the issue date of the New Notes.

*The Tender Offer*

The Company and AIV offer to purchase for cash the maximum aggregate principal amount of Vitro's Old Notes that can be purchased for $100,000,000 (subject to increase, the "Maximum Payment Amount"), at a purchase price per $1,000 principal amount equal to the clearing price. The Company and AIV reserve the right, but are not obligated, to increase the Maximum Payment Amount by up to 30% without permitting holders to withdraw Old Notes that have been previously tendered in the Tender Offer.

The definitive terms and conditions of the Tender Offer and Exchange Offer and Consent Solicitation will be contained in the offer documents, which are filed as Exhibits T3E.1 through T3E.3 hereto and incorporated herein by reference.

The Company intends to make the Exchange Offer and Consent Solicitation in reliance on the exemption from the registration requirements of the Securities Act of 1933, as amended (the "Securities Act"), afforded by Section 3(a)(9) thereof, based upon the following facts:

6

- The New Notes will be offered by the Company to its existing security holders exclusively and solely in exchange for its Old Notes, its DFI Claims and its Other Debt.

- No sales of securities of the same class as the New Notes have been or are to be made by the Company or by or through an underwriter at or about the same time as the Exchange Offer and Consent Solicitation for which the exemption is claimed.

- The Company has not paid or given, and will not pay or give, directly or indirectly, any commission or other remuneration to any broker, dealer, salesman, agent or other person for soliciting tenders in the Exchange Offer and Consent Solicitation. To the extent solicitations are undertaken by the Company's officers and employees, such officers and employees will not receive additional compensation for making such solicitations. The Company has engaged Rothschild, Inc. to act as its financial advisor in connection with restructuring its debt. The fees paid to Rothschild are not contingent on the success of this Exchange Offer and Consent Solicitation and the activities undertaken by Rothschild are consistent with the activities of other financial advisors as permitted by the SEC.

- The Company has not retained a dealer-manager in connection with the Exchange Offer and Consent Solicitation.

- No holder of Old Notes has made or will be requested to make any cash payment in connection with the Exchange Offer and Consent Solicitation other than the payment of any applicable withholding or other taxes in accordance with the terms of the Exchange Offer and Consent Solicitation.

## AFFILIATIONS
**3. AFFILIATES.**

For the purposes of this application only, the directors and executive officers of the Company named in response to Item 4 hereof and the principal owners of the Company's voting securities named in response to Item 5 hereof may be deemed affiliates of the Company by virtue of the positions held by such persons in relation to the Company.

The following is a list of all wholly owned or majority owned direct and indirect subsidiaries of the Company, all of which are considered affiliate companies, as of the date of this application. A diagram depicting the relationship of each affiliate to the Company is attached hereto as Exhibit T3H.

| Company Name | Jurisdiction of Formation | Percentage |
|---|---|---|
| Viméxico, S.A. de C.V. | Mexican | 91.8% |
| Vitro Envases Noréamerica, S.A. de C.V. | Mexican | 100% |
| Comercializadora Álcali, S.A. de C.V. (formerly Vitro Corporativo, S.A. de C.V.) | Mexican | 100% |
| FIC Regiomontano, S.A.P.I. de C.V. (formerly Servicios Corporativos de Edificaciones, S.A. de C.V.) | Mexican | 100% |
| Vidriera Monterrey, S.A. de C.V. | Mexican | 100% |
| Vidriera los Reyes, S.A. de C.V. | Mexican | 100% |
| Vidriera Guadalajara, S.A. de C.V. | Mexican | 100% |
| Vidriera Querétaro, S.A. de C.V. | Mexican | 100% |
| Vidriera Toluca, S.A. de C.V. | Mexican | 100% |
| Compañía Vidriera, S.A. de C.V. | Mexican | 100% |
| Fabricación de Máquinas, S.A. de C.V. | Mexican | 100% |
| Servicios Integrales de Acabados, S.A. de C.V. | Mexican | 100% |

| Company Name | Jurisdiction of Formation | Percentage |
|---|---|---|
| Vitro Packaging de México, S.A. de C.V. (formerly Inmobiliaria Loma del Toro, S.A. de C.V.) | Mexican | 100% |
| Industria del Álcali, S.A. de C.V. | Mexican | 100% |
| Vidrio Lux, S.A. | Bolivian | 100% |
| Vitro Packaging, LLC | Delaware, USA | 100% |
| Vitro Europa, Ltd. | Swiss | 100% |
| Vitro Asset Corp (formerly American Asset Holdings Corp.) | Texas, USA | 100% |
| V–MX Holdings, LLC (formerly Crisa Holding Co.) | Delaware, USA | 100% |
| Binswanger Glass Company (formerly Troper, Inc.) | Delaware, USA | 100% |
| Troper Services, Inc. | Delaware, USA | 100% |
| Amsilco Holdings, Inc. | Delaware, USA | 100% |
| B.B.O. Holdings, Inc. | Delaware, USA | 100% |
| Crisa Corporation | Delaware, USA | 100% |
| Vitro Automotriz, S.A. de C.V. | Mexican | 100% |
| Vitro Flex, S.A. de C.V. | Mexican | 100% |
| Vitro Vidrio y Cristal, S.A. de C.V. | Mexican | 100% |
| Vitro Flotado Cubiertas, S.A. de C.V. | Mexican | 100% |
| Distribuidor Vidriero LAN, S.A. de C.V. | Mexican | 100% |
| Vitrocar, S.A. de C.V. | Mexican | 100% |
| Cristales Inastillables de México, S.A. de C.V. | Mexican | 100% |
| Vidrio Plano de México, S.A. de C.V. | Mexican | 100% |
| VVP Holdings, LLC | Delaware, USA | 100% |
| VVP Auto Glass, Inc. | Delaware, USA | 100% |
| Vitro America, LLC | Delaware, USA | 100% |
| Super Sky Products, Inc. | Delaware, USA | 100% |
| Super Sky International, Inc. | Delaware, USA | 100% |
| VVP Finance Corporation | Delaware, USA | 100% |
| Vitro Colombia, S.A. | Colombian | 100% |
| VVP Europa Holdings, B.V. | Netherlands | 91.8% |
| Vitro do Brasil Indústria e Comércio, Ltda. | Brazilian | 100% |
| Vitro Chemicals, Fibers and Mining, LLC | Texas, USA | 100% |
| Vitro Global, Ltd. | Swiss | 100% |
| Vidrio Plano, S.A. de C.V. | Mexican | 100% |
| Distribuidora de Vidrio y Cristal, S.A. de C.V. | Mexican | 100% |
| Vidrio Plano de Mexicali, S.A. de C.V. | Mexican | 100% |
| Vitro Venezuela, S.A. | Venezuelan | 100% |
| Vitro Panamá, S.A. | Panamanian | 100% |
| Vitemco Ecuador, S.A. | Ecuatorian | 100% |
| Vidrio y Cristal del Noroeste, S.A. de C.V. | Mexican | 100% |
| Servicios Vitro Cosmos, S.A. de C.V. | Mexican | 100% |
| Servicios Vidriera Los Reyes, S.A. de C.V. | Mexican | 100% |

8

| Company Name | Jurisdiction of Formation | Percentage |
|---|---|---|
| Servicios Vidriera Guadalajara, S.A. de C.V. | Mexican | 100% |
| Servicios Vidriera Toluca, S.A. de C.V. | Mexican | 100% |
| Servicios Vidriera Querétaro, S.A. de C.V. | Mexican | 100% |
| VAU, S.A. de C.V. | Mexican | 100% |
| Inmobiliaria Vitalc, S.A. de C.V. | Mexican | 100% |
| Viqueretanos, S.A. de C.V. | Mexican | 100% |
| Productos de Valor Agregado en Cristal, S.A. de C.V. | Mexican | 55% |
| Grupo Sordo Noriega, S.A. de C.V. | Mexican | 55% |
| Productos de Valor Agregado en Cristal del Sureste, S.A. de C.V. | Mexican | 55% |
| Cristales Automotrices, S.A. de C.V. | Mexican | 51% |
| Cristales y Servicios, S.A. de C.V. | Mexican | 51% |
| VVP Funding Corporation | Delaware, USA | 100% |
| Vitro Car Colombia, S.A.S | Colombian | 100% |
| IP Vitro Vidrio y Cristal, Ltd. | Swiss | 82.5% |
| Vitro Cristalglass, S.L. | Spanish | 65.84% |
| Vitro Chaves-Indústria de Vidrio, S.A. | Portuguese | 60% |
| Aerovitro, S.A. de C.V. | Mexican | 100% |
| Administración de Inmuebles Vitro, S.A. de C.V. | Mexican | 100% |
| Vitro International Services Corporation | Delaware, USA | 100% |
| Trabajo de Administración y Servicios, A.C. | Mexican | 100% |
| Salud Corporativa, A.C. | Mexican | 100% |
| Formación Educativa, A.C. | Mexican | 100% |
| Clínica Vitro, A.C. | Mexican | 100% |
| ASRAC Caja de Ahorro, A.C. | Mexican | 100% |
| Fundación Vitro, A.C. | Mexican | 100% |
| Desarrollo Personal y Familiar, A.C. | Mexican | 100% |

## MANAGEMENT AND CONTROL

**4. DIRECTORS AND EXECUTIVE OFFICERS.**

The following table lists the names and offices held by all of the Company's directors and officers. The mailing address and telephone number for all individuals is Ave. Ricardo Margáin 400, Col. Valle del Campestre, San Pedro Garza García, Nuevo León, 66265 Mexico and (52-81) 8863-1200.

| Name | Office |
|---|---|
| Adrián Sada González | Chairman of the Board of Directors |
| Hugo A. Lara García | CEO, Director |
| Alejandro Sánchez Mújica | Executive Vice President and General Counsel |
| Claudio Del Valle Cabello | Chief Financial and Administrative Officer and Chief Restructuring Officer |
| Alfonso Gómez Palacio | President of the Glass Containers Business Unit |
| David González Morales | President of the Flat Glass Business Unit |
| Tomás González Sada | Director |
| Andrés Yarte Cantú | Director |

9

| Name | Office |
|------|--------|
| Federico Sada Melo | International Commercial Manager of the Vitro Flat Glass Business Unit, Director |
| Jaime Serra Puche* | Director |
| Joaquín Vargas Guajardo* | Director |
| Jaime Rico Garza | President and CEO of Vitro Europa, Ltd., Director |
| Manuel Güemez de la Vega* | Director |
| Ricardo Martín Bringas* | Director |
| Mario Martín Laborín Gómez | Director |
| Guillermo Ortiz Martínez* | Director |
| Adrián G. Sada Cueva | VP of Administration and Finance of Vitro Glass Containers Business Unit, Director |

\*                                                   Independent non‑management directors.

## 5. PRINCIPAL OWNERS OF VOTING SECURITIES.

The following table sets forth the Company's major shareholders and their shareholdings of our common stock as of September 24, 2010, unless otherwise indicated.

| Name | Address | Series A Shares Outstanding[1] | % of Shares Outstanding[1][2] |
|------|---------|-------------------------------|-------------------------------|
| Pension Plan Trust | Ave. Ricardo Margáin 400, Col. Valle del Campestre San Pedro Garza García, Nuevo León, 66265 Mexico | 59,484,349 | 15.39 |
| Stock Option Trust | Ave. Ricardo Margáin 400, Col. Valle del Campestre San Pedro Garza García, Nuevo León, 66265 Mexico | 39,777,907 | 10.29 |
| Mr. Alfredo Harp Helú[7][8] | Praga 21, Colonia Juárez, Delegación Cuauhtemoc México, D.F. 6600, México | 38,171,281 | 9.88 |
| Mr. Adrián Sada González[3][4][6][7] | Ave. Ricardo Margáin 400, Col. Valle del Campestre San Pedro Garza García, Nuevo León, 66265 Mexico | 29,545,712 | 7.65 |
| Mr. Federico Sada González[3][5] | Ave. Ricardo Margáin 400, Col. Valle del Campestre San Pedro Garza García, Nuevo León, 66265 Mexico | 29,212,591 | 7.56 |
| Ms. Alejandra Sada González[3][6][7] | Ave. Ricardo Margáin 400, Col. Valle del Campestre San Pedro Garza García, Nuevo León, 66265 Mexico | 26,058,188 | 6.74 |

(1)     All of the shares that may be issued upon exercise of the Company's outstanding options are held by its Stock Option Trust, and all of its outstanding options are currently exercisable. Therefore, shares outstanding and the calculation of percentage of shares outstanding include all the Company's outstanding options.

(2)     Calculation of percentage of shares outstanding based upon 386,857,143 issued shares minus 445,500 held as treasury stock. The total amount of outstanding shares includes 53.6 million of shares that are subject to dispute.

(3)     Mrs. María Nelly Sada de Yarte, her children and her children's spouses collectively hold 17,182,163 of the Company's shares, representing 4.45% of the Company's issued and outstanding shares, which are not included in the table above. Mrs. María Nelly Sada de Yarte is a sister of Mr. Adrián Sada González, Mr. Federico Sada González and Ms. Alejandra Sada González.

(4)    Reported as a group with his wife, Mrs. Esther Cueva de Sada, and his son Mr. Adrián Sada Cueva. In addition to the shares set forth below, Mr. Adrián Sada González may be deemed to be a beneficial owner of the 39,777,907 shares held by the Company's Stock Option Trust, as a member of the Technical Committee of the Stock Option Trust who shares the right to vote and the right to sell the shares held by the Stock Option Trust with the other member of the Technical Committee.

(5)    Reported as a group with his wife, Mrs. Liliana Melo de Sada, his sons Messrs. Federico Sada Melo and Mauricio Sada Melo, and his daughter, Ms. Liliana Sada Melo.

(6)    Entered into the 2009 Shareholders Agreement. The main provisions of the 2009 Shareholders Agreement set forth the rules to be followed by the abovementioned shareholders with respect to: (i) joint exercise of their voting rights and (ii) any transfer of their shares.

(7)    Entered into the 2010 Shareholders Agreement. The main provisions of the 2010 Shareholders Agreement set forth the rules to be followed by the abovementioned shareholders with respect to: (i) joint exercise of their voting rights, except with respect to certain specific and relevant matters, and (ii) any transfer of their shares.

(8)    Board of Directors, as required by Vitro's by-laws, approved the request of Mr. Harp Helú to acquire additional shares of Vitro in excess of 9.9%, up to a maximum of 15% of the Company's equity.

**6. UNDERWRITERS.**
No person has acted as an underwriter of any securities of the Company during the three years prior to the date of the filing of this application. There is no proposed principal underwriter for the New Notes that are proposed to be offered in connection with the Indentures that are to be qualified under this application.

**CAPITAL SECURITIES**

**7. CAPITALIZATION.**
(a) The following tables set forth certain information with respect to each authorized class of securities of the Company as of September 30, 2010.

| Title of Class | Amount Authorized (US$) | Amount Outstanding (US$)[1] |
|---|---|---|
| Shares of Series A, Class I, no par value | 324,000,000 | 323,554,500 |
| Shares of Series A, Class II, no par value (jointly with shares Class I referred to as "Shares") | 62,857,143 | 62,857,143 |
| 2012 Notes | 300,000,000 | 300,000,000 |
| 2013 Notes | 225,000,000 | 216,000,000 |
| 2017 Notes | 700,000,000 | 700,000,000 |
| *Certificados Bursátiles Vitro 03* | 199,982,401.55 | 11,998,944.09 |
| *Certificados Bursátiles Vitro 08* | 79,992.960.62 | 31,997,184.25 |
| DFI Claims[2] | N/A | 189,999,282 |
| RBS Note | 15,000,000 | 15,000,000 |

(b) The holders of the Shares are entitled to one vote for each share held of record on the applicable record date on all matters submitted to a vote of the stockholders.

As of September 30, 2010 there are 30,902,699 Ordinary Participation Certificates ("CPOs")[3] issued. Each CPO represents one Share and has no voting right with respect to the underlying Share, but have all the

[1]    Peso amounts have been translated into U.S. dollars, solely for the convenience of the reader, at the rate of 12.5011 pesos per one U.S. dollar, the Free Exchange Rate September 30, 2010.

[2]    DFI Claims arose from guarantees granted by the Company.

11

economic rights relating to that. The CPO trustee that holds the shares represented by CPOs is required to vote those Shares in the same manner as the majority of the shares not so held that are voted in the relevant shareholders' meeting.

**INDENTURE SECURITIES**

**8. ANALYSIS OF INDENTURE PROVISIONS.**

The New 2019 Notes will be issued under an indenture (the "New 2019 Notes Indenture") and the New MCDs will be issued under an indenture (the "New MCDs Indenture" and together with the New 2019 Notes Indenture, the "Indentures"), each between the Company and The Bank of New York Mellon, as trustee (the "Trustee"). The following is a summary of the provisions of the Indentures required to be summarized by Section 305(a)(2) of the Trust Indenture Act of 1939 and is not a complete description of the Indentures' provisions discussed. Holders of New Notes are encouraged to read the entire respective Indentures because many provisions that will control the rights of a holder of New Notes are not described in this analysis. The description makes use of a number of terms defined in the Indentures and is qualified in its entirety by express reference to the Indentures.

**Events of Default**

Each of the following is an "Event of Default" under the Indentures, unless specified to pertain only to the New 2019 Notes Indenture or the New MCDs Indenture:

(a) one or more final judgments or orders for the payment of money are rendered against the Company or any of its Material Subsidiaries and are not paid or discharged, and there is a period of 60 consecutive days following entry of the final judgment or order that causes the aggregate amount for all such final judgments or orders outstanding and not paid or discharged against all such Persons to exceed $25.0 million (in excess of amounts which the Company's insurance carriers have agreed to pay under applicable policies) during which a stay of enforcement, by reason of a pending appeal or otherwise, is not in effect;

(b) an involuntary case or other proceeding is commenced against the Company or any Material Subsidiary with respect to it or its debts under any bankruptcy, *concurso mercantil*, insolvency or other similar law now or hereafter in effect seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, and such involuntary case or other proceeding remains undismissed and unstayed for a period of 60 days; or an order for relief is entered against the Company or any Material Subsidiary under the federal bankruptcy laws as now or hereafter in effect; or

(c) the Company or any of its Material Subsidiaries (i) commences a voluntary case under any applicable bankruptcy, *concurso mercantil*, insolvency or other similar law now or hereafter in effect, or consents to the entry of an order for relief in an involuntary case under any such law, (ii) consents to the appointment of or taking possession by a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official of the Company or any of its Material Subsidiaries or for all or substantially all of the property and assets of the Company or any of its Material Subsidiaries or (iii) effects any general assignment for the benefit of creditors (an event of default specified in clause (b) or (c), a "bankruptcy default"); or

(d) the Company fails to (i) make an Excess Cash Flow prepayment or repurchase or (ii) conduct a Mandatory Redemption of the New Notes.

3   The CPOs are negotiable instruments under Mexican law, have been issued by National Financiera as CPO trustee pursuant to the terms of CPOs trust agreements between the CPO trustee and Vitro. Currently the maximum number of CPOs that can be issued pursuant to the CPO agreements is 200,000,000. The CPO trust agreements established a master trust that enables non−Mexican investors to acquire CPOs representing economic interests in the Shares. The trust is necessary because, under Vitro by−laws, the Shares may not be purchased or held directly or indirectly by non−Mexican investors, other than through this mechanism.

12

*Events of Default: New 2019 Notes Indenture:*

    (a) the Company defaults in any payment of interest (including any additional interest and Additional Amount) on any 2019 Note when the same becomes due and payable, and the default continues for 30 days;

    (b) the Company defaults in the payment of principal of any 2019 Note when due and payable at maturity, upon acceleration or redemption, or otherwise (other than pursuant to an Offer to Purchase);

    (c) the Company fails to make an Offer to Purchase and thereafter to accept and pay for New 2019 Notes tendered when and as required pursuant to the covenants regarding a Change of Control, Limitation on Asset Sales, or the Company or any Guarantor fails to comply with the covenant regarding Consolidation, Merger, Lease or Sale of Assets;

    (d) the Company defaults in the performance of or breaches any other covenant or agreement of the Company in the New 2019 Notes Indenture or under the New 2019 Notes and the default or breach continues for a period of 45 consecutive days after written notice to the Company by the trustee or to the Company and the trustee by the holders of 25% or more in aggregate principal amount of the New 2019 Notes;

    (e) there occurs with respect to any Debt of the Company or any of its Material Subsidiaries having an outstanding principal amount of $25.0 million or more in the aggregate for all such Debt of all such Persons (i) an event of default that results in such Debt being due and payable prior to its scheduled maturity or (ii) failure to make a principal payment when due and such defaulted payment is not made, waived or extended within the applicable grace period;

    (f) any Note Guaranty ceases to be in full force and effect, other than in accordance with the terms of the New 2019 Notes Indenture, or a Guarantor denies or disaffirms its obligations under its Note Guaranty;

    (g) the Company or any Restricted Subsidiary fails to comply with the covenant regarding "Limitation on Intercompany Debt"; or

    (i) any Lien on assets that, individually or in the aggregate, have a fair market value of $10.0 million or more and that was incurred for the benefit of the holders of the New 2019 Notes in connection with the pledge of any ownership interest in any Strategic Joint Venture or otherwise incurred for the benefit of the holders of the New 2019 Notes in accordance with the terms of the Indentures becomes or is declared to become invalid or ineffective, or the Company or any Restricted Subsidiary denies or disaffirms its obligations under any such Lien.

*Consequences of an Event of Default Under the New 2019 Notes Indenture:*

    If an Event of Default with respect to the New 2019 Notes, (other than an Event of Default relating to clause (d) or (e) above), occurs and is continuing under the New 2019 Notes Indenture, the trustee or the holders of at least 25% in aggregate principal amount of the New 2019 Notes then outstanding, by written notice to the Company (and to the trustee if the notice is given by the holders), may, and the trustee at the request of such holders shall, declare the principal of and accrued interest on the New 2019 Notes to be immediately due and payable. Upon a declaration of acceleration, such principal and interest will become immediately due and payable.

*Events of Default: New MCDs Indenture:*

    (a) the Company fails to comply with its obligation to convert the New MCDs in accordance with the New MCDs Indenture upon a Mandatory Conversion Event and such failure continues for a period of 5 Business Days or more (at maturity or otherwise);

    (b) the Company fails to make an Offer to Purchase all outstanding New MCDs within 30 days following a Change of Control; or

    (c) there occurs with respect to the New 2019 Notes (i) an event of default that results in such Debt being due and payable prior to its scheduled maturity or (ii) failure to make a principal or interest payment when due and such defaulted payment is not made, waived or extended within the applicable grace period.

*Consequences of an Event of Default Under the New MCDs Indenture:*

If an Event of Default with respect to the New MCDs, (other than an Event of Default relating to clause (d) or (e) above), occurs and is continuing under the New MCDs Indenture, the trustee or the holders of at least 25% in aggregate principal amount of the New MCDs then outstanding, by written notice to the Company (and to the trustee if the notice is given by the holders), may, and the trustee and the common representative at the request of such holders shall, declare that the principal of and accrued interest on the New MCDs will convert immediately to common shares (or CPOs, as applicable).

**Authentication and Delivery of the New Notes; Use of Proceeds**

One officer of the Company must sign the New Notes for the Company by either manual or facsimile signature. If an officer whose signature is on a New Note no longer holds that office at the time the Trustee authenticates the New Notes, the New Notes will nevertheless be valid.

The New Notes will not be valid until an authorized signatory of the Trustee manually signs the certificate of authentication on the New Notes. The signature will be conclusive evidence that the New Notes have been authenticated under the Indentures. At any time and from time to time after the execution and delivery of the Indentures, the Company may deliver Notes executed by the Company to the Trustee for authentication. The Trustee will authenticate and deliver New 2019 Notes in the aggregate principal amount not to exceed $850,000,000 and New MCDs in the aggregate principal amount not to exceed $100,000,000.

There will be no proceeds (and therefore no application of proceeds) from the issuance of the New Notes because the New Notes will be issued in exchange for the 2012 Notes, 2013 Notes, 2017 Notes, DFI Claims and the Other Debt of the Company pursuant to the Tender Offer and Exchange Offer and Consent Solicitation. No provisions are contained in the Indentures with respect to the Company's use of proceeds of the issuance of the New Notes.

**Release and Substitution of Property Subject to the Lien of the Indentures**

The New Notes are unsecured obligations of the Company. As such, the New Notes are not secured by any lien on any property.

**Satisfaction and Discharge**

The Company may discharge its obligations under the New Notes (except for those surviving obligations specifically set forth in the Indentures) when:

(a) either (i) all the New Notes have been delivered to the Trustee for cancellation, or (ii) the New Notes not delivered to the Trustee for cancellation mature within sixty days, or all of them are to be called for redemption within sixty days under arrangements satisfactory to the Trustee for giving the irrevocable notice of redemption in accordance with the Indentures and the Company has irrevocably deposited in trust with the Trustee solely for the benefit of the holders money, government notes or a combination thereof, in an amount sufficient to pay and discharge the entire debt on such New Notes; and

(b) the Company has paid or caused to be paid all sums payable under the Indentures by the Company.

Notwithstanding the satisfaction and discharge of the Indentures, certain of the Company's obligations shall survive as specified in the Indentures.

**Evidence as to Compliance with Conditions and Covenants**

The Company will deliver to the Trustee within 120 days after the end of each fiscal year an Officer's Certificate stating that the Company has fulfilled its obligations under the Indentures, if there has been a Default, specifying the Default and its nature and status. The Company will deliver to the Trustee, as soon as possible and in any event within 30 days after the Company becomes aware or should reasonably become aware of the occurrence of a Default, an Officers' Certificate setting forth the details of the Default, and the action which the Company proposes to take with respect thereto.

14

## 9. OTHER OBLIGORS.

The New 2019 Notes will be guaranteed by the following subsidiaries of the Company:

| Other Obligor | Address |
|---|---|
| Viméxico, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Vitro Envases Nortéamerica, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Comercializadora Álcali, S.A. de C.V. (formerly Vitro Corporativo, S.A. de C.V.) | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| FIC Regiomontano, S.A.P.I. de C.V. (formerly Servicios Corporativos de Edificaciones, S.A. de C.V.) | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| V−MX Holdings, LLC (formerly Crisa Holding Co.) | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Vitro Packaging de México, S.A. de C.V. (formerly Inmobiliaria Loma del Toro, S.A. de C.V.) | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Vidriera Monterrey, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Vidriera los Reyes, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Vidriera Guadalajara, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Vidriera Querétaro, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Vidriera Toluca, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Compañía Vidriera, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Fabricación de Máquinas, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Servicios Integrales de Acabados, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Vidrio Plano, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Industria del Álcali, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Distribuidora de Vidrio y Cristal, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Vidrio Lux, S.A. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Vitro Packaging, LLC | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Vidrio Plano de Mexicali, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Vitro Europa, Ltd. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Vitro Asset Corp. (formerly American Asset Holdings Corp.) | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Vitro Venezuela, S.A. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Binswanger Glass Company (formerly Troper, Inc.) | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Vitro Panamá, S.A. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Troper Services, Inc. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |

15

| Other Obligor | Address |
|---|---|
| Vitemco Ecuador, S.A. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Amsilco Holdings, Inc. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| B.B.O. Holdings, Inc. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Crisa Corporation | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Vitro Automotriz, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Vitro Flex, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Vitro Vidrio y Cristal, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Vitro Flotado Cubiertas, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Distribuidor Vidriero LAN, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Vitrocar, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Cristales Inastillables de México, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Vidrio Plano de México, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| VVP Holdings, LLC. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| VVP Auto Glass, Inc. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Vitro America, LLC. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Super Sky Products, Inc. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Super Sky International, Inc. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| VVP Finance Corporation | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Vitro Colombia, S.A. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| VVP Europa Holdings, B.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Vitro do Brasil Indústria e Comércio, Ltda. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Vitro Chemicals, Fibers and Mining, LLC. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Vitro Global, Ltd. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Vidrio y Cristal del Noroeste, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Servicios Vidriera Guadalajara, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Servicios Vidriera Toluca, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Servicios Vitro Cosmos, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Servicios Vidriera Querétaro, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Servicios Vidriera Los Reyes, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Inmobiliaria Vitalc, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |

| Other Obligor | Address |
| --- | --- |
| Viqueretanos, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre<br>Garza Garcia, N.L., 66265 Mexico |
| VAU, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre<br>Garza Garcia, N.L., 66265 Mexico |
| Vitro Car Colombia, S.A.S | Ave. Roble 660, Col. Valle del Campestre<br>Garza Garcia, N.L., 66265 Mexico |
| Vitro Cristalglass, S.L. | Ave. Roble 660, Col. Valle del Campestre<br>Garza Garcia, N.L., 66265 Mexico |

17

**CONTENTS OF APPLICATION FOR QUALIFICATION**

This application for qualification comprises:

    (a) Pages one to 18, consecutively.

    (b) The statement of eligibility and qualification on Form T−1 of The Bank of New York Mellon, as trustee, under the Indentures to be qualified.*

    (c) The following exhibits in addition to those filed as part of the statement of eligibility and qualification of the trustee:

| | |
|---|---|
| Exhibit T3A | Amended and Restated Certificate of Incorporation (acta constitutiva) of Vitro, S.A.B. de C.V., together with an English translation, is contained in the bylaws incorporated by reference herein as Exhibit T3B. |
| Exhibit T3B | Amended and Restated Bylaws (estatutos sociales) of Vitro, S.A.B. de C.V., together with an English translation, incorporated by reference to Exhibit 1.01 of the Company's Form 20−F filed with the Commission on July 1, 2009. |
| Exhibit T3C1** | New 2019 Notes Indenture between Vitro, S.A.B. de C.V., the guarantors named therein and The Bank of New York Mellon, as trustee. |
| Exhibit T3C2** | New MCDs Indenture between Vitro, S.A.B. de C.V. and The Bank of New York Mellon, as trustee. |
| Exhibit T3D | Not Applicable. |
| Exhibit T3E.1* | Tender Offer and Exchange Offer and Consent Solicitation Statement to offer to purchase for cash or exchange outstanding 2012 Notes, 2013 Notes, 2017 Notes, DFI Claims and the Other Debt for Notes due 2019 and mandatory convertible debentures. |
| Exhibit T3E.2* | Letter of Transmittal. |
| Exhibit T3E.3* | Letter of Instructions to Beneficial Holders. |
| Exhibit T3F** | Cross−reference sheet showing the location in the Indentures of the provisions inserted therein pursuant to Section 310 through 318(a), inclusive, of the Trust Indenture Act of 1939 (included as part of Exhibit T3C1 and T3C2). |
| Exhibit T3G* | Statement of eligibility and qualification on Form T−1 of The Bank of New York Mellon, as trustee, under the Indentures to be qualified. |
| Exhibit T3H* | Item 3 diagram depicting the relationship of each affiliate to Vitro, S.A.B. de C.V. |
| * | Filed herewith. |
| ** | To be filed by amendment. |

**SIGNATURE**

Pursuant to the requirements of the Trust Indenture Act of 1939, the applicant, Vitro, S.A.B. de C.V., a corporation organized and existing under the laws of Mexico, has duly caused this application to be signed on its behalf by the undersigned, thereunto duly authorized, and its seal to be hereunto affixed and attested all in the City of San Pedro Garza García and State of Nuevo León, on the 1st day of November, 2010.

VITRO, S.A.B. DE C.V.

By: /s/ Claudio del Valle Cabello _____
    Name:  Claudio del Valle Cabello
    Title:   Attorney–in–Fact


By: /s/ Alejandro Sánchez Mújica _____
    Name:  Alejandro Sánchez Mújica
    Title:   Attorney–in–Fact

19

As authorized signatory on behalf of each of
CRISTALES INASTILLABLES DE MÉXICO,
S.A. DE C.V., DISTRIBUIDOR VIDRIERO LAN,
S.A. DE C.V., DISTRIBUIDORA DE VIDRIO
Y CRISTAL, S.A. DE C.V., VAU, S.A. DE C.V.,
VIDRIO PLANO DE MÉXICO, S.A. DE C.V.,
VIDRIO PLANO, S.A. DE C.V., VIMÉXICO,
S.A. DE C.V., VITRO AUTOMOTRIZ, S.A.
DE C.V., VITRO FLEX, S.A. DE C.V., VITRO
FLOTADO CUBIERTAS, S.A. DE C.V., VITRO
VIDRIO Y CRISTAL, S.A. DE C.V. and
VITROCAR, S.A. DE C.V.

By:  /s/ Claudio del Valle Cabello
      Name:   Claudio del Valle Cabello
      Title:    Attorney−in−Fact

20

As authorized signatory on behalf of each of
VIDRIO PLANO DE MEXICALI, S.A. DE C.V.,
VIDRIO Y CRISTAL DEL NOROESTE,
S.A. DE C.V. and VITRO ENVASES
NORTEAMERICA, S.A. DE C.V.

By:    /s/ Javier Arechavaleta
       Name:   Javier Arechavaleta
       Title:     Attorney−in−Fact

21

As authorized signatory on behalf of each of
COMERCIALIZADORA ALCALI, S.A. DE C.V.
(formerly VITRO CORPORATIVO, S.A. DE C.V.),
COMPAÑIA VIDRIERA, S.A. DE C.V.,
FABRICACIÓN DE MÁQUINAS, S.A. DE C.V.,
FIC REGIOMONTANO, S.A.P.I. DE C.V. (formerly
SERVICIOS CORPORATIVOS DE
EDIFICACIONES, S.A. DE C.V.), INDUSTRIA
DEL ALCALI, S.A. DE C.V., INMOBILIARIA
VITALC, S.A. DE C.V., SERVICIOS
INTEGRALES DE ACABADOS, S.A. DE C.V.,
SERVICIOS VIDRIERA GUADALAJARA, S.A.
DE C.V., SERVICIOS VIDRIERA LOS REYES,
S.A. DE C.V., SERVICIOS VIDRIERA
QUERÉTARO, S.A. DE C.V., SERVICIOS
VIDRIERA TOLUCA, S.A. DE C.V., SERVICIOS
VITRO COSMOS, S.A. DE C.V., VIDRIERA
GUADALAJARA, S.A. DE C.V., VIDRIERA
LOS REYES, S.A. DE C.V., VIDRIERA
MONTERREY, S.A. DE C.V., VIDRIERA
QUERÉTARO, S.A. DE C.V., VIDRIERA
TOLUCA, S.A. DE C.V., VIQUERETANOS,
S.A. DE C.V., and VITRO PACKAGING DE
MÉXICO, S.A. DE C.V. (formerly INMOBILIARIA
LOMA DEL TORO, S.A. DE C.V.)

By:  /s/ Rafael Colome Carrasco
    Name:  Rafael Colome Carrasco
    Title:  Attorney–in–Fact

22

As authorized signatory on behalf of each of
AMSILCO HOLDINGS, INC., B.B.O. HOLDINGS,
INC., CRISA CORPORATION, VITRO ASSET
CORP. (formerly AMERICAN ASSET HOLDINGS
CORP.), VITRO CHEMICALS, FIBERS AND
MINING, LLC., VITRO PACKAGING, LLC. and
V–MX HOLDINGS, LLC. (formerly CRISA
HOLDING CO.)

By:  /s/ Rafael Colome Carrasco
    Name:  Rafael Colome Carrasco
    Title:    President and CEO

23

As authorized signatory on behalf of each of
VITRO EUROPA, LTD. and
VITRO GLOBAL, LTD.

By:   /s/ Jaime Rico
     Name:   Jaime Rico
     Title:    Member of the Board and President of the Board

24

As authorized signatory on behalf of each of
BINSWANGER GLASS COMPANY (formerly
TROPER INC.), SUPER SKY INTERNATIONAL,
INC., SUPER SKY PRODUCTS, INC., TROPER
SERVICES, INC., VITRO AMERICA, LLC.,
VVP AUTO GLASS, INC., VVP FINANCE
CORPORATION and VVP HOLDINGS, LLC.

By:  /s/ Arturo Carrillo
     Name:  Arturo Carrillo
     Title:  President and CEO

25

As authorized signatory on behalf of each of
VITEMCO ECUADOR, S.A., VITRO CAR
COLOMBIA, S.A.S, VITRO COLOMBIA, S.A.
and VITRO VENEZUELA, S.A.

By:  /s/ Alfonso Gomez
    Name:  Alfonso Gomez
    Title:   Legal Representative

26

VIDRIO LUX, S.A.

By: /s/ Hugo Aldo Suito Magnani
    Name:  Hugo Aldo Suito Magnani
    Title:    General Manager


By: /s/ Ramiro Soliz Delgadillo
    Name:  Ramiro Soliz Delgadillo
    Title:    Administrative Manager

27

VITRO PANAMÁ, S.A.

By: /s/ Ildivais O. Moreno B.
    Name:  Ildivais O. Moreno B.
    Title:    Legal Representative

28

VVP EUROPA HOLDINGS, B.V.

By:  /s/ ANT Management Netherlands B.V.
    Name:  A. Nagelmaker / M. Hager
    Title:   Director /Proxy Holder

29

VITRO DO BRASIL INDÚSTRIA
E COMÉRCIO, LTDA.

By: /s/ Elias Mufarej
    Name:  Elias Mufarej
    Title:   Administrator

30

VITRO CRISTALGLASS, S.L.

By: /s/ Claudio del Valle
　　　　Name:　Claudio del Valle
　　　　Title:　Attorney–in–Fact


By: /s/ Alejandro Sánchez Mújica
　　　　Name:　Alejandro Sánchez Mújica
　　　　Title:　Attorney–in–Fact

31

Table of Contents

CONFIDENTIAL

Exhibit T3E.1
SOLICITATION STATEMENT

# Vitro, S.A.B. de C.V.
### Offer to Purchase and Offer to Exchange and Consent Solicitation Relating to
**$300,000,000 Aggregate Principal Amount of 8.625% Senior Notes due 2012,**
**$216,000,000 Aggregate Principal Amount of 11.75% Senior Notes due 2013 and**
**$700,000,000 Aggregate Principal Amount of 9.125% Senior Notes due 2017**

This solicitation statement (as it may be amended or supplemented from time to time, the "Statement") relates to two alternative offers. In this Statement, (1) Vitro, S.A.B. de C.V. ("Vitro") and Administración de Inmuebles Vitro, S.A. de C.V. ("AIV"), a wholly–owned subsidiary of Vitro, are offering to purchase for cash (the "Tender Offer") the Old Notes (as defined below) and (2) Vitro is proposing an exchange offer and soliciting consents (the "Exchange Offer and Consent Solicitation") to an in–court restructuring under the *Ley de Concursos Mercantiles*, or Mexican Bankruptcy Law (as defined in "Considerations Relating to the Exchange Offer and Consent Solicitation" in this Statement, the "*Concurso* Plan").

Holders may tender their Old Notes in either the Tender Offer or the Exchange Offer and Consent Solicitation. Because the size of the Tender Offer is limited (as described below), holders that tender Old Notes in the Tender Offer will be required to specify whether, if their Old Notes are not accepted in the Tender Offer, they elect to tender them into the Exchange Offer and Consent Solicitation instead.

Except when indicated or the context otherwise requires, the words "we," "us," "our" and "ours" in this Statement (i) refer to Vitro and AIV when used in reference to the making and execution of the Tender Offer, (ii) refer to Vitro when used in reference to the making and execution of the Exchange Offer and Consent Solicitation, and (iii) otherwise refer to Vitro, S.A.B. de C.V., together with its consolidated subsidiaries.

**The Tender Offer**

We hereby offer to purchase for cash, upon the terms and subject to the conditions set forth in this Statement and in the Letter of Transmittal, the maximum aggregate principal amount of Vitro's outstanding 8.625% Senior Notes due 2012, which we refer to as the "2012 Notes," 11.75% Senior Notes due 2013, which we refer to as the "2013 Notes," and 9.125% Senior Notes due 2017, which we refer to as the "2017 Notes" (together with the 2012 Notes and 2013 Notes, the "Old Notes") that we can purchase for $100,000,000 (subject to increase, the "Maximum Payment Amount"), at a purchase price (the "Tender Offer Consideration") per $1,000 principal amount equal to the clearing price (the "Clearing Price") determined in accordance with the procedures set forth below. We reserve the right, but are not obligated, to increase the Maximum Payment Amount by up to 30% without permitting holders to withdraw Old Notes that have been previously tendered in the Tender Offer.

The Old Notes were issued by and represent obligations of Vitro. The Tender Offer is conditioned upon the satisfaction or waiver of the conditions set forth in the section titled "The Tender Offer—Conditions to the Tender Offer" in this Statement. The Tender Offer is not conditioned on any minimum amount of Old Notes being tendered. We expect to obtain the funds required to consummate the Tender Offer with the net proceeds of a loan agreement in the amount of up to the Maximum Payment Amount to be entered into between Fintech Investments Ltd. (together with any affiliate and/or investment vehicle thereof, "Fintech") and AIV (the "Loan Agreement"). We will cause the Old Notes that are accepted in the Tender Offer to be delivered to Fintech as payment for AIV's obligations under the Loan Agreement. Fintech will be permitted to exchange Old Notes it receives as a result in the *Concurso* Plan and receive a related consent payment.

Any tenders of Old Notes in the Tender Offer are irrevocable and may not be withdrawn.

The amount of the Tender Offer Consideration will be determined pursuant to a modified "Dutch Auction." The Tender Offer Consideration will be the same for Old Notes of all series and will be payable in cash. Holders whose Old Notes are accepted in the Tender Offer will not receive any payment in respect of accrued and unpaid interest on the Old Notes. Acceptance of Old Notes tendered in the Tender Offer may be subject to proration as described herein. Old Notes that are tendered in the Tender Offer but not accepted will be returned to the DTC Participant (as defined below) that tendered them promptly following the Expiration Time (as defined below) unless their holder has elected to submit them for exchange in the Exchange Offer and Consent Solicitation.

| Series of Old Notes | CUSIP No. | Outstanding Principal Amount | Tender Offer Consideration (Acceptable Bid Price Range)[1] |
|---|---|---|---|
| 8.625% Senior Notes due 2012 | 92851RAC1 | $300,000,000 | |
| 11.75% Senior Notes due 2013 | 92851FAD5 | $216,000,000 | $ 500 – $575 |
| 9.125% Senior Notes due 2017 | 92851RAD9 | $700,000,000 | |

(1)       Per $1,000 principal amount of Old Notes that are accepted for purchase.

**The Exchange Offer and Consent Solicitation**

Pursuant to the *Concurso* Plan, we are proposing to exchange all of the Old Notes and the DFI Claims and Other Debt (each as defined below) in the aggregate amount of $1,515 million for the following consideration on a pro rata basis:

i

Table of Contents

- $850.0 million in aggregate principal amount of new notes (the "New 2019 Notes");

- $100.0 million (plus the Issue Date Adjustment, as defined herein) in aggregate principal amount of newly issued mandatory convertible debentures (the "New MCDs" and, together with the New 2019 Notes, the "New Notes"), which will mandatorily convert into 15.0% of our equity on a fully diluted basis if not paid in full at maturity or upon the occurrence of certain events of default;

- a cash payment (the "Restructuring Cash Payment") in an amount equal to the unpaid portion of an aggregate of $75.0 million in cash held in a Mexican trust (the "Payment Trust") after the making of the Consent Payment (as defined below); and

- a restructuring fee, in cash, based on the issue date of the New Notes to be determined as described in "Summary—The New Notes—The New 2019 Notes" (the "Restructuring Fee" and, together with the New Notes and Restructuring Cash Payment described above, the "Restructuring Consideration").

Accordingly, for every $1,000 principal amount of the Restructured Debt exchanged, holders will be entitled to receive:

- $561 principal amount of New 2019 Notes,

- $66 principal amount of New MCDs (not including the Issue Date Adjustment),

- a portion of the Restructuring Cash Payment on a pro rata basis (depending on how many holders consent), and

- a portion of the Restructuring Fee on a pro rata basis (depending on the Issue Date).

The delivery and payment of the Restructuring Consideration pursuant to the proposed *Concurso* Plan is subject to, among other things, the approval of the *Convenio Concursal* (as defined herein). The New 2019 Notes will be guaranteed by the majority of our subsidiaries (which we refer to as the "Guarantors"). For a more detailed description of the New Notes, see "Description of the New Notes" beginning on page 167. The proposed *Concurso* Plan is set forth in Annex A, as summarized in "The Restructuring and the *Concurso* Plan" in this Statement. See also "Summary—Consequences if the Proposed Restructuring Fails."

The Payment Trust will pay a consent payment in an amount (to be determined as described herein) of no less than 5% and no greater than 10% of the aggregate principal amount of Old Notes held by the holder of such Old Notes (the "Note Consent Payment") for which a consent to the *Concurso* Plan is provided prior to the Expiration Time specified below. Any Old Notes submitted for exchange and consents provided after the date of this Statement are irrevocable and may not be withdrawn, except (i) in the event we amend the Exchange Offer and Consent Solicitation in a manner that is materially adverse to holders of Restructured Debt, (ii) as required by applicable law, (iii) in the event the *concurso mercantil* proceeding of the Company is not filed on or before December 31, 2010, (iv) if the Issue Date does not occur on or before the Outside Consummation Date (as defined herein) or (v) if the proposed *Concurso* Plan is amended in a manner that would have a material adverse effect on holders of the Old Notes. We are seeking the tender of the Old Notes and consent of each person in whose name an Old Note is registered as of 5:00 p.m., New York City time, on November 1, 2010 (the "Record Date"), or persons who held Old Notes through The Depository Trust Company ("DTC") as of the Record Date ("DTC Participants" and, together with such registered holders, the "Holders"); however, we may proceed with filing the proposed *Concurso* Plan without any such consents.

Concurrently with the Exchange Offer and Consent Solicitation for the Old Notes, we will be seeking consents to the *Concurso* Plan on comparable terms from certain of the holders of (i) claims of approximately $239.8 million relating to certain of our and our subsidiaries' derivative financial instruments (including certain agreed upon amounts in settlement represented by promissory notes, the "DFI Claims") of which a significant holder has entered into a lock-up agreement with us, as described herein, and (ii) other debt (the "Other Debt" and, together with the Old Notes and the DFI Claims, the "Restructured Debt") in an aggregate principal amount equivalent to $58.5 million consisting of certain *Certificados Bursátiles* and other unsecured debt. In connection therewith, the Payment Trust will pay a consent payment in an amount (to be determined as described herein) of no less than 5% and no greater than 10% of the aggregate principal amount of the DFI Claims and Other Debt held by the holder of such debt (the "Other Consent Payment" and, together with the Note Consent Payment, the "Consent Payment") for which a consent is provided prior to the Expiration Time specified below. Pursuant to the *Concurso* Plan, we would exchange the DFI Claims and the Other Debt for a pro rata portion of the Restructuring Consideration (based on the aggregate principal amount of debt subject to the restructuring). For additional information, see "Capitalization" and Annex A.

**Holders who participate in the Tender Offer will not receive a Consent Payment in respect of any Old Notes that are accepted for purchase in the Tender Offer or that are not accepted for purchase and are returned to such holder. Such holders may receive a Consent Payment (as described above) only in respect of any Old Notes of such holder that are included in the Exchange Offer and Consent Solicitation because (a) such holder elected in its Letter of Transmittal to have any Old Notes that are not accepted for purchase in the Tender Offer included in the Exchange Offer and Consent Solicitation and (b) such Old Notes are not accepted in the Tender Offer.**

**The Tender Offer and the Exchange Offer and Consent Solicitation will each expire at 9:00 a.m., New York City time, on December 1, 2010, unless extended or earlier terminated (as such time and date may be extended, the "Expiration Time"). We may, in our sole discretion (subject to applicable law), terminate either or both offers, and reserve the right to amend the terms or waive any of the conditions to either or both offers.**

**You should carefully consider the risk factors beginning on page 52 of this Statement before deciding whether or not to participate in the Tender Offer and/or the Exchange Offer and Consent Solicitation.**

November 1, 2010

ii

# TABLE OF CONTENTS

| | |
|---|---|
| Questions and Answers Relating to the Tender Offer and the Exchange Offer and Consent Solicitation | 2 |
| Considerations Relating to the Tender Offer | 7 |
| Considerations Relating to the Exchange Offer and Consent Solicitation | 10 |
| Notice to Investors | 12 |
| Presentation of Financial Information and Other Information | 14 |
| Exchange Rates | 16 |
| Where You Can Find More Information; Incorporation by Reference | 17 |
| Forward−Looking Statements | 19 |
| Enforceability of Civil Liabilities | 20 |
| Summary | 21 |
| Risk Factors | 52 |
| Capitalization | 72 |
| The Restructuring and the *Concurso* Plan | 73 |
| Selected Historical Consolidated Financial Information | 78 |
| Unaudited Pro Forma Financial Information | 82 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 90 |
| Liquidity and Capital Resources | 105 |
| Business | 113 |
| Directors, Senior Management and Employees | 131 |
| Major Shareholders | 140 |
| Related Party Transactions | 142 |
| The Mexican Law of Commercial Reorganizations | 143 |
| The Tender Offer | 147 |
| The Exchange Offer and Consent Solicitation | 157 |
| Description of the New Notes | 167 |
| Description of the CPOs | 228 |
| Certain U.S. Federal Income Tax Considerations | 233 |
| Material Mexican Federal Tax Considerations | 241 |
| Important Information for Non−U.S. Holders | 244 |
| Annex A − *Concurso* Plan | A−1 |
| Index to Consolidated Financial Statements | F−1 |

You should rely only on the information contained in this Statement or to which we have referred you. We have not authorized anyone to provide you with information that is different. This Statement may only be used where it is legal to do so. The information in this document may only be accurate on the date of this Statement.

Beneficial owners who wish to tender Old Notes in the Tender Offer or submit Old Notes for exchange in the Exchange Offer and Consent Solicitation, and whose Old Notes are held in a brokerage or custodian account through a custodian or nominee, including a broker, dealer, bank or trust company, must instruct that entity to tender or submit their Old Notes. Any such instruction must be made in accordance with procedures of the entity through which the Old Notes are held (including completing a Letter of Instruction and providing it to that entity). The valid tender of Old Notes in the Tender Offer or submission of Old Notes for exchange in the Exchange Offer and Consent Solicitation requires physical delivery by the Holder (the DTC Participant through which the Old Notes are held) of a duly executed, notarized and apostilled Transmittal Letter and other required documentation by the Expiration Date as well as completion of DTC's Automated Tender Offer Program ("ATOP") procedures. The additional time this will require should be taken into consideration in responding to the offers.

1

Table of Contents

### QUESTIONS AND ANSWERS RELATING TO THE TENDER OFFER
### AND THE EXCHANGE OFFER AND CONSENT SOLICITATION

**Q.  What are the Tender Offer and the Exchange Offer and Consent Solicitation?**

**A.**  In the Tender Offer, Vitro and our wholly–owned subsidiary AIV are offering, upon the terms and subject to the conditions set forth in this Statement and the Letter of Transmittal, to purchase the Old Notes (Vitro's outstanding 2012 Notes, 2013 Notes and 2017 Notes) for cash pursuant to a modified Dutch auction.

In the Exchange Offer and Consent Solicitation, Vitro is proposing, upon the terms and subject to the conditions set forth in this Statement and the Letter of Transmittal, an exchange offer and solicitation of consents to an in–court restructuring from holders of Restructured Debt, including beneficial owners of the Old Notes, registered holders and their duly designated proxies, including participants in DTC whose names are shown on a security position listing as owners of the Old Notes, as of 5:00 p.m., New York City time, on November 1, 2010.

**Q.  May I participate in both the Tender Offer and the Exchange Offer and Consent Solicitation?**

**A.**  You may choose one of the following three options to participate in the Tender Offer and/or the Exchange Offer and Consent Solicitation:

- You may tender your outstanding Old Notes in the Tender Offer and choose to have your Old Notes returned to you if they are not accepted in the Tender Offer;

- You may tender your outstanding Old Notes in the Tender Offer and choose to submit such Old Notes for exchange in the Exchange Offer and Consent Solicitation if they are not accepted in the Tender Offer; or

- You may submit your Old Notes for exchange in the Exchange Offer and Consent Solicitation.

If you submit your Old Notes for exchange in the Exchange Offer and Consent Solicitation, you are not permitted to also tender them in the Tender Offer. Alternatively, if you tender your Old Notes in the Tender Offer, you may only submit them in the Exchange Offer and Consent Solicitation on a provisional basis, i.e., for acceptance in the Exchange Offer and Consent Solicitation only if they are rejected from the Tender Offer. If your Old Notes are accepted in the Tender Offer, they will not be accepted in the Exchange Offer and Consent Solicitation. No Old Notes will be accepted in both offers.

**Q.  Is there a limit on the amount of Old Notes that may be accepted in the Tender Offer?**

**A.**  Yes. The funds available for the Tender Offer are limited to $100,000,000, the Maximum Payment Amount, so there is a limit on the amount of Old Notes that may be accepted in the Tender Offer. We reserve the right, but are not obligated, to increase the Maximum Payment Amount by up to 30% without permitting holders to withdraw Old Notes that have been previously tendered in the Tender Offer.

**Q.  Is there a limit on the amount of Old Notes that may be accepted in the Exchange Offer and Consent Solicitation?**

**A.**  No.

**Q.  How are payments for my Old Notes pursuant to the Tender Offer determined?**

**A.**  Because the Tender Offer is being conducted as a modified Dutch auction, you must specify the minimum amount you would be willing to receive in exchange for each $1,000 principal amount of Old Notes. This minimum amount is known as the "Bid Price." The Bid Price you specify must not be less than $500 nor more than $575. Bid Prices between those numbers must be in minimum increments of $2.50 above $500. If you do not enter a Bid Price, you will be deemed to have specified the lowest price in the range ($500). If your Bid Price is outside of this range, it will not be accepted and you will not receive any payments under the Tender Offer.

2

…

Table of Contents

The Bid Prices of all tendering holders are used to determine the payment amount, or "Tender Offer Consideration," that you will receive. The Tender Offer Consideration will be equal to the Clearing Price, which will be determined as described under "The Tender Offer—Terms of the Tender Offer" based on the price that maximizes the principal amount of Old Notes that may be purchased without exceeding the Maximum Payment Amount.

**Q.  What happens if my Old Notes are not accepted in the Tender Offer?**

**A.**  If your Old Notes are not accepted in the Tender Offer and you have not elected to exchange Old Notes that are rejected from the Tender Offer pursuant to the Exchange Offer and Consent Solicitation, your Old Notes will be returned to you and you will not receive the Consent Payment. If your Old Notes are not accepted in the Tender Offer and you have elected to exchange Old Notes that are rejected from the Tender Offer pursuant to the Exchange Offer and Consent Solicitation, your Old Notes will be submitted for exchange in the Tender Offer and you will be eligible to receive the Restructuring Consideration and the Consent Payment in respect of such Old Notes.

**Q.  What is being offered in exchange for the Old Notes that I hold in the Exchange Offer and Consent Solicitation?**

**A.**  For each U.S.$1,000 principal amount of the Old Notes accepted in the Exchange Offer and Consent Solicitation, you will be entitled to receive $561 of New 2019 Notes, $66 of New MCDs and a portion of the Restructuring Cash Payment on a pro rata basis (depending on how many holders consent) and a portion of the Restructuring Fee (depending on the Issue Date). In addition, you will receive a Consent Payment of between 5% and 10% of the principal amount of your Old Notes that are accepted in the Exchange Offer and Consent Solicitation.

**Q.  I am a beneficial owner of Vitro's outstanding Old Notes and I am not a DTC Participant. How do I participate in the Tender Offer and elect to have any Old Notes that are not accepted in the Tender Offer returned to me?**

**A.**  In order to participate in the Tender Offer and elect to have your Old Notes returned to you if they are not accepted in the Tender Offer you must complete the following steps:

(1)    From your bank, broker, dealer, trust company or other nominee, you should have received an instruction letter entitled "Letter of Instructions to Beneficial Owners" which you must complete.

(2)    In order to complete the instruction letter and tender your Old Notes in the Tender Offer you must:
- Execute and notarize the instruction letter and check the first box in Section I;

- Provide the relevant details about yourself and special payment instructions, if any, in Section II.A.1 or II.A.2, as applicable;

- Indicate in Section II.A.3 the aggregate principal amount of each series of Old Notes that you wish to tender and the Bid Price at which you wish to tender each series; and

- Return all pages of the completed instruction letter to your broker, dealer, trust company or other nominee.

(3)    We do not require you, as a beneficial owner, to complete the Letter of Transmittal (though we will require the DTC Participant that actually tenders your Old Notes in the Tender Offer to sign and obtain notarization and an apostille of the Letter of Transmittal). However, for its own record–keeping purposes, your bank, broker, dealer, trust company or other nominee may have sent you a Letter of Transmittal. If you have received a Letter of Transmittal and have been instructed to complete it, you must:
- Indicate in Section I the aggregate principal amounts of the Old Notes and the Bid Price you wish to submit;

**Table of Contents**

- Execute, notarize and apostille the Letter of Transmittal in Section II.A.1, checking box 1;

- Provide the relevant details about special payment instructions, if any, and about yourself and your accounts in Section III.A.2; and

- Complete the IRS Form W−9 or other withholding forms described in the Letter of Transmittal.
(4)     Promptly return all completed documents to your bank, broker, dealer, trust company or other nominee.

**Q.   I am a beneficial owner of Vitro's outstanding Old Notes and I am not a DTC Participant. How do I participate in the Tender Offer and elect to submit any Old Notes that are not accepted in the Tender Offer in the Exchange Offer and Consent Solicitation?**

**A.**   In order to participate in the Tender Offer and exchange any Old Notes that are not accepted in the Tender Offer in the Exchange Offer and Consent Solicitation you must complete the following steps:

(1)     From your bank, broker, dealer, trust company or other nominee, you should have received an instruction letter entitled "Letter of Instructions to Beneficial Owners" which you must complete.

(2)     In order to complete the instruction letter and tender your Old Notes in the Tender Offer and exchange any Old Notes that are not accepted in the Tender Offer in the Exchange Offer and Consent Solicitation you must:
- Execute and notarize the instruction letter in Section I and check the second box in Section I;

- Provide the relevant details about yourself and special payment instructions, if any, in Section II.A.1 or II.A.2, as applicable;

- Indicate in Section II.A.3 the aggregate principal amount of each series of Old Notes that you wish to tender and the Bid Price at which you wish to tender each series;

- Sign and date the authorization in the form attached to the instruction letter as Schedule I; and

- Return all pages of the completed instruction letter to your broker, dealer, trust company or other nominee.

(3)     We do not require you, as a beneficial owner, to complete the Letter of Transmittal (though we will require the DTC Participant that actually tenders your Old Notes in the Tender Offer to sign and obtain notarization and an apostille of the Letter of Transmittal). However, for its own record−keeping purposes, your bank, broker, dealer, trust company or other nominee may have sent you a Letter of Transmittal. If you have received a Letter of Transmittal and have been instructed to complete it, you must:
- Indicate in Section I the aggregate principal amounts of the Old Notes and the Bid Price you wish to submit;

- Execute, notarize and apostille the Letter of Transmittal in Section II.A.1, checking box 2;

- Provide the relevant details about special payment instructions, if any, and about yourself and your accounts in Section III.A.2; and

- Complete the IRS Form W−9 or other withholding forms described in the Letter of Transmittal; and

- Execute and notarize the signature page to the *Concurso* Plan attached to the Letter of Transmittal as Schedule II.

(4)     Promptly return all completed documents to your bank, broker, dealer, trust company or other nominee.

Table of Contents

**Q.  I am a beneficial owner of Vitro's outstanding Old Notes and I am not a DTC Participant. How do I participate in the Exchange Offer and Consent Solicitation?**

A.  In order to participate in the Exchange Offer and Consent Solicitation you must complete the following steps:

   (1)   From your bank, broker, dealer, trust company or other nominee, you should have received an instruction letter entitled "Letter of Instructions to Beneficial Owners" which you must complete.

   (2)   In order to complete the instruction letter and participate in the Exchange Offer and Consent Solicitation you must:

- Execute and notarize the instruction letter in Section I and check the third box in Section I;

- Provide the relevant details about yourself and special payment instructions, if any, in Section II.A.1 or II.A.2, as applicable;

- Indicate in Section II.A.3 the aggregate principal amount of each series of Old Notes that you wish to submit; and

- Return all pages of the completed instruction letter to your broker, dealer, trust company or other nominee.

   (3)   We do not require you, as a beneficial owner, to complete the Letter of Transmittal (though we will require the DTC Participant that actually submits your Old Notes in the Exchange Offer and Consent Solicitation to sign and obtain notarization and an apostille of the Letter of Transmittal). However, for its own record-keeping purposes, your bank, broker, dealer, trust company or other nominee may have sent you a Letter of Transmittal. If you have received a Letter of Transmittal and have been instructed to complete it, you must:

- Indicate in Section I the aggregate principal amounts of the Old Notes and the Bid Price you wish to submit;

- Execute, notarize and apostille the Letter of Transmittal in Section II.A.1, checking box 3;

- Provide the relevant details about special payment instructions, if any, and about yourself and your accounts in Section III.A.3;

- Complete the IRS Form W-9 or other withholding forms described in the Letter of Transmittal; and

- Execute and notarize the signature page to the *Concurso* Plan attached to the Letter of Transmittal as Schedule II.

   (4)   Promptly return all completed documents to your bank, broker, dealer, trust company or other nominee.

**Q.  I am a beneficial owner of Vitro's outstanding Old Notes. What do I need to do if I do not want to participate in the Tender Offer or the Exchange Offer and Consent Solicitation?**

A.  If you do not want to participate in the Tender Offer or the Exchange Offer and Consent Solicitation, then you do not need to complete the instruction letter or any other document relating to the Tender Offer or the Exchange Offer and Consent Solicitation.

**Q.  What happens if I fail to elect either the Tender Offer or the Exchange Offer and Consent Solicitation, whether because I do not submit the Letter of Transmittal or I do submit the Letter of Transmittal, but do not indicate my election?**

A.  If you fail to elect either option, whether by not submitting the Letter of Transmittal or failing to indicate your election in a submitted Letter of Transmittal, you will not receive the Tender Offer Consideration or the

Case 10-47473-dml11    Doc 4-2    Filed 11/18/10    Entered 11/19/10 00:01:24    Desc
Ex. E - part 1    Page 41 of 117

**Table of Contents**

Consent Payment. However, the *Convenio Concursal*, if approved and consummated, will bind all holders of the Old Notes, regardless of whether or how you voted with respect to the *Concurso* Plan in the consent solicitation or otherwise.

**Q.** **When will the Tender Offer and the Exchange Offer and Consent Solicitation expire?**
**A.** The Tender Offer and the Exchange Offer and Consent Solicitation will expire at 9:00 a.m., New York City time, on December 1, 2010, unless we extend the deadline at our sole discretion.

**Q.** **How will I be notified if the Tender Offer or the Exchange Offer and Consent Solicitation are extended?**

**A.** If we extend the Expiration Time, we will make a public announcement of the extension not later than 9:00 a.m., New York City time, on the first business day after the previously scheduled Expiration Time.

**Q.** **Will I have to pay any fees or other expenses?**

**A.** If you are the record owner of your Old Notes and you tender your Old Notes in the Tender Offer or exchange your Old Notes for exchange in the Exchange Offer and Consent Solicitation, you should not have to pay brokerage fees or similar expenses. If you own your Old Notes through a broker or other nominee and your broker tenders or votes your Old Notes on your behalf, your broker or nominee may charge you a fee for doing so. You should consult your broker or nominee to determine whether any charges will apply.

**Q.** **Can I withdraw previously tendered Old Notes or revoke my consent to the Exchange Offer and Consent Solicitation?**

**A.** You may not withdraw your previously tendered Old Notes. You may not revoke your consent to the Exchange Offer and Consent Solicitation except under very limited circumstances. See "The Exchange Offer and Consent Solicitation—Withdrawal Rights."

**Q.** **If I tender my Old Notes in the Tender Offer or submit my Old Notes for exchange in the Exchange Offer and Consent Solicitation, how will I be notified that you have accepted my Old Notes?**

**A.** If your Old Notes have been accepted pursuant to the Tender Offer or the Exchange Offer and Consent Solicitation, you will receive the Tender Offer Consideration or the Consent Payment, as applicable, promptly following the Expiration Time.

**Q.** **Who do I contact if I have questions about the Tender Offer or the Exchange Offer and Consent Solicitation?**

**A.** D.F. King & Co., Inc., which is acting as Depositary for the Tender Offer and Information and Exchange Agent for the Exchange Offer and Consent Solicitation, can help answer your questions. For further copies of this Statement and other materials related to the Tender Offer and the Exchange Offer and Consent Solicitation, and for questions regarding the procedures to be followed for tendering or exchanging your Old Notes, please contact D.F. King & Co., Inc. at the address and telephone number listed on the back cover of this Statement.

**Q.** **When will payments pursuant to the Tender Offer be made?**

**A.** The Tender Offer Consideration will be payable promptly following the Expiration Time.

**Q.** **When will the exchange and any payments to be made under the Exchange Offer and Consent Solicitation take place?**

**A.** We will make payment in cash of the Consent Payment in respect of the exchanged Old Notes promptly following the Expiration Time (no later than four business days following the Expiration Time). We will issue the New Notes and pay the rest of the Restructuring Consideration on the Issue Date, which will only occur if the *concurso mercantil* has been completed the *Convenio Concursal* is effectively consummated. See "The Exchange Offer and Consent Solicitation."

6

Table of Contents

## CONSIDERATIONS RELATING TO THE TENDER OFFER

The "Tender Offer Consideration" for each $1,000 principal amount of Old Notes validly tendered pursuant to the Tender Offer on or prior to the Expiration Time and accepted for purchase by us will be equal to the Clearing Price determined pursuant to a modified "Dutch Auction" as described below under "—Bid Prices and the Determination of the Tender Offer Consideration." The Tender Offer Consideration will be payable in cash promptly after the Expiration Time to those holders whose Old Notes are accepted for purchase in the Tender Offer. Holders whose Old Notes are accepted in the Tender Offer will not receive any payment in respect of accrued and unpaid interest on the Old Notes.

Holders may tender their Old Notes in the Tender Offer or submit their Old Notes for exchange in the Exchange Offer and Consent Solicitation. Because the size of the Tender Offer is limited (as described below), holders that tender Old Notes in the Tender Offer will be required to specify whether, if their Old Notes are not accepted in the Tender Offer, they elect to exchange them in the Exchange Offer and Consent Solicitation instead. Holders that tender Old Notes in the Tender Offer but fail to specify their election will be deemed to have elected not to exchange any Old Notes that are not accepted into the Tender Offer in the Exchange Offer and Consent Solicitation instead. Old Notes that are tendered in the Tender Offer but not accepted will be returned to their holder promptly following the Expiration Time unless their holder has elected to submit them for exchange in the Exchange Offer and Consent Solicitation if they are not accepted in the Tender Offer.

### Bid Prices and the Determination of the Tender Offer Consideration

The Tender Offer is being conducted as a modified "Dutch Auction." This means that if a holder elects to participate, they must specify the minimum Tender Offer Consideration (the "Bid Price") they would be willing to receive in exchange for each $1,000 principal amount of Old Notes they choose to tender in the Tender Offer. The Bid Price that the holder specifies for each $1,000 principal amount of Old Notes may not be less than $500 (the "Minimum Bid Price") nor more than $575 (the "Maximum Bid Price"). As a result, the Bid Price the holder specifies must be within the following range:

| | |
|---|---|
| **Minimum Bid Price** | $500 |
| **Maximum Bid Price** | $575 |

**Tenders of Old Notes outside of this range will not be accepted and will not be used for purposes of calculating the Clearing Price as described below.**

Bid Prices between the Minimum Bid Price and the Maximum Bid Price must be in minimum increments of $2.50 above $500. If any Bid Price is not submitted in a whole increment of $2.50, such Bid Price will be rounded down to the nearest $2.50 increment.

Each holder tendering Old Notes is to submit a Bid Price; holders who tender Old Notes without specifying a Bid Price will be deemed to have specified the Minimum Bid Price ($500) as their Bid Price.

Whether and to what extent your tendered Old Notes are accepted for purchase in the Tender Offer will depend upon how the Bid Price specified by you compares to Bid Prices specified by other tendering holders of Old Notes. Specifically, on the Expiration Time:

- we will use all the Bid Prices received across all series of Old Notes to calculate a single Clearing Price in accordance with the procedure set forth below; and

- the Tender Offer Consideration payable for Old Notes accepted in the Tender Offer will be the Clearing Price.

7

Table of Contents

The Tender Offer Consideration for all Old Notes, of all series, will be the same. Holders whose Old Notes are accepted in the Tender Offer will not receive any payment in respect of accrued and unpaid interest on the Old Notes.

The "Clearing Price" for the Old Notes will be determined by consideration of the Bid Prices of all validly tendered Old Notes of all series, in order of lowest to highest Bid Prices. The Clearing Price will be:

- the lowest single price for all tenders of Old Notes of all series such that, for all tenders of Old Notes of all series whose Bid Price is equal to or less than this lowest single price, we will be able to spend the Maximum Payment Amount under the Tender Offer, taking into account the Tender Offer Consideration and the proration described in the next paragraph (provided, however, that if the principal amount of Old Notes purchased at the Clearing Price that results from applying this formula and the proration described in the next paragraph would be less than the principal amount of the Old Notes that would be purchased using the Bid Price next lowest to such lowest single price, then the Clearing Price will be equal to such next lowest Bid Price), or

- except in the case described in the proviso in the previous bullet point, in the event that the purchase of all Old Notes validly tendered would result in us spending less than the Maximum Payment Amount under the Tender Offer, the Clearing Price will be the Maximum Bid Price.

If the amount of Old Notes validly tendered on or prior to the Expiration Time with a Bid Price equal to or less than the Clearing Price would cause us to spend more than the Maximum Payment Amount to repurchase such tendered Old Notes in the Tender Offer, then the Tender Offer will be oversubscribed, and we will accept for payment such tendered Old Notes as follows. First, we will accept for payment all Old Notes validly tendered with a Bid Price less than the Clearing Price (to the extent such acceptance would not result in a payment in respect of the Tender Offer in excess of the Maximum Payment Amount). Second, we will accept for payment all Old Notes validly tendered with a Bid Price equal to the Clearing Price (to the extent such acceptance would not result in a payment in respect of the Tender Offer in excess of the Maximum Payment Amount) on a prorated basis using a single proration factor.

To avoid purchases of Old Notes in principal amounts other than integral multiples of $1,000, if necessary, we will make appropriate adjustments downward to the nearest $1,000 principal amount with respect to each holder validly tendering Old Notes at a Bid Price equal to the Clearing Price. For series of Old Notes that have a minimum denomination of $2,000, the Company reserves the right to further adjust the amount of Old Notes of the relevant series that would otherwise be accepted from a given holder downward by $1,000 principal amount if an impermissible denomination of outstanding Old Notes would otherwise result. All Old Notes not accepted as a result of proration and all tenders of Old Notes with a Bid Price in excess of the Clearing Price will be rejected from the Tender Offer.

All holders whose Old Notes (regardless of series) are accepted in the Tender Offer will receive the Tender Offer Consideration even if they tendered at a Bid Price that was less than the Clearing Price.

**Our obligation to accept Old Notes in the Tender Offer and pay the Tender Offer Consideration is conditioned on the satisfaction or waiver of the conditions set forth in the section titled "The Tender Offer—Conditions to the Tender Offer" in this Statement. We reserve the right, in our sole discretion, to waive or modify any one or more of the conditions to the Tender Offer in whole or in part at any time on or before the date that any Old Notes are first accepted for purchase. We also reserve the right, but are not obligated, to increase the Maximum Payment Amount by up to 30% without permitting holders to withdraw Old Notes that have been previously tendered in the Tender Offer. The Tender Offer is not conditioned on any minimum amount of Old Notes being tendered.**

We will announce any increase in the Maximum Payment Amount in the Tender Offer by a press release during the pendency of the Tender Offer. If the Maximum Payment Amount is increased and there are fewer than ten business days until the scheduled Expiration Time, we will extend the Tender Offer so that at least ten business days remain until the Expiration Time.

8

Table of Contents

Any tenders of Old Notes in the Tender Offer are irrevocable and may not be withdrawn.

**See "Risk Factors," "Certain U.S. Federal Income Tax Considerations" and "Material Mexican Federal Tax Considerations" for a discussion of certain factors that you should consider in evaluating the Tender Offer.**

Questions and requests for assistance in respect of the Tender Offer may be directed to D.F. King & Co., Inc. as the depositary in the Tender Offer (the "Depositary"), at the address and telephone numbers set forth on the back cover of this Statement.

9

Table of Contents

### CONSIDERATIONS RELATING TO THE EXCHANGE OFFER AND CONSENT SOLICITATION

If you exchange your Old Notes and consent in the consent solicitation, you will be deemed to have consented to the proposed *Concurso* Plan set forth in Annex A (i) as it may be amended by the court during the contemplated *concurso mercantil* proceeding (as so amended, the "*Convenio Concursal*"), provided that any such amendment is not materially adverse to you as reasonably determined by the Company, (ii) whether it is filed on a prepackaged or non−prepackaged basis and (iii) whether it is filed in a voluntary or involuntary *concurso mercantil* proceeding at our option ((i) through (iii), the "*Concurso* Plan").

In addition to the Letter of Transmittal, Holders will also be required to notarize and execute an irrevocable power of attorney that will enable a third−party Mexican representative appointed by us to exercise your vote in favor of the *Convenio Concursal*, any other required documents in connection with the contemplated *concurso mercantil* proceeding and any related *concurso* filings by the Old Guarantors consistent with the *Concurso* Plan. New Notes issued pursuant to the *Convenio Concursal* will be issued in exchange for the Old Notes through a U.S.−based exchange agent that will be appointed by the Company prior to the issuance of the New Notes. Holders of DFI Claims and Other Debt who execute lock−up agreements prior to the date of this Statement will be deemed to have consented to the proposed *Concurso* Plan. The proposed *Concurso* Plan is set forth in Annex A, as summarized in "The Restructuring and the *Concurso* Plan" in this Statement, and the proposed terms of the New Notes to be issued pursuant to the *Concurso* Plan are set forth in the "Description of the New Notes" section of this Statement. In the event of any amendments to the *Concurso* Plan, consenting holders of Restructured Debt will be entitled to the benefit of any such amendments.

Any Old Notes tendered or consents provided after the date of this Statement are irrevocable and may not be withdrawn, except (i) in the event we amend the Exchange Offer and Consent Solicitation in a manner that is materially adverse to holders of Restructured Debt, (ii) as required by applicable law, (iii) in the event the *concurso mercantil* proceeding of the Company is not filed on or before December 31, 2010, (iv) if the Issue Date does not occur on or before the Outside Consummation Date (as defined herein) or (v) if the proposed *Concurso* Plan is amended in a manner that would have a material adverse effect on holders of the Old Notes.

The Consent Payment will be paid on or before the fourth business day following the Expiration Time to holders whose Old Notes are accepted in the Exchange Offer and Consent Solicitation.

The delivery and payment of the Restructuring Consideration pursuant to the proposed *Concurso* Plan is subject to, among other things, the approval of the *Convenio Concursal*, as described under "The Restructuring and the *Concurso* Plan" and "The Exchange Offer and Consent Solicitation—Condition to Delivery and Payment of the Restructuring Consideration."

We may, in our sole discretion, waive any of the conditions set forth in the Exchange Offer and Consent Solicitation, in whole or in part, at any time and from time to time. There can be no assurance that these conditions will be satisfied or waived.

**We have the requisite majority, among debt controlled by the Company, debt subject to lock−up agreements and other creditors that we believe will participate in the Exchange Offer and Consent Solicitation, to accomplish a prearranged *concurso mercantil*. Nevertheless, we are seeking the Exchange Offer and Consent Solicitation in a manner from holders of Restructured Debt because we believe that having such holders in agreement with us on the terms of our *Concurso* Plan could expedite our reorganization process to the benefit of both such holders and us. The *Concurso* Plan set forth in Annex A, which we believe provides for a fair recovery for holders of Restructured Debt in light of our available financial capacity, represents our final restructuring proposal. We intend to commence *concurso mercantil* proceedings and proceed with filing the proposed *Concurso* Plan even if there is no tender of Old Notes and no consents of holders of Restructured Debt are received. If the *Concurso* Plan is contested or litigation is initiated, we reserve the right to terminate the Exchange Offer and Consent Solicitation and not proceed with the *Concurso* Plan. The *Convenio Concursal*, if approved and consummated, will bind all holders of Restructured Debt, regardless of whether or how they voted with respect to the *Concurso* Plan in the consent solicitation or otherwise. Therefore, we**

10

Table of Contents

believe it is in your interest to consent to the *Concurso* Plan set forth in Annex A. See "Risk Factors Relating to the *Concurso* Plan."

See "Risk Factors," "Certain U.S. Federal Income Tax Considerations" and "Material Mexican Federal Tax Considerations" for a discussion of certain factors that you should consider in evaluating the Exchange Offer and Consent Solicitation. See "The Restructuring and the *Concurso* Plan" and the proposed *Concurso* Plan attached hereto as Annex A for a description of the proposed restructuring and some of the consequences of consenting thereto. See also "Summary—Consequences if the Proposed Restructuring Fails."

Questions and requests for assistance in respect of the Tender Offer may be directed to D.F. King & Co., Inc. as the depositary in the Tender Offer (the "Depositary"), at the address and telephone numbers set forth on the back cover of this Statement.

11

Table of Contents

## NOTICE TO INVESTORS

*This Statement and the Letter of Transmittal contain important information which you should read before any decision is made with respect to the Tender Offer and the Exchange Offer and Consent Solicitation.*

This Statement has not been reviewed by any U.S. federal or state securities commission or regulatory authority, nor has any such commission or authority passed upon the accuracy or adequacy of this Tender Offer and the Exchange Offer and Consent Solicitation. Any representation to the contrary is unlawful and may be a criminal offense.

You should not construe the contents of this Statement as investment, legal or tax advice. You should consult your counsel, accountant and other advisors as to legal, tax, business, financial and related aspects of the Tender Offer and the Exchange Offer and Consent Solicitation, including the proposed issuance of New Notes pursuant to the *Concurso* Plan. The Company is not making any representation to you regarding the legality of your participation in the Tender Offer and/or the Exchange Offer and Consent Solicitation under appropriate legal investment or similar laws.

In making a decision regarding the Tender Offer and/or the Exchange Offer and Consent Solicitation, you must rely on your own examination of the Company and the terms of the Tender Offer and the Exchange Offer and Consent Solicitation, including, without limitation, the merits and risks involved. The Tender Offer and the Exchange Offer and Consent Solicitation is being made on the basis of this Statement.

This Statement is being provided on a confidential basis for informational use solely in connection with the Tender Offer and the Exchange Offer and Consent Solicitation. This Statement may not be copied or reproduced in whole or in part, nor may it be distributed or any of its contents be disclosed to anyone other than the holders of Restructured Debt to whom it is being provided.

No representation or warranty, express or implied, is made by the Depositary or the Information and Exchange Agent as to the accuracy or completeness of any of the information set forth in this Statement, and nothing contained in this Statement is or shall be relied upon as a promise or representation, whether as to the past or the future. This Statement contains summaries, believed to be accurate, of some of the terms of specific documents, but reference is made to the actual documents, copies of which will be made available upon request, for the complete information contained in those documents. All summaries are qualified in their entirety by this reference.

No person is authorized in connection with the Tender Offer and the Exchange Offer and Consent Solicitation to give any information or to make any representation not contained in this Statement and the Letter of Transmittal and, if given or made, any other information or representation must not be relied upon as having been authorized. The information contained in this Statement is as of the date hereof and subject to change, completion or amendment without notice. Neither the delivery of this Statement at any time nor any subsequent commitment to enter into any financing shall, under any circumstances, create any implication that there has been no change in the information set forth in this Statement or in the affairs of the Company since the date of this Statement.

None of the Company, the Depositary, the Information and Exchange Agent, The Bank of New York Mellon (the trustee under the indentures governing the 2012 Notes and the 2017 Notes), U.S. Bank National Association as successor trustee to Wachovia Bank, National Association (the trustee under the indenture governing the 2013 Notes), nor any of their respective affiliates makes any representation to any holder of Restructured Debt as to whether to consent. If given or made, such information or representation should not be relied upon as having been authorized by any of those parties or any of their respective affiliates. Holders of Restructured Debt must make their own decisions as to whether to consents.

The distribution of this Statement, the Tender Offer and the Exchange Offer and Consent Solicitation for the Restructured Debt may be restricted by law in some jurisdictions. Persons into whose possession this Statement or any of the Restructured Debt comes must inform themselves about, and observe, any such restrictions.

12

Table of Contents

The information contained in this Statement is exclusively our responsibility, does not require authorization and has not been reviewed or authorized by the Mexican *Comisión Nacional Bancaria y de Valores* (the "CNBV"). The acceptance of the Tender Offer and/or the Exchange Offer and Consent Solicitation and the issuance of a consent hereunder by an investor, including any investor of Mexican nationality, will be such investor's own responsibility.

We will be subject to filing a notification and certain documentation regarding the New Notes at the time of their issuance, and we have not filed before the CNBV a request for authorization or registration of the New Notes. The New Notes have not been and will not be registered with the *Registro Nacional de Valores* maintained by the CNBV and therefore the New Notes will not be subject to public offering or intermediation in Mexico except pursuant to an exception under Article 8 of the *Ley del Mercado de Valores*, or Mexican Securities Market Law. Our notice to the CNBV regarding the issuance of the New Notes will be for information purposes only and will not imply or constitute a certification of the investment quality of the New Notes, our solvency or the accuracy or completeness of the information included in this Statement. The delivery to and receipt by the CNBV of such notice does not constitute or imply any certification as to the investment quality of the New Notes or our solvency, liquidity or credit quality or the accuracy or completeness of the information set forth herein.

13

Table of Contents

## PRESENTATION OF FINANCIAL INFORMATION AND OTHER INFORMATION

Vitro, S.A.B. de C.V., formerly Vitro, S.A. de C.V., is a corporation (*sociedad anónima bursátil de capital variable*) organized under the laws of Mexico, and is a holding company that conducts substantially all of its operations through its subsidiaries. In this Statement, except when indicated or the context otherwise requires, (a) the words "Vitro" and "our holding company" refer to Vitro, S.A.B. de C.V., and not its consolidated subsidiaries, (b) "the Company" refers to Vitro, S.A.B. de C.V., together with its consolidated subsidiaries and (c) the words "we," "us," "our" and "ours" (i) refer to Vitro and AIV when used in reference to the making and execution of the Tender Offer, (ii) refer to Vitro when used in reference to the making and execution of the Exchange Offer and Consent Solicitation, and (iii) otherwise refer to Vitro, S.A.B. de C.V., together with its consolidated subsidiaries. References in this Statement to business units are to combinations of various consolidated entities that have been grouped together for management and presentation purposes.

References in this Statement to "pesos" or "Ps." are to the lawful currency of the United Mexican States, which we refer to as "Mexico." References to "U.S. dollars," "dollars" or "$" are to dollars of the United States of America, which we refer to as the "United States" or "U.S."

Our consolidated financial statements are prepared in accordance with Mexican Financial Reporting Standards ("MFRS") issued by the Mexican Board for Research and Development of Financial Reporting Standards (the "CINIF"), which differs in certain significant respects from accounting principles generally accepted in the United States, which we refer to as "U.S. GAAP."

As of December 31, 2009, we were in default under the indentures governing the Old Notes and under certain other agreements and instruments governing our debt; therefore, Ps. 15,771 million was reclassified in our consolidated financial statements as short–term debt resulting in current liabilities significantly exceeding current assets. We are currently in negotiations with our financial creditors in order to restructure our debt. We continue to operate normally as we work to achieve a financial restructuring. Our consolidated financial statements do not include the effects that could result if such financial restructuring is unable to be realized.

As disclosed in note 3(a) to the accompanying consolidated financial statements, we adopted the following new MFRS, which impacted our financial position and results of operations in 2008: NIF B–2, Statement of Cash Flows; NIF B–10, Effects of Inflation; NIF D–3, Employee Benefits; and NIF D–4, Income Taxes. In 2009: NIF B–8, Consolidated or Combined Financial Statements; NIF C–8, Intangible Assets; and D–8, Share–based Payments.

In January 2009, the CNBV published amendments to its regulations applicable to issuers (*Circular Única*), making it compulsory for public entities to prepare and present their financial statements using International Financial Accounting Standards ("IFRS") beginning 2012 (early adoption is permitted). Therefore, beginning in first quarter of 2012, we will be required to report our financial information to the Bolsa Mexicana de Valores under IFRS.

Please refer to note 3(a) to our consolidated financial statements for more information about the impacts of these changes.

In November 2008, the by–laws of Empresas Comegua, S.A. ("Comegua"), a company of which we own 49.7%, were modified regarding the control of its operations. As a result, beginning on December 1, 2008 our consolidated financial statements present our 49.7% interest in Comegua under the equity method for purposes of MFRS, whereas previously Comegua was presented as a consolidated subsidiary. As a result of the deconsolidation of Comegua in November 2008, only the results of Comegua for the first eleven months of 2008 are included in our consolidated financial statements, and Comegua's individual assets and liabilities are not included in our consolidated balance sheet as of December 31, 2008. For more details regarding the deconsolidation of Comegua, see note 20(d) to our consolidated financial statements.

In August 2008, our partner in Vitro Cristalglass S.L. ("Vitro Cristalglass") exercised its right to sell its 40% interest in the company to our subsidiary Viméxico, S.A. de C.V. ("Viméxico"), the holding company for certain of our Flat Glass business unit subsidiaries. Therefore, beginning September 1, 2008, our consolidated

14

Table of Contents

financial statements present Vitro Cristalglass as a wholly owned subsidiary of Viméxico. In January 2009, a revised payment was agreed upon with the previous partner, extending the payment through the 2009 and 2010 periods, and providing that the purchase of the partnership interest in Vitro Cristalglass would be made through the same company, with a subsequent capital reduction. For more information, see note 20(c) to our consolidated financial statements.

In August 2007, Viméxico acquired 55% of the outstanding shares of Productos de Valor Agregado en Cristal, S.A. de C.V. ("PVA"), a company dedicated to the installation of value–added glass products, for an amount of approximately $10 million, and beginning September 1, 2007, our consolidated financial statements include PVA as a wholly owned subsidiary of Viméxico. For more information, see note 20(a) to our consolidated financial statements.

In July 2007, Viméxico exercised its option to acquire the 50% equity interest in Vitro AFG, S.A. de C.V. ("Vitro AFG") held by its joint venture partner AFG Industries ("AFG"), a subsidiary of Asahi Glass Co. Limited, and beginning August 1, 2007, our consolidated financial statements present Vitro AFG as a wholly owned subsidiary of Viméxico. For more information, see note 20(b) to our consolidated financial statements.

This Statement contains translations of certain peso amounts into U.S. dollars at specified rates solely for the convenience of the reader. These convenience translations should not be construed as representations that the peso amounts actually represent such U.S. dollar amounts or could be converted into U.S. dollars at the rate indicated or at all. The exchange rate used in preparing our consolidated financial statements and in preparing convenience translations of such information into U.S. dollars is the exchange rate calculated and published by the Banco de México, or the Mexican Central Bank, in the *Diario Oficial de la Federación*, Mexico's Daily Official Gazette of the Federal Government, for the conversion of U.S. dollar–denominated amounts into pesos, which we refer to as the "Free Exchange Rate." As of December 31, 2007, 2008 and 2009, the Free Exchange Rate was 10.8662, 13.8325, and 13.0587 pesos per U.S. dollar, respectively. As of June 30, 2009 and 2010, the Free Exchange Rate was 13.2023 and 12.6567 pesos per U.S. dollar, respectively. Within this Statement, we often compare variances between periods. In such instances, when addressing changes in nominal U.S. dollars, we calculate these amounts by dividing the nominal pesos for each period by the exchange rate published by the Mexican Central Bank on the date such transactions were realized. See "Exchange Rates" for additional information regarding exchange rates.

In accordance with MFRS, our consolidated financial statements for the years ended December 31, 2008 and 2009 and for the six–month periods ended June 30, 2009 and 2010, are expressed in nominal pesos, and all amounts for prior fiscal years are restated as constant pesos as of December 31, 2007, except where otherwise indicated.

For purposes of this Statement, we consider our "export sales" to be (a) sales of products produced by our Mexican subsidiaries to third parties outside Mexico and to our foreign subsidiaries that do not act as our distributors and (b) sales of products by our foreign distributor subsidiaries. For purposes of determining the amount of our export sales to be disclosed, we consider sales to be made at the time of sale to third parties outside Mexico and to our foreign subsidiaries that do not act as our distributors (principally Vitro America, Inc., which we refer to as "Vitro America"), and at the time of sale of the product by our foreign subsidiaries that act as our distributors to third parties outside Mexico.

Under Mexican corporate law, ordinary shares of our Series "A" common stock held by our Stock Option Trust (39,777,907 shares as of October 14, 2010, the date of our most recent general ordinary shareholder's meeting) are considered issued and outstanding and therefore are entitled to receive dividends and vote on matters on which our other shares are entitled to vote. However, for accounting purposes, our ordinary shares held by our Stock Option Trust are considered treasury stock and therefore not outstanding. Thus, for purposes of calculating net income (loss) from continuing operations per share, net income (loss) from discontinued operations per share, the cumulative effect of change in accounting principles per share and diluted and basic net income (loss) per share, as well as for purposes of determining shareholders' equity, we consolidated our ordinary shares held by our Stock Option Trust as treasury stock and not outstanding. As of October 14, 2010, 59,484,349 ordinary shares were held by our Pension Plan Trust. Those ordinary shares are treated as outstanding for all purposes.

Certain amounts included in this Statement may not sum due to rounding.

15

Table of Contents

## EXCHANGE RATES

The following table sets forth, for each year in the five year period ended December 31, 2009, the high, low, average and annual period−end Noon Buying Rates, all expressed in pesos per U.S. dollar. No representation is made that the peso or U.S. dollar amounts referred to in this Statement could have been or could be converted into U.S. dollars or pesos, as the case may be, at the rates indicated, at any particular rate or at all.

| Year ended December 31, | Noon Buying Rate | | | |
| --- | --- | --- | --- | --- |
| | High | Low | Average | Period−End |
| 2005 | 11.41 | 10.41 | 10.89 | 10.63 |
| 2006 | 11.46 | 10.43 | 10.91 | 10.80 |
| 2007 | 11.27 | 10.67 | 10.93 | 10.86 |
| 2008 | 13.94 | 9.92 | 11.19 | 13.83 |
| 2009 | 15.37 | 12.60 | 13.57 | 13.05 |

Source: The International Monetary Fund

The following table sets forth, for each month in the nine−month period ended on September 30, 2010 and the first 29 days of October, the high and low Noon Buying Rates, all expressed in pesos per U.S. dollar.

| | Noon Buying Rate | |
| --- | --- | --- |
| | High | Low |
| January 2010 | Ps.13.01 | Ps.12.65 |
| February | 13.18 | 12.78 |
| March | 12.75 | 12.41 |
| April | 12.37 | 12.16 |
| May | 13.18 | 12.26 |
| June | 12.93 | 12.46 |
| July | 13.06 | 12.65 |
| August | 13.14 | 12.54 |
| September | 13.06 | 12.48 |
| October (through October 29) | 12.59 | 12.32 |

Source: The International Monetary Fund

Table of Contents

## WHERE YOU CAN FIND MORE INFORMATION; INCORPORATION BY REFERENCE

We are in the process of terminating our registration under Section 12(g) of the Exchange Act and our obligations to file periodic reports with the U.S. Securities and Exchange Commission (the "SEC") under Section 13 and Section 15(d) of the Exchange Act, as described further below. You may access and read our SEC filings through the SEC's website at www.sec.gov. This website contains reports and other information that we file electronically with the SEC. You may also read and copy any reports or other information that we have filed with the SEC at the SEC's public reference room at 100 F Street, N.E., Room 1580, Washington, D.C. 20549. Please call the SEC at 1−800−SEC−0330 for further information on the public reference room.

You may request a copy of our SEC filings, at no cost, by contacting us at the number or address specified below.

Vitro, S.A.B. de C.V.
Ave. Ricardo Margáin Zozaya 400
Col. Valle del Campestre
San Pedro Garza García
66265 Nuevo León, México
Tel: (52−81) 8863−1200

Later information that we file with the SEC, to the extent that we identify such information as being incorporated by reference into this Statement, will automatically update and supersede the information in this Statement. We incorporate by reference into this Statement any future submissions on Form 6−K after the date of this Statement and prior to the termination of the Tender Offer and the Exchange Offer and Consent Solicitation that are identified as being incorporated into this Statement.

On June 22, 2009, the Company announced that it had notified the Bank of New York Mellon, the holder of the ordinary deposit certificates represented by its shares in circulation, of its decision to end its depositary contract that had been subscribed with this institution and through which the corresponding American Depositary Receipts (the "ADRs") were issued. This action was due to the Company's objective to improve the trading of its shares on the BMV and address the low volume of ADRs traded through the New York Stock Exchange (the "NYSE") and the high costs involved with the trading of the ADRs on the NYSE. On August 24, 2009, the Company's ADRs stopped trading on the NYSE.

On September 8, 2010, the Company filed a Form 15−F with the SEC with the intention to deregister its ADRs and the Old Notes and terminate its reporting obligations under Section 12(g) of the Securities Exchange Act.

Vitro is already eligible to suspend its Exchange Act reporting requirements as it complies with the rules of the Exchange Act given that there are no remaining holders of Vitro's ADRs and each class of Old Notes are held of record by fewer than 300 persons registered in the DTC on a worldwide basis.

If the SEC has no objection, the deregistration and termination of reporting obligations will become effective not later than 90 days after the filing of the Form 15−F. Upon filing of the Form 15−F, Vitro's reporting obligations with the SEC were suspended until the deregistration is effective. However, Vitro will continue to provide information to the BMV and will make such information available on its website.

We maintain a website at www.vitro.com that contains information about us. Information on that website is not incorporated by reference in this Statement, unless we expressly identify information posted on that website as being incorporated by reference into this Statement.

The Company has also furnished, and will be required periodically to furnish, certain information, including quarterly and annual reports, to the BMV.

The Company will make available to the holders of the New Notes, at the corporate trust office of the Trustee at no cost, copies of the indentures governing the New Notes.

17

Table of Contents

Questions and requests for assistance or for additional copies of this Statement or any other documents (including the above-referenced available information) may be directed to the Depositary or the Information and Exchange Agent, as applicable, at the address and telephone numbers set forth on the back cover of this Statement. Beneficial owners may also contact their broker, dealer, commercial bank, trust company or other nominee through which they hold the Old Notes with questions and requests for assistance.

**Table of Contents**

## FORWARD–LOOKING STATEMENTS

This Statement includes forward–looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. These statements relate to our future prospects, developments and business strategies.

These forward–looking statements are identified by our use of terms and phrases such as "anticipate," "believe," "could," "estimate," "expect," "intend," "may," "plan," "predict," "project," "goals," "target," "strategy" and similar terms and phrases, and may include references to assumptions. These statements are contained in the sections entitled "Risk Factors," "Business," and "Management's Discussion and Analysis of Financial Condition and Results of Operations" and other sections of this Statement.

These forward–looking statements reflect our best assessment at the time and thus involve uncertainty and risk. Therefore, these forward–looking statements are qualified by reference to the cautionary statements set forth in this Statement. It is possible that our future financial performance may differ materially from our expectations because of a variety of factors, some of which include, without limitation, the following:

- our ability to restructure and refinance our current debt;

- liquidity, debt repayment and access to credit;

- the general political, economic and competitive conditions in markets and countries where we have operations, including the current global recession conditions, competitive pricing pressures, inflation or deflation, increased security risks and changes in tax rates;

- fluctuations in the price and availability of energy, raw materials, labor and transportation;

- consolidation among competitors and customers;

- foreign currency exchange fluctuations relative to the U.S. dollar and the euro against the Mexican peso;

- changes in capital availability or cost, including interest rate or foreign currency exchange rate fluctuations;

- capacity utilization of our facilities;

- the ability to integrate operations of acquired businesses;

- consumer preferences for forms of packaging that are alternatives to glass containers;

- technological breakthroughs in the construction or auto industries which change the actual use or applications of glass in such industries;

- the ability to hire and retain experienced management;

- lifting of trade barriers and enforcement of measures against unfair trade practices;

- the enactment of stricter environmental laws; and

- the timing and occurrence of natural disasters and other events which are beyond our control and our capacity to recover our level of operations after such events.

Table of Contents

Any forward−looking statements in this Statement are based on certain assumptions and analysis made by us in light of our experience and perception of historical trends, current conditions, expected future developments and other factors we believe are appropriate under the current circumstances. Forward−looking statements are not a guarantee of future performance and actual results or developments may differ materially from expectations. You are therefore cautioned not to place undue reliance on such forward−looking statements. While we continually review trends and uncertainties affecting our results of operations and financial position, we do not intend to update any particular forward−looking statements contained in this document.

## ENFORCEABILITY OF CIVIL LIABILITIES

Vitro, S.A.B. de C.V., and many of Vitro's subsidiary guarantors with respect to the Old Notes are variable capital corporations organized under the laws of Mexico. Almost all of our directors and executive officers, and the directors and executive officers of many of our subsidiary guarantors, reside outside of the United States. All or a substantial portion of our assets and the assets of many of our subsidiary guarantors and of the directors and executive officers referred to in the preceding sentence are located and the majority of our revenues and the revenues of our subsidiary guarantors are derived from sources outside the United States. As a result, it may not be possible for holders of Restructured Debt to effect service of process outside Mexico upon us or upon our subsidiary guarantors, directors or executive officers, or to enforce against such parties judgments of courts located outside Mexico predicated upon the civil liabilities under the laws of jurisdictions other than Mexico, including judgments predicated upon the civil liability provisions of the U.S. federal securities laws or other laws of the United States. We have been advised by Alejandro Sánchez Mújica, our General Counsel, that no treaty exists between the U.S. and Mexico for the reciprocal enforcement of judgments issued in the other country. Generally, Mexican courts would enforce final judgments rendered in the United States if certain requirements are met, including the review in Mexico of the U.S. judgment to ascertain compliance with certain basic principles of due process and the non−violation of Mexican law or public policy, provided that the U.S. courts would grant reciprocal treatment to Mexican judgments. Additionally, we have been advised by Mr. Sánchez that there is doubt as to the enforceability, in original actions in Mexican courts, of liabilities predicated in whole or in part on U.S. federal securities laws and as to the enforceability in Mexican courts of judgments of U.S. courts obtained in actions predicated upon the civil liability provisions of U.S. federal securities laws.

Table of Contents

# SUMMARY

*This summary highlights information contained elsewhere in this Statement, and therefore it may not contain all the information that you should consider before consenting to the Concurso Plan.*

## Company Overview

Vitro, S.A.B. de C.V. is a corporation with variable capital (*sociedad anónima bursátil de capital variable*) organized under the laws of Mexico and is a holding company that conducts substantially all of its operations through subsidiaries. We were incorporated in Mexico in 1909 and, based on our consolidated net sales in 2009, we believe that we are the largest manufacturer of glass containers and flat glass in Mexico. Our principal executive offices are located at Ave. Ricardo Margáin 400, Col. Valle del Campestre, San Pedro Garza García, Nuevo León, 66265 Mexico, telephone number (52−81) 8863−1200.

Our Glass Containers business unit manufactures and distributes glass containers for the soft drink, beer, food, juices, liquor and wine, pharmaceutical and cosmetics industries, as well as raw materials, machinery and molds for the glass industry, and, based on its consolidated net sales of Ps. 12,385 million ($948 million) in 2009, we believe the Glass Containers business unit is the largest glass container producer in Mexico and Central America and among the largest in the world. Substantially all of the Glass Containers subsidiaries are wholly owned except for Comegua, our venture with London Overseas and Golden Beer in which we hold a significant investment of 49.7%. Compañía Vidriera, S.A. de C.V. ("Covisa"), which conducts a substantial majority of our glass containers operations in Mexico, is the only significant operating subsidiary (within the meaning of "significant subsidiary" in Rule 1−02 of Regulation S−X under the U.S. Securities Exchange Act of 1934, as amended (the "Exchange Act")) ("Significant Operating Subsidiary") in the Glass Containers business unit.

Our Flat Glass business unit focuses on the manufacturing, processing and distribution of flat glass for the construction and the automotive industries. Based on the Flat Glass business unit's consolidated net sales of Ps. 11,377 million ($871 million) in 2009, we believe the business unit is the largest flat glass producer in Mexico, the second largest in Latin America, one of the largest distributors of flat glass products in the United States and a leading provider of insulated flat glass products in Spain and Portugal.

Viméxico, our 91.8% venture with Pilkington, is a holding company for some of the Flat Glass business unit subsidiaries. Vitro Vidrio y Cristal, S.A. de C.V. ("Vidrio y Cristal"), which manufactures and distributes our raw (float) flat glass products for the Mexican construction industry, is the only Significant Operating Subsidiary in our Flat Glass business unit. In addition to Viméxico, we have partners in three additional subsidiaries: (i) Cristales Automotrices, S.A. de C.V. ("Cristales Automotrices"), which conducts our automotive glass replacement ("AGR") installation business throughout México City, (ii) Vitro Cristalglass, which is engaged in the manufacture and distribution of flat glass products for the Spanish, French and Portuguese construction industries and (iii) Vitro Chaves Industria de Vidrio, S.A. ("Vitro Chaves"), a subsidiary of Vitro Cristalglass in Portugal. See "Business."

## The Tender Offer

We are offering to purchase for cash, upon the terms and subject to the conditions set forth in this Statement and in the Letter of Transmittal, the maximum aggregate principal amount of Vitro's outstanding 2012 Notes, 2013 Notes and 2017 Notes that we can purchase for $100,000,000 (subject to increase, the "Maximum Payment Amount"), at a purchase price per $1,000 principal amount determined in accordance with the procedures set forth below. We reserve the right, but are not obligated, to increase the Maximum Payment Amount by up to 30% without permitting holders to withdraw Old Notes that have been previously tendered in the Tender Offer. Any tenders of Old Notes in the Tender Offer are irrevocable and may not be withdrawn.

The Old Notes were issued by and represent obligations of Vitro. Our obligation to accept Old Notes in the Tender Offer and pay the Tender Offer Consideration is conditioned on the satisfaction or waiver of the conditions set forth in the section titled "The Tender Offer—Conditions to the Tender Offer" in this Statement. The Tender Offer is not conditioned on any minimum amount of Old Notes being tendered. We expect to obtain the funds required to consummate the Tender Offer with the net proceeds of a loan agreement in the amount of up to the Maximum Payment Amount to be entered into between Fintech and AIV (the "Loan Agreement"). We will cause

21

**Table of Contents**

the Old Notes that are accepted in the Tender Offer to be delivered to Fintech as payment for AIV's obligations under the Loan Agreement. Fintech will be permitted to exchange Old Notes it receives as a result in the *Concurso* Plan and receive a related consent payment. See "The Tender Offer."

**Proposed Restructuring Plan**

We propose to effect a restructuring of the Old Notes through the *Concurso* Plan set forth in Annex A. Pursuant to the *Concurso* Plan, we would, among other things, exchange the Restructured Debt for the following Restructuring Consideration on a pro rata basis:

- $850.0 million in aggregate principal amount of New 2019 Notes;

- $100.0 million (plus the Issue Date Adjustment) in aggregate principal amount of New MCDs, which will mandatorily convert into 15.0% of our equity on a fully diluted basis if not paid in full at maturity or upon the occurrence of certain events of default;

- the Restructuring Cash Payment, which will be paid from the remainder of the cash in the Payment Trust after the Consent Payment is made, to all holders of Restructured Debt on a pro rata basis; and

- the Restructuring Fee, as described in "Summary—The New Notes—The New 2019 Notes."

The delivery and payment of the Restructuring Consideration pursuant to the proposed *Concurso* Plan is subject to, among other things, the approval of the *Convenio Concursal*.

For every $1,000 principal amount of the Restructured Debt exchanged, holders will be entitled to receive:

- $561 principal amount of New 2019 Notes,

- $66 principal amount of New MCDs (not including the Issue Date Adjustment),

- a portion of the Restructuring Cash Payment on a pro rata basis (depending on how many holders consent) and

- a portion of the Restructuring Fee on a pro rata basis (depending on the Issue Date).

Any intercompany debt will not receive the Restructuring Consideration and will be subordinated to payment of the Restructured Debt (subject to payments made in the ordinary course of business consistent with past practices).

The principal objectives of the restructuring described in this Statement are to lower our principal and interest payments and extend the maturity dates of the Old Notes and the other Restructured Debt. We do not have the means to repay or refinance the amounts that are payable under our indentures and other financial instruments. We believe that we are currently not likely to find a material source of financing to fund the interest and principal payments on the Old Notes. We believe that the completion of the restructuring through the *Concurso* Plan is critical to resolving our liquidity crisis and ensuring our continued viability.

While we have the requisite majority, among debt controlled by the Company, debt subject to lock-up agreements and other creditors that we believe will participate in the Tender Offer and/or the Exchange Offer and Consent Solicitation, to accomplish a prearranged *concurso mercantil*, we believe that the Exchange Offer and Consent Solicitation and the implementation of the *Concurso* Plan would benefit both you and the Company by helping us to avoid potential contentious litigation and protracted proceedings that could cause business disruptions or damage to the overall value of our business. See "—Advantages of the Proposed Restructuring" below.

Table of Contents

*The Exchange Offer and Consent Solicitation and Consent Payment*

We are seeking the tender of the Old Notes and the consent of holders of Restructured Debt to the *Concurso* Plan; however, we may proceed with filing the proposed *Concurso* Plan without any such tender or consents. Holders who tender Old Notes and deliver consents in the Exchange Offer and Consent Solicitation for Old Notes will be deemed to have consented to the proposed *Concurso* Plan. Holders of DFI Claims and Other Debt who execute lock–up agreements prior to the date of this Statement will be deemed to have consented to the proposed *Concurso* Plan. The proposed *Concurso* Plan is set forth in Annex A, as summarized in "The Restructuring and the *Concurso* Plan" in this Statement.

The Payment Trust will pay a Consent Payment to holders of Restructured Debt in an amount representing such holder's pro rata share of an aggregate of $75.0 million in cash paid in the Payment Trust based on the aggregate principal amount of Restructured Debt that is held by certain holders of the Restructured Debt (a) who have tendered the Old Notes into the Exchange Offer and Consent Solicitation or entered into lock–up agreements as of the date of this Statement or (b) who have provided a consent with respect to their Restructured Debt pursuant to the terms of this Statement (each such holder, a "Participating Creditor"); provided, however, that the aggregate Consent Payment paid to each Participating Creditor shall in no event be less than 5% or greater than 10% of the aggregate principal amount of Restructured Debt held by such holder. The payment of the Consent Payment shall be made by the Payment Trust on or before the fourth business day following the Expiration Time to Participating Creditors who consent to the *Concurso* Plan pursuant to the terms of this Statement.

Holders who participate in the Tender Offer will not receive a Consent Payment in respect of any Old Notes that are accepted for purchase in the Tender Offer or that are not accepted for purchase and are returned to such holder. Such holders may receive a Consent Payment (as described above) only in respect of any Old Notes of such holder that are included in the Exchange Offer and Consent Solicitation because (a) such holder elected in its Letter of Transmittal to have any Old Notes that are not accepted for purchase in the Tender Offer included in the Exchange Offer and Consent Solicitation and (b) such Old Notes are not accepted in the Tender Offer.

## Background of the Restructuring

*Our Financial Difficulties*

*The Global Recession and Its Effects on Our Business*

The global economic and financial crisis, and the severe economic recession, which began in the second half of 2008, affected each of our major markets, Mexico, the United States and Spain, and has significantly affected our Glass Container and Flat Glass businesses. The sharp decline in demand for new cars and trucks in the automobile industry, for new homes and buildings in the construction industry, and reduced beer bottle demand from our main client in Glass Containers resulted in a 36.8% decline in our consolidated operating income for 2008 compared to 2007, from Ps. 2,704 million to Ps. 1,710 million, and a further 22.3% decline in our operating income for 2009 compared to 2008, from Ps. 1,710 million to Ps. 1,329 million. Income before taxes decreased from Ps. 175 million in 2007 to a loss of Ps. 7,857 million in 2008 and a loss of Ps. 1,352 million in 2009. Net income decreased from Ps. 131 million in 2007 to a loss of Ps. 5,682 million in 2008 and a loss of Ps. 754 million in 2009. Even though the economy has shown moderate signs of recovery in 2010, some of our markets are still experiencing contraction and excess capacity, including the construction sector in the United States and Spain. For the six–month period ended June 30, 2010, our consolidated net sales decreased 7.3% to Ps. 11,399 million ($901 million) from Ps. 12,292 million ($931 million) for the same period ended June 30, 2009. For further discussion see "Management's Discussion and Analysis of Financial Condition and Results of Operations—Operating Results" and "Selected Historical Consolidated Financial Information."

*Claims Relating to Our Derivative Financial Instruments*

We are a large consumer of natural gas with an approximate consumption of 20 million British Thermal Units ("MMBTUs") in 2008 and 17 MMBTUs in 2009 through our 21 glass container furnaces, three float glass furnaces in Mexico and our 15–year "take–or–pay" power agreement with Tractebel Energía, S. de R.L. de C.V.

23

Table of Contents

("Tractebel Energía") in which natural gas is a pass through component in the energy price. See "Business—Our Raw Materials—Energy." During the first seven months of 2008, energy prices, mostly natural gas, our main energy input, recorded a sharp price increase from $6.51 to $12.60 per MMBTU, exerting negative pressure on our operating and financial results. During this period, in order to hedge against further increases in natural gas prices, we entered into certain Derivative Financial Instruments ("DFIs") that were different in characteristics and notional amounts from the derivative contracts we had historically entered into.

Additionally, during the first seven months of 2008, the Mexican peso appreciated 7.4% relative to the U.S. dollar. During the same period, the Mexican equilibrium interbank interest rates ("TIIE") increased 6.5%. During this period, we entered into certain additional DFIs materially different in characteristics and in notional amounts from the derivative contracts we had customarily entered into in order to hedge against continued increases in the value of the peso against the dollar and continued increases in interest rates.

In the fourth quarter of 2008, due to high volatility in the financial markets, coupled with a significant drop in the price of natural gas as well as a sharp decrease in the value of the Mexican peso compared to the U.S. dollar, our DFI positions were adversely impacted. Natural gas prices plummeted from a record high of $12.60 per MMBTU in July 2008 to $6.00 per MMBTU by year end 2008, and in the final months of 2008, the Mexican peso registered a 30% year end devaluation against the dollar, reversing the appreciation trend experienced in the first seven months. As a result of these changes, we were required to post $85 million in collateral deposits related to margin calls by our DFI counterparties ("Counterparties"). In order to eliminate further liquidity deterioration related to additional margin calls, in the fourth quarter of 2008 we restructured our DFI portfolio and unwound the majority of our open positions to guarantee our ability to continue our normal course of operations. Our failure to make payment on our closed DFI positions triggered cross–default provisions in the majority of our long–term debt instruments.

During February and March 2009, six out of seven Counterparties with whom we and/or some of our subsidiaries entered into DFIs filed lawsuits in the Supreme Court of the State of New York demanding payment of approximately $240.3 million plus interest and other fees related to the unwound positions. As of the date of this Statement, our subsidiary, Vitro Envases Nortéamerica, S.A. de C.V. ("Vena") has reached a settlement agreement with Calyon Credit Agricole CIB ("Calyon"), one of the six Counterparties who filed lawsuits, and the Calyon lawsuit was dismissed. The amount of the settlement agreed with Calyon is $63.4 million plus interest and other fees of $3.9 million. We are seeking to include this settlement in the Restructured Debt. However, if we do not reach an agreement with Calyon to do so, the amount of this settlement will not be included. The Restructuring Consideration for holders of Old Notes or other DFI Claims will not change regardless of whether the Calyon settlement is included as part of the Restructured Debt though the aggregate principal amount of the New 2019 Notes and New MCDs that we would issue on the Issue Date would be reduced accordingly. In any event, if we are unable to reach an agreement with Calyon to include our settlement with them in the Restructured Debt, we will not be able to subsequently enter into a restructuring transaction with Calyon on terms more favorable than the Restructuring Consideration (in terms of recovery, terms and conditions of new restructured securities or otherwise).

The other five Counterparties who filed lawsuits sold their DFI Claims (including their rights under the related lawsuits) to Fintech. The other Counterparty not party to the lawsuits sold its DFI Claim to Fintech also. Following Fintech's purchase of such DFI Claims, we engaged in settlement negotiations with Fintech. As a result of such negotiations, Fintech agreed to dismiss the lawsuits related to the DFI Claims and we and Fintech entered into a settlement agreement and standstill and tolling agreements with respect to such lawsuits and DFI Claims. Under the terms of such settlement agreement, among other things, we and certain of our subsidiaries acknowledged the debt outstanding under such DFI Claims (in an aggregate principal amount of approximately $176.4 million) and our subsidiaries that had originally entered into the DFIs with the Counterparties that sold such DFI Claims to Fintech issued promissory notes to Fintech in respect and in settlement of such outstanding debt ("Promissory Notes", which are the agreed upon amounts in settlement of DFI Claims and included in the definition of DFI Claims). The Promissory Notes were guaranteed "por aval" by us and some of our subsidiaries. The Promissory Notes, are subject to the Fintech Lock-up Agreement (the main terms of which are described in "Summary—Background of Restructuring—The Restructuring Process—Fintech Lock-up Agreement") and will be restructured pursuant to the terms of the Exchange Offer and Consent Solicitation described in this Statement.

24

*Interest and Principal Payment Default on the Old Notes and the Other Debt*

In order to preserve the necessary cash to continue our operations, Vitro did not make scheduled interest payments due February 2009, August 2009, February 2010 and August 2010 on the 2012 Notes and 2017 Notes and did not make scheduled interest payments due May 2009, November 2009 and May 2010 on the 2013 Notes. Under the indentures governing the Old Notes, the trustee or the registered holders of at least 25% in principal amount of the Old Notes have the right to accelerate this debt. On January 4, 2010, we received a document entitled "Notice of Acceleration of Payment" from a group of holders of the 2012 Notes and 2017 Notes, which was also addressed to the trustee under the indentures governing the 2012 Notes and the 2017 Notes. At our request, counsel to the signatories of such document stated that such signatories represented holders of 25% or more of each of the relevant series of 2012 Notes and 2017 Notes. On April 12, 2010, we also received a document entitled "Notice of Default and Acceleration" on letterhead of the trustee under the indenture governing the 2013 Notes.

In addition, Vitro also did not make a scheduled payment of Ps. 150 million ($11.9 million), plus accrued interest, due February 5, 2009, on its *Certificados Bursátiles* issued in 2003 ("*Certificados Bursátiles Vitro 03*"). The common representative (*representante común*) of the *Certificados Bursátiles* initiated a legal proceeding in Mexico involving attachment of Vitro's assets in order to demand payment of Ps. 150 million ($11.9 million), plus accrued interest to date, on such *Certificados Bursátiles Vitro 03*. A first instance ruling requiring Vitro to pay was issued and appealed by the Company. In its April 30, 2010 ruling, the Appeals Court dismissed the case involving the attachment of Vitro's assets; however, the court converted the case into a legal proceeding not involving such attachment.

In July 2009, we and other defendant subsidiaries received notification of an executive mercantile lawsuit filed in the Fifth Court Specialized in Civil Proceedings (*Juzgado Quinto Civil*) brought by ABN Amro (owned at one time by RBS Bank) in its capacity as creditor demanding the payment of $15 million plus interest. During September and October 2009, a preliminary ruling was given requiring the Company to pay the principal amount. On January 18, 2010, the Company appealed this and other rulings that were issued in proceedings where certain evidence was dismissed. In September 2010, the First Appeals Court of the Superior Tribunal of the Federal District (*Pimera Sala del Tribunal Superior de Justicia*) accepted one of the grounds for appeal on the merits, finding a violation of certain defense rights, and ordered to restart the proceedings to gather evidence by the Company, leaving without effect the ruling on the first instance judgment and the appeal without merits.

**The Restructuring Process**

As a result of the foregoing, in February 2009, we announced our intention to restructure the outstanding Old Notes and the other Restructured Debt. We subsequently retained Rothschild Inc. as financial advisor to advise us on restructuring alternatives.

*Financial Liquidity Transactions*

In an effort to strengthen our liquidity and maintain normal operations during the restructuring process, we entered into the following transactions:

• *Bancomext Transaction.* In November 2008, through one of our subsidiaries, we contributed non–productive real estate assets with a book value of Ps. 1,875 million ($136 million), as of December 31, 2009, to a trust created for the sole purpose of selling such assets ("Bancomext Trust") if necessary in order to generate the necessary resources to pay off the principal from an $85 million credit obtained from a financial institution. As of December 31, 2008 and 2009 and June 30, 2010, the proceeds drawn against the loan were $85 million, $68 million and $68 million, respectively. On August 24, 2010, we finalized the sale of non–productive properties, amounting to US $63.8 million. The resources of such sale and $5.5 million were contributed to the trust to pay in full the balance of US $69.3 million to that date and thereby recover the property of our two corporate office buildings, which were part of the assets that were originally provided as collateral for such support.

Table of Contents

- *Refinancing of Bladex Credit Facility*. In July 2009, one of our subsidiaries refinanced a $30 million credit with Banco Latinoamericano de Exportaciones, S.A. ("Bladex") for five years. The new note has several scheduled amortizations and a final maturity date of July 30, 2014. This amount is not part of the Restructured Debt.

- *Fintech Sale and Leaseback Transaction*. In December 2009, we completed a $75 million transaction with Fintech Advisory Limited, an affiliate of Fintech ("Fintech Advisory"), through the creation of a Mexican trust (the "Real Estate Trust"). Vitro and its subsidiaries, Comercializadora Álcali, S.A. de C.V. ("Álcali"), Vidriera Guadalajara, S.A. de C.V., Vidriera Monterrey, S.A. de C.V., Vidriera Querétaro, S.A. de C.V., Vidriera Los Reyes, S.A. de C.V. and Vidriera Toluca, S.A. de C.V. contributed seven real estate assets (industrial land) to the Real Estate Trust, receiving $75 million in cash contributed by Fintech Advisory to acquire these assets. We entered into a 15 year lease agreement that allows the Company to continue using the assets. The Company has the right to repurchase the title to these real estate assets in exchange for $126 million in cash in certain circumstances. If we default on a payment under the lease agreement or if certain other specified events were to occur, Fintech Advisory will have the right to sell such assets to third parties (assuming we have not already repurchased the assets), with the exception of certain parties such as competitors or creditors. If Fintech exercises its right to sell or lease the real estate assets, this could adversely affect our business. Additionally, after the execution of a restructuring plan or agreement for the restructuring of substantially all of our financial indebtedness and the satisfaction of certain other conditions precedent, Fintech may exercise one of two options obtained on the same date to exchange the rights over the Real Estate Trust for shares of the Company and/or a sub−holding subsidiary's common shares. The option related to the common shares of the Company, if exercised, would be for up to a maximum of 93,099,849 shares that in the aggregate are currently held by the Company's Pension and Stock Option Trusts (described herein), valued in accordance with the relevant valuation formula set forth in the option agreement and would leave Fintech with up to a maximum equity stake in the Company of approximately 24%. If those common shares are not sufficient to satisfy the $75 million option purchase, the remainder of the purchase option would be fulfilled with the delivery to Fintech of the necessary shares of the sub−holding subsidiary valued in accordance with the relevant valuation formula set forth in the option agreement. Alternatively, Fintech may elect to exercise the second option, over certain shares of the sub−holding subsidiary exclusively (Only one of the two options may be exercised). Fintech's equity options expire three years after a restructuring plan or agreement for the restructuring of substantially all of our financial indebtedness is executed. The Company has the option to repurchase the sub−holding subsidiary's shares during the three years following Fintech's exercise of either option. In the event that Fintech exercises the option related to the Company's common shares, a shareholders agreement among Fintech and the Company's controlling shareholders will come into effect and would continue to be in effect as long as Fintech holds at least a 5% ownership in Vitro. Pursuant to the terms of such shareholders agreement, among other things, subject to certain limitations and qualifications, Fintech specifically agreed to vote with Mr. Adrian Sada Gonzalez, Ms. Esther Cueva de Sada, Ms. Maria Alejandra Sada Gonzalez and Mr. Adrian Sada Cueva, and the consent of such persons (including Fintech) will be required with respect to certain fundamental actions and voting matters affecting the Company. Moreover, under the shareholders agreement, Fintech and the other shareholders party thereto will be subject to certain transfer restrictions, in each case customary for a significant shareholder of a Company like ours.

- *Refinancing of Flat Glass Accounts Receivable Financing Program*. In December 2009, we refinanced our Flat Glass accounts receivable program originally due August 22, 2010. The original $21.5 million private issuance was replaced with a new issuance of Ps. 300 million ($24 million) with a five year maturity.

- *Sale of Float Glass Inventory in Mexico*. In March 2010, we refinanced a transaction involving the sale of some of our float glass inventory for approximately Ps. 250 million ($20 million) for an additional year.

26

Table of Contents

- *Covisa / Álcali Securitization Refinancing.* In April 2010, we refinanced the senior Ps. 550 million ($43 million) variable rate TIIE+ 4% bond of the accounts receivable securitization trust of our subsidiaries Covisa and Álcali for an additional two years. The remaining $10 million balance of the subordinated notes was repaid.

- *Renewal of Vitro America's Credit Lines.* In June 2010, we renewed $32.5 million of Vitro America's credit lines with Bank of America for an additional year.

- *Refinancing of Credit Lines in Spain.* In August 2010, we refinanced 44.8 million euros of credit lines of Vitro Cristalglass, our subsidiary in Spain. We have reached agreements to extend these credit lines for three years.

*Discussions with an Ad hoc Steering Committee for the Old Notes*

As part of the negotiation process in connection with the restructuring, certain Holders claiming to represent approximately 30% of the principal amount of the Old Notes formed an ad hoc committee of holders of the Old Notes, which we refer to as the "Steering Committee." We agreed to pay the fees and expenses of the legal advisors and a financial advisor to the Steering Committee. The Steering Committee subsequently retained Chanin Capital Partners as financial advisor and White & Case LLP and Heather & Heather, S.C. as legal advisors.

We have engaged in extensive negotiations with the advisors to the Steering Committee and certain members of the Steering Committee regarding the terms of the restructuring, with the Company providing an initial restructuring proposal in August 2009. The Steering Committee responded with a counterproposal in September 2009, to which the Company responded with an additional proposal in March 2010. The Steering Committee subsequently issued another counterproposal in April 2010, and we presented another proposal in July 2010 and have continued to have discussions with various members of the Steering Committee. However, we have not been able to come to an agreement regarding the final terms of the restructuring.

*Negotiations with Fintech*

In addition to our extensive negotiations with the Steering Committee, during the past two months we have been involved in active negotiations with Fintech, as a significant holder of Restructured Debt, to improve the economic terms and other terms and conditions of our prior restructuring proposal for the benefit of all holders of Restructured Debt. To that end, we held several discussions and negotiations with Fintech and its U.S. and Mexican counsel and advisors and agreed to make substantial changes to the terms and conditions of the proposed Restructuring Consideration (including the terms and conditions of the New Notes), all of which are reflected in this Statement. As a result of such negotiations and discussions, we believe that our proposed *Concurso* Plan provides for a fair recovery for holders of Restructured Debt in light of our available financial capacity and reflects our commitment to significantly deleverage our Company and return to financial soundness. In response to the favorable outcome of such negotiations and discussions, Fintech has agreed to enter into a lock–up and plan support agreement in respect of all of its Restructured Debt and to provide the financing for our offer to purchase Old Notes pursuant to the Tender Offer, subject to certain conditions and the terms of the Loan Agreement.

*Fintech Lock–up Agreement*

We have entered into a lock–up agreement with Fintech (the "Fintech Lock–Up Agreement") which provides, among other customary obligations, that (a) Fintech will cause all of Fintech's Restructured Debt to be voted in favor of acceptance of the *Concurso* Plan; (b) Fintech will submit all of its Restructured Debt for participation in the *Concurso* Plan and will receive the Restructuring Consideration in respect thereof; (c) Fintech will not participate in or support the liquidation or dissolution of Vitro, nor will it object or oppose the voluntary commencement by Vitro or certain of its subsidiaries of one of more chapter 15 or chapter 11 bankruptcy cases (provided that such cases are not inconsistent with the *Concurso* Plan and are in form and substance reasonably satisfactory to Fintech); and (d) Vitro will pay the Consent Payment in respect of all of Fintech's Restructured Debt

Table of Contents

that is voted in favor of the *Concurso* Plan (including any Old Notes purchased in the Tender Offer and delivered to Fintech as payment under the Loan Agreement).

  The Fintech Lock–Up Agreement may be terminated by either party following, among other things, a breach of that party's obligations under the Fintech Lock–Up Agreement, subject to a 30 day grace period. Following (a) any modification, amendment or supplement to the *Concurso* Plan that is prejudicial in any material respect to Fintech; (b) the rejection or reduction of Fintech's Restructuring Debt claims during the *concurso mercantil*; (c) the failure of Vitro or the Payment Trust to pay the Consent Payment on or prior to four business days following the Expiration Time; or (d) certain other events, Fintech may terminate the Fintech Lock–Up Agreement.

  The Fintech Lock–Up Agreement may also be terminated by Fintech following our failure to meet certain milestones in connection with the proposed restructuring, including the occurrence of each of the following events: (a) the Expiration Time is extended beyond December 15, 2010; (b) the *concurso mercantil* proceeding is not filed on or before the earlier of the fifteenth business day after the Expiration Time and December 31, 2010; (c) the *Concurso* Plan fails to receive the support of holders representing more than fifty percent (50%) of the aggregate amount of outstanding Restructured Debt and intercompany claims by December 15, 2011; and (d) the Mexican federal court presiding over the *concurso mercantil* proceeding does not issue a first instance ruling approving the *Concurso* Plan and the *Convenio Concursal* within sixty (60) days after the conciliation stage of the *concurso mercantil* proceeding, including any extensions, concludes, but in any event by February 15, 2012.

  The Fintech Lock–Up Agreement will automatically terminate upon the earlier to occur of (a) the date the *Convenio Concursal* becomes effective or is approved or (b) the Outside Consummation Date, which is the date that is fifteen (15) calendar days after the *Convenio Concursal* is approved by the Mexican federal court presiding over the *concurso mercantil* proceeding of the Company unless: (i) the Mexican federal court has issued an order or decree staying or legally prohibiting consummation of the *Convenio Concursal*; or (ii) (1) any appeal is pending, a potential outcome of which is the invalidation or reversal of the Mexican federal court's approval of the *Convenio Concursal* and (2) within fifteen (15) calendar days after approval by the Mexican federal court of the *Convenio Concursal*, the holders of a majority in amount of the acknowledged claims (as defined in the *Concurso* Plan, which, for the avoidance of doubt, includes all recognized intercompany debt) provide the Company with written consent to postpone consummation of the *Convenio Concursal* until the earlier of (A) the resolution of such pending appeal and (B) the date that is ten (10) months after the date the *Convenio Concursal* was approved by the Mexican federal court (the "Long–Stop Date"); provided, however, that if such appeal is not resolved prior to the Long–Stop Date, the Company will be required to effectuate consummation of the *Convenio Concursal*, unless legally prohibiting from doing so, within five (5) Business Days of the Long–Stop Date notwithstanding such appeal has not been resolved.

**Advantages of the Proposed Restructuring**

  We believe that the issuance of the New Notes in exchange for the Restructured Debt pursuant to the *Concurso* Plan provides Holders with a net present value of $835.9m, which represents a 55.2% recovery on the face value of their claims and a premium of 19.2% over the average price of the Old Notes in the last twelve months, in each case assuming (i) a 10.0% discount rate with respect to the New 2019 Notes and a 20.0% discount rate with respect to the New MCDs and (ii) pro rata treatment for alleged DFI Claims. These amounts assume that the New Notes are issued on the Value Date but exclude cash payments made as a Restructuring Cash Payment or a Consent Payment.

  If the minimum 5% Consent Payment is paid, Holders participating in the Exchange Offer and Consent Solicitation will recover 60.1% on the face value of their claims and a premium of 29.9% over the average price of the Old Notes in the last twelve months. If the maximum 10% Consent Payment is paid, Holders participating in the Exchange Offer and Consent Solicitation will recover 65.2% on the face value of their claims and a premium of 40.8% over the average price of the Old Notes in the last twelve months. These recoveries for the 5% Consent Payment and 10% Consent Payment assume the New Notes are issued on the Value Date but exclude and Restructuring Cash Payment, and in each case also assume (i) and (ii) above.

28

Table of Contents

We believe that the proposed *Concurso* Plan provides for a fair recovery for Holders in light of our available financial capacity. We believe the counterproposals submitted by the Steering Committee would require us to maintain an unviable leverage profile at levels that are much higher than those of our peers, which we believe would put us at a competitive disadvantage and would be objectionable to our customers and vendors. Moreover, we believe that the proposed *Concurso* Plan represents a significantly enhanced recovery for Holders relative to the recovery they could potentially achieve through litigation and higher than the average market price of the Old Notes for the last twelve months. For a more complete discussion of the *Concurso* Plan, see Annex A and "The Restructuring and the *Concurso* Plan." For a more complete discussion of the terms of the New Notes, see "Description of the New Notes."

We believe that the primary benefits of the restructuring through the implementation of the *Concurso* Plan to us and to you are:

- improving our ability to continue operating as a going concern and avoiding the risk of an involuntary *concurso mercantil* or U.S. bankruptcy proceeding, the outcome of which would be uncertain;

- lowering our interest payment obligations to more closely align our debt service obligations with our current and projected cash flows while giving us the flexibility to pursue advantageous refinancing opportunities in the future;

- enabling us to create a "serviceable" capital structure that will allow us to remain competitive and avoid a subsequent restructuring;

- providing for a fair recovery for our creditors in light of our available financial capacity and market conditions;

- avoiding potential contentious litigation and protracted proceedings to minimize any potential business disruption or any damage to the overall value of our business;

- deleveraging the Company to provide us with greater financial flexibility to maintain and improve our business; and

- extending the scheduled maturity dates of nearly all of our financial indebtedness to provide us with additional time to withstand the negative global economic conditions and the global downturn in the glass container, automotive and construction industries.

We believe the consummation of the restructuring through the *Concurso* Plan is beneficial to you, as a Holder, because we cannot assure you that an involuntary *concurso mercantil* or bankruptcy (*quiebra*) proceeding in Mexico or a U.S. bankruptcy proceeding would result in a more favorable outcome for you. Additionally, we believe that if we are subject to an involuntary *concurso mercantil* or *quiebra* proceeding or U.S. bankruptcy proceeding in lieu of the *Concurso* Plan, you will receive significantly less consideration for the Old Notes than you will receive if the restructuring based on the *Concurso* Plan is successful. See "—Consequences if the Proposed Restructuring Fails" below.

**Adverse Effects of the Proposed Restructuring on Holders**

In connection with the *Concurso* Plan, you will receive New 2019 Notes which will have a final maturity that is later than the final maturities for the Old Notes and an interest rate that is lower than the interest rates for the Old Notes. In addition, the Company will have the option to pay half of the interest in kind on the New 2019 Notes for the first three years and will be permitted to redeem the New 2019 Notes at any time at par (out of Excess Cash Flow, as defined in "Description of the New Notes," or the proceeds of new debt or equity financings). See "Description of the New Notes" for more information on the terms of the New Notes, including the New MCDs. Holding the New Notes involves risks, and after the restructuring, you may still receive less than the full principal amount of the New Notes.

Table of Contents

We have the requisite majority, among debt controlled by the Company, debt subject to lock–up agreements and other creditors that we believe will participate in the Exchange Offer and Consent Solicitation, to accomplish a prearranged *concurso mercantil*. Nevertheless, we are seeking the tender of the Old Notes and the consents from holders of Restructured Debt because we believe that having such holders in agreement with us on the terms of our *Concurso* Plan could expedite our reorganization process to the benefit of both such holders and us. The *Concurso* Plan set forth in Annex A, which we believe provides for a fair recovery for holders of Restructured Debt in light of our available financial capacity, represents our final restructuring proposal. We intend to commence *concurso mercantil* proceedings and proceed with filing the proposed *Concurso* Plan even if there is no tender of Old Notes and no consents of holders of Restructured Debt are received. If the *Concurso* Plan is contested or litigation is initiated, we reserve the right to terminate the Exchange Offer and Consent Solicitation and not proceed with the *Concurso* Plan. The *Convenio Concursal*, if approved and consummated, will bind all holders of Restructured Debt, regardless of whether or how they voted with respect to the *Concurso* Plan in the consent solicitation or otherwise. Therefore, we believe it is in your interest to consent to the *Concurso* Plan set forth in Annex A.

For further information, see "Risk Factors—Risk Factors Relating to Our Business—Even if our debt restructuring is successful, our indebtedness and other obligations could continue to be significant and could contain significant restrictions."

**Consequences if the Proposed Restructuring Fails**

We did not make certain interest payments described above on the Old Notes and, as the payment grace period has expired for such interest payments, the indentures governing the Old Notes provide holders of at least 25% in principal amount of the Old Notes with the right to accelerate this debt. On January 4, 2010, we received a document entitled "Notice of Acceleration of Payment" from a group of holders of the 2012 Notes and 2017 Notes, which was also addressed to the trustee under the indentures governing the 2012 Notes and the 2017 Notes. At our request, counsel to the signatories of such document stated that such signatories represented holders of 25% or more of each of the relevant series of 2012 Notes and 2017 Notes. On April 12, 2010, we also received a document entitled "Notice of Default and Acceleration" on letterhead of the trustee under the indenture governing the 2013 Notes. We are not currently able to pay the amounts due on the Old Notes. In addition, as described above, we currently owe amounts to additional creditors, including holders of certain DFI Claims and Other Debt. There can be no assurance that our creditors will not take additional legal actions against us, including instituting an involuntary *concurso mercantil* proceeding in Mexico or U.S. bankruptcy proceeding.

If we become involved in an involuntary proceeding in Mexico or the United States or a voluntary non–prepackaged proceeding in Mexico, we could not predict the duration thereof or the ability of Holders or any other creditor to influence the outcome of such proceedings. A reorganization proceeding is likely to result in significant changes to our existing obligations, including the Old Notes, which could include the cancellation or rescheduling of all or part of those obligations. During or after the pendency of any such proceeding, our ability to operate or manage our business, to retain employees, to maintain existing or create new customer relationships, to continue to collect payments for our services or to obtain any type of funding or financing would likely be significantly jeopardized and, as a result, the potential recovery for the Holders could be materially adversely affected.

In a Mexican reorganization proceeding, if we are unable to reach an agreement with the majority of our unsecured creditors, including the Holders, during the conciliation phase of the proceeding, we could be forced to enter the bankruptcy phase of a Mexican reorganization proceeding and could be subject to liquidation and ultimately be forced to sell all or substantially all of our assets. This lack of agreement could force us to operate in bankruptcy (*concurso mercantil*) for a period of time, which could materially adversely affect the relationships between us and our customers, suppliers and employees. See "The Mexican Law of Commercial Reorganizations" for a further description of a Mexican reorganization proceeding. As a result of the downturn in the global market, we expect that the proceeds from any potential liquidation and sale of our assets would not be sufficient to satisfy all of our obligations to you, and would result in a net recovery to you that is projected to be substantially less than you would receive pursuant to the *Concurso* Plan. See "Risk Factors—Risk Factors Relating to the *Concurso* Plan—If we or the Mexican Guarantors were to be declared bankrupt, holders of the New Notes may find it difficult to collect payment on the New Notes."

30

Table of Contents

**Recent Developments**

*Earthquake in Mexicali temporarily affected our facility*

In April 2010, our flat glass facility in Mexicali and the inventories in that plant sustained damage as a result of an earthquake. The plant resumed normal operations in 7 days. The Company is working to recover the amount of the damages through the insurance companies.

*Temporary Suspension of Operations at Manufacturing Facilities in García, Nuevo León*

On July 1, 2010, our manufacturing facilities in the Municipality of García in Nuevo León, Mexico were affected as a result of the severe flooding and damage caused by Hurricane Alex. Our float glass manufacturing and automotive processing facilities and our facilities at Álcali suffered significant damage and were forced to temporarily suspend operations. In particular:

- two of our four automotive glass manufacturing facilities (both located in García) were affected by this event; however, because of current inventory levels and measures taken to restore production in the succeeding days, we were able to minimize the impact on our original equipment manufacturer ("OEM") clients and auto glass replacement clients;

- two of our three float glass manufacturing facilities (both located in García) were also affected by this event; one of the affected facilities resumed normal operations initially in the last week of July; however, its operations were temporarily suspended due to stability issues and it resumed full operations again in the last week of August; the other affected facility is expected to resume operations in October; our float glass facility in Mexicali, which is currently operating at 100% capacity, is temporarily supplying glass to our OEM glass processing plants; and

- our facilities at Álcali suspended operations for a few days and a portion of Álcali's end-product, raw material and packaging inventories were damaged; however, we were able to minimize the impact on our clients by working jointly to supply only the minimal amount necessary for them to continue operating.

We have not yet determined the full impact on our operating results of the damage caused by Hurricane Alex. We expect such damages will be covered by insurance less any applicable deductibles; however, we can provide no assurance as to the amount and timing of such recovery. See "Risk Factors—Risk Factors Relating to Economies in Which We Participate—Our operations may be adversely affected by earthquakes, hurricanes or some other natural disaster that could have an effect on our service to clients."

**Table of Contents**

## THE TENDER OFFER

The Tender Offer

We are offering to purchase your Old Notes upon the terms and subject to the conditions set forth in this Statement. The Old Notes were issued by and are the obligations of Vitro.

Notes Subject to the Tender Offer

We are making a tender offer for the maximum aggregate principal amount of Vitro's 2012, 2013 and 2017 Notes that we can purchase for $100,000,000 (subject to increase as described below, the "Maximum Payment Amount") at a purchase price per $1,000 principal amount determined in accordance with the procedures set forth below. We reserve the right, but are not obligated, to increase the Maximum Payment Amount by up to 30% without permitting holders to withdraw Old Notes that have been previously tendered in the Tender Offer. Our obligation to accept Old Notes in the Tender Offer and pay the Tender Offer Consideration is conditioned on the satisfaction or waiver of the conditions set forth in the section titled "The Tender Offer—Conditions to the Tender Offer" in this Statement. The Tender Offer is not conditioned on any minimum amount of Old Notes being tendered.

Because the size of the Tender Offer is limited (as described below), holders that tender Old Notes in the Tender Offer will be required to specify whether, if their Old Notes are not accepted in the Tender Offer, they elect to submit Old Notes that are tendered but not accepted for payment in the Tender Offer for exchange in the Exchange Offer and Consent Solicitation. Holders that tender Old Notes in the Tender Offer but fail to specify their election will be deemed to have elected not to submit Old Notes that are tendered but not accepted for payment in the Tender Offer for exchange in the Exchange Offer and Consent Solicitation. Old Notes that are tendered in the Tender Offer but not accepted will be returned to the DTC Participant that tendered them promptly following the Expiration Time unless their holder has elected to submit them for exchange in the Exchange Offer and Consent Solicitation if they are not accepted in the Tender Offer.

The following table sets forth, for each series of Old Notes, the security description for the Notes, the CUSIP number and the aggregate principal amount outstanding for that series of Old Notes:

| Security Description | CUSIP | Outstanding Principal Amount |
|---|---|---|
| 8.625% Senior Notes due 2012 | 92851RAC1 | $300,000,000 |
| 11.75% Senior Notes due 2013 | 92851FAD5 | $216,000,000 |
| 9.125% Senior Notes due 2017 | 92851RAD9 | $700,000,000 |

Tender Offer Consideration

The "Tender Offer Consideration" for each $1,000 principal amount of Old Notes validly tendered pursuant to the Tender Offer on or prior to the Expiration Time and accepted for purchase by us (subject to proration) will be equal to the Clearing Price determined pursuant to a modified "Dutch Auction" as described herein.

32

**Table of Contents**

Holders must validly tender their Old Notes on or prior to the Expiration Time in order to be eligible to receive the Tender Offer Consideration.

Submitting a Bid Price

The Tender Offer is being conducted as a modified "Dutch Auction." This means that if a holder elects to participate, they must specify a Bid Price, which is the minimum Tender Offer Consideration they would be willing to receive in exchange for each $1,000 principal amount of Old Notes they choose to tender in the Tender Offer. The Bid Price that the holder specifies for each $1,000 principal amount of Old Notes may not be less than the Minimum Bid Price ($500) nor more than the Maximum Bid Price ($575). As a result, the Bid Price the holder specifies must be within the following range:

| | |
|---|---|
| **Minimum Bid Price** | $500 |
| **Maximum Bid Price** | $575 |

**Tenders of Old Notes outside of this range will not be accepted and will not be used for purposes of calculating the Clearing Price as described below.**

Bid Prices between the Minimum Bid Price and the Maximum Bid Price must be in minimum increments of $2.50 above $500. If any Bid Price is not submitted in a whole increment of $2.50, such Bid Price will be rounded down to the nearest $2.50 increment.

Each holder tendering Old Notes in the Tender Offer is to submit a Bid Price; holders who tender Old Notes without specifying a Bid Price will be deemed to have specified the Minimum Bid Price ($500) as their Bid Price.

Determination of Tender Offer Consideration

Whether and to what extent your tendered Old Notes are accepted for purchase in the Tender Offer will depend upon how the Bid Price specified by you compares to Bid Prices specified by other tendering holders of Old Notes, regardless of series. Specifically, on the Expiration Time:

- we will use all the Bid Prices received across all series of Old Notes to calculate a single Clearing Price in accordance with the procedure set forth below; and

- the Tender Offer Consideration payable for Old Notes accepted in the Tender Offer will be the Clearing Price.

The Tender Offer Consideration for all Old Notes, of all series, will be the same.

Holders whose Old Notes are accepted in the Tender Offer will not receive any payment in respect of accrued and unpaid interest on the Old Notes.

33

**Table of Contents**

| | |
|---|---|
| Clearing Price | The "Clearing Price" for the Old Notes will be determined by consideration of the Bid Prices of all validly tendered Old Notes of all series, in order of lowest to highest Bid Prices. The Clearing Price will be: |

- the lowest single price for all tenders of Old Notes of all series such that, for all tenders of Old Notes of all series whose Bid Price is equal to or less than this lowest single price, we will be able to spend the Maximum Payment Amount under the Tender Offer, taking into account the Tender Offer Consideration and the proration described in the next paragraph (provided, however, that if the principal amount of Old Notes purchased at the Clearing Price that results from applying this formula and the proration described in the next paragraph would be less than the principal amount of the Old Notes that would be purchased using the Bid Price next lowest to such lowest single price, then the Clearing Price will be equal to such next lowest Bid Price), or

- except in the case described in the proviso in the previous bullet point, in the event that the purchase of all Old Notes validly tendered would result in us spending less than the Maximum Payment Amount under the Tender Offer, the Clearing Price will be the Maximum Bid Price.

| | |
|---|---|
| Proration | If the amount of Old Notes validly tendered on or prior to the Expiration Time with a Bid Price equal to or less than the Clearing Price would cause us to spend more than the Maximum Payment Amount to repurchase such tendered Old Notes in the Tender Offer, then the Tender Offer will be oversubscribed, and we will accept for payment such tendered Old Notes as follows. |

- First, we will accept for payment all Old Notes validly tendered with a Bid Price less than the Clearing Price (to the extent such acceptance would not result in a payment in respect of the Tender Offer in excess of the Maximum Payment Amount).

- Second, we will accept for payment all Old Notes validly tendered with a Bid Price equal to the Clearing Price (to the extent such acceptance would not result in a payment in respect of the Tender Offer in excess of the Maximum Payment Amount) on a prorated basis using a single proration factor.

**All Old Notes not accepted as a result of proration and all tenders of Old Notes with a Bid Price in excess of the Clearing Price will be rejected from the Tender Offer.**

To avoid purchases of Old Notes in principal amounts other than integral multiples of $1,000, we will make appropriate adjustments downward to the nearest $1,000 principal amount with respect to each holder validly tendering Old Notes at a Bid Price equal to the Clearing Price. For series of Old Notes that have a minimum denomination of $2,000, the Company reserves the right to further adjust the amount of Old Notes of the relevant series that would otherwise be accepted from

34

**Table of Contents**

a given holder downward by $1,000 principal amount if an impermissible denomination of outstanding Old Notes would otherwise result.

| | |
|---|---|
| Maximum Payment Amount | We will pay for the Old Notes purchased in the Tender Offer in cash. The Maximum Payment Amount of cash we will use to pay the Tender Offer Consideration for Old Notes purchased pursuant to the Tender Offer is $100,000,000 (subject to the next succeeding paragraph). We reserve the right, but are not obligated, to increase the Maximum Payment Amount by up to 30% without permitting holders to withdraw Old Notes that have been previously tendered in the Tender Offer. |
| | We will announce any increase in the Maximum Payment Amount in the Tender Offer by a press release during the pendency of the Tender Offer. If the Maximum Payment Amount is increased and there are fewer than ten business days until the scheduled Expiration Time, we will extend the Tender Offer so that at least ten business days remain until the Expiration Time. |
| Source of Funds | We expect to obtain the funds required to consummate the Tender Offer with the net proceeds of the Loan Agreement. We will cause the Old Notes that are accepted in the Tender Offer to be delivered to Fintech as payment for AIV's obligations under the Loan Agreement. Fintech will be permitted to exchange Old Notes it receives as a result in the *Concurso* Plan and receive a related consent payment. See "The Tender Offer—Source and Amount of Funds." |
| Expiration Time | The Tender Offer will expire at 9:00 a.m., New York City time, on December 1, 2010, unless extended by us. We expressly reserve the right, subject to applicable law, to terminate the Tender Offer at any time prior to the Expiration Time. |
| No Withdrawal Rights | Any tenders of Old Notes in the Tender Offer are irrevocable and may not be withdrawn. |
| Payment Date | The payment date for the Tender Offer will occur promptly following the Expiration Time. The Tender Offer Consideration will be payable on such date. |
| Conditions to the Tender Offer | Our obligation to accept Old Notes in the Tender Offer and pay the Tender Offer Consideration is conditioned on the satisfaction or waiver of the conditions set forth in the section titled "The Tender Offer—Conditions to the Tender Offer" in this Statement. |
| Procedure for Tendering | All of the Old Notes are held in book-entry form through the facilities of DTC. If you own Old Notes and wish to tender them in the Tender Offer, you should follow the instructions below. |
| | If you hold your Old Notes in a brokerage or custodian account through a custodian or nominee, including a broker, dealer, bank or trust company, you will need to timely instruct your custodian or nominee to tender your Old Notes on or prior to the Expiration Time (in order to receive the Tender Offer Consideration), in the manner described below and upon the terms and conditions set forth in this Statement and the Letter of Transmittal. Please refer to any materials forwarded to you by your custodian or nominee to determine how you can timely instruct your custodian or nominee to take these actions. |

35

**Table of Contents**

In order to participate in the Tender Offer, you must instruct your nominee or custodian to participate on your behalf. Your nominee or custodian should arrange for the DTC Participant holding the Old Notes through its DTC account to tender those Old Notes in the Tender Offer to the Depositary prior to the Expiration Time.

The Tender Offer is being conducted using DTC's ATOP procedures. Accordingly, DTC Participants holding Old Notes through DTC should note that before completing, executing and delivering the Letter of Transmittal, DTC Participants must tender their Old Notes in the Tender Offer in accordance with DTC's ATOP procedures. Since all Old Notes must be tendered by book–entry transfer to the applicable DTC account of the Depositary, your broker, dealer, trust company, or other nominee must execute the tender or exchange through ATOP. Financial institutions that are DTC Participants must execute tenders and exchanges through ATOP by transmitting acceptance of the Tender Offer to DTC on or prior to the Expiration Time.

DTC will verify acceptance of the Tender Offer, execute a book–entry transfer of the tendered Old Notes into the applicable DTC account of the Depositary and send to the Depositary a "book–entry confirmation," which shall include a message (the "Agent's Message") transmitted by DTC to and received by the Depositary and forming part of a book–entry confirmation, which states that DTC has received an express acknowledgment from a DTC Participant tendering that the DTC Participant has received and agrees to be bound by the terms of the Letter of Transmittal as a signatory thereof and that the Company, AIV and their transferees may enforce such agreement against the DTC Participant.

In addition, each DTC Participant must deliver a separate executed, notarized and apostilled and properly completed Letter of Transmittal and other required documentation to the Depositary on behalf of each beneficial owner for whom it holds Old Notes. See "The Tender Offer—Procedure for Tendering Old Notes."

Depositary

D.F. King & Co., Inc.

Taxation

For a summary of certain U.S. federal income tax consequences of the disposition of Old Notes pursuant to the Tender Offer, see "Certain U.S. Federal Income Tax Considerations." For a summary of certain Mexican federal income tax consequences of the disposition of Old Notes pursuant to the Tender Offer, see "Material Mexican Tax Considerations."

Further Information

Any questions or requests for assistance concerning the Tender Offer may be directed to the Depositary at the telephone number and address set forth on the back cover of this Statement. Additional copies of this Statement, the Letter of Transmittal and the Letter of Instructions may be obtained by contacting the Depositary at the telephone number and address set forth on the back cover of this Statement. Beneficial owners may also contact their broker, dealer, commercial bank, trust company or other nominee through which they hold the Old Notes with questions and requests for assistance.

36

Table of Contents

### The Exchange Offer and Consent Solicitation

| | |
|---|---|
| The Exchange Offer and Consent Solicitation | We are proposing an exchange offer and soliciting consents to the *Concurso* Plan, pursuant to which we would exchange the Restructured Debt for the Restructuring Consideration on a pro rata basis. For every $1,000 principal amount of the Restructured Debt exchanged, holders are entitled to receive $561 principal amount of New 2019 Notes, $66 principal amount of New MCDs (not including the Issue Date Adjustment) and a portion of the Restructuring Cash Payment on a pro rata basis (depending on how many holders consent) and a portion of the Restructuring Fee on a pro rata basis (depending on the Issue Date). The proposed *Concurso* Plan is set forth in Annex A, as summarized in "The Restructuring and the *Concurso* Plan" in this Statement. For a description of the New Notes, see "—The New Notes" below and "Description of the New Notes." |
| Notes for Which We Are Seeking Consents | We are seeking the exchange of Old Notes and consent of Holders of the 2012 Notes, the 2013 Notes and the 2017 Notes and holders of the DFI Claims, including the Promissory Notes, and Other Debt. Information on the Old Notes is set forth below. |

| Series | Outstanding Amount | CUSIP Number | ISIN Number |
|---|---|---|---|
| 2012 Notes | $300,000,000 | 92851RAC1 | US92851RAC16 |
| 2013 Notes | $216,000,000 | 92851FAD5 | US92851FAD50 |
| 2017 Notes | $700,000,000 | 92851RAD9 | US92851RAD98 |

| | |
|---|---|
| Consideration Offered in the Consent Solicitation | The Payment Trust will pay a consent payment in an amount (to be determined as described herein) of no less than 5% and no greater than 10% of the aggregate principal amount of Restructured Debt held by the holder of such Restructured Debt for which a consent is provided prior to the Expiration Time specified below. This Consent Payment will be paid from the Payment Trust to Participating Creditors no later than 4 business days following the Expiration Time. |
| Source of Funds | The Information and Exchange Agent will act as agent for the consenting Holders for the purpose of receiving the Note Consent Payment and transmitting such payments for the Note Consent Payment to the consenting Holders. Thus, the Company will cause the Payment Trust to deposit same–day funds in payment of the Note Consent Payment with the Information and Exchange Agent following the Expiration Time. The Consent Payment will be made no later than the Consent Payment Date. Under no circumstances will any additional interest be payable by the Company because of any delay in the transmission of funds from the Information and Exchange Agent to the consenting Holders. See "The Exchange Offer and Consent Solicitation—Acceptance for Payment of Note Consent Payment; Source of Funds." |

**Table of Contents**

| | |
|---|---|
| Expiration Time | The Exchange Offer and Consent Solicitation will expire at 9:00 a.m., New York City time, on December 1, 2010, unless extended or earlier terminated. We may in our sole discretion (subject to applicable law) terminate, prior to the Expiration Time, the Exchange Offer and Consent Solicitation described herein. |
| Withdrawal Rights | Any Old Notes tendered or consents provided after the date of this Statement are irrevocable and may not be withdrawn, except (i) in the event we amend the Exchange Offer and Consent Solicitation in a manner that is materially adverse to holders of Restructured Debt, (ii) as required by applicable law, (iii) in the event the *concurso mercantil* proceeding of the Company is not filed on or before December 31, 2010, (iv) if the Issue Date does not occur on or before the Outside Consummation Date (as defined herein) or (v) if the proposed *Concurso* Plan is amended in a manner that would have a material adverse effect on holders of the Old Notes. |
| Certain Terms and Conditions of the Exchange Offer and Consent Solicitation | As described in this Statement, Vitro will, and certain of the Old Guarantors may, file for *concurso mercantil* proceedings and will submit the *Concurso* Plan to the Mexican bankruptcy court and other parties of the *concurso mercantil* proceeding. Commencement of the *concurso mercantil* proceedings and approval of the *Concurso* Plan in the *concurso mercantil* may still occur even if there is no tender of Old Notes and no consents of holders of Restructured Debt are received. For more information about the terms of the Exchange Offer and Consent Solicitation, see "The Exchange Offer and Consent Solicitation—Certain Terms and Conditions of the Exchange Offer and Consent Solicitation." For more information about *concurso mercantil* proceedings under Mexican law, see "The Mexican Law of Commercial Reorganizations." |
| | The delivery and payment of the Restructuring Consideration pursuant to the *Concurso* Plan is subject to, among other things, the approval of the *Convenio Concursal*. For more information about conditions to the delivery and payment of the Restructuring Consideration, see "The Exchange Offer and Consent Solicitation—Condition to Delivery and Payment of the Restructuring Consideration." |
| Procedure for Exchanging and Consenting | Beneficial owners who hold Old Notes in a brokerage or custodian account through a custodian or nominee, including a broker, dealer, bank or trust company, will need to timely instruct their custodian or nominee to submit their Old Notes for exchange on or prior to the Expiration Time (in order to receive the Note Consent Payment), in the manner described below and upon the terms and conditions set forth in this Statement and the Letter of Transmittal. Beneficial owners should refer to any materials forwarded by the custodian or nominee to determine how they can timely instruct their custodian or nominee to take these actions. |

38

Table of Contents

In order to participate in the Exchange Offer and Consent Solicitation, beneficial owners must instruct their nominee or custodian to participate on their behalf. Each beneficial owner's nominee or custodian should arrange for the DTC Participant holding the Old Notes through its DTC account to submit those Old Notes for exchange in the Exchange Offer and Consent Solicitation to the Information and Exchange Agent prior to the Expiration Time.

In addition to instructing the DTC Participant to submit Old Notes for exchange pursuant to the procedure set forth in "The Exchange Offer and Consent Solicitation—Procedure for Exchanging Old Notes" and —Procedure for Consenting to the *Concurso* Plan," the beneficial owner must instruct the DTC Participant to (A) properly complete and duly execute the Power of Attorney in the form attached to the Letter of Transmittal authorizing or appointing the representative to carry out all necessary or expedient steps required or advisable under Mexican law to submit the Letter of Transmittal before the Mexican court within the *concurso mercantil* proceeding, to join and adhere to any *concurso mercantil* to be filed by the Company and to execute and consent to the *Concurso* Plan and (B) properly execute and notarize the signature to the *Concurso* Plan attached to the Letter of Transmittal.

The Exchange Offer and Consent Solicitation is being conducted using DTC's ATOP procedures. Accordingly, DTC Participants holding Old Notes through DTC should note that before completing, executing and delivering the Letter of Transmittal, DTC Participants must submit their Old Notes for exchange in the Exchange Offer and Consent Solicitation in accordance with DTC's ATOP procedures. Since all Old Notes must be exchanged by book−entry transfer to the applicable DTC account of the Information and Exchange Agent, the beneficial owner's bank, broker, dealer, trust company, or other nominee must execute exchange through ATOP. Financial institutions that are DTC Participants must execute exchanges through ATOP by transmitting acceptance of the Exchange Offer and Consent Solicitation to DTC on or prior to the Expiration Time.

DTC will verify acceptance of the Exchange Offer and Consent Solicitation, execute a book−entry transfer of the exchanged Old Notes into the applicable DTC account of the Information and Exchange Agent, and send to the Information and Exchange Agent a "book−entry confirmation," which shall include an Agent's Message transmitted by DTC to and received by the Information and Exchange Agent and forming part of a book−entry confirmation, which states that DTC has received an express acknowledgment from a DTC Participant exchanging Old Notes that the DTC Participant has received and agrees to be bound by the terms of the Letter of Transmittal as a signatory thereof and that the Company may enforce such agreement against the DTC Participant.

In addition, each DTC Participant must deliver a separate executed, notarized and apostilled and properly completed Letter of Transmittal and other required documentation to the Information and Exchange Agent on behalf of each beneficial owner for whom it holds Old Notes. See "The Exchange Offer and Consent Solicitation—Procedure for Exchanging Old Notes."

39

| | |
|---|---|
| Consequences to Holders of Restructured Debt Not Consenting | We have the requisite majority, among debt controlled by the Company, debt subject to lock—up agreements and other creditors that we believe will participate in the Exchange Offer and Consent Solicitation, to accomplish a prearranged *concurso mercantil*. Nevertheless, we are seeking the tender of the Old Notes and the consents from holders of Restructured Debt because we believe that having such holders in agreement with us on the terms of our *Concurso* Plan could expedite our reorganization process to the benefit of both such holders and us. The *Concurso* Plan set forth in Annex A, which we believe provides for a fair recovery for holders of Restructured Debt in light of our available financial capacity, represents our final restructuring proposal. We intend to commence *concurso mercantil* proceedings and proceed with filing the proposed *Concurso* Plan even if there is no tender of Old Notes and no consents of holders of Restructured Debt are received. If the *Concurso* Plan is contested or litigation is initiated, we reserve the right to terminate the Exchange Offer and Consent Solicitation and not proceed with the *Concurso* Plan. The *Convenio Concursal*, if approved and consummated, will bind all holders of Restructured Debt, regardless of whether or how they voted with respect to the *Concurso* Plan in the consent solicitation or otherwise. Therefore, we believe it is in your interest to consent to the *Concurso* Plan set forth in Annex A. |
| Information and Exchange Agent | D.F. King & Co., Inc. |
| Payment Trust | A trust organized under the laws of Mexico has been created and funded to hold the Consent Payment and the Restructuring Cash Payment in escrow pending the approval and consummation of the *Concurso* Plan. |
| Use of Proceeds | We will not realize any proceeds from the Exchange Offer and Consent Solicitation. |
| Certain U.S. Federal Income Tax Considerations | See the discussion herein under the heading "Certain U.S. Federal Income Tax Considerations" for a discussion of the tax consequences of the exchange of Old Notes for the Restructuring Consideration and Note Consent Payment. The exchange of a class of Old Notes for the Restructuring Consideration will be a taxable event for U.S. federal income tax purposes unless it qualifies as a recapitalization. If the exchange is a taxable event, U.S. Holders will be required to pay current tax on any gain resulting from the exchange. The U.S. Federal income tax treatment in connection with receipt of the Note Consent Payment is unclear. The Note Consent Payment may give rise to ordinary taxable income for a U.S. Holder even if the exchange qualifies as a recapitalization or the Holder would otherwise recognize a loss on the exchange. The New Notes will likely be treated as issued with original issue discount and may be subject to special rules applicable to contingent payment debt instruments. These rules could result in U.S. Holders being required to include amounts in taxable income in advance of the receipt of cash payments.

The United States Federal income tax consequences associated with exchanging Restructured Debt for the Restructuring Consideration, receiving the Note Consent Payment, and of owning the New Notes is very complex. U.S. Holders should consult their own tax advisers as to the United States Federal income tax consequences to them of granting |

Table of Contents

their consent, and of the ownership and disposition of the New Notes, including the application of the tax considerations discussed in this Statement to their particular situations, as well as the application of state, local, foreign or other tax laws.

See "Certain U.S. Federal Income Tax Considerations" for a discussion of the tax consequences of the disposition of Old Notes pursuant to the Tender Offer.

| Material Mexican Federal Tax Considerations | Under Mexican tax law, consent payments made to Foreign Holders (as defined under "Material Mexican Federal Tax Considerations—Mexican Income Tax Considerations" below) of the Old Notes will be considered to qualify as "interest" for Mexican tax purposes, as they will be viewed as a yield under the Old Notes, and therefore the tax treatment described below in "Material Mexican Federal Tax Considerations—Note Consent Payment; Payment of Interest, Principal and Premium in Respect of the New Notes" will be applicable to such payments. |
|---|---|

The summary of Mexican federal tax considerations provided in this Statement is based on the federal tax laws of Mexico (including the tax treaties described in "Material Mexican Federal Tax Considerations—Tax Treaties") as in effect on the date hereof, as well as on the rules and regulations of Mexico available on or before such date and now in effect. All of the foregoing is subject to change, which change could affect the continued validity of this summary. In addition you should be aware that the federal tax laws of Mexico, the tax treaties and the rules and regulations thereunder may have changed at the time of issuance of the New Notes, and such change could affect the continued validity of the summary contained in this Statement.

Holders to whom this Statement is addressed and any persons that may acquire the New Notes should consult their own tax advisers as to the Mexican or other tax consequences of granting their consent, and of the ownership and disposition of the New Notes, including the application of the tax considerations discussed in this Statement to their particular situations, as well as the application of state, local, foreign or other tax laws.

| Further Information | Any questions or requests for assistance concerning the Exchange Offer and Consent Solicitation may be directed to the Information and Exchange Agent at the address and telephone numbers set forth on the back cover of this Statement. Additional copies of this Statement, the Letter of Transmittal and the Letter of Instructions may be obtained by contacting the Information and Exchange Agent at the address and telephone numbers set forth on the back cover of this Statement. Beneficial owners may also contact their broker, dealer, commercial bank, trust company or other nominee through which they hold the Old Notes with questions and requests for assistance. |
|---|---|

**Table of Contents**

## The New Notes
### I. The New 2019 Notes

| | |
|---|---|
| New 2019 Notes | The New 2019 Notes will be issued to recognized creditors in the *concurso* proceedings. |
| Issuer | Vitro |
| Principal Amount | $850.0 million |
| Value Date and Restructuring Fee | Regardless of the date of issuance and date of delivery of the New Notes pursuant to the *Concurso* Plan, the maturity date, amortization provisions and other relevant terms and conditions of the New Notes will be based on a value date of January 1, 2011 (the "Value Date"). On the date of issuance, Vitro will pay holders a one time restructuring fee equal to an annualized return of 8.00% on the aggregate principal amount of the New 2019 Notes, calculated for the period from the Value Date to the date of issuance (the "New 2019 Notes Restructuring Fee"). |
| Interest | Fixed interest rate, payable semi–annually in arrears on each June 30th and December 31st, commencing with the first such date immediately following the Issue Date, will accrue on the New 2019 Notes in accordance with the following grid: |

| Year | Total Interest Rate | Per Annum Cash Rate | Per Annum PIK Rate |
|---|---|---|---|
| Year 1 | 8.0% | 8.0% or 4.0% if PIK Option elected | 4.0% if elected |
| Year 2 | 8.0% | 8.0% or 4.0% if PIK Option elected | 4.0% if elected |
| Year 3 | 8.0% | 8.0% or 4.0% if PIK Option elected | 4.0% if elected |
| Year 4 | 8.0% | 8.0% | None |
| Year 5 | 8.0% | 8.0% | None |
| Year 6 | 8.0% | 8.0% | None |
| Year 7 | 8.0% | 8.0% | None |
| Year 8 | 8.0% | 8.0% | None |

Interest that is elected to be paid in kind will be added to the outstanding principal amount (the "Additional PIK Principal") of the New 2019 Notes, and shall be considered principal for all purposes, and without limiting the foregoing, the Additional PIK Principal of the New 2019 Notes shall bear interest at the rate then applicable to the New 2019 Notes, beginning on the date such interest is paid in kind and added to the principal amount thereof. The Company may only elect to pay interest in kind (the "PIK Option") if certain conditions described in "Description of the New Notes—New 2019 Notes—Principal, Maturity and Interest" are met. In the event that

42

**Table of Contents**

the Company exercises the PIK Option, certain consequences and restrictions on the Company will apply, as described in "Description of the New Notes—New 2019 Notes—Principal, Maturity and Interest."

All interest shall be computed on the basis of a year of 360 days consisting of twelve 30–day months.

| | |
|---|---|
| Maturity Date | Eight years after the Value Date. |
| Amortization | The amortization of the New 2019 Notes is payable at the end of each year on the immediately preceding regular record date, upon the following schedule: |

Year 1: None
Year 2: None
Year 3: None
Year 4: None
Year 5: June 30, 2015 — $12,500,000
       December 31, 2015 — $12,500,000
Year 6: June 30, 2016 — $12,500,000
       December 31, 2016 –– $12,500,000
Year 7: June 30, 2017 — $12,500,000
       December 31, 2017 — $12,500,000
Year 8: Balance at maturity.

| | |
|---|---|
| Guarantors | The obligations of the Company pursuant to the New 2019 Notes, including any repurchase obligation resulting from a Change of Control and other mandatory prepayment provisions under the New 2019 Notes, will be unconditionally guaranteed, jointly and severally, on an unsecured basis, by the Guarantors. Each Guarantor will provide a guarantee of the New 2019 Notes on the Issue Date. See "Description of the New Notes—New 2019 Notes—Guaranties." |
| Change of Control | Following a Change of Control, holders of the New 2019 Notes will have the right to put their New 2019 Notes to Vitro at 101% of the aggregate principal amount of the New 2019 Notes, plus accrued and unpaid interest to the date of repayment. |
| Excess Cash Sweep | In the event that the yield–to–maturity of the New Notes is equal to or higher than 9%, Vitro will annually apply 70% of Excess Cash Flow to repurchase New Notes through market purchases or prepay the New Notes. In the event that the yield–to–maturity of the New Notes is lower than 9%, Vitro will annually apply 50% of Excess Cash Flow to repurchase New Notes through market purchases or prepay the New Notes. See "Description of the New Notes—Provisions Applicable to All of the New Notes—Excess Cash Sweep." |
| | 30% or 50% of the Excess Cash Flow, as applicable, can be used at Vitro's discretion for general corporate purposes and optional redemptions of its New Notes, subject to the covenant described under "Description of the New Notes—New 2019 Notes—Certain Covenants—Limitation on Restricted Payments." |

43

**Table of Contents**

| | |
|---|---|
| Optional Redemption | Redemptions of New 2019 Notes may be made by Vitro at any time and from time to time at a redemption price equal to par plus accrued interest thereon. |
| | See "Description of the New Notes—New 2019 Notes—Optional Redemption." |
| Mandatory Redemption | The New 2019 Notes are subject to mandatory redemption upon an equity issuance by Vitro if certain conditions are met. See "Description of the New Notes—Provisions Applicable to All of the New Notes—Mandatory Redemption." |
| Certain Covenants | The indenture governing the New 2019 Notes (the "New 2019 Notes Indenture" and, together with the indenture governing the New MCDs, the "New Indentures") will contain covenants limiting our ability and our subsidiaries' ability to: |

- incur additional debt or issue subsidiary preferred stock or stock with a mandatory redemption feature before the maturity of the New 2019 Notes;

- create, acquire or participate in strategic joint ventures;

- pay dividends on our capital stock;

- redeem or repurchase capital stock or prepay or repurchase subordinated debt;

- make some types of investments and sell assets;

- create liens;

- engage in transactions with affiliates, except on an arm's–length basis;

- enter into hedging agreements;

- enter into sale and leaseback transactions;

- make certain capital expenditures; and

- consolidate or merge with, or sell substantially all our assets to, another person.

In addition, under the terms of the New 2019 Notes, we will be required to assign all of our intercompany debt to a voting trust pursuant to which all such intercompany debt will be voted by the trustee of such trust (at the instruction of a majority of third party creditors) in the event of a subsequent *concurso mercantil* or other similar insolvency proceeding involving us and/or our subsidiaries. Certain other restrictions will apply to our intercompany debt. See "Description of the New Notes—New 2019 Notes—Certain Covenants—Limitation on Intercompany Debt."

44

**Table of Contents**

|  |  |
|---|---|
|  | See "Description of the New Notes—New 2019 Notes—Certain Covenants" for a description of these covenants. |
| Events of Default | For a discussion of certain events of default that will permit acceleration of the principal of the New 2019 Notes plus accrued interest, see "Description of the New Notes—New 2019 Notes—Default and Remedies." |
| Ratings | We intend to obtain ratings for the New 2019 Notes. |
| Trustee | The Bank of New York Mellon will act as trustee (the "Trustee") for the New 2019 Notes. |
| Paying Agent | The Trustee will initially act as the Paying Agent. |
| Exchange Agent | New 2019 Notes issued pursuant to the *Concurso* Plan will be issued in exchange for the Old Notes through a U.S.–based exchange agent that will be appointed by Vitro prior to the issuance of the New 2019 Notes. |
| Transferability | We are making the Exchange Offer and Consent Solicitation in accordance with Section 3(a)(9) of the Securities Act, which will result in the New Notes being freely transferable, like the Old Notes, when issued in exchange for the Old Notes. Upon filing of our *concurso mercantil* petition, we intend to seek an order of a bankruptcy judge in connection with a bankruptcy proceeding whether pursuant to chapter 11 of the U.S. Bankruptcy Code or an ancillary proceeding pursuant to chapter 15 of the U.S. Bankruptcy Code providing an exemption from registration under the Securities Act and applicable state and local laws requiring registration of securities with respect to the New Notes issued under the *Concurso* Plan in exchange for all of the Restructured Debt. We cannot provide any assurance that we will be successful in obtaining such an order. If we do not obtain such an order, the New Notes issued in exchange for the DFI Claims and Other Debt will be subject to certain transfer restrictions. See "Description of the New Notes—Certain Transfer Restrictions." |

### II. The New MCDs

|  |  |
|---|---|
| New MCDs | The New MCDs (*obligaciones convertibles en acciones*) will be issued to recognized creditors in the *concurso* proceedings. |
| Issuer | Vitro |
| Principal Amount | $100.0 million, plus the Issue Date Adjustment described below. |
| Issue Date Adjustment | On the date of issuance, Vitro will adjust and increase the principal amount of the New MCDs by an aggregate amount equal to a one time restructuring fee equal to an annualized return of 10.50% (on $100 million principal amount) calculated for the period from the Value Date to the date of issuance (the "Issue Date Adjustment"). |

45

**Table of Contents**

| Interest | Fixed interest rate, payable annually in kind in arrears will accrue on the New MCDs in accordance with the following grid: |
|---|---|

| Year | Per Annum PIK Rate |
|---|---|
| Year 1 | 10.50% |
| Year 2 | 10.50% |
| Year 3 | 10.50% |
| Year 4 | 10.50% |
| Year 5 | 10.50% |

All accrued interest will be added to the Additional PIK Principal of the New MCDs, and shall be considered principal for all purposes, and without limiting the foregoing, the Additional PIK Principal of the New MCDs shall bear interest at the rate then applicable to the New MCDs, beginning on the date such interest is paid in kind and added to the principal amount thereof.

All interest shall be computed on the basis of a year of 360 days consisting of twelve 30–day months.

| Maturity Date | Five years after the Value Date. |
|---|---|
| Mandatory Conversion | The New MCDs will be mandatorily convertible into common shares or Ordinary Participation Certificates *(Certificados de Participacion Ordinaria,* or "CPOs") of Vitro representing in aggregate 15.0% of our equity on a fully diluted basis if the New MCDs are not repaid at maturity or upon the occurrence and continuation of certain events of default. For more information regarding the CPOs, see "Description of the CPOs." |
| Amortization | None |
| Guarantors | None |
| Change of Control | Following a Change of Control, holders of the New MCDs will have the right to put their New MCDs to Vitro at 101% of the aggregate principal amount of the New MCDs (less the applicable prepayment discount described below), plus accrued and unpaid interest to the date of repayment. |
| Excess Cash Sweep | In the event that the yield–to–maturity of the New Notes is equal to or higher than 9%, Vitro will annually apply 70% of Excess Cash Flow to repurchase New Notes through market purchases or prepay the New Notes. In the event that the yield–to–maturity of the New Notes is lower than 9%, Vitro will annually apply 50% of Excess Cash Flow to repurchase New Notes through market purchases or prepay the New Notes. See "Description of the New Notes—Provisions Applicable to All of the New Notes—Excess Cash Sweep." |

30% or 50% of the Excess Cash Flow, as applicable, can be used at Vitro's discretion for general corporate purposes and optional redemptions of its New Notes, subject to the covenant described under "Description of the New Notes—New 2019 Notes—Certain Covenants—Limitation on Restricted Payments."

46

**Table of Contents**

| | |
|---|---|
| Optional Redemption | Redemptions of New MCDs may be made by Vitro at any time and from time to time at a redemption price equal to par (less the applicable prepayment discount described below) plus accrued interest. |
| | Redemptions of New MCDs will be subject to the following prepayment discounts: |
| | Year 1: 35.7%<br>Year 2: 30.2%<br>Year 3: 24.2%<br>Year 4: 17.7%<br>Year 5: 10.6% |
| Mandatory Redemption | The New MCDs are subject to mandatory redemption upon an equity issuance by Vitro if certain conditions are met. See "Description of the New Notes—Provisions Applicable to All of the New Notes—Mandatory Redemption." |
| Events of Default | For a discussion of certain events of default that will permit acceleration of the principal of the New MCDs plus accrued interest, see "Description of the New Notes—New MCDs—Default and Remedies." |
| Ratings | We intend to obtain ratings for the New MCDs. |
| Trustee | The Bank of New York Mellon will act as Trustee for the New MCDs. |
| Conversion Agent | Vitro will initially appoint the Trustee as the Conversion Agent. |
| Common Representative | A Mexican financial institution (expected to be The Bank of New York Mellon, S.A., Institución de Banca Múltiple) appointed at the shareholders' meeting of Vitro approving the issuance of the New MCDs. |
| | See "Description of the New Notes—New MCDs—Common Representative of the New MCDs." |
| Paying Agent | The Trustee will initially act as paying agent. |
| Exchange Agent | New MCDs issued pursuant to the *Concurso* Plan will be issued in exchange for the Old Notes through a U.S.–based exchange agent that will be appointed by Vitro prior to the issuance of the New MCDs. |
| Transferability | We are making the Exchange Offer and Consent Solicitation in accordance with Section 3(a)(9) of the Securities Act, which will result in the New Notes being freely transferable, like the Old Notes, when issued in exchange for the Old Notes. Upon filing of our *concurso mercantil* petition, we intend to seek an order of a bankruptcy judge in connection with a bankruptcy proceeding whether pursuant to chapter 11 of the U.S. Bankruptcy Code or an ancillary proceeding pursuant to chapter 15 of the U.S. Bankruptcy Code providing an exemption from registration under the Securities Act and applicable state and local laws requiring registration of |

47

Table of Contents

securities with respect to the New Notes issued under the *Concurso* Plan in exchange for all of the Restructured Debt. We cannot provide any assurance that we will be successful in obtaining such an order. If we do not obtain such an order, the New Notes issued in exchange for the DFI Claims and Other Debt will be subject to certain transfer restrictions. See "Description of the New Notes—Certain Transfer Restrictions."

48

Table of Contents

## The *Concurso* Plan

The *Concurso* Plan

The *Concurso* Plan for which we are seeking consent consists of a restructuring agreement to implement a plan of reorganization under the *Ley de Concursos Mercantiles*, or Mexican Bankruptcy Law (the "Mexican Bankruptcy Law"). Pursuant to the Mexican Bankruptcy Law, in order to initiate a *concurso* proceeding with a pre–approved reorganization agreement, the plan of reorganization must be approved and subscribed by Vitro and creditors representing at least 40% of all of Vitro's outstanding liabilities. We have the requisite majority, among debt controlled by the Company, debt subject to lock–up agreements and other creditors that we believe will participate in the Exchange Offer and Consent Solicitation, to initiate a *concurso* proceeding with a pre–approved reorganization agreement, even if there is no tender of Old Notes and no consents of holders of Restructured Debt are received.

We intend to commence *concurso mercantil* proceedings and proceed with filing the proposed *Concurso* Plan even if there is no tender of Old Notes and no consents of holders of Restructured Debt are received. If the *Concurso* Plan is contested or litigation is initiated, we reserve the right to terminate the Exchange Offer and Consent Solicitation and not proceed with the *Concurso* Plan. The *Convenio Concursal*, if approved and consummated, will bind all holders of Restructured Debt, regardless of whether or how they voted with respect to the *Concurso* Plan in the consent solicitation or otherwise.

Under the *Concurso* Plan, the holders of Restructured Debt that consent in the Exchange Offer and Consent Solicitation will be entitled to receive the Restructuring Consideration on a pro rata basis. If you exchange your Old Notes or consent in the consent solicitation, you will be deemed to have consented to the proposed *Concurso* Plan.

Voting on the *Concurso* Plan;
Required Acceptances

According to the Mexican Bankruptcy Law, in order for a plan of reorganization to become effective, such plan must be agreed upon and executed by Vitro and a number of recognized creditors representing more than 50% of the sum of (i) the amount of recognized claims of unsecured creditors, and (ii) the amount of recognized claims of secured creditors or creditors with special privileges that decide to join or are parties to the plan of reorganization. The commencing of a *concurso* proceeding with a pre–approved reorganization agreement presumes the consent or approval of the plan from creditors representing at least 40% of all of Vitro's outstanding liabilities. Under the Mexican Bankruptcy Law, there is no voting on the plan as such, but the law provides for the adherence or acceptance of the proposed plan either in advance of filing as the *Concurso* Plan or during the statutory term for such purpose within the proceeding.

Effects of Exchanging and Voting

If you exchange your Old Notes or consent in the consent solicitation, you are thereby agreeing with the *Concurso* Plan and, as it may be requested to be amended by the Court presiding over the *concurso* proceeding of Vitro or the Work–out Specialist (*Conciliador*) during the proceeding, to the definitive terms of the plan to be approved by the Court or *Convenio Concursal*, as long as such amendments do not affect in a material or substantive manner the terms of the *Concurso* Plan.

**Table of Contents**

Pursuant to the Mexican Bankruptcy Law, once a plan of reorganization becomes effective and is approved by the competent bankruptcy court, it binds (i) Vitro; (ii) all common or unsecured recognized creditors; (iii) all secured recognized creditors that join or execute the plan; and (iv) those secured recognized creditors that do not execute the *Concurso* Plan but whose recognized claims are to be paid under the reorganization plan.

According to the Mexican Bankruptcy Law, all unsecured recognized creditors would be deemed to have consented to the reorganization plan, without any right to express an opinion on such plan, provided the plan contemplates payment of their claims owed at the time the *concurso* ruling became effective.

Secured recognized creditors that do not join or execute the reorganization plan may, under certain specific rules provided by the Mexican Bankruptcy Law, start or continue to enforce their collateral, unless the reorganization plan provides for the repayment of their claims or the payment of the value of their corresponding collateral. In such case, any amount of the recognized amount of claims that exceeds the value of the collateral shall be regarded as a common or unsecured claims.

| | |
|---|---|
| Interest | As a general rule under the Mexican Bankruptcy Law, upon issuance of the *concurso* ruling all outstanding debts shall cease accruing interest and be converted into *UDIs* or *Unidades de Inversion*, with the exception of secured claims which continue to accrue interest up to the value of the corresponding collateral. In the case of the Old Notes, once the *concurso* ruling is issued all amounts outstanding will be converted into Pesos at the exchange rate calculated and published by the Banco de México or the Mexican Central Bank, in the *Diario Oficial de la Federación*, Mexico's Daily Official Gazette of the Federal Government, and then from Pesos into UDIs. |
| Voting Record Date | Pursuant to the Mexican Bankruptcy Law, there is no need for recognized creditors to hold a meeting and vote on a reorganization plan. Rather, the Mexican Bankruptcy Law provides that once the Work–out Specialist believes the reorganization plan has sufficient consents to be approved, including those granted in advance in the case or pre–approved plans of reorganization, such as the *Concurso* Plan, the Work–out Specialist shall present the agreement to recognized creditors, who will have the right to review it within a period of 10 days and adhere to it, if desired. |
| | Once the Work–out Specialist considers that the *Concurso* Plan is subscribed by the required majority, the *Concurso* Plan shall be presented to the bankruptcy court, which court shall grant recognized creditors a five–day period to object to the authenticity of their consent and to exercise "veto" rights, in case a majority of recognized creditors (in number) or recognized creditors holding a majority of recognized debt so desire. |
| In–Court Solicitation Expiration Time | Within the *concurso* proceeding, the recognized creditors shall be required to review and execute the *Concurso* Plan within 10 days following the date on which the Work–out Specialist presents the pre–approved restructuring agreement for the consideration and approval of recognized creditors. |

50

**Table of Contents**

| | |
|---|---|
| Withdrawal | Acceptance and subscription of the *Concurso* Plan in the *concurso* proceeding may not be withdrawn by the Holders of the Old Notes. |
| Waiver of Acceleration and Extension of Accrued and Unpaid Interest | Pursuant to the Mexican Bankruptcy Law, upon the issuance of the *concurso* ruling all foreclosure and attachment proceedings (except for labor indemnities and wages) are suspended or stayed and generally, debts shall cease accruing interest, with the exception of secured debts up to the value of the corresponding collateral. |
| Processing Fee | The Mexican Bankruptcy Law does not provide for the payment of a processing fee. Costs and expenses related to the *concurso* proceeding incurred by Vitro will be paid from the bankruptcy estate and, in certain circumstances, specifically if an involuntary petition does not succeed, by the party that initiated the *concurso* proceeding. |
| Voting Agent and Information Agent | The Mexican Bankruptcy Law does not provide for the appointment of an agent for recognized creditors nor the existence or appointment of an information agent. |

Table of Contents

## RISK FACTORS

*You should carefully consider the following risk factors, as well as all of the other information presented in this Statement, including our consolidated financial statements and the notes thereto. In general, investing in the securities of issuers in emerging market countries such as Mexico involves certain risks not typically associated with investing in securities of U.S. companies.*

*The risks and uncertainties described below are not the only risks and uncertainties affecting us or the New Notes. Additional risks and uncertainties that we do not know about or that we currently think are immaterial also may impair our business operations or our ability to make payments on the New Notes and under other existing indebtedness.*

*This Statement also contains forward−looking statements that involve risks. Our actual results could differ materially from those anticipated in these forward−looking statements as a result of certain factors, including risks faced by us describing this section, and under the section entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations." See also cautionary statements regarding "Forward−Looking Statements."*

*For purposes of this section, when we state that a risk, uncertainty or problem may, could or would have an "adverse effect" on us, we mean that the risk, uncertainty or problem may, could or would have an adverse effect on our business, financial condition, liquidity, results of operations or prospects, except as otherwise indicated or as the context may otherwise require.*

## RISK FACTORS RELATING TO THE TENDER OFFER

*The amount of Old Notes accepted for payment in the Tender Offer will be limited.*

The amount of Old Notes accepted for payment in the Tender Offer will be limited, because we are offering to purchase the maximum aggregate principal amount of Vitro's 2012 Notes, 2013 Notes and 2017 Notes that we can purchase for the Maximum Payment Amount at a purchase price per $1,000 principal amount determined in accordance with the procedures described in this Statement. See "The Tender Offer—Terms of the Tender Offer." We will not be able to determine the Clearing Price or the Tender Offer Consideration until the Expiration Time.

*Consummation of the Tender Offer is subject to certain conditions and if such conditions are not met, the Tender Offer will be terminated.*

Our obligation to accept Old Notes in the Tender Offer and pay the Tender Offer Consideration is conditioned on the satisfaction or waiver of the conditions set forth in the section titled "The Tender Offer—Conditions to the Tender Offer" in this Statement. In addition, we may terminate the Tender Offer for any reason in our sole discretion if any of the applicable conditions described herein are unsatisfied. We may also decide to terminate the Tender Offer but continue with the Exchange Offer and Consent Solicitation. There can be no assurance that such conditions will be met, that we will not terminate the Tender Offer, or that, in the event that the Tender Offer is not consummated, the market value and liquidity of the Old Notes will not be materially adversely affected.

*The Maximum Payment Amount is subject to change in the sole discretion of Vitro and AIV.*

We reserve the right, but are not obligated, to increase the Maximum Payment Amount by up to 30% without permitting holders to withdraw Old Notes that have been previously tendered in the Tender Offer. If we increase the Maximum Payment Amount in the Tender Offer, we will promptly announce such increase by a press release. If the Maximum Payment Amount is increased and there are fewer than ten business days from and including the date of such announcement to the scheduled Expiration Time, we will extend the Tender Offer so that at least ten business days remain until the Expiration Time.

Table of Contents

*Old Notes not tendered in the Tender Offer will be tendered in the Exchange Offer and Consent Solicitation or will remain outstanding and will be subject to the* concurso mercantil *proceedings.*

Old Notes not tendered and purchased in the Tender Offer will remain outstanding or will be tendered in the Exchange Offer and Consent Solicitation, at the election of the holder, provided that the holder elects to have any Old Notes that are not accepted for purchase in the Tender Offer to be included in the Exchange Offer and Consent Solicitation at the time such holder tenders its Old Notes into the Tender Offer. If you do not tender your Old Notes in the Tender Offer, your Old Notes will become subject to the *concurso mercantil* proceedings described below under "The Exchange Offer and Consent Solicitation." As a result, holders that do not participate in the Exchange Offer and Consent Solicitation will not receive the Consent Payment they would have received upon election of one of the options so to participate described in this Statement.

**RISK FACTORS RELATING TO THE *CONCURSO* PLAN**

*If the* Concurso *Plan or any other revised plan or prepackaged plan of* concurso mercantil *is not consummated, we will not be able to successfully restructure our debt.*

We are in default under our indentures and other financial instruments, and our future is dependent upon our ability to restructure our debt and other financial instruments.

Vitro did not make scheduled interest payments due February 2009, August 2009, February 2010 and August 2010 on the 2012 Notes and 2017 Notes and did not make a scheduled interest payment due May 2009, November 2009 and May 2010 on the 2013 Notes. In addition, Vitro also did not make a scheduled payment of Ps. 150 million ($11.9 million), plus accrued interest due February 5, 2009, on our *Certificados Bursátiles Vitro 03*. The common representative of the *Certificados Bursátiles Vitro 03* initiated a legal proceeding in Mexico involving attachment of Vitro's assets in order to demand payment of Ps. 150 million ($11.9 million), plus accrued interest to date, on such *Certificados Bursátiles Vitro 03*. A first instance ruling requiring Vitro to pay was issued and appealed by the Company. In its April 30, 2010 ruling, the Appeals Court dismissed the case involving the attachment of Vitro's assets; however, the court converted the case into a legal proceeding not involving such attachment. For further discussion, see "Summary—Background of the Restructuring—Our Financial Difficulties—Interest and Principal Default on the Old Notes and the Other Debt."

In July 2009, we and other defendant subsidiaries received notification of an executive mercantile lawsuit brought by RBS Bank in its capacity as creditor demanding the payment of $15 million plus interest. During September and October 2009, a preliminary ruling was given requiring the Company to pay the principal amount plus ordinary and default interest. On January 18, 2010, the Company appealed this resolution as well as others that were issued in these proceedings where certain evidence was dismissed. In September 2010, the Court of Appeals accepted one of the appeals, finding a violation of certain defense rights, and ordered to restart the proceedings to gather evidence by the Company, leaving without effect the ruling on the first instance judgment and the appeal without merits.

In the fourth quarter of 2008, we decided to unwind a majority of our open derivative positions that had been adversely affected due to the high volatility experienced in the financial markets, which resulted in a significant devaluation between the Mexican peso and the U.S. dollar and the Mexican peso and the euro (see "Management's Discussion and Analysis of Financial Condition and Results of Operations—Operating Results—Inflation and Foreign Currency Exchange Rate Fluctuations"), as well as a significant reduction in natural gas prices. As of the date of this Statement, our subsidiary, Vena has reached a settlement agreement with Calyon Credit Agricole CIB ("Calyon"), one of the six Counterparties who filed lawsuits, and the Calyon lawsuit was dismissed. The amount of the settlement agreed with Calyon is $63.4 million plus interest and other fees of $3.9 million. We are seeking to include this settlement in the Restructured Debt. However, if we do not reach an agreement with Calyon to do so, the amount of this settlement will not be included. The Restructuring Consideration for holders of Old Notes and other DFI Claims will not change regardless of whether the Calyon settlement is included as part of the Restructured Debt, though the aggregate principal amount of the New 2019 Notes and New MCDs that we would issue on the Issue Date would be reduced accordingly. In any event, if we are unable to reach an agreement with Calyon to include our settlement with them in the Restructured Debt, we will not

53

Table of Contents

be able to subsequently enter into a restructuring transaction with Calyon on terms more favorable than the Restructuring Consideration (in terms of recovery, terms and conditions of new restructured securities or otherwise).

The other five Counterparties who filed lawsuits sold their DFI Claims (including their rights under the related lawsuits) to Fintech. The other Counterparty not party to the lawsuits sold its DFI Claim to Fintech also. Following Fintech's purchase of such DFI Claims, we engaged in settlement negotiations with Fintech. As a result of such negotiations, Fintech agreed to dismiss the lawsuits related to the DFI Claims and we and Fintech entered into a settlement agreement and standstill and tolling agreements with respect to such lawsuits and DFI Claims. Under the terms of such settlement agreement, among other things, we and certain of our subsidiaries acknowledged the debt outstanding under such DFI Claims (in an aggregate principal amount of approximately $176.4 million) and our subsidiaries that had originally entered into the DFIs with the Counterparties that sold such DFI Claims to Fintech issued the Promissory Notes to Fintech in respect and in settlement of such outstanding debt. The Promissory Notes were guaranteed "*por aval*" by us and some of our subsidiaries. The Promissory Notes are subject to the Fintech Lock–up Agreement (the main terms of which are described in "Summary—Background of Restructuring—The Restructuring Process—Fintech Lock–up Agreement") and will be restructured pursuant to the terms of the Exchange Offer and Consent Solicitation described in this Statement.

We do not have the means to repay or refinance the amounts that are payable under our indentures and other financial instruments. We believe that we are currently not likely to find a material source of financing to fund the interest and principal payments on the Old Notes. Our future is dependent on our ability to restructure our obligations under our indentures and other financial instruments, which will involve a significant reduction of the claims of the holders of Restructured Debt and other financial instruments. If we are faced with a Mexican or U.S. bankruptcy that is protracted and contentious, this could force us to operate in uncertain circumstances for an extended period of time, which could materially adversely affect the relationships between us and our customers, suppliers and employees, and may result in a liquidation of the Company.

We believe it is likely that each holder of Restructured Debt would incur a significant loss if the *Concurso* Plan or any other revised plan or prepackaged plan of *concurso mercantil* is not consummated. In addition, in our opinion, the recovery that would be received by holders of Restructured Debt in a liquidation scenario would very likely be materially less than they would receive under the *Concurso* Plan.

*Even if the Concurso Plan is approved by the Mexican bankruptcy court and consummated in Mexico, our ability to successfully restructure our debt is dependant upon certain relief being granted in foreign jurisdictions, including the U.S.*

Certain of our assets are located in jurisdictions outside of Mexico, including the United States. In addition, certain of our indirect subsidiaries, who are guarantors of certain of the Company's obligations, including the Old Notes, are organized, have their principal place of business and/or have significant assets in foreign jurisdictions, including the United States. In order to commence and operate effectively during the *Concurso* proceeding, and to thereafter fully implement the terms and conditions of the *Concurso* Plan upon its approval by the Mexican bankruptcy court and consummation in Mexico (including, without limitation, the release of our subsidiaries' guarantees of the Old Notes and any claims, in the nature of subrogation or otherwise, such subsidiaries may have against the Company) we will need to obtain relief from courts in one or more of these foreign jurisdictions to protect our assets and/or prevent the exercise of remedies against our subsidiaries from jeopardizing our ability to maintain operations and service our restructured debt.

As a part of the implementation of the restructuring, we may commence proceedings in certain applicable foreign jurisdictions to recognize, give effect to and implement the *Concurso* Plan in such jurisdictions, including an ancillary proceeding in the United States pursuant to chapter 15 of the United States Bankruptcy Code, as amended (the "U.S. Bankruptcy Code") seeking recognition of the *concurso mercantil* proceeding in Mexico (the "Main Proceeding"). See "The Restructuring and the *Concurso* Plan." Upon commencement of such proceedings, we may seek relief in such proceedings, including, among other things, a stay and/or injunction, enjoining all creditors of the Company or its subsidiaries from taking any action to enforce any pre–petition claims against the Company or its subsidiaries in such jurisdictions. In addition, upon approval of the *Concurso* Plan in the *concurso mercantil* proceeding in Mexico, we may request that the foreign court in which such proceedings have been commenced issue

54

Table of Contents

an order implementing the *Concurso* Plan in such jurisdiction, including a permanent injunction against any action to enforce against the Company or ay of its direct or indirect subsidiaries any claims dealt with or discharged in the *Concurso* Plan.

It is possible that some or all of the relief we request in an ancillary proceeding that is necessary to implement the *Concurso* Plan in a foreign jurisdiction with regard to the Company's indirect subsidiaries in such jurisdictions may not be granted by the foreign court in which such proceedings have been commenced. In that event, it may not be possible to successfully complete our restructuring plan with regard to the Company's indirect subsidiaries in such jurisdictions notwithstanding approval of the *Concurso* Plan by the Mexican bankruptcy court and consummation thereof in Mexico.

***If the* Concurso *Plan or any other revised plan or prepackaged plan of* concurso mercantil *is not consummated, we may be subject to an involuntary Mexican or U.S. reorganization related proceeding.***

Since we have defaulted on our Old Notes, some of our creditors have already taken legal action against us. Some or all of our other creditors may also take legal action against us, including instituting an involuntary *concurso mercantil* in Mexico or filing an involuntary petition against us in the United States under the U.S. Bankruptcy Code. If we become involved in an involuntary proceeding in Mexico or the United States or if holders challenge or seek to invalidate the *Concurso* Plan, we could not predict the ability of holders of Restructured Debt or any other creditor to influence the outcome of such proceedings. A reorganization proceeding is likely to result in significant changes to our existing obligations, including the Old Notes, which could include the cancellation or rescheduling of all or part of those obligations, and we could be subject to liquidation and ultimately be forced to sell all or substantially all of our assets. See "The Mexican Law of Commercial Reorganizations" for a further description of a Mexican reorganization proceeding. During or after the pendency of any such proceeding, our ability to operate or manage our business, to retain employees, to maintain existing or create new customer relationships, to continue to collect payments for our services or to obtain any type of funding or financing would likely be significantly jeopardized and, as a result, the potential recovery for the holders of Restructured Debt could be materially adversely affected. As a result of the downturn in the global market, we expect that the proceeds from any potential liquidation and sale of our assets would not be sufficient to satisfy all of our obligations to holders of Restructured Debt, and would result in a net recovery to holders of Restructured Debt that is projected to be substantially less than they would receive pursuant to the *Concurso* Plan. In addition, in the event that we become involved in an involuntary proceeding in Mexico or the United States, subject to certain qualifications and cure periods, holders who have signed lock–up agreement with us will be entitled to terminate their commitments under such lock–up agreements. See "Summary—Background of Restructuring—The Restructuring Process—Fintech Lock–up Agreement".

***If we or the Mexican Guarantors were to be declared bankrupt, holders of the New Notes may find it difficult to collect payment on the New Notes.***

Under the Mexican Bankruptcy Law, if we or the Mexican Guarantors are declared bankrupt or become subject to *concurso mercantil*, or judicial reorganization, our obligations and the obligations of the Mexican Guarantors under the New Notes, respectively, (i) would be converted into Mexican pesos and then from Mexican pesos into UDIs and would not be adjusted to take into account any devaluation of the Mexican peso relative to the U.S. dollar occurring after such conversion, (ii) would be satisfied at the time claims of all our creditors are satisfied, (iii) would be subject to the outcome of, and priorities recognized in, the relevant proceedings, (iv) would cease to accrue interest from the date a *concurso mercantil* is declared and (v) would be subject to certain statutory preferences, including tax, social security and labor claims and claims of secured creditors. In addition, the guarantees may not be enforceable. See "—Risk Factors Relating to the New Notes" and "—Risk Factors Relating to the New Notes—The guarantees may not be enforceable" in particular, which risk factors may also be applicable to the Old Notes.

55

Table of Contents

*We have the requisite majority, among debt controlled by the Company, debt subject to lock–up agreements and other creditors that we believe will tender Old Notes and participate in the Exchange Offer and Consent Solicitation, to approve the Concurso Plan or any other revised plan or prepackaged plan of concurso mercantil, and holders of Restructured Debt will be bound by the terms of any such Concurso plan, if approved and consummated.*

We have the requisite majority, among debt controlled by the Company, debt subject to lock–up agreements and other creditors that we believe will participate in the Exchange Offer and Consent Solicitation, to accomplish a prearranged *concurso mercantil*. Nevertheless, we are seeking the tender of the Old Notes and the consents from holders of Restructured Debt because we believe that having such holders in agreement with us on the terms of our *Concurso* Plan could expedite our reorganization process to the benefit of both such holders and us. The *Concurso* Plan set forth in Annex A, which we believe provides for a fair recovery for holders of Restructured Debt in light of our available financial capacity, represents our final restructuring proposal. We intend to commence *concurso mercantil* proceedings and proceed with filing the proposed *Concurso* Plan even if there is no tender of Old Notes and no consents of holders of Restructured Debt are received. If the *Concurso* Plan is contested or litigation is initiated, we reserve the right to terminate the Exchange Offer and Consent Solicitation and not proceed with the *Concurso* Plan. The *Convenio Concursal*, if approved and consummated, will bind all holders of Restructured Debt, regardless of whether or how they voted with respect to the *Concurso* Plan in the consent solicitation or otherwise.

*The Concurso Plan may not be commenced, may not become effective or may be dismissed regardless of the number and amount of holders of Restructured Debt that vote to accept the Concurso Plan.*

The approval and effectiveness of the *Concurso* Plan are subject to certain conditions and requirements that may not be satisfied, and the Mexican bankruptcy court may conclude that the requirements for approval and effectiveness of the *Concurso* Plan have not been satisfied. See "The Restructuring and the *Concurso* Plan" and "The Mexican Law of Commercial Reorganizations."

*We may not be able to successfully complete our restructuring plan and continue our operations.*

Our ability to successfully complete our restructuring plan and continue our operations is also dependent on:

- The overall strength and stability of general economic conditions in the glass container, automotive and construction industries;

- Customer confidence in our viability going forward, and our ability to continue to maintain and expand our customer base;

- The availability of adequate financing on acceptable terms from our suppliers and their continuing business relationships with us;

- Our ability to maintain receivables securitization and sale of receivables programs which provide working capital for operations;

- Our ability to sell non–productive assets at favorable prices; and

- Development of new products and new uses for our products.

56

Table of Contents

**RISK FACTORS RELATING TO OUR BUSINESS**

*Our business and our ability to continue operations are highly dependent on sales volume, which has been significantly affected by the global economic and financial crisis and the severe recession.*

Our operational and financial results are highly sensitive to sales volume, as demonstrated by the sharp declines in each of our core businesses, Glass Containers and Flat Glass sales, in relation to the global economic and financial crisis, and the severe recession, that began in the second half of 2008, particularly in the markets in which we operate, principally Mexico, the Unites States and Europe. The sharp decline in demand for new cars and trucks in the automobile industry, for new homes and buildings in the construction industry, and reduced beer bottle demand for our main client in our Glass Containers business unit, resulted in a 36.8% decline in our consolidated operating income for 2008 compared to 2007, from Ps. 2,704 million to Ps. 1,710 million, and a further 22.3% decline in our operating income for 2009 compared to 2008, from Ps. 1,710 million to Ps. 1,329 million. Income before taxes decreased from Ps. 175 million in 2007 to a loss of Ps. 7,857 million in 2008 and a loss of Ps. 1,352 million in 2009. Net income decreased from Ps. 131 million in 2007 to a loss of Ps. 5,682 million in 2008 and a loss of Ps. 754 million in 2009.

Even though the economy has shown moderate signs of recovery in 2010, some of our markets are still experiencing contraction and excess capacity, including the construction sector in the United States and Spain. For the six–month period ended June 30, 2010, we experienced a 7.3% decline year over year of our consolidated net sales compared with the same period of 2009, from Ps. 12,292 million to Ps. 11,399 million, reflecting lower volumes and price erosion as well as the effect of the appreciation of the Mexican peso to the U.S. dollar of 3.1% for that same period. Operating income in the same period went down from Ps. 633 million in 2009 to Ps. 616 million in 2010, due to the same factors affecting sales and increased natural gas prices. Net loss in the same period went from a loss of Ps. 409 million in 2009 to a loss of Ps. 459 million in 2010.

The continuation of the economic downturn will continue to adversely affect our business and our ability to maintain profitable operations. A continued downturn in the Mexican economy, from which we derived 44% and 46% of our consolidated net sales for the years ended December 31, 2008 and 2009, respectively, would reduce the demand for our products and negatively impact our results of operations. Similarly, a prolonged economic downturn in the United States and Europe, from which we derived 47% and 46% of our consolidated net sales in 2008 and 2009, respectively, would have an adverse impact on the exports and foreign subsidiaries' sales of our Flat Glass and Glass Containers business units. In recent years, economic conditions in Mexico have become increasingly correlated to economic conditions in the United States. Therefore, continuing adverse economic conditions in the United States could have a significant adverse effect on the Mexican economy. Also, in the past, economic crises in Asia, Russia, Brazil, Argentina and other countries have adversely affected the Mexican economy and therefore our results of operations.

*We have insufficient liquidity to repay our existing obligations and meet our capital requirements.*

For the twelve months ended June 30, 2010, our operating income was Ps. 1,311 million ($103 million). As of June 30, 2010, our total consolidated indebtedness was Ps. 19,347 million ($1,528 million), of which Ps. 17,557 million ($1,387 million) is short–term debt. As of June 30, 2010, our unrestricted cash and cash equivalent balances were Ps. 2,203 million ($174 million).

As a result of our financial condition, a number of our suppliers have imposed more restrictive payment terms and security arrangements, which further restrict our liquidity. In addition, under our arrangements to purchase the minority interest in Vitro Cristalglass, we are obligated to make payments of approximately 7 million euros ($10 million) from July 2010 to December 2010. See "Management's Discussion and Analysis of Financial Condition and Results of Operations—Operating Results—Inflation and Foreign Currency Exchange Rate Fluctuations."

As of June 30, 2010, we had open DFI hedges with Petróleos Mexicanos, S.A. de C.V., which we refer to as "Pemex," for approximately 32% of our estimated natural gas consumption for the remainder of the year at an average price of approximately $6.80 per MMBTU for 2010, and approximately 19% of our estimated natural gas

Table of Contents

consumption at an average price of approximately $7.32 per MMBTU for 2011. As of June 30, 2010, our open DFIs with Pemex had a mark−to−market liability value of approximately $13.8 million. Although Pemex has historically never required collateral or requested early termination, Pemex has historically had the right to seek such remedies pursuant to the agreements and recently requested some collateral.

Under the Pemex agreements mentioned above, we are obligated to make monthly settlement payments until December 2011 to the extent the market price on the monthly settlement date of natural gas is below the exercise price set forth in the agreement. During the first 6 months of 2010, we have made monthly settlement payments of an aggregate of Ps. 113 million ($8.9 million). If the market price of natural gas increases above the exercise price set forth in the agreement, we will be entitled to receive payments from Pemex. However, if the market price ($4.04 per MMBTU as of June 30, 2010) remains low or continues to decrease, our monthly settlement payments will continue at the same level or increase. If the negative mark−to−market value increases, we could be more likely subject to an unprecedented Pemex margin call, which would adversely impact our liquidity.

Under our indentures governing the Old Notes, we are prohibited from incurring additional debt, other than the refinancing of outstanding debt and other limited exceptions, and, in addition, based upon our financial condition, we may not be able to arrange debt and other financings that could provide us with additional liquidity to operate our businesses.

***Even if our debt restructuring is successful, our indebtedness and other obligations could continue to be significant and could contain significant restrictions.***

Even if we are successful in restructuring our obligations under our indentures governing the Old Notes and other financial instruments and complete our restructuring plan, we could continue to have a significant amount of indebtedness and other obligations. Our ability to make scheduled interest and principal payments on the restructured debt will depend upon our ability to achieve profitability levels to support our new debt, which may be dependent upon an improvement in the current economic environment in the industries we operate. Our net interest expense on debt for the twelve months ended June 30, 2010 was Ps. 2,254 million ($178 million), while our operating income was Ps. 1,311 million ($103 million).

The amount of our interest payment requirements could adversely affect our business in a number of ways, including but not limited to, the following:

- We may have less cash available to expand and improve our business, since we are required to dedicate a significant portion of our cash flow from operations to the payment of interest on our debt;

- Our ability to obtain additional debt financing may be limited and the terms on which such financing is obtained may be negatively affected; and

- Our ability to compete effectively against better−capitalized competitors and to withstand downturns in our business may be affected since a significant portion of our cash flow from operations is required to be dedicated to making interest payments. As a result, we may lose market share and experience lower sales, which, in turn, could result in a material adverse effect on our financial condition, results of operations and liquidity.

***Price pressures that result from over−capacity, lower−margin business opportunities, flat glass customers' initiatives, and consolidation of our customer base may adversely affect our businesses.***

Due to the global economic and financial crisis and the severe recession, there is a significant over−capacity in the markets in which we operate; therefore, we could face significant pricing pressure or could be forced to temporarily enter into different business segments with lower margins within our Glass Containers and Flat Glass businesses.

58

Table of Contents

Downward pricing pressure by automotive manufacturers is a characteristic of the automotive industry. Virtually all automakers have aggressive price reduction initiatives and objectives each year with their suppliers, and such actions are expected to continue in the future. In addition, estimating such amounts is subject to risk and uncertainties as any price reductions are a result of negotiations and other factors. If we are unable to offset customer price reduction in the future through improved operating efficiencies and other cost reduction initiatives, our results of operations would be adversely affected.

Some of our largest customers, mainly in the Glass Containers business, have acquired companies with similar or complementary product lines. This consolidation has increased the concentration of our business with our largest customers. In many cases, such consolidation has been accompanied by pressure from customers for lower prices, reflecting the increase in the total volume of products purchased or the elimination of a price differential between the acquiring customer and the company acquired. Increased pricing pressures from our customers may have a material adverse effect on our results of operations.

*We have customers that are significant to us and the loss of all or a portion of their business will have an adverse effect on us.*

Because of the relative importance of our largest customers, our business is exposed to a certain degree of risk related to customer concentration. In December 2008, Grupo Modelo, one of our key customers in our Glass Containers business notified us that due to the current world market contraction, it would significantly reduce its beer bottle orders from us. Based on our consolidated sales for 2008, the volume reduction impact on our annual consolidated sales for 2009 was approximately 6.45%, measured in Mexican pesos.

Our significant customers in our Flat Glass segment are major original equipment car and truck manufacturers, Ford, General Motors, Chrysler, Nissan and Freightliner. Our automotive sales in 2009 declined 34% from 2008. The global downturn affected the level of sales in the automotive industry, and some of our key customers are rationalizing their product offering after emerging from reorganizations under U.S. bankruptcy laws or industry consolidations which may further reduce our levels of sales to this business segment. Given that our profitability depends on our maintenance of a high capacity utilization rate, the loss of all or a portion of the sales volume from a significant customer would have an adverse effect on us.

*We have to pay interest and principal on our U.S. dollar–denominated debt with revenues generated in Mexican pesos or other currencies, as we do not generate sufficient revenue in U.S. dollars from our operations.*

As of June 30, 2010, 89% of our outstanding debt was denominated in U.S. dollars. We do not generate sufficient revenues in U.S. dollars from our operations to service our entire U.S. dollar–denominated debt. Consequently, we have to use revenues generated in pesos or other currencies to service our U.S. dollar–denominated debt. A devaluation of the Mexican peso against the U.S. dollar could adversely affect our ability to service our debt.

Because of our financial condition, we are currently unable to enter into hedging transactions to mitigate our exposure to fluctuations in foreign currency exchange rates, and were we able to enter into such transactions, we could not assure you they would be on favorable terms.

*We have experienced rising operating costs in each of our businesses.*

Some of our components of our costs of goods sold are subject to market price variations, especially energy costs which represented approximately 10% of our consolidated cost of goods sold in 2009. Such cost is directly linked to the price of natural gas which has experienced significant volatility in recent years. Since the price of natural gas in Mexico is tied to the price of natural gas in Southern Texas, which in turn is fully exposed to market factors such as demand in the United States or the amount of available natural gas reserves, we are exposed to such price variations. Each one dollar change in our unit price of natural gas per million MMBTU has a direct impact of approximately $18 million on our annual operating costs based on our average historical consumption of approximately 1.5 million MMBTUs per month.

59

Table of Contents

For the year ended December 31, 2009, the natural gas price decreased 28% to $4.40 per MMBTU when compared to its closing price for the year ended December 31, 2008 of $6.07 per MMBTU. Our operating income was also affected by the increase in natural gas price as the average price increasing 22% from $3.71 to $4.54 per MMBTU for the six–month period ended June 30, 2009 compared to the same period of 2010.

We have historically entered into swaps and other DFIs in the ordinary course of our business to hedge our exposure to natural gas price increases. As of June 30, 2010, however, the only hedging arrangements to which we remain subject consist of hedging contracts with Pemex for approximately 32% of our estimated consumption for the remainder of the year and approximately 19% of our estimated consumption for 2011. Because of our financial condition, we are currently unable to enter into hedging transactions to further minimize our exposure to increases in natural gas prices, interest rates and foreign exchange rates, and were we able to enter into such transactions, we could not assure you they would be on favorable terms. In addition, the New Indentures governing the New Notes contain restrictions on entering into hedging agreements. See "Description of the New Notes—Certain Covenants—Hedging Agreements." If the price of natural gas increases, we cannot assure you we would be able to raise the prices of our products to fully reflect the increases in our operating costs and, therefore, our results of operations could be adversely affected by continued high prices of natural gas.

Furthermore, although a further decrease in the price of natural gas would have a positive impact of substantially reducing our cost of goods sold, the benefits to our cost of sales would be realized over a period of time, whereas such a further decrease would also have an adverse effect on the fair market value of our natural gas DFIs, resulting in losses that would be immediately recorded within our comprehensive financial results in our statements of operations as a result of mark–to–market valuation accounting requirements. See "Summary—Background of the Restructuring—Our Financial Difficulties—Claims Relating to Our Derivative Financial Instruments."

We are also a large consumer of soda ash with a consumption of approximately 300 thousand metric tons in 2009, which represented approximately 4% of our cost of goods sold. In the last four years, the price of the soda ash has increased by approximately 70%.

Other potential sources of significant variations in our cost of goods sold are packaging and freight costs, which represented 6% and 2% respectively of our cost of goods sold in 2009, respectively.

*We operate in a highly competitive industry in which we compete with global competitors and vertically integrated customers, have relatively high fixed costs and are faced with sharply decreasing demands.*

Historically, aggressive investment by our global competitors such as Compagnie de Saint Gobain ("Saint Gobain") and Guardian Industries Corporation ("Guardian"), and vertically integrated customers with glass manufacturing facilities in Mexico, coupled with the increased imports of low–cost competitive products into several of our important markets, has resulted in an increase in capacity that has brought significant pricing pressure on our products, particularly in our flat glass construction market where the industry is faced with over–capacity. Similarly, our competitors may make new investments in Mexico in the glass containers market. Loss of existing or future market share to competitors or customers in any of our business units may adversely affect our performance and, to the extent that one or more of our competitors becomes more successful than us with respect to any key competitive factor, our results of operations, financial position and liquidity may be adversely affected.

Our operations have relatively high fixed costs relating to equipment purchases and employee costs. Customer financial difficulties have resulted, and could result in the future, in sharp decreases in demand and we may be unable to adjust our cost structure in a timely manner to compensate for shortfalls in sales. If current and anticipated customers do not place orders with us in accordance with our expectations or at all, it may be difficult to plan our capacity which cannot be altered easily. If our capacity does not match our customer demand, we will be burdened with expensive and unutilized overcapacity which could have an adverse effect on our business and results of operations.

60

**Table of Contents**

*We face intense competition from other glass container producers, as well as from makers of alternative forms of packaging.*

We face competition from other glass container producers, as well as from makers of alternative forms of packaging, such as aluminum cans and plastic containers. We compete with each rigid packaging competitor on the basis of price, quality, service and the marketing attributes of the container. Advantages or disadvantages in any of these competitive factors may be sufficient to cause the customer to consider changing suppliers and/or using an alternative form of packaging. We also compete with manufacturers of non−rigid packaging alternatives, including flexible pouches and aseptic cartons, in serving the packaging needs of, among others, juice and food customers.

*Difficult market conditions in the automotive industry may affect our operating margins and results of operations.*

The North American automotive industry has recently faced difficult market conditions. North American automobile manufacturers have experienced slower demand and increased pricing pressures on their products. Even though the industry has shown moderate signs of recovery in 2010, these difficult market conditions in the automotive industry may continue to lead to additional pricing pressure on our products and may lead to loss of sales volume, either of which may have an adverse effect on us. In addition, the automotive industry has experienced pressures due to increased oil prices and the elimination of certain tax incentives in the United States which could decrease our OEM business sales, as the U.S. demand in the auto sector has declined.

Certain of our flat glass products sold to OEMs in the automotive industry are sold under global purchase agreements, which are entered into after completion of a bidding process. Such automotive OEMs have significant buying power which, coupled with substantial competition, puts pressure on prices and margins relating to products supplied under the global purchase agreements. As a result, even if we were awarded the right to sell to an automotive OEM under a global purchase agreement, we may sell at operating margins that are lower than margins generally achievable from sales to other flat glass customers. The automotive OEM business line represented 9% and 7% of our consolidated net sales for the years ended December 31, 2008 and 2009, respectively.

*The costs of complying with environmental protection and health and safety laws, and any liabilities arising thereunder, may increase and adversely affect our business, results of operations, cash flows or financial condition.*

We are subject to various environmental protection and health and safety laws and regulations governing, among other things, the generation, storage, handling, use, remediation, disposal and transportation of hazardous materials, the emission and discharge of hazardous materials into the ground, air or water, and the health and safety of our employees.

We are also required to obtain permits from governmental authorities for certain operations. We cannot assure you that we have been or will be at all times in complete compliance with such laws, regulations and permits. If we violate or fail to comply with these laws, regulations or permits, we could be fined or otherwise sanctioned by regulators. We could also be held liable for any and all consequences arising out of human exposure to hazardous substances or other environmental damage.

Since 1998, we have been participating in a voluntary audit program at our Mexican facilities. As a result of audits by and implementation of certain measures suggested by the *Procuraduría Federal de Protección al Ambiente* (Federal Environmental Protection Agency), which we refer to as "PROFEPA," action plans are entered into, and costs are incurred, to make environmental investments and improvements required for PROFEPA Clean Industry certification.

Environmental laws are complex, change frequently and have tended to become more stringent over time. While we have budgeted for future capital and operating expenditures to maintain compliance with environmental laws, we cannot assure you that environmental laws will not change or become more stringent in the future. Therefore, we cannot assure you that our costs of complying with current and future environmental and health and

61

Table of Contents

safety laws, and our liabilities arising from past or future releases of, or exposure to, hazardous substances will not adversely affect our business, results of operations, cash flow or financial condition.

*Substitution trends in the glass container industry may continue to adversely affect our business.*

Glass containers have been, and continue to be, subject to competition from alternate forms of packaging, including plastic containers, aluminum cans and laminated paper containers. In mature glass containers markets, such as in the United States, demand for glass containers began a sustained long–term decline in the 1970s (although such decline has substantially diminished in recent years). In connection with such decline, the glass containers industry experienced a reduction in capacity and consolidation among glass container producers. The remaining glass containers producers in mature markets have faced, and may continue to face, pricing pressures as a result of competition from other forms of packaging. Mexico is becoming a mature market, with increased competition from alternate forms of packaging, particularly plastic, aluminum cans and laminated paper containers. Such products have adversely affected, and may continue to adversely affect, our prices and operating margins, principally with respect to glass containers for the beer, soft drinks and food industries. Our Glass Containers business unit represented 52% of our consolidated net sales in 2009.

*Protracted constraints on our capital expenditures may impact our business operations.*

We are constrained in our capital expenditures by our current financial condition. Therefore, our capital expenditures are limited in 2010. During 2009, we invested $77 million. Should we be unable to fund the total amount of our capital expenditures with cash flows from operations, we may be required to defer a portion of such expenditures to future periods. See "Liquidity and Capital Resources." A prolonged constraint on our available resources for capital expenditures could have a materially adverse effect on our results of operations.

### RISK FACTORS RELATING TO ECONOMIES IN WHICH WE PARTICIPATE

*Economic developments in Mexico, the United States and Europe affect our business.*

The year 2009 was characterized by a continuation of the slowdown in global economic activity and a global recession that led to tight credit markets and a global decline in demand. The global economic deceleration had its roots in the U.S. economy, which experienced growth decline from 2.1% in 2007 to 0.4% in 2008 and contracted at a rate of 2.4% in 2009. During the global economic crisis, the United States and other countries around the world, and particularly Spain's construction market, experienced deteriorating economic conditions. Global consumer confidence eroded amidst concerns over declining asset values, inflation, energy costs, geopolitical issues, the availability and cost of credit, rising unemployment, and the stability and solvency of financial institutions, financial markets, businesses and sovereign nations.

The housing and construction markets in the United States have been seriously affected by the sub–prime mortgage crisis, which has also affected the economy overall. The growth in housing sales and construction financed by credit played a large role in the economy's expansion by lifting other sectors of the economy. Losses on sub–prime mortgages have negatively affected not only the housing and construction markets but other sectors and the availability of credit generally. Increased foreclosures could generate increased inventory on the housing market which could affect our residential and commercial construction sales. See "Management's Discussion and Analysis of Financial Condition and Results of Operations—Trend Information."

As a consequence of the global economic and financial crisis, and the severe recession, that began in the second half of 2008, the Mexican economy entered into a recession. In 2009, Mexico's GDP registered a contraction rate of 6.5%. In 2008, Mexico's GDP registered a growth rate of 1.3%, a lower figure than the GDP growth rate of 3.3% reported for 2007. The majority of our manufacturing facilities are located in Mexico. Most of our manufacturing facilities are located in Mexico. Our consolidated net sales resulting from sales to parties located within Mexico were 42%, 44% and 46% for each of the years ended December 31, 2007, 2008 and 2009, respectively. Thus, the current recession in Mexico could affect our operations to the extent that we are unable to reduce our costs and expenses in response to falling demand. These factors could result in a decrease in our sales and revenues.

62

Table of Contents

Even though the economy has shown moderate signs of recovery in 2010, some of our markets are still experiencing contraction and excess capacity, including the construction sector in the United States and Spain. In Mexico, for 2010, we expect the country to continue confronting difficulties, due to a slower than expected recovery in the domestic market and in the U.S. economy.

Future economic declines in or affecting Mexico, the United States or Europe could adversely affect us and our ability to obtain financing.

***Foreign currency exchange rate fluctuations may have an adverse effect on our operating income and our total comprehensive financial result.***

Our total comprehensive financing result is impacted by changes in the value of the Mexican peso relative to the U.S. dollar. Foreign currency exchange gains or losses included in our total financing cost result primarily from the impact of changes in the U.S. dollar–Mexican peso exchange rate on our Mexican subsidiaries' U.S. dollar–denominated monetary liabilities (such as U.S. dollar–denominated debt and accounts payable arising from imports of raw materials and equipment) and assets (such as U.S. dollar–denominated cash, cash equivalents and accounts receivable). Because historically our U.S. dollar–denominated liabilities have exceeded our U.S. dollar–denominated monetary assets, the devaluation and appreciation of the Mexican peso resulted in exchange losses and gains, respectively. The closing exchange rate of 2009, Ps. 13.0587 per one dollar, compared with the closing exchange rate of 2008, Ps. 13.8325 per one dollar, showed an appreciation of the Mexican peso of 5.6%. This appreciation reflected an exchange gain in our financial statement. As of June 30, 2010 the exchange rate is Ps. 12.6567 per one dollar, an appreciation of 3.1% compared with the closing exchange rate of Ps. 13.0587 in December 31, 2009. Accordingly, during the six–month period ended June 30, 2010, the appreciation of the Mexican peso relative to the U.S. dollar resulted in foreign currency exchange gains. See "Management's Discussion and Analysis of Financial Condition and Results of Operations—Operating Results—Inflation and Foreign Currency Exchange Rate Fluctuations."

Changes in the value of the Mexican peso to the U.S. dollar also have an effect on our results of operations. In general, a devaluation of the Mexican peso results in an increase of our operating margins, and an appreciation of the Mexican peso results in a decrease in our operating margins, in each case, when measured in pesos. This is because the aggregate amount of our consolidated net sales denominated in or linked to the U.S. dollar exceeds the aggregate amount of our costs of goods sold and our general, administrative and selling expenses denominated in or linked to the U.S. dollar.

A substantial portion of the sales generated by our Mexican subsidiaries and U.S. subsidiaries are either denominated in or linked to the U.S. dollar. The prices of a significant number of the products we sell in Mexico, particularly flat glass for automotive uses and capital goods, are linked to the U.S. dollar. In addition, substantially all of our export sales are invoiced in U.S. dollars and subsequently translated into Mexican pesos using the exchange rate in effect at the date of the transaction.

Further, a strong Mexican peso relative to the U.S. dollar makes the Mexican market more attractive for importers and competitors that might not otherwise sell in the Mexican market. A strong Mexican peso relative to the U.S. dollar also makes our products with prices denominated in or affected by the value of the U.S. dollar less competitive or profitable. With respect to such products, when the Mexican peso appreciates we must either increase our prices in U.S. dollars, which makes our products less price–competitive, or bear reduced operating margins when measured in pesos. Given the competitive nature of the industries in which we operate, we have chosen to reduce our operating margins for such products in response to appreciation of the Mexican peso relative to the U.S. dollar in the past.

The sales generated by our Spanish subsidiary are either denominated in or linked to the euro, while its cost of goods sold is denominated in or linked to the U.S. dollar. Changes in the value of the U.S. dollar to the euro may have an adverse effect on us in a similar fashion to those described with respect to the value of the Mexican peso above.

63

Table of Contents

*We may be adversely affected by increases in natural gas prices, interest rates or foreign exchange rate changes that we are unable to mitigate through derivative transactions due to our financial condition.*

Some of our components of our costs of goods sold are subject to market price variations, especially energy costs which represented approximately 10% of our consolidated cost of goods sold in 2009. Such cost is directly linked to the price of natural gas which has experienced significant volatility in recent years. Since the price of natural gas in Mexico is tied to the price of natural gas in Southern Texas, which in turn is fully exposed to market factors such as demand in the United States or the amount of available natural gas reserves, we are exposed to such price variations.

Interest rate risk exists primarily with respect to our floating–rate Mexican peso and U.S. dollar–denominated debt, which generally bear interest based on the TIIE or LIBOR. If the TIIE or LIBOR increase significantly, our ability to service our debt will be adversely affected. As of June 30, 2010, our TIIE–rate and LIBOR–rate debt amounted to Ps. 1,548 million ($122 million) and Ps. 623 million ($49 million), respectively.

Because our net sales and a significant portion of our operations are denominated in the Mexican peso and the U.S. dollar, our business is subject to adverse effects of foreign exchange rate fluctuations. These fluctuations may result from changes in economic conditions, investor sentiment, monetary and fiscal policies, the liquidity of global markets, international and regional political events, and acts of war or terrorism. In addition, the fluctuation of the foreign exchange rate may adversely affect our U.S. dollar–denominated debt.

We have historically entered into swaps and other DFIs in the ordinary course of our business to hedge our exposure to natural gas price increases, interest rates or foreign exchange rates. As of June 30, 2010, however, the only hedging arrangements to which we remain subject consist of hedging contracts with Pemex for approximately 32% of our estimated consumption for the remainder of the year and approximately 19% of our estimated consumption for 2011. Because of our financial condition, we are currently unable to enter into hedging transactions to further minimize our exposure to increases in natural gas prices, interest rates or foreign exchange rates, and were we able to enter into such transactions, we could not assure you they would be on favorable terms.

*Developments in other emerging market countries may adversely affect our business or the market price of our securities.*

As is the case with respect to securities of issuers from other emerging markets, the market value of securities of Mexican companies is, to varying degrees, affected by economic and market conditions in other emerging market countries. Although economic conditions in these countries may differ significantly from economic conditions in Mexico, investors' reactions to developments in any of these other countries may have an adverse effect on the market value of securities of Mexican issuers. In recent years, for example, prices of both Mexican debt securities and Mexican equity securities dropped substantially as a result of developments in Russia, Asia and Brazil.

During recent years, Venezuela, Colombia and certain EU markets have shown instability related to certain political and economic troubles (e.g., sovereign debt problems in Greece, Spain and Portugal). In the countries in which we operate, we are subject to government protectionist measures, anti–dumping regulation, actions aimed at imposing controls on capital and other such practices that may adversely affect our business.

In addition, the correlation between economic conditions in Mexico and the United States has sharpened as a result of the North American Free Trade Agreement (NAFTA) and increased economic activity between the two countries. As a result of the slowing economy in the United States and the uncertainty it could have on the general economic conditions in Mexico and the United States, our financial condition and results of operations could be adversely affected. In addition, due to recent developments in the international credit markets, capital availability and cost could be significantly affected and could restrict our ability to obtain financing or refinance our existing indebtedness on favorable terms, if at all.

64

Table of Contents

*If foreign currency exchange controls and other restrictions are imposed, we may not be able to service our debt in U.S. dollars, which exposes investors to foreign currency exchange risk.*

In the past, the Mexican economy has experienced balance of payments deficits, shortages in foreign currency reserves and other problems that have affected the availability of foreign currencies in Mexico. The Mexican government does not currently restrict or regulate the ability of persons or entities to convert pesos into U.S. dollars. However, it has done so in the past and could do so again in the future. We cannot assure you that the Mexican government or any other government in countries in which we operate will not institute a restrictive currency exchange control policy in the future. Such restrictive foreign currency exchange control policies could prevent or restrict access to U.S. dollars and limit our ability to service our U.S. dollar–denominated debt.

*Political events in Mexico could affect Mexican economic policy and adversely affect us.*

Our business, financial condition and/or results of operations may be affected by economic, political or social developments in Mexico, including, among other things, any political or social instability, changes in the rate of economic growth or contraction, changes in the exchange rate between the Mexican peso and the U.S. dollar, an increase in Mexican inflation or interest rates, changes in Mexican taxation and any amendments to existing Mexican laws and regulations.

Federal Congressional mid–term elections were held on July 5, 2009, and the opposition Institutional Revolutionary Party (Partido Revolucionario Institucional, or "PRI") won a relative majority of the seats in the Mexican Congress, while the National Action Party (Partido Acción Nacional) lost its majority position. The PRI congressional majority, as well as its de–facto coalition with Mexico's Green Party (Partido Verde Ecologista de Mexico) and the possible lack of alignment between the President and this new legislature may result in government gridlock. We cannot provide any assurance that the current political situation or any future political developments in Mexico will not have a material adverse effect on our results of operations and financial condition.

*Security issues and social instability in Mexico could adversely affect us.*

High incidences of crime throughout Mexico, including kidnappings and drug trafficking, could have an adverse effect on our business as foreign investors may be less likely to invest in Mexico, which could negatively impact our domestic economy. Social instability in Mexico or adverse social or political developments in or affecting Mexico could adversely affect us and our ability to obtain financing. The possibility of having similar or other incidents in the future could adversely affect our business and operations.

*We face risks related to health epidemics and other outbreaks.*

In April 2009, an outbreak of A H1N1 virus occurred in Mexico and the United States, followed by cases in Asia and Europe. A future occurrence of A H1N1 virus or other adverse public health developments in Mexico, or in the countries where we operate, may have a material adverse effect on our business operations. Our operations may be impacted by a number of health–related factors, including, among other things, quarantines or closures of our facilities that could disrupt our operations, and a general slowdown in the Mexican economy. Any of the foregoing events or other unforeseen consequences of public health problems could adversely affect our business and results of operations.

*Our financial statements may not give you the same information as financial statements prepared under United States accounting principles or Exchange Act reporting requirements.*

Mexican companies listed on the Bolsa Mexicana de Valores, which we refer to as the "Mexican Stock Exchange," including us, must prepare their financial statements in accordance with MFRS. MFRS differs in certain significant respects from U.S. GAAP as it relates to our consolidated financial statements, including, among other things, the treatment of minority interests, workers' profit sharing, accounting for the effects of deferred income taxes and consolidation of subsidiaries. Moreover, we filed a Form 15F for deregistration to terminate our registration and reporting requirements under the Exchange Act; if such deregistration is successfully completed, we will no longer be required to disclose financial and other information that is compliant with Exchange Act reporting

65

**Table of Contents**

requirements. For these and other reasons, the presentation of financial statements and reported earnings prepared in accordance with MFRS may differ materially from the presentation of financial statements and reported earnings prepared in accordance with U.S. GAAP and Exchange Act reporting requirements.

*Our operations may be adversely affected by earthquakes, hurricanes or some other natural disaster that could have an effect on our service to clients.*

In April 2010, our float glass facility in Mexicali and the inventories in that plant sustained damage as the result of an earthquake, which caused a temporary halt in production and the loss of a large amount of inventories. On July 1, 2010, our manufacturing facilities in the Municipality of García in Nuevo León, Mexico were affected as a result of the severe flooding and damage caused by Hurricane Alex. Our float glass manufacturing and automotive processing facilities and our facilities at Álcali suffered significant damage and were forced to temporarily suspend operations. See "Summary—Recent Developments—Temporary Suspension of Operations at Manufacturing Facilities in García, Nuevo León."

Our operations may be impacted in the future by a number of natural disasters or their consequences, including, among other things, flood, damage to roads, highways and/or bridges, and interruption of water, electricity and natural gas supply, which could disrupt our operations and impact our service to our clients.

## RISK FACTORS RELATING TO THE NEW NOTES

*Our ability to repay the New Notes and our other debt depends on cash flow from our subsidiaries.*

Vitro is a holding company whose only material assets will be its ownership interests in its subsidiaries. Consequently, we depend on distributions or other inter-company transfers of funds from our subsidiaries to meet our debt service and other obligations, including with respect to the New Notes. Our non-guarantor subsidiaries are not obligated to make funds available to us for payments on the New Notes. We cannot assure you that the operating results of our subsidiaries will be sufficient to enable us to make payments on the New Notes. Furthermore, under Mexican law, our subsidiaries may only pay dividends out of retained earnings and after all losses from prior fiscal years have been satisfied.

*The New Indentures governing the New Notes are expected to contain restrictive covenants.*

The New Indentures governing the terms of our indebtedness are expected to contain certain covenants that are customary for similar indebtedness. Such covenants include, among other things, restrictions on our ability and our subsidiaries' ability to (i) incur additional debt or issue subsidiary preferred stock or stock with a mandatory redemption feature before the maturity of the New 2019 Notes, (ii) pay dividends on our capital stock, (iii) redeem or repurchase capital stock or prepay or repurchase subordinated debt, (iv) make some types of investments and sell assets, (v) create liens, (vi) create, acquire or participate in strategic joint ventures, (vii) engage in transactions with affiliates, except on an arm's-length basis, (viii) enter into sale and leaseback transactions, (ix) make certain capital expenditures, (x) enter into hedging agreements; and (xi) consolidate or merge with, or sell substantially all our assets to, another person. In addition, under the terms of the New Indentures, we will be required to assign all of our intercompany debt to a voting trust pursuant to which all such intercompany debt will be voted by the trustee of such trust (at the instruction of a majority of third party creditors) in the event of a subsequent *concurso mercantil* or other similar insolvency proceeding involving us and/or our subsidiaries. As of June 30, 2010, under the restrictive covenants of our current indentures, we were prohibited from incurring any additional debt other than certain limited permitted debt exceptions.

The restrictions in our New Indentures governing the New Notes could include similar restrictions that could limit our flexibility to adjust to changes in our business and the industries in which we operate, and limit our ability to fund future operations, acquisitions or meet extraordinary capital needs.

*The guarantees may not be enforceable.*

The guarantees provide a basis for a direct claim against the Guarantors; however, it is possible that the guarantees may not be enforceable under Mexican law. Mexican law does not prohibit the giving of guarantees and

66

Table of Contents

as a result does not prevent the guarantees of the New Notes from being valid, binding and enforceable against the Guarantors in the event that a Guarantor becomes subject to a *concurso mercantil* or to a bankruptcy (*quiebra*). However, the relevant guarantee may be deemed to have been a fraudulent transfer and declared void if the Guarantor is deemed not to have received fair consideration in exchange for such guarantee.

*The guarantees of our non–Mexican Guarantors may be held to be unenforceable under fraudulent conveyance laws or limited by other applicable laws.*

We have agreed to cause our non–Mexican Guarantors to guarantee the New Notes. The guarantees of such non–Mexican Guarantors may be subject to review under various laws for the protection of creditors. It is possible that the creditors of such non–Mexican Guarantors may challenge a guarantee as a fraudulent transfer under relevant U.S. federal and state laws by claiming, for example, that, since the guarantees of such non–Mexican Guarantors were incurred for our benefit (and only indirectly, if at all, for the benefit of such non–Mexican Guarantors), the obligations of such non–Mexican Guarantors were incurred for less than reasonable equivalent value or fair consideration. Moreover, laws for the protection of creditors of other jurisdictions also provide similar remedies to creditors of a guarantor. Under certain circumstances, including a finding that a guarantor was insolvent at the time its guarantee was issued, a court could hold that the obligations of the guarantor under the guarantee may be voided or is subordinate to other obligations of the guarantors or that the amount for which a guarantor is liable under a guarantee may be limited. Different jurisdictions define "insolvency" differently. However, a guarantor generally would be considered insolvent under applicable U.S. laws at the time it guaranteed the New Notes if:

- the fair market value (or fair saleable value) of its assets is less than the amount required to pay its total existing debts and liabilities (including the probable liability of contingent liabilities) as they become absolute or mature; or

- the guarantor were incurring debts beyond its ability to pay as such debts mature.

In addition, in compliance with Swiss law, the aggregate amount payable by each Swiss Guarantor will be limited for each such Swiss Guarantor to an amount equal to the maximum amount of the freely distributable retained earnings of such Swiss Guarantor as of such time. There may be other limitations on the guarantees of our other non–Mexican Guarantors required under local applicable laws.

We cannot assure you what standard a court would apply to determine whether a guarantor was "insolvent" as of the date the New Notes were guaranteed. Irrespective of the method of valuation, a court may determine that the guarantees constituted fraudulent transfers on another ground whether or not a guarantor was insolvent on the date the guarantee was issued. In addition, although the New Indentures governing the New Notes will limit the amount of the guarantees to the amount that will result in the guarantees not constituting fraudulent transfers or improper corporate distributions, we cannot be certain which standard a court would apply in determining the maximum liability of the guarantors.

*Payments on the New Notes and the guarantees will be junior to any secured debt obligations of Vitro and the Guarantors, as the case may be, and effectively junior to debt obligations of any non–guarantor subsidiaries.*

The New Notes and the guarantees will constitute unsecured unsubordinated obligations of Vitro and the Guarantors and will rank equal in right of payment with all of the other existing and future unsecured unsubordinated indebtedness of Vitro and the Guarantors, respectively. Although the holders of the New Notes will have a direct, but unsecured, claim on the assets and property of Vitro, payment on the New Notes will be subordinated to any secured debt of Vitro to the extent of the assets and property securing such debt. Payment on the guarantees of the New Notes will be subordinated to any present or future secured debt of the Guarantors to the extent of the assets and property securing such debt. Payment on the New Notes will also be effectively subordinated to the payment of secured and other creditors of our and the Guarantors' non–guarantor subsidiaries. In addition, under Mexican law, the obligations of Vitro and the Guarantors under the guarantees are subordinated to certain statutory preferences, including claims for salaries, wages, secured obligations, social security and taxes. In the event of Vitro's and of the Guarantors' *concurso mercantil,* or bankruptcy liquidation, such statutory preferences will have preference over any other unsecured claims, including

Table of Contents

claims by any holder of the New Notes. As of June 30, 2010, our secured debt was Ps. 2,324 million ($183.6 million).

Not all of our subsidiaries will be guarantors of the New Notes. However, our financial information (including our financial statements incorporated by reference) is presented on a consolidated basis. For the six–month period ended June 30, 2010, our non–guarantor subsidiaries accounted for 3% of our revenues and 9% of our total assets. As of June 30, 2010, our non–guarantor subsidiaries had Ps. 865 million ($68 million) of indebtedness, all of which is structurally senior to the New Notes.

**U.S. Holders of the Old Notes accepting the Concurso *Plan may recognize income in the exchange offer.***

A U.S. Holder (as defined under "Certain U.S. Federal Income Tax Considerations") that exchanges Old Notes for the Restructuring Consideration will be subject to U.S. federal income tax on any gain resulting from the exchange unless the exchange qualifies as a "recapitalization." In addition, the Note Consent Payment and Restructuring Fee may give rise to ordinary taxable income for a U.S. Holder even if the exchange qualifies as a recapitalization or the Holder would otherwise recognize a loss on the exchange. Finally, the terms of the New 2019 Notes will likely subject the New 2019 Notes to the original issue discount rules and, possibly, to certain rules applicable to contingent payment debt instruments. These rules could result in U.S. Holders being required to include amounts in taxable income in advance of the receipt of cash payments on the New 2019 Notes. The proper characterization for U.S. tax purposes of the New MCDs is unclear. See the discussion herein under the heading "Certain U.S. Federal Income Tax Considerations" and "Material Mexican Federal Tax Considerations" for a discussion of the tax consequences of the exchange of the Old Notes for the Restructuring Consideration and Note Consent Payment.

The U.S. federal income tax consequences associated with exchanging Old Notes for the Restructuring Consideration, receiving the Note Consent Payment and Restructuring Fee and owning the New Notes are very complex. U.S. Holders should consult their own tax advisers as to the U.S. federal income tax consequences to them of granting their consent, and of the ownership and disposition of the New Notes, including the application of the tax considerations discussed in this Statement to their particular situations, as well as the application of state, local, foreign or other tax laws.

***The provisions of the New Indentures governing the New Notes generally will not apply to our Unrestricted Subsidiaries and therefore their ability, among other things, to incur debt, encumber their assets and make payments and distributions will not be limited thereby.***

Generally, the covenants and events of default to be included in the New Indentures governing the New Notes will not apply to the Unrestricted Subsidiaries. See "Description of the New Notes." As a result, the New Indentures governing the New 2019 Notes will impose no limitations on the ability of the Unrestricted Subsidiaries, among other things, to incur debt, make restricted payments, pledge their assets, make asset sales and permit restrictions on their ability to pay dividends or make other distributions to us or to issue their stock to third parties.

Moreover, our Unrestricted Subsidiaries will not guarantee the New Notes. Thus, the New Notes will be effectively subordinated to all obligations, including indebtedness and trade payables, of our Unrestricted Subsidiaries. As a result, when evaluating our credit risk and making an investment decision with respect to the New Notes, you should not expect that the assets or cash flow of, if any, or our equity interest in, the Unrestricted Subsidiaries will be available to repay the principal of, or pay interest on, the New Notes. Subject to the limitations described under "Description of the New Notes—Certain Covenants—Designation of Restricted and Unrestricted Subsidiaries," we will be permitted to designate new or existing subsidiaries as Unrestricted Subsidiaries.

***Absent an exemption from registration under the Securities Act, we cannot assure you that the New Notes will not be subject to certain transfer restrictions. There is no established trading market for the New Notes and holders of New Notes may not be able to sell the New Notes at the price that holders paid, or at all.***

We are making the Exchange Offer and Consent Solicitation in accordance with Section 3(a)(9) of the Securities Act, which will result in the New Notes being freely transferable, like the Old Notes, when issued in

**Table of Contents**

exchange for the Old Notes. Upon filing of our *concurso mercantil* petition, we intend to seek an order of a bankruptcy judge in connection with a bankruptcy proceeding whether pursuant to chapter 11 of the U.S. Bankruptcy Code or an ancillary proceeding pursuant to chapter 15 of the U.S. Bankruptcy Code providing an exemption from registration under the Securities Act and applicable state and local laws requiring registration of securities with respect to the New Notes issued under the *Concurso* Plan in exchange for all of the Restructured Debt. We cannot provide any assurance that we will be successful in obtaining such an order. If we do not obtain such an order, the New Notes issued in exchange for the DFI Claims and Other Debt will be subject to certain transfer restrictions.

There is no established trading market for the New Notes. We do not intend to list the New Notes on any securities exchange or to arrange for their quotation on any automated dealer quotation system. As a result, we can make no assurances as to the liquidity of any trading market for the New Notes.

We also can make no assurances that holders of New Notes will be able to sell their New Notes at a particular time or that the prices that such holders receive when they sell the New Notes will be equal to or more than the prices they paid for the New Notes. Future trading prices of the New Notes will depend on many factors, including:

- our operating performance and financial condition;

- ratings of our debt published by credit rating agencies;

- the level, direction and volatility of market interest rates generally;

- the time remaining to maturity of the New Notes;

- the liquidity of the New Notes generally and the interest of securities dealers in making a market in the New Notes;

- the market for similar securities; and

- general economic and political conditions.

***We may not have the ability to raise funds necessary to finance the Change of Control offer required by the New Indentures governing the New Notes.***

If we undergo a Change of Control (as defined in the New Indentures governing the New Notes), we may need to refinance large amounts of our debt, including the New Notes and certain indebtedness. Under the New Indentures governing the New Notes, if a Change of Control occurs, we must offer to buy back the New Notes for a price equal to 101% of the outstanding principal amount of the applicable New Notes, plus any accrued and unpaid interest. We may not have sufficient funds available to us to make any required repurchases of the New Notes upon a Change of Control. If we fail to repurchase the Old Notes, as applicable, in those circumstances, we will be in default under the applicable indenture.

Any future debt that we incur may also contain restrictions on repurchasing of the New Notes upon a Change of Control. If any Change of Control occurs, we may not have sufficient funds to satisfy all of our debt obligations.

***Various provisions of Mexican law may make it difficult for holders of New Notes to convert payments they receive in pesos into U.S. dollars or may make it difficult for holders of New Notes to recognize full value of payments to them.***

We are required to make payments of amounts owed on the New Notes in U.S. dollars. However, under the *Ley Monetaria de los Estados Unidos Mexicanos*, which we refer to as the "Mexican Monetary Law," obligations to

69

make payments in Mexico in foreign currency, whether by agreement or upon enforcement of a judgment, may be discharged in pesos at the exchange rate for pesos prevailing at the time and place of payment. This rate is currently determined by the Mexican Central Bank every business day in Mexico and published the next business day in Mexico's Daily Official Gazette of the Federal Government. Accordingly, we will be legally entitled to make payment of amounts due on the New Notes in pesos if payment of the New Notes is sought in Mexico through the enforcement of a non-Mexican judgment or otherwise. If we elect to make payments due on the New Notes in pesos in accordance with the Mexican Monetary Law, we can make no assurances that the amounts paid may be converted by the payee into U.S. dollars or that, if converted, such amounts would be sufficient to purchase U.S. dollars equal to the amount of principal, interest or additional amounts due on the New Notes.

*You may not be able to effect service of process on us, our non–U.S. subsidiaries, our directors or our officers or to enforce in Mexican courts judgments obtained against us in the United States.*

We are a corporation (*sociedad anonima bursátil de capital variable*) organized under the laws of Mexico. Almost all of our directors and officers reside outside the United States. Substantially all of the assets of such persons are located outside the United States. A substantial portion of our assets are located (and a majority of our resources are derived from sources) in Mexico. As a result, it may not be possible for investors to effect service of process within the United States or in any other jurisdiction outside of Mexico upon us, our non–U.S. subsidiaries, our directors or our officers or to enforce against us, our non–U.S. subsidiaries, our directors or our officers in any jurisdiction outside of Mexico judgments predicated upon the laws of any such jurisdiction, including any judgment predicated upon the U.S. federal and state securities laws. We have been advised by our special Mexican counsel, Kuri Breña, Sánchez Ugarte y Aznar S.C., that there is uncertainty as to the enforceability in Mexican courts, in original actions or in actions for enforcement of judgments obtained in courts of jurisdictions outside of Mexico, of civil liabilities arising under the laws of any jurisdiction outside of Mexico, including any judgment predicated solely upon the U.S. federal and state securities laws.

*Judgments of Mexican courts enforcing the obligations of the Company and the Guarantors in respect of the New Notes would be paid only in pesos.*

Under the Mexican Monetary Law, in the event that any proceedings are brought in Mexico seeking performance of the obligations of the Company or the Guarantors under the New Notes, pursuant to a judgment or on the basis of an original action, we and the Guarantors may discharge our obligations denominated in any currency other than Mexican pesos by paying Mexican pesos converted at the rate of exchange prevailing on the date payment is made. This rate is currently determined by the Mexican Central Bank every business day in Mexico and published the next business day in Mexico's Daily Official Gazette of the Federal Government.

In addition, if we or the Guarantors are declared bankrupt or become subject to *concurso mercantil,* our obligations and the obligations of the Guarantors under the New Notes, respectively, (i) would be converted into Mexican pesos and then from Mexican pesos into UDIs and would not be adjusted to take into account any devaluation of the Mexican peso relative to the U.S. dollar occurring after such conversion, (ii) would be satisfied at the time claims of all our creditors are satisfied, (iii) would be subject to the outcome of, and priorities recognized in, the relevant proceedings, (iv) would cease to accrue interest from the date a *concurso mercantil* is declared and (v) would be subject to certain statutory preferences, including tax, social security and labor claims and claims of secured creditors. In addition, the guarantees may not be enforceable.

*Our by–laws only permit Mexican ownership of our shares, and we do not have an ADS program. Upon conversion of the New MCDs, you may not hold shares directly but only through our CPO program.*

Our by–laws (*estatutos sociales*) contain limitations for share holding by non–Mexican investors. We may consider modifying our by–laws prior to the conversion of the New MCDs in order to avoid such restrictions. Because a by–law amendment requires shareholder approval at an extraordinary shareholders' meeting, no assurance may be given that the shareholders will approve such an amendment. Absent such amendment, non–Mexican investors may not currently hold our shares and may only be entitled to the benefits of our shares through our CPO program, which we have in place through a Mexican trust in Nacional Financiera. Moreover, the Company does not have an American Depositary Shares ("ADS") program in place, and does not intend to implement one in the near

70

**Table of Contents**

future. Therefore, shares or CPOs resulting from the conversion of the New MCDs may not be traded in any market other than Mexico.

*If you hold New MCDs, you will not be entitled to any rights with respect to our by-laws and our shares, but will be subject to all changes made with respect to our shares.*

    If you hold New Notes, you will not be entitled to any rights with respect to our shares (including, without limitation, voting rights or rights to receive any dividends or other distributions) but will be subject to all changes affecting our shares. You will have rights with respect to our shares only if and when you tender your New MCDs for conversion and comply with the other requirements to convert them and, in limited cases, under the conversion rate adjustments applicable to the New MCDs, as set forth in "Description of the New Notes." For example, in the event that an amendment is proposed to our by-laws (*estatutos sociales*) requiring shareholder approval and the record date for determining the shareholders of record entitled to vote on the amendment occurs prior to the conversion date, you will not be entitled to vote on the amendment, although you will nevertheless be subject to any changes in the powers, preferences or special rights of our shares that result from the amendment. Similarly, if we declare a dividend and the record date determining the shareholders of record entitled to the dividend occurs prior to the conversion date, you will not be entitled to the dividend. See "Description of the New Notes."

*There are restrictions in Mexico on resale of the New Notes.*

    The New Notes will not be recorded in Mexico's National Securities Registry (*Registro Nacional de Valores*). As a result, you may transfer or resell the New Notes and the shares issuable upon conversion of the New Notes in Mexico only in a private transaction or otherwise pursuant to a private placement exception set forth under Article 8 of the *Ley del Mercado de Valores*, or Mexican Securities Market Law, to institutional and qualified buyers. Participating Creditors who consent pursuant to the terms of this Statement should proceed on the assumption that they may have to hold the New Notes until maturity. See "Notice to Investors."

*We may not be able to obtain shareholders' or regulatory authorizations for the issuance of the New MCDs and sufficient shares for purposes of timely satisfying our settlement obligations in connection with a conversion.*

    We expect to obtain shareholders' authorization for the issuance of the New MCDs and additional ordinary shares, free of preemptive rights, to be kept in our treasury for the purpose of complying with our conversion obligations under the New MCDs. Because the issuance of the New MCDs and the issuance of ordinary shares require shareholder approval and such a covenant may not be enforced through specific performance, no assurances may be given that our shareholders will authorize the issuance of the New MCDs and such additional shares. In addition, under our by-laws, non-Mexican investors may only be entitled to the benefits of our shares through a CPO program that we have in place through a Mexican trust agreement with Nacional Financiera. See "Description of the CPOs." Failure by us to have sufficient ordinary shares, free of preemptive rights, available for conversion, would result in an event of default under the New MCDs and you would have to pursue your remedies provided in the New MCDs.

*An adverse rating of the New Notes may cause their trading prices to fall.*

    We intend to obtain ratings for the New Notes. If a rating agency rates the New Notes, it may assign a rating that is lower than investors' expectations. Rating agencies also may lower ratings on the New Notes in the future. If rating agencies assign a lower-than-expected rating or reduce, or indicate that they may reduce, their ratings in the future, the trading price of the New Notes could decline significantly.

Table of Contents

# CAPITALIZATION

The following table sets forth our capitalization on a consolidated basis as of June 30, 2010:

- on an actual basis; and

- as adjusted to give effect to the *Concurso* Plan.

This table should be read in conjunction with "Selected Historical Consolidated Financial Information," "Unaudited Pro Forma Financial Information," "Liquidity and Capital Resources" and the consolidated financial statements included in this Statement.

| | As of June 30, 2010 | | | |
| | Actual (Ps. millions) | Actual ($ millions)[1] | As Adjusted (Ps. millions) | As Adjusted ($ millions)[1] |
|---|---|---|---|---|
| **Restructured Debt:** | | | | |
| **Old Notes** | | | | |
| 2012 Notes | 3,797 | 300 | — | — |
| 2013 Notes | 2,734 | 216 | — | — |
| 2017 Notes | 8,860 | 700 | — | — |
| Total | 15,391 | 1,216 | — | — |
| DFI Claims (including Promissory Notes) | 3,040 | 240 | — | — |
| **Other Debt** | | | | |
| *Certificados Bursátiles Vitro 03* | 150 | 12 | — | — |
| *Certificados Bursátiles Vitro 08* | 400 | 32 | — | — |
| Other | 190 | 15 | — | — |
| Total | 740 | 58 | — | — |
| Total debt subject to restructuring | 19,171 | 1,515 | — | — |
| Total past−due interest | 2,622 | 207 | — | — |
| Unamortized discounts | (96) | (8) | — | — |
| Total | 21,697 | 1,714 | — | — |
| **Non−restructured Debt:** | | | | |
| Total debt not subject to restructuring | 3,314 | 262 | 3,314 | 262 |
| New 2019 Notes | — | — | 10,758 | 850 |
| **Total Debt** | 25,011 | 1,976 | 14,072 | 1,112 |
| **Stockholders' Equity:** | | | | |
| Majority stockholders' equity | 10 | 0 | 6,344[2] | 501[2] |
| Minority stockholders' equity | 1,312 | 104 | 1,312 | 104 |
| New MCDs | — | — | 1,266 | 100 |
| Total stockholders' equity | 1,322 | 104 | 8,922 | 705 |
| **Total Capitalization** | 26,332 | 2,080 | 22,994 | 1,817 |

(1)   Peso amounts have been translated into U.S. dollars, solely for the convenience of the reader, at the rate of 12.6567 pesos per one U.S. dollar, the Free Exchange Rate June 30, 2010.

(2)   Includes gains from restructured debt, net of applicable tax.

72

Table of Contents

### THE RESTRUCTURING AND THE *CONCURSO* PLAN

We have not commenced a *concurso* proceeding under the Mexican Bankruptcy Law. The Exchange Offer and Consent Solicitation requests advance acceptance of the *Concurso* Plan in the event that a *concurso* proceeding is commenced and the *Concurso* Plan is filed along with a voluntary or involuntary *concurso mercantil* declaration petition, and contains information relevant to a decision to accept or reject the *Concurso* Plan. Concurrently with this Exchange Offer and Consent request, we are seeking consent from the holders of the DFI Claims and the Other Debt with respect to the *Concurso* Plan.

If the requisite 40% acceptance requirement for the *Concurso* Plan is met, we will file a request for a *concurso mercantil* declaration pursuant to the Mexican Bankruptcy Law, to pursue the restructuring through the *Concurso* Plan.

For a summary of our financial condition, the background of and reasons for the restructuring and the reasons why we are seeking acceptance of the *Concurso* Plan, see "Summary—Background of the Restructuring."

We have decided to effect the restructuring through the commencement of a *concurso* proceeding, and in order to pursue a Mexican bankruptcy reorganization in the quickest and most cost efficient manner, we are proposing an exchange offer and soliciting acceptances of the *Concurso* Plan from the holders of the Restructured Debt pursuant to this Statement. The *Concurso* Plan provides for, among other things, the distribution of the Restructuring Consideration to the holders of the Restructured Debt on a pro rata basis. If the *Concurso* Plan is consummated, we will implement a recognition and ratification proceeding in the United States through chapter 15 of the U.S. Bankruptcy Code and issue the New Notes, which we will distribute with the Restructuring Cash Payment in full settlement and satisfaction of the claims arising from or related to the Old Notes.

The distributions to the holders of Restructured Debt under the *Concurso* Plan are subject to proration with all other recognized creditors.

The *Concurso* Plan or restructuring agreement is attached to this Statement as Annex A. The *Concurso* Plan and this Statement should be read and studied in their entirety prior to voting on the *Concurso* Plan. See "Risk Factors" for a discussion of risks associated with the *Concurso* Plan and the transactions contemplated thereunder. You are urged to consult your counsel about the *Concurso* Plan and its effect on your legal rights before voting.

We have prepared the *Concurso* Plan for effecting our restructuring through a *concurso* proceeding. We are therefore separately soliciting the tender of Old Notes and the consent of each Holder in favor of the *Concurso* Plan in the Exchange Offer and Consent Solicitation along with the consent from each holder of the DFI Claims arising from guarantees issued by the Company and the Other Debt.

The Company will issue the New Notes following the approval of the *Convenio Concursal*. See "Summary—Background of Restructuring—The Restructuring Process—Fintech Lock–up Agreement".

**Anticipated Events in a *Concurso* Proceeding with a Pre–approved Restructuring Agreement**

The *Concurso* Plan constitutes a restructuring agreement to be filed with a petition for a *concurso* proceeding governed by the Mexican Bankruptcy Law, to be approved within the Work–out Stage of such proceeding and affecting all creditors recognized therein. The Work–out Stage shall not last more than one calendar year following the last publication of the *Concurso* ruling in the *Diario Oficial de la Federación*, Mexico's Daily Official Gazette of the Federal Government. In the event the Company does enter into the pre–approved restructuring agreement with creditors holding the sufficient percentage of the outstanding liabilities of the Company provided for in the Mexican Bankruptcy Law (40%), the *concurso* of the Company shall be declared, starting with the Work–out Stage, without exhausting a previous review of the financial and accounting situation of the Company, known as the *Visit* procedure in the *concurso*. See "The Mexican Law of Commercial Reorganizations" section of this Statement for more information on the *concurso* proceeding.

73

Table of Contents

The Mexican Bankruptcy Law provides that a debtor may continue to operate its business and remains in possession of its property and management of its business unless the Work-out Specialist requests the bankruptcy court and the bankruptcy court concedes in a contested procedure the removal of management on grounds of protection of the estate of the debtor. The filing of a reorganization case also triggers the automatic stay provisions of the Mexican Bankruptcy Law.

The *Concurso* Plan provides that recognized creditors, including the holders of Restructured Debt, will be entitled to receive the Restructuring Consideration on a pro rata basis. More specifically, pursuant to the *Concurso* Plan, the Company would, among other things, exchange the Restructured Debt for the following Restructuring Consideration on a pro rata basis:

- $850.0 million in aggregate principal amount of New 2019 Notes;

- $100.0 million in aggregate principal amount of New MCDs (not including the Issue Date Adjustment), which will mandatorily convert into 15.0% of our equity if not paid in full at maturity;

- the Restructuring Cash Payment, which will be paid from the remainder of the cash in the Payment Trust after the Consent Payment is made, to all holders of the Restructured Debt on a pro rata basis; and

- a restructuring fee based on the issue date of the New Notes to be determined as described in "Summary—The New Notes—The New 2019 Notes."

Any intercompany debt will not receive the Restructuring Consideration and (other than ordinary course payments) will be subordinated to payment of the Restructured Debt.

The delivery and payment of the Restructuring Consideration pursuant to the proposed *Concurso* Plan is subject to, among other things, the approval of the *Convenio Concursal*, including its implementation through a further chapter 15 bankruptcy case in the United States to recognize and ratify the restructuring agreement and the issuance of the New Notes. See "Description of the New Notes" for a more detailed description of the New Notes.

*Filing of* **Concurso** *Proceeding Petition*

Pursuant to article 339 of the Mexican Bankruptcy Law, a *concurso* declaration request with a pre-approved plan of reorganization must be admitted by the *bankruptcy* court if (i) the request is filed by the Company together with creditors representing at least 40% of the Company's outstanding liabilities; (ii) the requests complies with the requirements set forth in article 20 of the Mexican Bankruptcy Law; (iii) the Company represents to be in default or in imminent default of its payment obligations representing at least 35% of its total outstanding liabilities for more than 30 days or lacks sufficient liquid assets (as identified in Article 10 section II of the Mexican Bankruptcy Law) to meet at least 80% of its overdue obligations; and (iv) the request is filed along with the pre-approved restructuring agreement executed by the Company and creditors representing at least said 40% of the Company's outstanding liabilities. Participating Creditors that deliver their consent in the consent solicitation will adhere to the petition of the Company for the *concurso* and will authorize an attorney-in-fact appointed by the Company to appear on their behalf before the bankruptcy court in order to pursue the corresponding *concurso* proceeding declaration and the approval of the *Concurso* Plan, or as it may be requested to be adjusted by the bankruptcy court or the Work-out Specialist, the restructuring plan or *Convenio Concursal* to be approved by said court.

**Concurso** *Ruling or Declaration*

After filing the *concurso* declaration request and provided all the filing and legal requirements are met, the bankruptcy court will declare the Company in *concurso mercantil*, without the prior review of the financial condition by a court-appointed Visitor Specialist as provided in article 341 of the Mexican Bankruptcy Law. Thenceforth and pursuant to article 342 of the Mexican Bankruptcy Law, the Company's *concurso* proceeding will

74

Table of Contents

be substantiated in the same manner as any other *concurso* proceeding, except that any restructuring proposal shall be based on the *Concurso* Plan initially submitted by the Company and the filing creditors.

The *concurso* ruling shall comply with the requirements set forth in article 43 of the Mexican Bankruptcy Law and shall address, among other, the following: (i) the initiation of the Work−out Stage; (ii) an order to the Company to suspend all payments that the Company should otherwise make, except for those required for the ongoing operation of the business; (iii) the date for the look−back period from which the entity's transactions may be scrutinized in order to determine if such transactions could have constituted fraudulent conveyances (the "Retroactive Date" and the period thenceforth, the "Retroactive Period") (the statutory Retroactive Date is 270 days prior to the initial declaratory ruling, but the Retroactive Period may be extended if certain conditions are met); (iv) the order to the Federal Institute of Bankruptcy Specialists or *IFECOM* to appoint the Work−out Specialist or *conciliador*, who shall conduct a part of the *concurso* proceedings without the intervention of the judiciary; (v) an order to the Work−out Specialist, to initiate the recognition of claims proceeding; and (vi) a notice to the creditors of their right to request the recognition of their claims.

Pursuant to article 44 of the Mexican Bankruptcy Law, the bankruptcy court will give notice of the *concurso* ruling to the Company and the IFECOM on the day after the *concurso* ruling is issued. The bankruptcy court will also notify all creditors whose domiciles are known by means of certified mail or by any other legal means. Moreover, the Work−out Specialist shall file the *concurso* ruling for registration with the Public Registry of Commerce located at the place where the Company has its corporate domicile (San Pedro Garza García, State of Nuevo Leon, Mexico) and shall publish a summary of the *concurso* ruling in the *Diario Oficial de la Federación*, Mexico's Daily Official Gazette of the Federal Government, and in a newspaper with broad distribution coverage in the place where the *concurso* proceeding is substantiated. Those parties to the *concurso* proceeding not notified pursuant to articles 44 and 45 of the Mexican Bankruptcy Law shall be considered notified of the *concurso* ruling on the day the publication in the newspaper is made.

### Appointment of the Work−out Specialist

The Federal Institute of Bankruptcy Specialists or *IFECOM* shall appoint the Work−out Specialist or *conciliador*, who shall conduct a part of the Work−out Stage of the *concurso* proceeding without the intervention of the judiciary. The Work−out Specialist shall inform the holders of Restructured Debt and other creditors of its appointment and designate a domicile for purposes of the *concurso* proceeding. The holders of Restructured Debt shall have the right to contest the appointment of the Work−out Specialist in those cases where a conflict of interest exists as provided in articles 56 and 328 of the Mexican Bankruptcy Law.

### Recognition of Debts Request

Pursuant to article 122 of the Mexican Bankruptcy Law, each creditor may request the recognition of its claims against the Company (i) within 20 days following the date on which the *concurso* ruling is published in the Federal Official Gazette; (ii) within the term provided in article 129 of the Mexican Bankruptcy Law for objecting to the preliminary list of creditors; or (iii) within the term to appeal the debt recognition ruling. No debt recognition request shall be made after the term to appeal the debt recognition ruling has elapsed.

The debt recognition request will be filed with the Work−out Specialist by using the forms provided by the IFECOM for such purposes, containing the information specified in article 125 of the Mexican Bankruptcy Law and including the originals or certified copies of the documents evidencing the debt to be recognized.

### Lists of Recognized Creditors

In accordance with article 121 of the Mexican Bankruptcy Law, the Work−out Specialist shall prepare and submit to the bankruptcy court a preliminary list of creditors within 30 days from the day on which the *concurso* ruling is published in the Official Gazette. Such list shall be prepared based on the accounting records of the Company, the information provided by the Company and creditors' recognition requests. The preliminary list of recognized creditors shall provide (i) the name and domicile of each creditor; (ii) the recognized amount of the claim; (iii) the collateral, terms and conditions of each claim, including a description of the type of document

75

**Table of Contents**

evidencing the claim; and (iv) the ranking assigned to such claim pursuant to the Mexican Bankruptcy Law. The list shall also contain a description of those credits that will not be recognized and the reasons thereto. Pursuant to article 129 of the Mexican Bankruptcy Law, upon receiving the preliminary list from the Work−out Specialist, the bankruptcy court shall, within a term of five days, make the list available to the Company and the creditors in order for those to review it and submit in writing any objections and make such objection available to the Work−out Specialist on the following day. The Work−out Specialist shall have a period of 10 days to prepare and present to the bankruptcy court the definitive list of recognized creditors based on the preliminary list of recognized creditors and the objections submitted by the Company and the creditors.

 *Credit Recognition and Ranking Ruling*

 The bankruptcy court shall issue the debt recognition, graduation and ranking ruling within five days from the date on which the definitive list of recognized creditors is submitted by the Work−out Specialist. On the following day, the bankruptcy court shall notify the credit recognition, graduation and ranking ruling to the recognized creditors and the Work−out Specialist through the publication made through the bankruptcy court board or *estrados*. Any of the creditors, including any holders of Restructured Debt, the Company or the Work−out Specialist may appeal the Credit Recognition and Ranking Ruling in terms of articles 135 to 144 of the Mexican Bankruptcy Law.

 *Agreement with Recognized Creditors*

 The Company and the recognized creditors representing the majority (as defined in the Mexican Bankruptcy Law) shall enter into an agreement for the payment of debts within a period of 185 days after the publication of the *concurso* ruling in the *Diario Oficial de la Federación*, Mexico's Daily Official Gazette of the Federal Government (article 145 of the Mexican Bankruptcy Law). Under certain circumstances, such term may be extended for up to two additional extensions of 90 days each. The required majority under article 157 of the Mexican Bankruptcy Law for the approval of the restructuring plan consists of a number of recognized creditors representing more than 50% of the sum of (i) the recognized amount to all recognized unsecured creditors, and (ii) the recognized amount to those secured recognized creditors or creditors with special privileges joining or executing the restructuring plan. As mentioned above, the commencing of a *concurso* presumes the approval from creditors representing at least 40% of all of the Company's outstanding liabilities.

 Pursuant to article 161 of the Mexican Bankruptcy Law, once the Work−out Specialist considers that the *Concurso* Plan has sufficient votes to be approved, the Work−out Specialist shall present the plan to recognized creditors, who will have the right to review and sign it within a term of 10 days. Once the *Concurso* Plan is executed by the required majority, the Work−out Specialist shall present it to the bankruptcy court. The bankruptcy court shall grant recognized creditors or creditors with special privileges that executed the *Concurso* Plan a five−day term to present objections based on the authenticity of their vote. Recognized creditors representing a majority in number or in amount may veto the *Concurso* Plan.

 Pursuant to the Mexican Bankruptcy Law, once a *Concurso* Plan becomes effective and is approved by the competent bankruptcy court, it shall bind (i) the Company; (ii) all common recognized creditors; (iii) all secured recognized creditors that subscribe the *Concurso* Plan; and (iv) those secured recognized creditors that do not subscribe the *Concurso* Plan but whose recognized credits are to be paid under the *Concurso* Plan. According to the Mexican Bankruptcy Law, all unsecured recognized creditors would be deemed to have consented to the *Concurso* Plan, without any right to express an opinion on such plan, provided the plan contemplates payment of their credits owed at the time the *concurso* ruling becomes effective.

**Concurso Ruling Effects**

 Among the most important effects of the *concurso* ruling are (in each case, subject to certain exceptions): (i) the suspension of payments by the Company; (ii) the suspension of foreclosure and attachment proceedings (except for labor indemnities and wages); and (iii) the cessation of interest accrual on all payment obligations, and their conversion to UDIs (*Unidades de Inversión*), however, secured obligations will continue in their denominated currency and will only accrue ordinary interest provided for in the corresponding documentation, up to the value of

Table of Contents

the assets securing such obligations. The *concurso* ruling does not suspend the obligation to pay salaries, taxes or employer related contributions. Any assets that are in possession of the Company but which are not rightfully owned by the Company may be separated from the bankruptcy estate. Subject to certain exceptions provided for in the Mexican Bankruptcy Law, the general provisions of contracts law and the agreements between the parties shall continue to govern the company's outstanding transactions.

In addition, there are certain agreements which are not considered terminated due to a *concurso* ruling unless in the opinion of the Work–out Specialist their fulfillment is not in the best interest of the bankruptcy estate including, among other things: (i) preliminary and final agreements pending enforcement; (ii) deposits, credit extensions, commission or agency agreements; and (iii) lease agreements.

**Graduation and Ranking of Creditors**

Subject to certain rules and exceptions (i.e., labor liabilities, bankruptcy estate management expenses, attorney fees, and Work–out Specialist, Receiver and inspector fees), pursuant to Section Seventh of the Mexican Bankruptcy Law, the ranking of creditors generally shall be as follows: (i) solely privileged creditors, or *acreedores singularmente privilegiados*, meaning those holding credits related to funeral and medical expenses (only applicable to individuals); (ii) secured creditors with *in rem* right guarantees (mortgage or pledge), or *acreedores con garantía real*; (iii) certain labor liabilities; (iv) creditors which under the Mexican Commercial Code have special privileges by right of retention; (v) certain labor and tax liabilities; and (vi) common creditors, on a *pro rata* basis, without distinction as to the date on which their credits were granted or became due.

Holders of the Restructured Debt would be considered common creditors.

**U.S. Bankruptcy Proceeding**

As a part of the implementation of the restructuring, Vitro shall, following the *concurso mercantil* filing, file an ancillary proceeding in the United States (the "Chapter 15 Proceeding") pursuant to chapter 15 of the United States Bankruptcy Code, as amended (the "U.S. Bankruptcy Code") based on the *concurso mercantil* proceeding in Mexico (the "Main Proceeding").

The purpose of the filing of a Chapter 15 Proceeding would be the recognition of the Main Proceeding to give effect to the *Concurso* Plan in the United States. In addition, Vitro intends to file various motions in the Chapter 15 Proceeding, seeking, among other things, application of the automatic stay under section 362 of the U.S. Bankruptcy Code and a preliminary injunction co–extensive with the automatic stay to implement such stay, enjoining all U.S. creditors of Vitro or its subsidiaries from taking any action to enforce any pre–petition claims against Vitro or its subsidiaries. In addition, upon approval of the *Concurso* Plan in the *concurso mercantil* proceeding in Mexico, Vitro intends to request that the Court in the Chapter 15 Proceeding enter an order implementing the *Concurso* Plan in the United States, including a permanent injunction against any action to enforce any claims dealt with or discharged in the *Concurso* Plan.

As a part of the Exchange Offer and Consent Solicitation, each holder of Restructured Debt shall agree that upon the filing of a Chapter 15 Proceeding, it will not challenge the Chapter 15 Proceeding during or after the pendency of the Main Proceeding, including, without limitation, seeking relief from the automatic stay or challenging or seeking relief from any injunction or restraining order sought or entered to implement such a stay.

Table of Contents

## SELECTED HISTORICAL CONSOLIDATED FINANCIAL INFORMATION

The following table presents selected consolidated financial information and other data for each of the periods presented. This information and data should be read in conjunction with, and is qualified in its entirety by reference to, our consolidated financial statements and the notes thereto included elsewhere in this Statement and the information under the section entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations" as it relates to 2007, 2008 and 2009. The years ended December 31, 2005 and 2006 are derived from our public financial statements not included in this Statement. Our consolidated financial statements are prepared in accordance with MFRS.

Financial data expressed in pesos and set forth in the following table for 2008, 2009 and June 30, 2009 and 2010 are presented in nominal pesos and for all amounts pertaining to fiscal year 2007 and earlier are restated in constant pesos as of December 31, 2007, except where otherwise indicated.

| | Year Ended December 31, | | | | | | Six Months Ended June 30, | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2005 | 2006 | 2007 | 2008 | 2009 | 2009 | 2009 | 2010 | 2010 | |
| | | | (Ps. millions)[1] | | | ($ millions)[2] | (Ps. millions) | | ($ millions)[2] | |
| **Income Statement Data:** | | | | | | | | | | |
| **MFRS:** | | | | | | | | | | |
| Net sales | Ps.26,567 | Ps.27,876 | Ps.28,591 | Ps.29,013 | Ps.23,991 | $ 1,837 | Ps.12,292 | Ps.11,399 | $ 901 | |
| Cost of sales | 19,198 | 20,230 | 20,187 | 21,279 | 17,180 | 1,316 | 8,723 | 8,386 | 663 | |
| Gross profit | 7,369 | 7,646 | 8,404 | 7,734 | 6,811 | 521 | 3,569 | 3,013 | 238 | |
| Selling, general and administrative expenses | 5,530 | 5,529 | 5,700 | 6,024 | 5,482 | 420 | 2,936 | 2,397 | 189 | |
| Operating income | 1,839 | 2,117 | 2,704 | 1,710 | 1,329 | 101 | 633 | 616 | 49 | |
| Financing result: | | | | | | | | | | |
| Interest expense, net | 2,355 | 2,155 | 1,836 | 2,089 | 2,772 | 212 | 1,355 | 1,267 | 100 | |
| Derivative financial instruments | 17 | 337 | 201 | 3,766 | 570 | 44 | 459 | 108 | 9 | |
| Exchange loss (gain), net | (417) | 224 | 94 | 3,222 | (976) | (75) | (774) | (285) | (23) | |
| Gain from monetary position[3] | (455) | (440) | (471) | — | — | — | — | — | — | |
| Total comprehensive financing result | 1,500 | 2,276 | 1,660 | 9,077 | 2,366 | 181 | 1,039 | 1,090 | 86 | |
| Other expenses (income), net[4] | 494 | (229) | 869 | 495 | 291 | 22 | 159 | 152 | 12 | |
| (Loss) income before income and asset tax | (155) | 70 | 175 | (7,858) | (1,352) | (104) | (551) | (612) | (48) | |
| Income and asset tax expense (benefit) | (519) | 228 | 44 | (2,175) | (598) | (47) | (142) | (152) | (12) | |
| Net income (loss) from continuing operations before changes in accounting principles | 364 | (158) | 131 | (5,682) | (754) | (57) | (409) | (459) | (36) | |
| Net income (loss) from discontinued operations | 3 | (31) | | | | | | | | |
| Gain on sale of discontinued operations | | 480 | | | | | | | | |
| Cumulative effect of changes in accounting principle | (124) | — | — | — | — | — | — | — | — | |
| Net income (loss) | 243 | 291 | 131 | (5,682) | (754) | (57) | (409) | (459) | (36) | |
| Net income (loss) of majority interest | 63 | 401 | (13) | (5,706) | (787) | (60) | (362) | (459) | (36) | |
| Net income (loss) from continuing operations per share | 1.33 | (0.54) | 0.38 | (16.57) | (2.17) | (0.17) | (1.18) | (1.33) | (0.11) | |

78

**Table of Contents**

| | Year Ended December 31, | | | | | Six Months Ended June 30, | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2005 | 2006 | 2007 | 2008 | 2009 | 2009 | 2009 | 2010 | 2010 |
| | (Ps. millions)[1] | | | | | ($ millions)[2] | (Ps. millions) | | ($ millions)[2] |
| Net income (loss) from discontinued operations per share | 0.01 | 1.55 | — | — | — | — | — | — | — |
| Diluted and basic net income (loss) of majority interest per share | 0.23 | 1.39 | (0.04) | (16.64) | (2.27) | (0.18) | (1.04) | (1.32) | (0.10) |

| | As of December 31, | | | | | As of June 30, | | |
|---|---|---|---|---|---|---|---|---|
| | 2005 | 2006 | 2007 | 2008 | 2009 | 2009 | 2010 | 2010 |
| | (Ps. Millions)[1] | | | | | ($ millions)[2] | (Ps. Millions) | ($ millions)[2] |
| **Balance Sheet Data:** | | | | | | | | |
| **MFRS:** | | | | | | | | |
| Cash and cash equivalents[11] | 1,441 | 1,222 | 1,638 | 1,428 | 2,616 | 200 | 2,518 | 199 |
| Current assets | 9,863 | 9,175 | 11,136 | 11,981 | 10,096 | 773 | 10,391 | 820 |
| Total assets from discontinued operations | 2,021 | | | | | | | |
| Total assets | 32,937 | 28,695 | 32,187 | 35,774 | 32,652 | 2,500 | 32,281 | 2,551 |
| Current liabilities | 8,675 | 4,835 | 7,140 | 29,063 | 27,580 | 2,112 | 27,862 | 2,200 |
| Total debt [12] | 15,959 | 12,826 | 14,918 | 22,062 | 20,101 | 1,540 | 19,347 | 1,528 |
| Total liabilities from discontinued operations | 1,398 | | | | | | | |
| Total liabilities | 23,704 | 19,329 | 22,801 | 32,666 | 30,668 | 2,348 | 30,959 | 2,446 |
| Stockholders' equity | 9,234 | 9,366 | 9,386 | 3,108 | 1,984 | 152 | 1,322 | 105 |
| Minority interest in consolidated subsidiaries | 3,198 | 1,892 | 1,960 | 1,404 | 1,464 | 112 | 1,312 | 104 |
| Majority stockholders' equity | 6,036 | 7,474 | 7,426 | 1,704 | 520 | 40 | 10 | 1 |

| | Year Ended December 31, | | | | | Six Months Ended June 30, | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2005 | 2006 | 2007 | 2008 | 2009 | 2009 | 2009 | 2010 | 2010 |
| | (Ps. Millions)[1] | | | | | ($ millions)[2] | (Ps. Millions) | | ($ millions)[2] |
| **Other Data:** | | | | | | | | | |
| **MFRS:** | | | | | | | | | |
| Capital expenditures[10] | 1,107 | 1,252 | 2,695 | 1,798 | 1,009 | 77 | 185 | 232 | 18 |
| Depreciation and amortization | 1,854 | 1,795 | 1,414 | 1,469 | 1,473 | 113 | 727 | 754 | 60 |
| Total shares issued at end of period[5] | 324 | 386.9 | 386.9 | 386.9 | 386.9 | | 386.9 | 386.9 | |
| Total shares held in Stock Option Trust at end of period[5][9] | 22.3 | 17.6 | 17.5 | 11.7 | 39.8 | | 39.8 | 39.8 | |
| Total shares held as treasury stock at end of period[5][9] | 28.2 | 28.3 | 28.3 | 28.5 | 0.4 | | 0.4 | 0.4 | |
| Total shares issued and outstanding at end of period[5] | 273.5 | 341.0 | 341.0 | 346.7 | 346.7 | | 346.7 | 346.7 | |
| Average total shares outstanding during period[5] | 273.1 | 289.6 | 341.0 | 342.8 | 346.7 | | 346.7 | 346.7 | |
| **Inflation and Foreign Currency Exchange Rate Data:** | | | | | | | | | |
| Percentage of change in INPC[6] | 3.3% | 4.1% | 3.8% | 6.5% | 3.6% | | 1.28% | 1.39% | |

**Table of Contents**

| | | Year Ended December 31, | | | | Six Months Ended June 30, | | |
|---|---|---|---|---|---|---|---|---|
| | 2005 | 2006 | 2007 | 2008 | 2009 | 2009 | 2009 | 2010 | 2010 |
| | | | (Ps. Millions)[1] | | | ($ millions)[2] | (Ps. Millions) | | ($ millions)[2] |
| Peso/dollar exchange rate at the end of period[7] | 10.6344 | 10.8116 | 10.8662 | 13.8325 | 13.0587 | | | 13.2023 | 12.6567 |
| Average exchange rate[8] | 10.8786 | 10.9034 | 10.9371 | 11.1939 | 13.5723 | | | 13.9607 | 12.7038 |

[1] Except per share amounts, number of shares and inflation and foreign currency exchange rate data.

[2] Peso amounts have been translated into U.S. dollars, solely for the convenience of the reader, at the rate of 13.0587 and 12.6567 pesos per one U.S. dollar, the Free Exchange Rate on December 31, 2009 and June 30, 2010, respectively.

[3] Through December 31, 2007, the gain from monetary position reflected the result of holding monetary assets and liabilities during periods of inflation. Values stated in current monetary units decreased in purchasing power over time. This means that losses were incurred by holding monetary assets over time, whereas gains were realized by maintaining monetary liabilities. Beginning January 1, 2008, we stopped recognizing gains in monetary position as well as inflation effects. See "Presentation of Financial Information and Other Information" for more information on changes in NIF B–10 regarding effects of inflation.

[4] Other expenses (income), net, include:

| | | Year Ended December 31, (millions) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 2005 | | 2006 | | 2007 | | 2008 | | 2009 |
| Restructuring charges (i) | Ps. | 332 | Ps. | 61 | Ps. | 7 | Ps. | 185 | Ps. | 265 |
| Impairment of long-lived assets | | 385 | | 393 | | 122 | | 196 | | 207 |
| Loss (gain) from sale of long–lived assets | | 6 | | (795) | | 47 | | (3) | | (209) |
| Loss (gain) on sale of subsidiaries | | 137 | | (68) | | 11 | | | | |
| Assignment of Vitro Club Trust (ii) | | (458) | | | | | | | | |
| Early extinguishment of employee retirement obligations | | 18 | | 8 | | 97 | | 69 | | |
| Fees and costs for extinguishment of debt | | | | | | 488 | | | | 7 |
| Statutory employee profit sharing | | 51 | | 55 | | 54 | | 10 | | 13 |
| Other | | 23 | | 117 | | 43 | | 38 | | 8 |
| | Ps. | 494 | Ps. | (229) | Ps. | 869 | Ps. | 495 | Ps. | 291 |

(i) The restructuring charges relate to the downsizing and streamlining of our corporate functions and organization at some of our business units and are part of an ongoing benefit arrangement.

(ii) The Vitro Club holds land and facilities for our employee's recreational activities, which are held in a trust (the "Trust"). The Trust can only be assigned if all of the participants name one entity as the sole beneficiary. In 2005, all the participants named the Company as the sole beneficiary, and therefore the Company has the right to take control of the Trust. The Company recorded the fair value of the assets and recognized other income of Ps. 458 million. At the end of 2008, we decided to temporarily suspend the services provided at the Vitro Club facilities. In April 2010, as part of the cost reduction plan, we sold the land and facilities of Vitro Club.

[5] Millions of shares.

[6] Calculated using year–end INPC of the most recent year divided by the year–end INPC of the previous year.

[7] Based on the Free Exchange Rate at the end of the period.

[8] Calculated using the average of Free Exchange Rates on the last day of each month during the period.

[9] See "Major Shareholders."

[10] For 2008, 2009, and 2010, these amounts represent the capital expenditures paid over the period, which differ from the capital expenditures realized for financial matters.

**Table of Contents**

(11)                    Does not include restricted cash for the years 2005 to 2009. As of June 30, 2010, includes restricted cash due to the change in NIF C‑1.

(12)                    As mentioned above, NIF B‑8 establishes that special purpose entities, over which control is exercised, should be consolidated. We adopted this bulletin beginning January 1, 2009. As a result of this bulletin the amounts as of December 2008 and 2009 include the Company's securitization transactions. For the years ended as of December 31, 2005, 2006 and 2007 the amount of the Company's securitizations were Ps. 1,518, Ps. 1,744 and Ps. 1,631, respectively; such transactions are not included in this table.

As of December 31, 2008 and 2009, we were in default under the indentures governing the Old Notes for $300 million, $216 million and $700 million and certain other debt; therefore, Ps. 16,689 million and Ps. 15,771 million were reclassified as short‑term debt.