**Table of Contents**

(2) reduce the rate of or change the Stated Maturity of any interest payment on any New 2019 Note or New MCD, as the case may be,

(3) reduce the amount payable upon, or discount applicable to, the redemption of any New 2019 Notes or the New MCDs, as the case may be, or change the time of any mandatory redemption, or modify, amend or waive the obligations to make mandatory prepayments of the New Notes in accordance with "—Excess Cash Sweep", in a manner materially adverse to the holders of the New 2019 Notes or the New MCDs, as the case may be, or, in respect of an optional redemption, the times at which any New 2019 Note or New MCD, as the case may be, may be redeemed or, once notice of redemption has been given, the time at which it must thereupon be redeemed,

(4) after the time an Offer to Purchase is required to have been made, reduce the purchase amount or purchase price, or extend the latest expiration date or purchase date thereunder,

(5) change the place or currency of payment of principal of, or any premium or interest on, any New 2019 Note or New MCD, as the case may be,

(6) reduce the percentage in principal amount of outstanding New 2019 Notes or the New MCDs, as the case may be, necessary for modifications or waiver of compliance with certain provisions of the relevant New Indenture or for waiver of certain defaults under the relevant New Indenture and their consequences;

(7) (i) reduce the percentage in principal amount of outstanding New 2019 Notes or the New MCDs, as the case may be, that is required for the adoption of a resolution at a meeting of holders of such New Notes, (ii) reduce the percentage in principal amount of outstanding New 2019 Notes or the New MCDs, as the case may be, that is required for a quorum at a meeting of holders of such New Notes, or (iii) reduce the percentage in principal amount of outstanding New 2019 Notes or the New MCDs, as the case may be, that is required to request the calling of a meeting of holders of such New Notes;

(8) modify any prepayment or redemption provision in a manner that alters the pro rata sharing of payments required thereby;

(9) impair the right of any holder of New 2019 Notes or the New MCDs, as the case may be, to receive any principal payment or interest payment on such holder's New 2019 Notes or the New MCDs, as the case may be, on or after the Stated Maturity thereof, or to institute suit for the enforcement of any such payment,;

(10) modify or change any provision of the relevant New Indenture affecting the ranking of the New 2019 Notes or the New MCDs, as the case may be, or any relevant Note Guaranty in a manner adverse to the holders of the New 2019 Notes or the New MCDs, as the case may be,, or waive or amend the provision in the relevant New Indenture requiring that the New 2019 Notes or the New MCDs, as the case may be, rank *pari passu* with all other senior unsecured debt of the Company;

(11) make any change in the provisions of the New Indentures described under "—Additional Amounts" or "—Optional Tax Redemption" that adversely affects the rights of any holder or amend the terms of the New 2019 Notes or the New MCDs, as the case may be, or the relevant New Indenture in a way that would result in the loss of an exemption from any of the Taxes described thereunder or would otherwise adversely affect any holder for United States or Mexican tax purposes;

(12) modify the governing law or jurisdiction applicable to the relevant New Indenture;

(13) make any change in any Note Guaranty that would adversely affect the holders; or

(14) terminate or deprive any holders of the New 2019 Notes or the New MCDs, as the case may be, of the benefit of any Liens on assets that, individually or in the aggregate, have a fair market value of $10.0 million or more.

203

Table of Contents

It is not necessary for holders to approve the particular form of any proposed amendment, supplement or waiver, but is sufficient if their consent approves the substance thereof.

Neither the Company nor any of its Subsidiaries or Affiliates may, directly or indirectly, pay or cause to be paid any consideration, whether by way of interest, fee or otherwise, to any holder for or as an inducement to any consent, waiver or amendment of any of the terms or provisions of the New Indentures or the New Notes of a series unless such consideration is offered to be paid or agreed to be paid to all holders of the New Notes of such series that consent, waive or agree to amend such term or provision within the time period set forth in the solicitation documents relating to the consent, waiver or amendment.

**Defeasance and Discharge**

The Company may discharge certain of its obligations under a series of the New Notes and the New Indentures by irrevocably depositing in trust with the trustee money or U.S. Government Obligations sufficient to pay principal of and interest on the New Notes of such series to maturity or redemption within sixty days, subject to meeting certain other conditions.

The Company may also elect to

(1) discharge most of its obligations in respect of a series of the New Notes and the New Indentures, not including obligations related to the defeasance trust or to the replacement of New Notes or its obligations to the trustee ("legal defeasance") or

(2) discharge its obligations with respect to a series of New Notes under most of the covenants and under clauses (3) and (4) of the sections captioned "—Consolidation, Merger, Lease or Sale of Assets" under each of "New 2019 Notes" and "New MCDs" (and the events listed in clauses (3), (4), (5) and (6) under "—Default and Remedies—Events of Default" under each of "New 2019 Notes" and "New MCDs" and, in the case of a covenant defeasance of the New 2019 Notes, clause (9) under "New 2019 Notes—Default and Remedies—Events of Default", will no longer constitute Events of Default) ("covenant defeasance")

by irrevocably depositing in trust with the trustee money or U.S. Government Obligations sufficient to pay principal of and interest on the New Notes of such series to maturity or redemption and by meeting certain other conditions, including delivery to the trustee of either a ruling received from the Internal Revenue Service or an Opinion of Counsel to the effect that the holders of New Notes of such series will not recognize income, gain or loss for federal income tax purposes as a result of the defeasance and will be subject to federal income tax on the same amount and in the same manner and at the same times as would otherwise have been the case. In the case of legal defeasance, such an opinion could not be given absent a change of law after the date of the New Indentures. The defeasance would in each case be effective when 123 days have passed since the date of the deposit in trust.

In the case of either discharge or defeasance, the Note Guarantees with respect to such series of New 2019 Notes, if any, will terminate.

**Enforceability of Judgments**

Since the Company is organized under the laws of Mexico and the Subsidiaries of the Company may be incorporated in various non–U.S. jurisdictions, including Mexico, and all of their directors and substantially all of their officers and certain of the experts named herein are non–U.S. residents, and all or a significant portion of the assets of those persons may be, and the most significant portion of the Company's and Subsidiaries' assets are, located outside the United States, it may not be possible for investors to effect service of process within the United States upon those persons or to enforce against them or against the Company or the Subsidiaries in U.S. courts judgments predicated upon civil liability provisions of the US. federal or state securities laws. See "Enforceability of Civil Liabilities."

204

Table of Contents

An obligation denominated in a currency other than Mexican currency which is payable in Mexico may be satisfied through the payment of Mexican currency at the rate of exchange determined and published by *Banco de México (*the Bank of Mexico), or the Central Bank, in effect on the date such payment occurs. Pursuant to the *Ley Monetaria de los Estados Unidos Mexicanos* (Mexican Monetary Law), in the event that proceedings are brought in Mexico seeking to enforce the obligations of the Company and/or each of the Guarantors under the New Notes, the Company or any Guarantors would not be required to discharge such obligations in Mexico in a currency other than Mexican currency, and any difference resulting from the conversion of such Mexican currency into U.S. dollars may not be claimed from or enforced against the Company or such Guarantors. The exchange currency rate is currently determined by the Central Bank every business banking day in Mexico, published the second following business banking day in the Official Gazette of the Federation (*Diario Oficial de la Federación*).

**Currency Indemnity**

U.S. dollars are the sole currency of account and payment for all sums payable by the Company or the Guarantors under or in connection with the New Notes, including damages. Any amount received or recovered in a currency other than dollars (whether as a result of, or of the enforcement of, a judgment or order of a court of any jurisdiction, in the winding up or dissolution of the Company or the Guarantors or otherwise) by any holder of a New Note in respect of any sum expressed to be due to it from the Company or the Guarantors shall constitute a discharge to the Company or the Guarantors only to the extent of the dollar amount which the recipient is able to purchase with the amount so received or recovered in that other currency on the date of that receipt or recovery (or, if it is not practicable to make that purchase on that date, on the first date on which it is practicable to do so). If that dollar amount is less than the dollar amount expressed to be due to the recipient under any New Note, the Company or the Guarantors shall indemnify the recipient against any loss sustained by it as a result. In any event, the Company or the Guarantors shall indemnify the recipient against the cost of making any such purchase. For the purposes of this paragraph, it will be sufficient for the holder of a New Note to certify in a satisfactory manner (indicating the sources of information used) that it would have suffered a loss had an actual purchase of dollars been made with the amount so received or recovered in that other currency on the date of receipt or recovery (or, if a purchase of dollars on such date had not been practicable, on the first date on which it would have been practicable, it being required that the need for a change of date be certified in the manner mentioned above). These indemnities constitute a separate and independent obligation from the other obligations of the Company or the Guarantors, shall give rise to a separate and independent cause of action, shall apply irrespective of any indulgence granted by any holder of a New Note and shall constitute in full force and effect despite any other judgment, order, claim or proof for a liquidated amount in respect of any sum due under any New Note.

**Concerning the Trustee**

The Bank of New York Mellon will be the trustee under each of the New Indentures. A Mexican institution (expected to be The Bank of New York Mellon, S.A., Institución de Banca Múltiple) will be the common representative for the New MCDs. There may be minor changes in the Description of the New Notes to accommodate input from the applicable trustee or common representative and its respective counsel that is not materially adverse to the holders. Except during the continuance of an MCD Event of Default or an Event of Default with respect to the New 2019 Notes, the trustee need perform only those duties that are specifically set forth in the New Indentures and no others, and no implied covenants or obligations will be read into the New Indentures against the trustee. In case an MCD Event of Default or an Event of Default with respect to the New 2019 Notes has occurred and is continuing, the trustee shall exercise those rights and powers vested in it by the New Indentures, and use the same degree of care and skill in their exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs. No provision of the New Indentures will require the trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of its duties thereunder, or in the exercise of its rights or powers, unless it receives indemnity satisfactory to it against any loss, liability or expense.

The Indenture and provisions of the Trust Indenture Act incorporated by reference therein contain limitations on the rights of the trustee, should it become a creditor of any obligor on the New Notes, to obtain payment of claims in certain cases, or to realize on certain property received in respect of any such claim as security or otherwise. The trustee is permitted to engage in other transactions with the Company and its Affiliates; *provided*

Table of Contents

that if it acquires any conflicting interest it must either eliminate the conflict within 90 days, apply to the Commission for permission to continue, or resign.

**Certain Transfer Restrictions**

Any New Notes issued in exchange for the DFI Claims or Other Debt will not be registered under the Securities Act and may not be offered, sold or delivered in the United States or to, or for the account or benefit of, any U.S. person, except pursuant to an effective registration statement or in a transaction not subject to the registration requirements of the Securities Act or in accordance with an applicable exemption from the registration requirements thereof. Accordingly, the New Notes issued in exchange for the DFI Claims and Other Debt are being offered and sold only pursuant to Regulation S.

Each holder acquiring such New Notes will be deemed to have represented and agreed that it understands that with respect to any transfer of interests in a Regulation S note, on or prior to the 40th day after the Issue Date, if to a transferee who takes delivery in the form of an interest in a restricted note, the Trustee will require written certification from the transferee or transferor, as the case may be, to the effect that (i) such transferee is acquiring the New Notes for its own account or for accounts as to which it exercises sole investment discretion and that it and, if applicable, each such account is a qualified institutional buyer within the meaning of Rule 144A, in each case, in a transaction meeting the requirements of Rule 144A and in accordance with any applicable securities laws of any state of the United States or any other jurisdiction or (ii) the transferor did not acquire such New Notes as part of the initial distribution thereof and the transfer is being effected pursuant to and in accordance with an applicable exemption from the registration requirements of the Securities Act and the transferor has delivered to the Trustee such additional evidence that Vitro or the Trustee may require as to compliance with such available exemption.

**Book–Entry; Delivery and Form**

The New 2019 Notes will be, issued in fully registered global form in minimum denominations of $2,000 principal amount and integral multiples of $1,000 in excess thereof. Each of the New 2019 Notes and the New MCDs initially will be represented by a single permanent global certificate (which may be subdivided) without interest coupons (together with the global certificates that were issued for the Old Notes on the Issue Date, the "Global Notes").

The Global Notes will be deposited upon issuance with the trustee as custodian for DTC, in New York, New York, and registered in the name of DTC or its nominee for credit to an account of a direct or indirect participant in DTC, including Euroclear Bank S.A./N.V., as operator of the Euroclear System ("Euroclear"), and Clearstream Banking, société anonyme ("Clearstream"), as described below under "—Depositary Procedures."

Except as set forth below, the Global Notes may be transferred, in whole and not in part, only to another nominee of DTC or to a successor of DTC or its nominee. Beneficial interests in the Global Notes may not be exchanged for New Notes in certificated form except in the limited circumstances described below under "—Exchange of Book–Entry Notes for Certificated Notes."

Transfers of beneficial interests in the Global Notes will be subject to the applicable rules and procedures of DTC and its direct or indirect participants (including, if applicable, those of Euroclear and Clearstream), which may change from time to time.

The trustee is not required (i) to issue, register the transfer of or exchange any New Note for a period of 15 days before a selection of New Notes to be redeemed or purchased pursuant to the *Concurso* Plan, (ii) to register the transfer of or exchange any New Note so selected for redemption or purchase in whole or in part, except, in the case of a partial redemption or purchase, that portion of any New Note not being redeemed or purchased, or (iii) if a redemption or a purchase pursuant to the *Concurso* Plan is to occur after a regular record date but on or before the corresponding interest payment date, to register the transfer or exchange of any New Note on or after the regular record date and before the date of redemption or purchase.

Table of Contents

No service charge will be imposed in connection with any transfer or exchange of any New Note, but the Company may in general require payment of a sum sufficient to cover any transfer tax or similar governmental charge payable in connection therewith.

*Depositary Procedures*

The following description of the operations and procedures of DTC, Euroclear and Clearstream are provided solely as a matter of convenience. These operations and procedures are solely within the control of the respective settlement systems and are subject to changes by them. The Company takes no responsibility for these operations and procedures and urges investors to contact the systems or their participants directly to discuss these matters.

DTC is a limited−purpose trust company created to hold securities for its participating organizations (collectively, the "Participants") and facilitate the clearance and settlement of transactions in those securities between Participants through electronic book−entry changes in accounts of its Participants. The Participants include securities brokers and dealers (including the initial purchasers), banks, trust companies, clearing corporations and certain other organizations. Access to DTC's system is also available to other entities such as banks, brokers, dealers and trust companies that clear through or maintain a custodial relationship with a Participant, either directly or indirectly (collectively, the "Indirect Participants"). Persons who are not Participants may beneficially own securities held by or on behalf of DTC only through Participants or Indirect Participants. DTC has no knowledge of the identity of beneficial owners of securities held by or on behalf of DTC. DTC's records reflect only the identity of Participants to whose accounts securities are credited. The ownership interests and transfer of ownership interests of each beneficial owner of each security held by or on behalf of DTC are recorded on the records of the Participants and Indirect Participants.

Pursuant to procedures established by DTC:

- upon deposit of the Global Notes, DTC will credit the accounts of Participants designated by the initial purchasers with portions of the principal amount of the Global Notes; and

- ownership of such interests in the Global Notes will be maintained by DTC (with respect to the Participants) or by the Participants and the Indirect Participants (with respect to other owners of beneficial interests in the Global Notes).

Investors in the Global Notes may hold their interests therein directly through DTC, if they are Participants in such system, or indirectly through organizations (including Euroclear and Clearstream) that are Participants or Indirect Participants in such system. Euroclear and Clearstream will hold interests in the New Notes on behalf of their participants through customers' securities accounts in their respective names on the books of their respective depositaries, which are Euroclear Bank, S.A./N.V., as operator of Euroclear, and Citibank, N.A., as operator of Clearstream. The depositaries, in turn, will hold interests in the New Notes in customers' securities accounts in the depositaries' names on the books of DTC.

All interests in a Global Note, including those held through Euroclear or Clearstream, will be subject to the procedures and requirements of DTC. Those interests held through Euroclear or Clearstream will also be subject to the procedures and requirements of these systems. The laws of some states require that certain persons take physical delivery of certificates evidencing securities they own. Consequently, the ability to transfer beneficial interests in a Global Note to such persons will be limited to that extent. Because DTC can act only on behalf of Participants, which in turn act on behalf of Indirect Participants, the ability of beneficial owners of interests in a Global Note to pledge such interests to persons or entities that do not participate in the DTC system, or otherwise take actions in respect of such interests, may be affected by the lack of a physical certificate evidencing such interests. For certain other restrictions on the transferability of the New Notes, see "—Exchange of Book−Entry Notes for Certificated Notes."

207

Table of Contents

Except as described below, owners of interests in the Global Notes will not have New Notes registered in their names, will not receive physical delivery of New Notes in certificated form and will not be considered the registered owners or holders thereof under the New Indentures for any purpose.

Payments in respect of the principal of and premium, if any, and interest on a Global Note registered in the name of DTC or its nominee will be payable by the trustee (or the Paying Agents if other than the trustee) to DTC in its capacity as the registered holder under the Indenture. The Company and the trustee will treat the persons in whose names the New Notes, including the Global Notes, are registered as the owners thereof for the purpose of receiving such payments and for any and all other purposes whatsoever. Consequently, none of the Company, the trustee or any agent of the Company or the trustee has or will have any responsibility or liability for:

- any aspect of DTC's records or any Participant's or Indirect Participant's records relating to or payments made on account of beneficial ownership interests in the Global Notes, or for maintaining, supervising or reviewing any of DTC's records or any Participant's or Indirect Participant's records relating to the beneficial ownership interests in the Global Notes; or

- any other matter relating to the actions and practices of DTC or any of its Participants or Indirect Participants.

DTC has advised the Company that its current practice, upon receipt of any payment in respect of securities such as the New Notes (including principal and interest), is to credit the accounts of the relevant Participants with the payment on the payment date in amounts proportionate to their respective holdings in the principal amount of the relevant security as shown on the records of DTC, unless DTC has reason to believe it will not receive payment on such payment date. Payments by the Participants and the Indirect Participants to the beneficial owners of New Notes will be governed by standing instructions and customary practices and will be the responsibility of the Participants or the Indirect Participants and will not be the responsibility of DTC, the trustee or the Company. Neither the Company nor the trustee will be liable for any delay by DTC or any of its Participants in identifying the beneficial owners of the New Notes, and the Company and the trustee may conclusively rely on and will be protected in relying on instructions from DTC or its nominee for all purposes.

Except for trades involving only Euroclear and Clearstream participants, interests in the Global Notes are expected to be eligible to trade in DTC's Same−Day Funds Settlement System and secondary market trading activity in such interests will therefore settle in immediately available funds, subject in all cases to the rules and procedures of DTC and its Participants.

Transfers between Participants in DTC will be effected in accordance with DTC's procedures, and will be settled in same−day funds, and transfers between participants in Euroclear and Clearstream will be effected in accordance with their respective rules and operating procedures.

Cross−market transfers between Participants in DTC, on the one hand, and Euroclear or Clearstream participants, on the other hand, will be effected through DTC in accordance with DTC's rules on behalf of Euroclear or Clearstream, as the case may be, by their depositaries. Cross−market transactions will require delivery of instructions to Euroclear or Clearstream, as the case may be, by the counterparty in that system in accordance with the rules and procedures and within the established deadlines (Brussels time) of that system. Euroclear or Clearstream, as the case may be, will, if the transaction meets its settlement requirements, deliver instructions to its respective depositaries to take action to effect final settlement on its behalf by delivering or receiving interests in the relevant Global Note in DTC, and making or receiving payment in accordance with normal procedures for same−day funds settlement applicable to DTC. Euroclear and Clearstream participants may not deliver instructions directly to the depositaries for Euroclear or Clearstream.

Because of time zone differences, the securities account of a Euroclear or Clearstream participant purchasing an interest in a Global Note from a Participant in DTC will be credited and reported to the relevant Euroclear or Clearstream participant, during the securities settlement processing day (which must be a Business Day for Euroclear and Clearstream) immediately following the settlement date of DTC. DTC has advised the Company that cash received in Euroclear or Clearstream as a result of sales of interests in a Global Note by or through a

Table of Contents

Euroclear or Clearstream participant to a Participant in DTC will be received with value on the settlement date of DTC but will be available in the relevant Euroclear or Clearstream cash account only as of the Business Day for Euroclear or Clearstream following DTC's settlement date.

DTC has advised the Company that it will take any action permitted to be taken by a holder of New Notes only at the direction of one or more Participants to whose account with DTC interests in the Global Notes are credited and only in respect of such portion of the aggregate principal amount of the New Notes as to which such Participant or Participants has or have given such direction.

Although DTC, Euroclear and Clearstream have agreed to the foregoing procedures to facilitate transfers of interests in the Global Notes among participants in DTC, Euroclear and Clearstream, they are under no obligation to perform or to continue to perform such procedures, and the procedures may be discontinued at any time. Neither the Company nor the trustee will have any responsibility for the performance by DTC, Euroclear or Clearstream or their respective participants or indirect participants of their respective obligations under the rules and procedures governing their operations.

The information in this section concerning DTC, Euroclear and Clearstream and their book−entry systems has been obtained from sources that the Company believes to be reliable, but the Company takes no responsibility for the accuracy thereof.

*Exchange of Book−Entry Notes for Certificated Notes*

The Global Notes are exchangeable for certificated notes in definitive, fully registered form without interest coupons (the "Certificated Notes") only in the following limited circumstances:

- DTC notifies the Company that it is unwilling or unable to continue as depositary for the Global Notes or DTC ceases to be a clearing agency registered under the Exchange Act at a time when DTC is required to be so registered in order to act as depositary, and in each ease the Company fails to appoint a successor depositary within 90 days of such notice;

- the Company notifies the trustee in writing that the Global Notes shall be so exchangeable; or

- if there shall have occurred and be continuing an MCD Event of Default or an Event of Default with respect to the New 2019 Notes and the trustee has received a request from DTC.

In all cases, Certificated Notes delivered in exchange for any Global Note or beneficial interests therein will be registered in the names, and issued in any approved denominations, requested by or on behalf of DTC (in accordance with its customary procedures).

**Same Day Settlement and Payment**

The New Notes represented by the global notes are expected to be eligible to trade in DTC's Same−Day Funds Settlement System, and any permitted secondary market trading activity in such New Notes will, therefore, be required by DTC to be settled in immediately available funds. The Company expects that secondary trading in any certificated notes will also be settled in immediately available funds.

**Governing Law**

The New Indentures, including any Note Guaranties, and the New Notes shall be governed by, and construed in accordance with, the laws of the State of New York.

209

Table of Contents

**Certain Definitions**

"80% Owned Subsidiary" means, with respect to any Restricted Subsidiary, a Restricted Subsidiary 80% or more of the outstanding Capital Stock of which (other than any director's qualifying shares) is owned by the Company and one or more Restricted Subsidiaries (or a combination thereof).

"Acquired Debt" means Debt of a Person existing at the time the Person merges with or into or becomes a Restricted Subsidiary and not Incurred in connection with, or in contemplation of, the Person merging with or into or becoming a Restricted Subsidiary.

"Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under direct or indirect common control with, such Person. For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with") with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"Asset Sale" means any sale, lease, transfer or other disposition of any assets by the Company or any Restricted Subsidiary, including by means of a merger, consolidation or similar transaction and including any sale or issuance of the Equity Interests of any Restricted Subsidiary (each of the above referred to as a "disposition"), *provided* that the following are not included in the definition of "Asset Sale":

(1) a disposition to the Company or a Substantially Wholly Owned Restricted Subsidiary, including the sale or issuance by the Company or any Restricted Subsidiary of any Equity Interests of any Restricted Subsidiary to the Company or any Substantially Wholly Owned Restricted Subsidiary;

(2) the disposition by the Company or any Restricted Subsidiary in the ordinary course of business of (i) cash and cash management investments, (ii) inventory and other assets acquired and held for resale in the ordinary course of business, (iii) damaged, worn out or obsolete assets, or (iv) rights granted to others pursuant to leases or licenses;

(3) the sale or discount of accounts receivable arising in the ordinary course of business in connection with the compromise or collection thereof;

(4) a transaction covered by the provisions under the caption "—New 2019 Notes—Consolidation, Merger, Lease or Sale of Assets";

(5) a Restricted Payment permitted under the covenant described under the caption "—New 2019 Notes—Certain Covenants—Limitation on Restricted Payments" or a Permitted Investment;

(6) a Sale and Leaseback Transaction;

(7) dispositions of accounts receivable and related assets in connection with a Permitted Receivables Financing;

(8) foreclosures on Liens that are permitted under the covenant described under the caption "Limitation on Liens" above; and

(9) dispositions of assets with an aggregate fair market value of less than $5.0 million in any 12–month period.

"Attributable Debt" means, in respect of a Sale and Leaseback Transaction, the present value, discounted at the interest rate implicit in the Sale and Leaseback Transaction, of the total obligations of the lessee for rental payments during the remaining term of the lease in the Sale and Leaseback Transaction.

Table of Contents

"Average Life" means, with respect to any Debt, the quotient obtained by dividing (i) the sum of the products of (x) the number of years from the date of determination to the dates of each successive scheduled principal payment of such Debt and (y) the amount of such principal payment by (ii) the sum of all such principal payments.

"Board of Directors" means the board of directors of the Company.

"Board Resolution" means a resolution duly adopted by the Board of Directors, in accordance with the by–laws of the Company, and all applicable requirements of law, certified by the Secretary of the Company, to have been duly adopted by the Board of Directors thereof and to be in full force and effect on the date of such certification.

"Business Day" means any day other than a Saturday or Sunday, or a day on which commercial banking institutions in The City of New York or Mexico City are authorized or required by law, regulation or executive order to remain closed.

"Capital Lease" means, with respect to any Person, any lease of any property (whether real, personal or mixed) of which the discounted present value of the rental obligations of such Person as lessee, in conformity with Mexican GAAP is required to be capitalized on the balance sheet of such Person.

"Capital Lease Obligation" means the discounted present value of the rental obligations of a Person under a Capital Lease.

"Capital Stock" means, with respect to any Person, any and all shares of stock of a corporation, partnership interests or other equivalent interests (however designated, whether voting or non–voting) in such Person's equity, entitling the holder to receive a share of the profits and losses, and a distribution of assets, after liabilities, of such Person.

"Cash Equivalents" means

(1) direct obligations of the United States of America or any agency or instrumentality thereof with a maturity of 365 days or less from the date of acquisition and other obligations issued or directly and fully Guaranteed or insured by the United States of America or any agency or instrumentality thereof (*provided* that the full faith and credit of the United States of America is pledged in support thereof);

(2) demand deposits, time deposits, certificates of deposit or Eurodollar deposits with a maturity of 365 days or less from the date of acquisition of any financial institution which at the date of acquisition has outstanding indebtedness rated at least "A–" by S&P or at least "A3" by Moody's (or the equivalent of such rating by such rating organization, or, if no rating of S&P or Moody's then exists because neither of the foregoing then rates obligations of the type described in this clause, the equivalent of such rating by any other United States nationally recognized securities rating agency);

(3) commercial paper with a maturity of 180 days or less from the date of acquisition of an issuer which at the date of acquisition has outstanding indebtedness rated at least "A–1" by Standard & Poor's Rating Group or at least "P–1" by Moody's (or the equivalent of such rating by such rating organization, or, if no rating of S&P or Moody's then exists because neither of the foregoing then rates obligations of the type described in this clause, the equivalent of such rating by any other United States nationally recognized securities rating agency);

(4) repurchase agreements and reverse repurchase agreements relating to marketable obligations directly or indirectly issued or unconditionally guaranteed by the United States of America or issued by any agency thereof and backed by the full faith and credit of the United States government, in each case maturing within one year from the date of acquisition; *provided, however*, that the terms of such agreements comply with the guidelines set forth in the Federal Financial Agreements of Depository Institutions with Securities Dealers and Others, as adopted by the Comptroller of the Currency;

Table of Contents

(5) securities with maturities of six months or less from the date of acquisition issued or fully and unconditionally guaranteed by any state, commonwealth or territory of the United States of America, or by any political subdivision or taxing authority thereof, and rated at the date of acquisition at least "A−" by S&P or "A3" by Moody's (or the equivalent of such rating by such rating organization, or, if no rating of S&P or Moody's then exists because neither of the foregoing then rates obligations of the type described in this clause, the equivalent of such rating by any other United States nationally recognized securities rating agency);

(6) instruments backed by letters of credit of institutions satisfying the requirements of clause (2) above;

(7) *Certificados de la Tesorería de la Federación (Cetes), Bonos de Desarrollo del Gobierno Federal (Bondes)* or *Bonos Ajustables del Gobierno Federal (Ajustabonos)*, in each case, issued by the government of Mexico;

(8) any other instruments issued or guaranteed by the government of Mexico and denominated and payable in pesos;

(9) any investment in any fund substantially all the assets of which consist of investments of the type described in clauses (1) through (8) above;

(10) repurchase agreements or reverse repurchase agreements relating to marketable obligations of a type described in clause (7) or (8) above or with a bank described in clause (11) below; and

(11) demand deposits, certificates of deposit, time deposits and bankers' acceptances maturing not more than 180 days (or 365 days in the case of subclause (A)(I) or (B)(I) of this clause 11) after the acquisition thereof (A) denominated in pesos and issued by (I) any of the five top−rated banks (as evaluated by any internationally recognized rating agency) organized under the laws of Mexico or any other state thereof, or (II) any such bank which at the date of acquisition is a lender to or has made available a line of credit to (in each case in an amount equal to or greater than the amount of the proposed acquisition), the Company or any of its Restricted Subsidiaries, (B) in any jurisdiction other than Mexico where the Company or any of its Restricted Subsidiaries conducts business and (I) issued by one of the three largest banks doing business in such jurisdiction, or (II) any such bank in such jurisdiction which at the date of acquisition is a lender to or has made available a line of credit to (in each case in an amount equal to or greater than the amount of the proposed acquisition), the Company or any of its Restricted Subsidiaries, or (C) issued by any bank which at the date of acquisition is a lender to or has made available a line of credit to the Company or any of its Restricted Subsidiaries and which is not under intervention, receivership or any similar arrangement at the time of acquisition; *provided* that the aggregate amount of all such demand deposits, certificates of deposit, time deposits and bankers' acceptances acquired in accordance with this clause (C) does not exceed $50.0 million at any one time or (D) issued by any bank which at the date of acquisition has an outstanding loan to the Company or any of its Restricted Subsidiaries in an aggregate principal amount at least equal to the aggregate principal amount of such demand deposit, certificate of deposit, time deposit or bankers' acceptance.

"Change of Control" means

(1) the merger or consolidation of the Company with or into another Person or the merger of another Person with or into the Company or the merger of any Person with or into a Subsidiary of the Company if Capital Stock of the Company is issued in connection therewith, or the sale of all or substantially all the assets of the Company to another Person (in each case, unless such other Person is a Permitted Holder) unless (x) holders of a majority of the aggregate voting power of the Voting Stock of the Company immediately prior to such transaction, hold securities of the surviving or transferee Person that represent, immediately after such transaction, at least a majority of the aggregate voting power of the Voting Stock of the surviving Person or (y) (i) the surviving or transferee Person is (A) an internationally−recognized entity organized or existing under the laws of Mexico, a member of the European Union or any state of the United

212

Table of Contents

States of America or the District of Columbia engaged in a Permitted Business whose Capital Stock is publicly−traded on the New York Stock Exchange, the London Stock Exchange or any other internationally−recognized stock exchange, or (B) a Subsidiary of an entity described in the preceding clause (A) whose Consolidated Net Worth is at least substantially the same as the Consolidated Net Worth of the Company (or of all or substantially all of its assets, as the case may be) immediately prior to such merger, consolidation or sale, and (ii) immediately following such merger, consolidation or sale, on a pro forma basis, the Leverage Ratio of the surviving Person is no greater than the Leverage Ratio of the Company immediately prior to such merger, consolidation or sale; or

(2) any "person" or "group" (as such terms are used for purposes of Sections 13(d) and 14(d) of the Exchange Act), other than Permitted Holders, is or becomes the "beneficial owner" (as such term is used in Rules 13d−3 under the Exchange Act), directly or indirectly, of more than 35% of the total voting power of the Voting Stock of the Company.

"Commission" means the United States Securities and Exchange Commission.

"Common Stock" means Capital Stock not entitled to any preference on dividends or distributions, upon liquidation or otherwise.

"Consolidated Net Income" means, for any period, the aggregate net income (or loss) of the Company and its Restricted Subsidiaries for such period determined on a consolidated basis in conformity with Mexican GAAP *provided* that the following (without duplication) will be excluded in computing Consolidated Net Income:

(1) the net income (or loss) of any Person that is not a Restricted Subsidiary, except to the extent of the lesser of:

(x) the dividends or other distributions actually paid in cash to the Company or any of its Restricted Subsidiaries (subject to clause (3) below) by such Person during such period, and

(y) the Company's *pro rata* share of such Person's net income earned during such period;

(2) the net income (but not loss) of any Restricted Subsidiary to the extent that the declaration or payment of dividends or similar distributions by such Restricted Subsidiary of such net income would not have been permitted for the relevant period by charter or by any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to such Restricted Subsidiary;

(3) any net after−tax gains (or losses) attributable to Asset Sales;

(4) any net after−tax extraordinary gains (or losses); and

(5) the cumulative effect of a change in accounting principles.

In calculating the aggregate net income (or loss) of the Company and its Restricted Subsidiaries on a consolidated basis, income attributable to Unrestricted Subsidiaries will be excluded altogether.

"Consolidated Net Tangible Assets" means the total amount of assets of the Company and its Restricted Subsidiaries, less applicable depreciation, amortization and other valuation reserves, after deducting therefrom:

(1) all current liabilities, excluding intercompany items, and

(2) all goodwill, trade names, trademarks, patents, unamortized debt discount and expense and other like intangibles,

213

**Table of Contents**

all as set forth on the most recent quarterly or annual consolidated balance sheet of the Company and its Restricted Subsidiaries prepared in accordance with Mexican GAAP.

"Consolidated Net Worth" means, with respect to any Person, at any date of determination, the consolidated stockholder's equity of such Person (and, in the case of the Company, the Company and its Restricted Subsidiaries), calculated excluding

(1) any amounts attributable to Disqualified Stock,

(2) treasury stock, and

(3) all write−ups (other than write−ups resulting from foreign currency translations and write−ups of tangible assets of a going concern business made in accordance with Mexican GAAP as a result of the acquisition of such business) subsequent to the date of the New Indentures in the book value of any asset.

"Conversion Agent" means, the trustee under the New MCD Indenture, as appointed by the Company.

"Debt" means, with respect to any Person, without duplication,

(1) all indebtedness of such Person for borrowed money;

(2) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments;

(3) all obligations of such Person in respect of letters of credit, bankers' acceptances or other similar instruments, excluding obligations in respect of trade letters of credit or bankers' acceptances issued in respect of Trade Payables to the extent not drawn upon or presented, or, if drawn upon or presented, the resulting obligation of the Person is paid within 10 Business Days;

(4) all obligations of such Person to pay the deferred and unpaid purchase price of property or services which are recorded as liabilities under Mexican GAAP, excluding Trade Payables arising in the ordinary course of business;

(5) all obligations of such Person as lessee under Capital Leases, including all Attributable Debt under a Sale and Leaseback Transaction under which such Person is a lessee;

(6) all Debt of other Persons Guaranteed by such Person to the extent so Guaranteed (including under Project Finance Guarantees);

(7) all Debt of other Persons secured by a Lien on any asset of such Person, whether or not such Debt is assumed by such Person;

(8) Disqualified Stock of such Person;

(9) all obligations of such Person under Hedging Agreements;

(10) all sales of account receivables of such person (including under any Permitted Receivables Financing) together with any obligation of such Person to pay any discount, interest, fees, indemnities, penalties, recourse, expenses or other amounts in connection therewith (except to the extent such sales of account receivables are Non−Recourse Debt); and

(11) the net present value of all future payments of such Person under operating leases; *provided* that (i) an operating lease will only be counted as Debt if the nominal value of the payments due under such operating lease and any other substantially related operating lease in any given calendar year exceeds $250,000 and the remaining term of such operating lease is more than 3 years and (ii) the net present value

214

**Table of Contents**

of future payments of operating leases will be calculated using a discount rate of 9% for payments denominated in U.S. dollars and 12% for payments denominated in any other currency.

The amount of Debt of any Person will be deemed to be:

(A) with respect to contingent obligations, the maximum liability upon the occurrence of the contingency giving rise to the obligation;

(B) with respect to Debt secured by a Lien on an asset of such Person but not otherwise the obligation, contingent or otherwise, of such Person, the lesser of (x) the fair market value of such asset on the date the Lien attached and (y) the amount of such Debt;

(C) with respect to any Debt issued with original issue discount, the face amount of such Debt less the remaining unamortized portion of the original issue discount of such Debt, as determined in conformity with Mexican GAAP;

(D) with respect to any Hedging Agreement, the net amount payable if such Hedging Agreement terminated at that time due to default by such Person; and

(E) otherwise, the outstanding principal amount thereof.

Notwithstanding the foregoing, "Debt" shall not include (i) any liability to the Pension Benefit Guaranty Corporation under the term sheet dated January 29, 1997 and entered into in connection with the sale of assets of Anchor Glass Container Corporation (or any definitive agreement in respect thereof or instrument relating thereto), (ii) Trade Payables or (iii) the New MCDs (and any accrued interest thereon).

"Default" means any event that is, or after notice or passage of time or both would be, an Event of Default with respect to the New 2019 Notes.

"Disqualified Equity Interests" means Equity Interests that by their terms or upon the happening of any event are:

(1) required to be redeemed or redeemable at the option of the holder prior to the Stated Maturity of the New Notes for consideration other than Qualified Equity Interests, or

(2) convertible at the option of the holder into Disqualified Equity Interests or exchangeable for Debt;

*provided* that Equity Interests will not constitute Disqualified Equity Interests solely because of provisions giving holders thereof the right to require repurchase or redemption upon an "asset sale" or "change of control" occurring prior to the Stated Maturity of the notes if those provisions:

(A) are no more favorable to the holders than the covenants described above under the captions "—New 2019 Notes—Certain Covenants—Limitation on Asset Sales" and "—New 2019 Notes—Certain Covenants—Repurchase of Notes Upon a Change of Control," and

(B) specifically state that repurchase or redemption pursuant thereto will not be required prior to the Company's repurchase of the notes as required by the New Indentures.

"Disqualified Stock" means Capital Stock constituting Disqualified Equity Interests.

215

**Table of Contents**

"EBITDA" means, for any period, the sum of Consolidated Net Income, plus or minus, as the case may be, without duplication, to the extent such amount was deducted or added, as the case may be, in calculating Consolidated Net Income:

(1) Interest Expense, *plus*

(2) income and alternative minimum tax (IETU) and workers' profit sharing (other than income taxes (either positive or negative) attributable to extraordinary gains or losses or to gains or losses on sales of assets), *plus*

(3) depreciation expense, *plus*

(4) amortization expense, *plus*

(5) non–cash items related to pension plan liabilities, *plus*

(6) extraordinary non–recurring severance payments to employees, *plus*

(7) to the extent deducted from Consolidated Net Income, any payments made under any operating lease counted as Debt pursuant to clause (11) of the definition thereof; *plus*

(8) any other non–cash items according to Mexican GAAP that are reported below the "operating income (loss)" line on the Company's consolidated statements of operations, all as determined on a consolidated basis for the Company and its Restricted Subsidiaries in conformity with Mexican GAAP.

"Equity Interests" means all Capital Stock and all warrants or options with respect to, or other rights to purchase, Capital Stock, but excluding Debt convertible into equity other than the New MCDs.

"Excess Cash Flow" means, for each Calculation Period, without duplication, the amount equal to the sum of the following items for the Company and its 80% Owned Subsidiaries as of the last day of such Calculation Period:

(a) EBITDA increased by the sum of dividends received in cash and interest income; *plus/minus*

(b) any negative/positive change in the working capital of the Company and its Restricted Subsidiaries; *minus*

(c) any cash used to make a Qualified Investment in a Subsidiary; *minus*

(d) the proceeds of any Permitted Receivables Financing received during such Calculation Period; *minus*

(e) the aggregate amount of Interest Expense in respect of Debt permitted pursuant to the covenant "—New 2019 Notes—Certain Covenants—Limitation on Debt and Disqualified or Preferred Stock" paid in cash during such Calculation Period from cash generated by operations of the Company or its 80% Owned Subsidiaries (except, for the avoidance of doubt, any Interest Expense in respect of Project Finance Indebtedness); *minus*

(f) all income taxes and other similar taxes paid in cash during such Calculation Period; *minus*

(g) all payments that are (i) principal payments in respect of the New Notes or (ii) payments made to permanently repay Debt that is (x) not Subordinated Debt of the Company or a Guarantor or any Debt of a Restricted Subsidiary that is not a Guarantor and (y) permitted pursuant to the covenant "—New 2019 Notes—Certain Covenants—Limitation on Debt and Disqualified or Preferred Stock" (and in the case of a revolving credit, permanently reduce the commitment thereunder by such amount), in each case owing to a Person other than the Company or any Restricted Subsidiary and in each case paid in cash during such

216

Table of Contents

Calculation Period from cash generated by operations of Company or its 80% Owned Subsidiaries; *provided* that if a Leverage Compliance Date occurs, the permanent reduction of any amount of Debt permitted to be incurred pursuant to such covenant prior to such Leverage Compliance Date shall be reversed; *minus*

(h) all Permitted Capital Expenditures paid in cash during such Calculation Period; *plus/minus*

(i) any cash collateral required to be released/posted during such Calculation Period in connection with Hedging Agreements permitted under the New Indentures; *minus*

(j) without duplication, severance payments and pension plan obligations paid in cash during such Calculation Period and not included in the calculation of operating income; *minus*

(k) the amount, if any, necessary to replenish the amount of Unrestricted Cash as of the last day of such Calculation Period to an amount equal to $95.0 million;

*provided, however,* that for the initial Calculation Period, the amount of Excess Cash Flow shall include all Excess Cash Flow (calculated pursuant to the formula set forth above) for the period commencing on the Value Date through the end of the first fiscal year immediately following the Issue Date.

For the purposes of determining Excess Cash Flow, to the extent any cash amounts included in items (c) through (k) above are included in the calculation of the change in working capital of the Company and its Restricted Subsidiaries, such amount shall not be duplicated in calculating items (c) through (k) above.

"Finance Subsidiary" means any Subsidiary of the Company that is designated a "Finance Subsidiary" by the Board of Directors and (i) in the case of a Finance Subsidiary that is created to issue Debt of the Company or a Restricted Subsidiary other than in connection with a Permitted Receivables Financing, does not hold any assets (other than Intercompany Debt) and does not engage in any activity other than issuing such Debt of the Company or its Restricted Subsidiary or issuing Capital Stock, or (ii) in the case of a Finance Subsidiary that is created in connection with a Permitted Receivables Financing, does not hold any assets (other than (x) Intercompany Debt or (y) accounts receivable in connection with such Permitted Receivables Financing) and does not engage in any activity other than issuing Debt in connection with such Permitted Receivables Financing or issuing Capital Stock, and, in each case of the foregoing, any activity necessary, incidental or related to the foregoing; *provided* that (a) any Intercompany Debt held by any such Finance Subsidiary shall be subordinated to the New Notes and transferred to the Fideicomiso pursuant to the terms of the covenant "—New 2019 Notes—Certain Covenants—Limitation on Intercompany Debt" and (b) any Debt of such Finance Subsidiary shall be Non–Recourse Debt.

"Guarantee" means any obligation, contingent or otherwise, of any Person directly or indirectly guaranteeing any Debt or other obligation of any other Person and, without limiting the generality of the foregoing, any obligation, direct or indirect, contingent or otherwise, of such Person (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Debt or other obligation of such other Person (whether arising by virtue of partnership arrangements, or by agreement to keep–well, to purchase assets, goods, securities or services, to take–or–pay, or to maintain financial statement conditions or otherwise) or (ii) entered into for purposes of assuring in any other manner the obligee of such Debt or other obligation of the payment thereof or to protect such obligee against loss in respect thereof, in whole or in part; *provided* that the term "Guarantee" does not include endorsements for collection or deposit in the ordinary course of business. The term "Guarantee" used as a verb has a corresponding meaning.

"Guarantor" means (i) ViMéxico, S.A. de C.V. ("ViMexico"), (ii) Vitro Envases Norteamérica, S.A. de C.V. ("VENA"), (iii) Comercializadora Alcali, S.A. de C.V., (iv) Fic Regiomontano, S.A.P.I. de C.V., (v) V–Mx Holdings, LLC, (vi) Vitro Packaging de Mexico, S.A. de C.V., (vii) Vidriera Monterrey, S.A. de C.V., (viii) Vidriera Los Reyes, S.A. de C.V., (ix) Vidriera Guadalajara, S.A. de C.V., (x) Vidriera Querétaro, S.A. de C.V., (xi) Vidriera Toluca, S.A. de C.V., (xii) Compañía Vidriera, S.A. de C.V., (xiii) Fabricación de Máquinas, S.A. de C.V., (xiv) Servicios Integrales de Acabados, S.A. de C.V., (xv) Vidrio Plano, S.A. de C.V., (xvi) Industria del Alcali, S.A. de C.V., (xvii) Distribuidora de Vidrio y Cristal, S.A. de C.V., (xviii) Vidrio Lux, S.A., (xix) Vitro

217

Table of Contents

Packaging, LLC, (xx) Vidrio Plano de Mexicali, S.A. de C.V., (xxi) Vitro Europa, Ltd., (xxii) Vitro Asset Corp., (xxiii) Vitro Venezuela, S.A., (xxiv) Binswanger Glass Company, (xxv) Vitro Panamá, S.A., (xxvi) Troper Services, Inc., (xxvii) Vitemco Ecuador, S.A., (xxviii) Amsilco Holdings, Inc., (xxix) BBO Holdings, Inc., (xxx) Crisa Corporation, (xxxi) Vitro Automotriz, S.A. de C.V., (xxxii) Vitro Flex, S.A. de C.V., (xxxiii) Vitro Vidrio y Cristal, S.A. de C.V., (xxxiv) Vitro Flotado Cubiertas, S.A. de C.V., (xxxv) Distribuidor Vidriero LAN, S.A. de C.V., (xxxvi) Vitrocar, S.A. de C.V., (xxxvii) Cristales Inastillables de México, S.A. de C.V., (xxxviii) Vidrio Plano de Mexico, S.A. de C.V., (xxxix) VVP Holdings LLC., (xl) VVP Auto Glass, Inc., (xli) Vitro America, LLC, (xlii) Super Sky Products, Inc., (xliii) Super Sky International, Inc., (xliv) VVP Finance Corporation, (xlv) Vitro Colombia, S.A., (xlvi) VVP Europa Holdings, B.V., (xlvii) Vitro do Brasil Indústria e Comércio, Ltda., (xlviii) Vitro Chemicals, Fibers and Mining, LLC, (xlix) Vitro Global, Ltd., (l) Vidrios y Cristal del Noroeste, S.A. de C.V., (li) Servicios Vidriera Guadalajara, S.A. de C.V., (lii) Servicios Vidriera Toluca, S.A. de C.V., (liii) Servicios Vitro Cosmos, S.A. de C.V., (liv) Servicios Vidriera Querétaro, S.A. de C.V., (lv) Servicios Vidriera los Reyes, S.A. de C.V., (lvi) Inmobiliaria Vitalc, S.A. de C.V., (lvii) Viqueretanos, S.A. de C.V., (lviii) VAU, S.A. de C.V., (lix) Vitro Car Colombia, S.A.S., (lx) Vitro Cristalglass, S.L., (lxi) each Restricted Subsidiary that executes a supplemental indenture in the form set forth as an exhibit to the applicable indenture providing for the Guarantee of the payment of the notes of the relevant series, or (lxii) any successor obligor under its Note Guaranty pursuant to provisions of the section entitled "—New 2019 Notes—Consolidation, Merger, Lease or Sale of Assets," in each case unless and until such Guarantor is released from its Note Guaranty pursuant to the New 2019 Indenture.

"Hedging Agreement" means (i) any interest rate swap agreement, interest rate cap agreement or other agreement designed to protect against fluctuations in interest rates or (ii) any foreign exchange forward contract, currency swap agreement or other agreement designed to protect against fluctuations in foreign exchange rates or (iii) any commodity or raw material futures contract or any other agreement designed to protect against fluctuations in raw material prices of any commodity or raw material used in a Permitted Business.

"IFRS" mean International Financial Reporting Standards.

"Incur" means, with respect to any Debt or Capital Stock, to incur, create, issue, assume or Guarantee such Debt or Capital Stock. If any Person becomes a Restricted Subsidiary on any date after the date of the New Indentures (including by redesignation of an Unrestricted Subsidiary or failure of an Unrestricted Subsidiary to meet the qualifications necessary to remain an Unrestricted Subsidiary), the Debt and Capital Stock of such Person outstanding on such date will be deemed to have been Incurred by such Person on such date for purposes of the covenant described under the caption "—New 2019 Notes—Certain Covenants—Limitation on Debt and Disqualified or Preferred Stock," but will not be considered the sale or issuance of Equity Interests for purposes of the covenant described under the caption "New 2019 Notes—Certain Covenants—Limitation on Asset Sales." The accretion of original issue discount or payment of interest in kind will not be considered an Incurrence of Debt.

"Independent Financial Advisor" means an accounting firm, appraisal firm, investment banking firm or consultant of internationally recognized standing that is, in the judgment of the Board of Directors, qualified to perform the task for which it has been engaged and which is independent in connection with the relevant transaction.

"Interest Expense" means, for any period, the consolidated interest expense of the Company and its Restricted Subsidiaries, *plus*, to the extent not included in such consolidated interest expense, and to the extent incurred, accrued or payable by the Company or its Restricted Subsidiaries, without duplication, (i) interest expense attributable to Sale and Leaseback Transactions, (ii) amortization of debt discount and debt issuance costs, (iii) capitalized interest, (iv) non-cash interest expense, (v) commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptance financing, (vi) net costs or expenses associated with Hedging Agreements (including the amortization of fees), (vii) any of the above expenses with respect to Debt of another Person Guaranteed by the Company or any of its Restricted Subsidiaries and (viii) any premiums, fees, discounts, expenses and losses on the sale of accounts receivable (and any amortization thereof) payable by the Company or any Restricted Subsidiary in connection with a Permitted Receivables Financing or on the issuance of any Debt as determined on a consolidated basis and in accordance with Mexican GAAP.

218

Table of Contents

"Investment" means

(1) any direct or indirect advance, loan or other extension of credit to another Person (other than advances to customers in the ordinary course of business that are, in conformity with Mexican GAAP, recorded as accounts receivable on the balance sheet of the Company or its Restricted Subsidiaries, travel and similar advances to employees in the ordinary course of business and advances of sales commissions to agents in the ordinary course of business),

(2) any capital contribution to another Person, by means of any transfer of cash or other property or in any other form,

(3) any purchase or acquisition of Equity Interests other than the New MCDs, bonds, notes or other Debt, or other instruments or securities issued by another Person, including the receipt of any of the above as consideration for the disposition of assets or rendering of services, or

(4) any Guarantee of any obligation of another Person.

If the Company or any Restricted Subsidiary (x) sells or otherwise disposes of any Equity Interests of any direct or indirect Restricted Subsidiary so that, after giving effect to that sale or disposition, such Person is no longer a Subsidiary of the Company, or (y) designates any Restricted Subsidiary as an Unrestricted Subsidiary in accordance with the provisions of the New Indentures, all remaining Investments of the Company and the Restricted Subsidiaries in such Person shall be deemed to have been made at such time.

"Issue Date" means, with respect to a series of New Notes, the date on which such New Notes are issued under the New Indentures.

"Leverage Ratio" means, on any date of determination (the "transaction date"), the ratio of:

(x) Debt (on a consolidated basis) of the Company and its Restricted Subsidiaries, other than Project Finance Indebtedness, to

(y) the aggregate amount of EBITDA (on a consolidated basis) for the four fiscal quarters immediately prior to the transaction date for which internal consolidated financial statements are available (the "reference period");

*provided* that

(1) any Debt, Disqualified Stock or Preferred Stock that is repaid or redeemed on the transaction date will be excluded;

(2) pro forma effect will be given to:

(A) the creation, designation or redesignation of Restricted and Unrestricted Subsidiaries,

(B) the acquisition or disposition of companies, divisions or lines of businesses by the Company and its Restricted Subsidiaries, including any acquisition or disposition of a company, division or line of business since the beginning of the reference period by a Person that became a Restricted Subsidiary after the beginning of the reference period, and

(C) the discontinuation of any discontinued operations

that have occurred since the beginning of the reference period as if such events had occurred, and, in the case of any disposition, the proceeds thereof applied, on the first day of the reference period. To the extent that pro forma effect is to be given to an acquisition or disposition of a company, division or

219

Table of Contents

line of business, the pro forma calculation will be based upon the most recent four full fiscal quarters for which the relevant financial information is available; and

    (3) if and to the extent any Strategic Joint Venture is not combined or consolidated with the Company under Mexican GAAP the Proportional Debt of such Strategic Joint Venture shall be included in the preceding clause (x) for purposes of calculating the Debt of the Company and its Restricted Subsidiaries and (ii) only the Proportional EBITDA from such Strategic Joint Venture shall be included in the preceding clause (y) for purposes of calculating the consolidated EBITDA of the Company and its Restricted Subsidiaries.

    "Lien" means any mortgage, pledge, security interest, encumbrance, lien or charge of any kind (including any conditional sale or other title retention agreement or Capital Lease).

    "Market Purchase" means the purchase of any New Notes available for sale in the secondary market through broker–dealers or similar intermediaries at a price lower than the principal amount thereof (plus any accrued and unpaid interest thereon).

    "Material Subsidiary" means, on any date, any Subsidiary, or group of Subsidiaries, that would, taken together, produce 5% or more of the Company's EBITDA for the four fiscal quarters immediately prior to such date for which internal consolidated financial statements are available, other than Vitro Envases Nortéamerica, S.A. de C.V.

    "MCD Default" means any event that is, or after notice or passage of time or both would be, an MCD Event of Default with respect to the New MCDs.

    "Mexican GAAP" means the Mexican Financial Reporting Standards issued by the Mexican Board for Research and Development of Financial Reporting Standards. If, at any time after the Issue Date, the Company elects or is required by the CNBV to apply IFRS in lieu of Mexican GAAP, thereafter, references herein to Mexican GAAP shall be construed to mean IFRS; provided that any such election, once made, shall be irrevocable. The Issuer shall give notice of any such election to the Trustee.

    "Mexico" means the *Estados Unidos Mexicanos* (the United Mexican States) and any branch of power thereof and any ministry, department, authority or statutory corporation or other entity (including a trust), owned or controlled directly or indirectly by the *Estados Unidos Mexicanos* or any of the foregoing.

    "Moody's" means Moody's Investors Service, Inc. and its successors.

    "Net Cash Proceeds" means, with respect to any Asset Sale, the proceeds of such Asset Sale in the form of cash or Cash Equivalents, including payments in respect of deferred payment obligations (to the extent corresponding to the principal, but not interest, component thereof) when received in the form of cash or Cash Equivalents (except to the extent such obligations are financed or sold with recourse to the Company or any Restricted Subsidiary) and proceeds from the conversion of other property received when converted to cash or Cash Equivalents, net of:

    (1) brokerage commissions and other fees and expenses (including fees and expenses of counsel, accountants and investment bankers) related to such Asset Sale,

    (2) provisions for all taxes (whether or not such taxes will actually be paid or are payable) as a result of such Asset Sale without regard to the consolidated results of operations of the Company and its Restricted Subsidiaries taken as a whole,

    (3) payments made to repay Debt or any other obligation outstanding at the time of such Asset Sale that either (A) is secured by a Lien on the property or assets sold or (B) is required to be paid as a result of such sale and

<div align="center">220</div>

Table of Contents

(4) appropriate amounts to be provided by the Company or any Restricted Subsidiary as a reserve against any liabilities associated with such Asset Sale, including, without limitation, pension and other post–employment benefit liabilities, liabilities related to environmental matters and liabilities under any indemnification obligations associated with such Asset Sale, all as determined in conformity with Mexican GAAP.

"Non–Recourse Debt" means Debt as to which (i) neither the Company nor any Restricted Subsidiary provides any Guarantee and as to which the lenders have been notified in writing that they will not have any recourse to the stock or assets of the Company or any Restricted Subsidiary and (ii) no default thereunder would, as such, constitute a default under any Debt of the Company or any Restricted Subsidiary.

"Note Guaranty" means the guaranty of the notes of each series by a Guarantor pursuant to the New 2019 Indenture.

"Obligations" means, with respect to any Debt, all obligations (whether in existence on the Issue Date or arising afterwards, absolute or contingent, direct or indirect) for or in respect of principal (when due, upon acceleration, upon redemption, upon mandatory repayment or repurchase pursuant to a mandatory offer to purchase, or otherwise), premium, interest, penalties, fees, indemnification, reimbursement and other amounts payable and liabilities with respect to such Debt, including all interest accrued or accruing after the commencement of any bankruptcy, insolvency or reorganization or similar case or proceeding at the contract rate (including, without limitation, any contract rate applicable upon default) specified in the relevant documentation, whether or not the claim for such interest is allowed as a claim in such case or proceeding.

"Officers' Certificate" means a certificate signed on behalf of the Company or a Guarantor, as the case may be, by two officers of the Company or Guarantor, as applicable, one of whom must be the principal executive officer, principal financial officer, the treasurer, or the principal accounting officer of the Company or the Guarantor, as applicable, that meets the requirements set forth in the New Indentures.

"Old Notes" means the Company's outstanding 8.625% Senior Notes due 2012, 11.75% Senior Notes due 2013 and 9.125% Senior Notes due 2017.

"Opinion of Counsel" means a written opinion of counsel, who may be an employee of or counsel for the Company and who shall be reasonably acceptable to the trustee.

"Ordinary Course Intercompany Debt" means Intercompany Debt issued by the Company or its Restricted Subsidiaries to the Company or a Restricted Subsidiary in the ordinary course of business, consistent with past practice, including without limitation trade payables and Intercompany Debt issued for treasury management purposes of the Company or such Restricted Subsidiary.

"Permitted Business" means any of the businesses in which the Company and its Restricted Subsidiaries are engaged on the Issue Date, and any business reasonably related, incidental, complementary or ancillary thereto.

"Permitted Holders" means any or all of the following:

(1) any member of the Board of Directors on the Issue Date;

(2) a parent, brother or sister of any of the individuals named in clause (1);

(3) the spouse or a former spouse of any individual named in clause (1) or (2);

(4) the lineal descendants of any person named in clauses (1) through (3) and the spouse or a former spouse of any such lineal descendant;

221

(5) the estate or any guardian, custodian or other legal representative of any individual named in clauses (1) through (4);

(6) any trust established solely for the benefit of any one or more of the individuals named in clauses (1) through (5);

(7) any Person in which all of the Equity Interests are owned, directly or indirectly, by any one or more of the Persons named in clauses (1) through (6);

(8) the Company's employee stock option trust and subsidiary trusts of such trust; and

(9) anyone who enters into a voting agreement with any one or more of the Persons named in clauses (1) through (7) above, in which the vote is generally controlled by one or more of such Persons named in clauses (1) through (7) above.

"Permitted Investments" means:

(1) any Investment in the Company or in a Guarantor that is engaged in a Permitted Business;

(2) any Investment in Cash Equivalents;

(3) any Investment by the Company or any Subsidiary of the Company in a Person, if as a result of such Investment,

(A) such Person becomes a Substantially Wholly Owned Restricted Subsidiary of the Company that is (i) a Guarantor engaged in a Permitted Business or (ii) a Strategic Joint Venture engaged in a Permitted Business, the Capital stock of which is pledged, concurrently with the acquisition or creation of, or participation in, such Strategic Joint Venture, as collateral for the Company's obligations under the New 2019 Notes, in accordance with the terms of the New 2019 Notes Indenture, or

(B) such Person is merged or consolidated with or into, or transfers or conveys substantially all its assets to, or is liquidated into, the Company or a Substantially Wholly Owned Restricted Subsidiary that is (i) a Guarantor engaged in a Permitted Business or (ii) a Strategic Joint Venture engaged in a Permitted Business, the Capital Stock of which is pledged, concurrently with the acquisition or creation of such Strategic Joint Venture, as collateral for the Company's obligations pursuant to the New 2019 Notes, in accordance with the terms of the New 2019 Notes Indenture;

(4) Investments received as non-cash consideration in an Asset Sale made pursuant to and in compliance with the provisions of "—New 2019 Notes—Certain Covenants—Limitation on Asset Sales";

(5) any Investment acquired solely in exchange for Qualified Stock of the Company;

(6) Hedging Agreements otherwise permitted under the New Indentures;

(7) (i) receivables owing to the Company or any Restricted Subsidiary if created or acquired in the ordinary course of business, (ii) Cash Equivalents or other cash management investments or liquid or portfolio securities pledged as collateral pursuant to the covenant described under the caption "—New 2019 Notes—Certain Covenants—Limitation on Liens," (iii) endorsements for collection or deposit in the ordinary course of business, and (iv) securities, instruments or other obligations received in compromise or settlement of debts created in the ordinary course of business, or by reason of a composition or readjustment of debts or reorganization of another Person, or in satisfaction of claims or judgments;

(8) Investments in Unrestricted Subsidiaries in an aggregate amount, taken together with all other Investments made in reliance on this clause, not to exceed $1.0 million (net of, with respect to the

Table of Contents

Investment in any particular Person, the cash return thereon received after the Issue Date as a result of any sale for cash, repayment, redemption, liquidating distribution or other cash realization (not included in Consolidated Net Income), not to exceed the amount of Investments in such Person made after the Issue Date in reliance on this clause);

(9) payroll, travel and expenses of officers and employees in the ordinary course of business;

(10) Investments in a Finance Subsidiary that are necessary or desirable to effect any Permitted Receivables Financing;

(11) Project Finance Investments; *provided* that such Project Finance Investment is funded with funds from the Company ECF Account available as of the date such Project Finance Investment is made or Incurred;

(12) any Qualified Investment in a Subsidiary; and

(13) in addition to Investments listed above, Investments in Persons engaged in Permitted Businesses in an aggregate amount, taken together with all other Investments made in reliance on this clause, not to exceed 5% of Consolidated Net Tangible Assets; *provided* that such Investments are made solely out of any available funds (to the extent not already used) in the Company ECF Account.

"Permitted Liens" means

(1) Liens existing on the Issue Date (other than Liens permitted pursuant to clause (15) below);

(2) Liens securing the notes or any Note Guaranties;

(3) pledges or deposits under worker's compensation laws, unemployment insurance laws or similar legislation, or good faith deposits or encumbrances in connection with bids, tenders, contracts or leases, or to secure public or statutory obligations, surety bonds, customs duties and the like, or for the payment of rent, in each case incurred in the ordinary course of business and not securing Debt;

(4) Liens imposed by law, such as carriers', vendors', warehousemen's and mechanics' liens, in each case for sums not yet due or being contested in good faith and by appropriate proceedings;

(5) Liens in respect of taxes and other governmental assessments and charges which are not yet due or which are being contested in good faith and by appropriate proceedings;

(6) minor survey exceptions, minor encumbrances, easements or reservations of, or rights of others for, licenses, rights of way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning or other restrictions as to the use of real property, not interfering in any material respect with the conduct of the business of the Company and its Restricted Subsidiaries;

(7) licenses or leases or subleases as licensor, lessor or sublessor of any of its property, including intellectual property, in the ordinary course of business;

(8) customary Liens in favor of trustees and escrow agents, and netting and setoff rights, banker's liens and the like in favor of financial institutions and counterparties to financial obligations and instruments, including Hedging Agreements permitted under the terms of the New Indentures;

(9) customary Liens prohibiting the disposition of assets pursuant to merger agreements, stock or asset purchase agreements and similar agreements in respect of the disposition of such assets;

223

Table of Contents

(10) judgment liens, and Liens securing appeal bonds or letters of credit issued in support of or in lieu of appeal bonds, that in the aggregate do not exceed $25.0 million, so long as no MCD Event of Default or no Event of Default with respect to the New 2019 Notes then exists;

(11) pledges of any Capital Stock or other Equity Interests in any Project Finance Entity or any special purpose holding company owning such Project Finance Entity to secure Project Finance Indebtedness (other than from an Affiliate of the Company or any Restricted Subsidiary) Incurred by such Project Finance Entity;

(12) Liens securing any Purchase Money Debt permitted under the covenant described under the caption "—New 2019 Notes—Certain Covenants—Limitation on Debt and Disqualified or Preferred Stock" above;

(13) Liens on property of a Person at the time such Person becomes a Restricted Subsidiary of the Company, *provided* such Liens were not created in contemplation thereof and do not extend to any other property of the Company or any Restricted Subsidiary;

(14) Liens on property at the time the Company or any of the Restricted Subsidiaries acquires such property, including any acquisition by means of a merger or consolidation with or into the Company or a Restricted Subsidiary of such Person, *provided* such Liens were not created in contemplation thereof and do not extend to any other property of the Company or any Restricted Subsidiary;

(15) customary margin requirements and the like (including any liens on real property for natural gas derivatives) securing Hedging Agreements entered into in compliance with the covenant described under the caption "—New 2019 Notes—Certain Covenants—Limitation on Hedging Agreements";

(16) Liens arising in connection with Debt permitted pursuant to clause (1) of paragraph (b) of the covenant described under the caption "Limitation on Debt and Disqualified or Preferred Stock" above;

(17) any Lien which secures only Debt owing by one or more Restricted Subsidiaries to the Company or a Guarantor, to the extent required by applicable law;

(18) Liens on the headquarters of the Company, located in San Pedro Garza García, 66265 Nuevo León, Mexico arising in connection with a Sale and Leaseback Transaction in connection therewith;

(19) extensions, renewals or replacements of any Liens referred to in clause (1), (2), (12), (13), (14) or (16) in connection with the refinancing of the obligations secured thereby, *provided* that such Lien does not extend to any other property and that such extension, renewal or replacement of the obligation secured by such Lien constitutes "Permitted Refinancing Debt" in accordance with the covenant described under clause (5) of the caption ""—New 2019 Notes—Certain Covenants—Limitation on Debt and Disqualified or Preferred Stock" above;

(20) Liens on the assets of a Project Finance Entity to secure the Project Finance Indebtedness issued by such Project Finance Entity;

(21) other Liens for operating purposes and arising in the ordinary course of business securing obligations in an aggregate amount not exceeding $20.0 million.

"Permitted Receivables Financing" means any receivables financing facility, factoring program or arrangement pursuant to which accounts receivable of the Company or any Restricted Subsidiaries are sold or are financed by third parties on terms that the Board of Directors has concluded are customary and market terms fair to the Company and its Restricted Subsidiaries; *provided* that (i) any debt obligation related to such Permitted Receivables Financing shall be Non–Recourse Debt, except for customary rights of indemnity in such financings, and (ii) neither the Company nor any Restricted Subsidiary shall be obligated to generate accounts receivable at any point pursuant to any such transaction.

224

Table of Contents

"Person" means an individual, a corporation, a partnership, a limited liability company, an association, a trust or any other entity, including a government or political subdivision or an agency or instrumentality thereof.

"Preferred Stock" means, with respect to any Person, any and all Capital Stock which is preferred as to the payment of dividends or distributions, upon liquidation or otherwise, over another class of Capital Stock of such Person.

"Project Finance Entity" means any special purpose entity or Mexican trust (*fideicomiso*) in which the Company or any Restricted Subsidiary has an interest as an equity holder or beneficiary, in each case, formed for the purpose of (i) constructing, developing, extending, expanding or improving (or acquiring or purchasing, in order to complete any such construction, development, extension, expansion or improvement), fixed or capital assets or other property, plant or equipment or (ii) being a holding company that owns at least 95% of the Equity Interests in any Person meeting the criteria set forth in clause (i) above, and which in any case satisfies each of the following criteria:

(a)    such Project Finance Entity does not conduct business with the customers or Affiliates of the Company or any Restricted Subsidiary unless any such business (x) is conducted on an arm's−length basis and on terms no less favorable to such Project Finance Entity than it would obtain in a comparable arm's−length transaction with a Person which is not a customer or Affiliate of the Company or any Restricted Subsidiary and (y) is not reasonably expected to have a material adverse effect on the assets, liabilities, cash flows, business or operations of the Company and its Restricted Subsidiaries taken as a whole (disregarding such Project Finance Entity), in each case as certified by a qualified independent expert; and

(b)    the sole source of recourse of any creditor of such Project Finance Entity for the payment of principal, interest and other amounts of Debt will be (v) recourse to the aggregate cash flow or net cash flow (or the revenues or any portion thereof as may be negotiated by such Project Finance Entity) generated by the assets of such Project Finance Entity, and/or (w) recourse to the assets of such Project Finance Entity, and/or (x) a Project Finance Guaranty, and/or (y) recourse to the capital stock or other equity or quasi−equity interests in such Project Finance Entity that is pledged in connection with the Incurrence of such Project Finance Indebtedness, and/or (z) recourse to credit enhancement (e.g., letters of credit, insurance policies, surety bonds, guaranty contracts of the types customary in project finance transactions and in respect or as a result of which there is no recourse, whether direct or indirect, to the Company, any of its Restricted Subsidiaries (other than the relevant Project Finance Entity) or any Strategic Joint Venture) provided by third parties (other than Subsidiaries of the Company or Strategic Joint Ventures).

"Project Finance Guaranty" means a guarantee, surety or other similar obligation in respect of Project Finance Indebtedness, granted to lenders (other than Affiliates of the Company) to a project of the relevant Project Finance Entity in respect of completion of the construction, development, extension, expansion or improvement of that project.

"Project Finance Indebtedness" means Debt Incurred by any Project Finance Entity in connection with the financing of all or any part of the purchase price or cost of the construction, development, extension, expansion or improvement of any of its assets (including the purchase price of and acquisition costs relating to materials, equipment and other assets required to complete such construction, development, extension, expansion or improvement); *provided* that the sole source of recourse of any creditor of such Project Finance Entity for the payment of principal, interest, premium, fees and other amounts of such Debt shall be (i) recourse to the aggregate cash flow or net cash flow (or the revenues or any portion thereof as may be negotiated by such Project Finance Entity) generated by the assets of the Project Finance Entity, and/or (ii) recourse to the assets of such Project Finance Entity, and/or (iii) a Project Finance Guaranty, and/or (iv) recourse to the capital stock or other interests in such Project Finance Entity that is pledged in connection with the Incurrence of such Project Finance Indebtedness, and/or (v) recourse to credit enhancement (e.g., letters of credit, insurance policies, surety bonds, guaranty contracts of the types customary in project finance transactions and in respect or as a result of which there is no recourse, whether direct or indirect, to the Company, any of its Restricted Subsidiaries (other than the relevant Project Finance Entity) or any Strategic Joint Venture) provided by third parties (other than Subsidiaries of the Company or Strategic Joint Ventures).

225

Table of Contents

"Proportional Debt" means, with respect to any Strategic Joint Venture, the Debt of such Strategic Joint Venture multiplied by a fraction, the numerator of which is the amount of Capital Stock of such Strategic Joint Venture owned by the Company or its Restricted Subsidiaries, and the denominator of which is the total amount of Capital Stock of such Strategic Joint Venture.

"Proportional EBITDA" means, with respect to any Strategic Joint Venture, the EBITDA of such Strategic Joint Venture multiplied by a fraction, the numerator of which is the amount of Capital Stock of such Strategic Joint Venture owned by the Company or its Restricted Subsidiaries, and the denominator of which is the total amount of Capital Stock of such Strategic Joint Venture.

"Purchase Money Debt" means Debt (a) consisting of the deferred purchase price of property, conditional sale obligations, Capital Leases, obligations under any title retention agreement, other purchase money obligations and obligations in respect of industrial revenue bonds, in each case where the maturity of such Debt does not exceed the anticipated useful life of the property being financed, and (b) Incurred to finance the acquisition, construction, development, improvement or lease by the Company or a Restricted Subsidiary of such property, including additions and improvements thereto.

"Qualified Equity Interests" means all Equity Interests of a Person other than Disqualified Equity Interests.

"Qualified Investment in a Subsidiary" means an Investment in a Subsidiary that is not an 80% Owned Subsidiary, the result of which Investment is that such Subsidiary becomes an 80% Owned Subsidiary; *provided* that no Investment in a Subsidiary shall be a Qualified Investment in a Subsidiary unless, concurrently with such Investment, such Subsidiary becomes a Guarantor.

"Qualified Stock" means all Capital Stock of a Person other than Disqualified Stock.

"Responsible Officer" means, when used with respect to the trustee, any officer within the corporate trust department of the trustee, including any vice president, assistant vice president, assistant secretary, assistant treasurer, trust officer or any other officer of the trustee who customarily performs functions similar to those performed by the persons who at the time shall be such officers, respectively, or to whom any corporate trust matter is referred because of such person's knowledge of and familiarity with the particular subject and who shall have direct responsibility for the administration of the New Indentures.

"Restricted Subsidiary" means any Subsidiary of the Company other than an Unrestricted Subsidiary.

"S&P" means Standard & Poor's Ratings Group, a division of McGraw-Hill, Inc. and its successors.

"Sale and Leaseback Transaction" means, with respect to any Person, an arrangement whereby such Person enters into a lease of property previously transferred by such Person to the lessor.

"Significant Subsidiary" means any Subsidiary, or group of Subsidiaries, that would, taken together, be a "significant subsidiary" as defined in Article 1, Rule 1-02 (w)(1) or (2) of Regulation S-X promulgated under the Securities Act, as such regulation is in effect on the date of the New Indentures.

"Stated Maturity" means (i) with respect to any Debt, the date specified as the fixed date on which the final installment of principal of such Debt is due and payable or (ii) with respect to any scheduled installment of principal of or interest on any Debt, the date specified as the fixed date on which such installment is due and payable as set forth in the documentation governing such Debt, not including any contingent obligation to repay, redeem or repurchase prior to the regularly scheduled date for payment; *provided* that in the case of Debt that has become immediately due and payable due to acceleration, the Stated Maturity shall be the date of acceleration.

"Strategic Joint Venture" means with respect to any Person, any corporation, association or other business entity of which 51% or less of the outstanding Capital Stock is owned, directly or indirectly, by, or, in the case of a partnership, the sole general partner or the managing partner or the only general partners of which are, such Person and one or more Subsidiaries of such Person (or a combination thereof), other than any such corporation, association

226

Table of Contents

or other business entity that is combined or consolidated in accordance with Mexican GAAP, with such Person for purposes of general financial reporting. Unless otherwise specified, "Strategic Joint Venture" means a Strategic Joint Venture of the Company.

"Subordinated Debt" means any Debt of the Company or any Guarantor which is subordinated in right of payment to the New Notes or the Note Guaranty, as applicable, pursuant to a written agreement to that effect.

"Subsidiary" means with respect to any Person, (i) any corporation, association or other business entity of which more than 50% of the outstanding Voting Stock is owned, directly or indirectly, by, or, in the case of a partnership, the sole general partner or the managing partner or the only general partners of which are, such Person and one or more Subsidiaries of such Person (or a combination thereof) or (ii) any other corporation, association or other business entity that is combined or consolidated in accordance with Mexican GAAP with such Person for purposes of general financial reporting. Unless otherwise specified, "Subsidiary" means a Subsidiary of the Company.

"Substantially Wholly Owned" means, with respect to any Restricted Subsidiary, a Restricted Subsidiary 90% or more of the outstanding Capital Stock of which (other than any director's qualifying shares) is owned by the Company and one or more Wholly Owned Restricted Subsidiaries (or a combination thereof).

"Swiss Subsidiary Guarantor" means each of Vitro Europa, Ltd. and Vitro Global, Ltd. (both incorporated in Switzerland), or any successor thereto.

"Trade Payables" means, with respect to any Person, any accounts payable owed by such Person arising in the ordinary course of business in connection with the acquisition of goods or services and required to be paid within one year from the date of Incurrence thereof which constitute accounts payable and are considered current liabilities in accordance with Mexican GAAP.

"U.S. Government Obligations" means obligations issued or directly and fully guaranteed or insured by the United States of America or by any agent or instrumentality thereof, *provided* that the full faith and credit of the United States of America is pledged in support thereof.

"Unrestricted Cash" means, with respect to any interest period, unencumbered cash on the Company's consolidated balance sheet as of the last day of the most recent fiscal period preceding such interest period for which consolidated financial statements are available.

"Unrestricted Subsidiary" means Administración de Inmuebles Vitro S.A. de C.V., and any Subsidiary of the Company that at the time of determination has previously been designated, and continues to be, an Unrestricted Subsidiary in accordance with "—New 2019 Notes—Certain Covenants—Designation of Restricted and Unrestricted Subsidiaries."

"Voting Stock" means, with respect to any Person, Capital Stock of any class or kind ordinarily having the power to vote for the election of directors, managers or other voting members of the governing body of such Person.

"Wholly Owned" means, with respect to any Restricted Subsidiary, a Restricted Subsidiary all of the outstanding Capital Stock of which (other than any director's qualifying shares) is owned by the Company and one or more Wholly Owned Restricted Subsidiaries (or a combination thereof).

227

Table of Contents

## DESCRIPTION OF THE CPOs

The following is a description of certain provisions of (i) the Trust Agreement dated as of November 24, 1989, between Nacional Financiera, as CPO Trustee, and us, which we refer to as the "First Trust Agreement," (ii) the Trust Agreement dated as of November 28, 1990, between Nacional Financiera, as CPO Trustee, and us, which we refer to as the "Second Trust Agreement" and, together with the First Trust Agreement, the "CPO Trust Agreements," (iii) the public deed dated as of November 29, 1990, which evidences the issuance of CPOs by the CPO Trustee pursuant to the CPO Trust Agreements and which deed is registered with, and may be examined at, the *Registro Público del Comercio de la Ciudad de México, D.F.*, which deed we refer to as the "First CPO Deed," (iv) the public deed dated as of June 24, 1998 which evidences the issuance of CPOs by the CPO Trustee pursuant to the CPO Trust Agreements and which deed is registered with, and may be examined at, the *Registro Público del Comercio de la Ciudad de México, D.F.*, which deed we refer to as the "Second CPO Deed," and (v) applicable provisions of the *Ley General de Títulos y Operaciones de Crédito*, which we refer to as the "Negotiable Instruments Law." We refer to the First CPO Deed and the Second CPO Deed together as the "CPO Deeds." This description does not purport to be complete and is qualified in its entirety by reference to the CPO Trust Agreements, the CPO Deeds and the provisions of Mexican law referred to in this description.

The CPO Trust Agreements established a master trust that enables non-Mexican investors to acquire CPOs representing economic interests in our shares. The trust is necessary because, under our by-laws, our shares may not be purchased or held directly or indirectly by non-Mexican investors, other than through these mechanisms.

The terms of the CPO Trust Agreement were authorized by an official communication dated November 27, 1990 from the *Dirección General de Inversiones Extranjeras de la Comisión Nacional de Inversiones Extranjeras*. The CPO Trust Agreement is registered with the *Registro Nacional de Inversiones Extranjeras*, or National Registry of Foreign Investment. An official communication of the CNBV authorized the issuance of CPOs by the CPO Trustee pursuant to the CPO Trust Agreements.

CPOs, which are negotiable instruments under Mexican law, have been issued by the CPO Trustee pursuant to the terms of the CPO Trust Agreements and the CPO Deeds and may be redeemed as described in "—Deposit and Withdrawal of Our Shares." Each CPO represents an economic interest in one of our shares held in the CPO Trust. Currently, the maximum number of CPOs that can be issued pursuant to the CPO Deeds is 200,000,000. Holders of CPOs are not entitled to exercise any voting rights with respect to our shares held in the CPO Trust. Such rights are exercisable by the CPO Trustee pursuant to the terms of the CPO Trust Agreements. Pursuant to the *Ley de Inversión Extranjera*, or Foreign Investment Law, the CPO Trust Agreement qualifies as a "neutral investment" trust because, among other things, voting rights in respect of the underlying shares are exercisable only by the CPO Trustee in the same manner as the majority of the outstanding shares and not by the holders of the CPOs.

### Deposit and Withdrawal of Our Shares

Holders of our shares may deliver such shares to the account of the CPO Trustee at the S.D. Indeval, S.A. de C.V. ("Indeval") through their financial advisor (bank or brokerage house) and receive in return CPOs delivered by the CPO Trustee pursuant to the CPO Trust Agreements. All of our shares delivered to the CPO Trustee will be held in trust by the CPO Trustee in accordance with the terms and conditions of the CPO Trust Agreements. We will deem the CPO Trustee to be the holder of the shares delivered to the CPO Trustee. Transfer of ownership of those of our shares that underlie CPOs will be effected through the records maintained by Indeval.

The CPO Trustee will deliver CPOs in respect of our shares transferred as described above. All of the CPOs are evidenced by a single certificate, which we refer to as the "Global CPO," which has been issued to and deposited with Indeval, acting as depositary. Ownership of CPOs deposited with Indeval will be shown on, and transfer of the ownership of such CPOs will be effected through, records maintained by Indeval and Indeval Depositors. Holders of CPOs are not entitled to receive physical certificates evidencing such CPOs but may request statements issued by Indeval and Indeval Depositors evidencing ownership of CPOs. Holders of CPOs that are non-Mexican investors are not entitled to withdraw the shares that are held in the CPO Trust and represented by CPOs.

228

Table of Contents

Holders of CPOs may sell their CPOs (i) to a non−Mexican investor, in which case the non−Mexican investor will become the transferee of such CPOs or (ii) to a Mexican investor, in both cases through the Mexican Stock Exchange, in which case the Mexican investor would be the transferee of the shares underlying such CPOs directly or, by keeping such shares deposited at an account at Indeval, such CPOs will be held by the CPO Trustee pending delivery.

**Dividends, Other Distributions and Preemptive and Other Rights**

Holders of CPOs are entitled to receive the economic benefits related to the shares underlying such CPOs, including those dividends or distributions approved by our shareholders, and to receive the proceeds from the sale of such shares at the termination of the CPO Trust Agreement. See "Item 10. Additional Information—Mexican Corporate Law and By−Laws—Termination of the CPO Trust." The CPO Trustee, through Indeval, will distribute cash dividends and other cash distributions received by it with respect to our shares held in the CPO Trust to the holders of the CPOs in proportion to their respective holdings in the same currency in which they were received. Dividends paid with respect to our shares underlying CPOs will be distributed to CPO holders by Indeval on the business day following the date on which Indeval receives the funds on behalf of the CPO Trustee.

If a distribution by us consists of a stock dividend on our shares, such distributed shares will be transferred to Indeval on behalf of the CPO Trustee, and held in the CPO Trust. The CPO Trustee will distribute to the holders of outstanding CPOs, in proportion to their holdings, additional CPOs in an aggregate number equal to the aggregate number of our shares received by the CPO Trustee as the stock dividend. If the maximum amount of CPOs that may be delivered under the CPO Deeds would be exceeded as a result of a dividend on our shares, a new CPO deed will be entered into setting forth that new CPOs (including those CPOs exceeding the number of CPOs authorized under the CPO Deed) may be issued. If the CPO Trustee receives any distribution with respect to our shares held in the CPO Trust (other than in the form of cash or additional shares), the CPO Trustee will adopt such method as it may deem legal, equitable and practicable to effect the distribution of such property. If we offer, or cause to be offered, to the holders of our shares, the right to subscribe for additional shares, subject to applicable law, the CPO Trustee will offer to each holder of CPOs the right to instruct the CPO Trustee to subscribe for such holder's proportionate share of such additional shares (subject to such holder providing the CPO Trustee (through Indeval) with the funds necessary to subscribe for such additional shares). If an offering of rights occurs and CPO holders provide the CPO Trustee with the necessary funds, the CPO Trustee (through Indeval) will subscribe for the corresponding number of our shares, which will be placed in the CPO Trust (to the extent possible), and deliver additional CPOs (through Indeval) in respect of such shares to the applicable CPO holders pursuant to the CPO Deeds or, if applicable, through a new CPO deed.

According to Mexican law, dividends or other distributions and the proceeds from the sale of our shares held in the CPO Trust that are not received or claimed by a CPO holder within three years from the receipt of such dividends or distributions by the CPO Trustee or ten years from such sale will become the property of the Mexican *Secretaría de Salud.*

**Changes Affecting Our Shares**

With respect to our shares, upon any change in par value, a stock split, any other reclassification, a merger or consolidation affecting us, or if we pay dividends by distributing shares or other goods different from our shares, the CPO Trustee shall determine, in an equitable and proportional manner, any required amendments to be made to the CPO Trust, the CPO Deeds and the CPOs, as well as to the instruments representing such CPOs. If in connection with a redemption of our shares, any of our shares held in the CPO Trust are called for redemption, the CPO Trustee will, in accordance with the instructions of the CPO Technical Committee (as defined in "—Administration of the CPO Trust") determine, in any manner deemed to be legal, equitable and practicable, the CPOs that are to be redeemed (in a number equal to the number of our shares held in the CPO Trust called for redemption) and pay the holders of such CPOs their proportionate share of the consideration paid by us in respect thereof.

Table of Contents

**Voting of Our Shares**

Holders of CPOs are not entitled to exercise any voting rights with respect to our shares held in the CPO Trust. Such voting rights are exercisable only by the CPO Trustee, which is required by the terms of the CPO Trust to vote such shares in the same manner as a majority of our outstanding shares that are not held in the CPO Trust are voted at the relevant shareholders' meeting. Because CPOs grant no voting rights to holders thereof, such holders do not have the benefit of any rights (including minority protection rights) granted under applicable law or our by-laws to holders of our shares.

**Administration of the CPO Trust**

Pursuant to the terms of the CPO Trust Agreement, the CPO Trustee administers the CPO Trust under the direction of a technical committee. The technical committee of the CPO Trust, which we refer to as the "CPO Technical Committee," consists of five members and their respective alternates. Each of the following entities appoints one member of the CPO Technical Committee: the *Comisión Nacional de Inversiones Extranjeras*, the Mexican Stock Exchange, the *Asociación Mexicana de Casas de Bolsa*, the CPO Common Representative (as defined below) and the CPO Trustee. Actions taken by the CPO Technical Committee must be approved by a majority of the members present at any meeting of such committee, at which at least the majority of the members are present. Banco Santander Mexico, S.A. has been appointed as the common representative of the holders of CPOs and we refer to it as the "CPO Common Representative."

Pursuant to the Negotiable Instruments Law, the duties of the CPO Common Representative include, among others (i) verifying the due execution and terms of the CPO Trust Agreements, (ii) verifying the existence of our shares being held in the CPO Trust, (iii) authenticating the Global CPO, (iv) exercising the rights of the CPO holders in connection with the payment of any dividend or distribution to which such CPO holders are entitled, (v) undertaking any other action to protect the rights, actions or remedies to which CPO holders are entitled, (vi) calling and presiding over CPO holders' general meetings, each of which we refer to as a "CPO General Meeting," and (vii) carrying out the decisions adopted thereat. The CPO Common Representative may request from the CPO Trustee all information and data necessary for the performance of its duties. The CPO holders, by a resolution adopted at a duly held CPO General Meeting, may (i) revoke the appointment of the CPO Common Representative and appoint a substitute CPO Common Representative and (ii) instruct the CPO Common Representative to undertake certain actions.

Holders of CPOs representing at least 10% of the aggregate number of outstanding CPOs may request that the CPO Common Representative call a CPO General Meeting, including in such request the order of business for such meeting. Announcements of CPO General Meetings shall be published in the *Diario Oficial de la Federación*, Mexico's Daily Official Gazette of the Federal Government, and in one of the newspapers with the widest distribution in the domicile of the CPO Trustee, which is currently México City, at least ten days in advance of the date on which the CPO General Meeting is scheduled. Announcements of CPO General Meetings shall include the order of business for such meetings.

In order for holders of CPOs to be entitled to attend CPO General Meetings, such holders must request a statement from Indeval or an Indeval Depositor, not less than two days prior to the date on which such meeting is scheduled evidencing their holdings of CPOs and must submit such statement to the institution designated for such purpose in the notice for such meeting on or before the day prior to the date on which such meeting is scheduled. Persons appointed by an instrument in writing as representatives for a holder of CPOs will be entitled to attend CPO General Meetings.

At CPO General Meetings, each holder of a CPO will be entitled to one vote per CPO owned by him, her or it. Resolutions of the CPO holders must be approved by at least a majority of CPOs present at a CPO General Meeting at which there is a quorum. A quorum at a CPO General Meeting initially is constituted by holders of a majority of CPOs delivered and, if no quorum is present at such meeting, any CPOs present at a subsequently called CPO General Meeting shall constitute a quorum. Resolutions adopted by the required number of CPO at a duly convened CPO General Meeting will bind all CPOs, including absent and dissident holders.

230

Table of Contents

Certain matters must be approved at a special CPO General Meeting at which, for the first call, at least 75% of the CPOs delivered must be present, and resolutions with respect to such matters must be approved by a majority of CPOs present at such meeting. Such matters include appointment and revocation of the CPO Common Representative and the granting of consents, waivers or grace periods to the CPO Trustee. If a quorum is not present with respect to a CPO General Meeting discussing any such matters, a subsequent meeting may be called at which action may be taken regardless of the percentage of delivered CPOs present at such meeting.

**Enforcement of Rights of CPO Holders**

In accordance with the Negotiable Instruments Law, CPO holders may, with certain limitations, individually and directly exercise certain rights with respect to CPOs. Such rights include, among others, the right to cause the CPO Trustee to distribute dividends or other distributions received by it (directly or through Indeval), to cause the CPO Common Representative to protect the rights to which the CPO holders are entitled and to enforce such rights and to bring actions against the CPO Common Representative for civil liabilities in the event of willful misconduct.

**Status of CPO Holders**

The CPO Trust Agreements and the CPO Deeds provide that any investor deemed a non–Mexican investor acquiring CPOs shall be considered under the CPO Trust Agreement, by virtue of its acquisition of CPOs, to be a Mexican national with respect to its holdings of CPOs and shall be deemed to have agreed not to invoke the protection of its own government. If such protection is invoked, such CPO holder will forfeit its CPOs to the Mexican government. A holder of CPOs is deemed to have invoked the protection of the home government of such holder by, for example, asking such government to interpose a diplomatic claim against the Mexican government with respect to the CPO holders' rights or by bringing suit in its home jurisdiction against the Mexican government with respect to such rights. CPO holders will not be deemed to have waived any of their other rights, including any rights such holders may have pursuant to the terms and provisions of the CPOs.

**Termination of the CPO Trust**

The CPO Trust Agreement and the CPOs issued under the CPO Deeds will expire 30 years after the date of execution of the CPO Trust Agreement. The CPO Trustee will commence the procedure for the termination of the CPO Trust Agreement 12 months prior to its expiration. At the time of such termination, the CPO Trustee will sell our shares held in the CPO Trust and will distribute the proceeds of such sale to the holders of the CPOs on a pro rata basis in accordance with the number of CPOs owned by each holder. The CPO Trust may also be terminated upon a resolution approved by a majority of the CPOs present at a CPO General Meeting. Notwithstanding the foregoing, the CPO Trust Agreement cannot be terminated if any dividends or other distributions previously received by the CPO Trustee remain unpaid to the CPO holders.

Upon the expiration of the CPO Trust Agreement, subject to obtaining the applicable authorizations from the Mexican government, the CPO Trustee and any CPO holder may execute a new trust agreement with the same terms as the CPO Trust Agreement. There can be no assurances that a new trust agreement will be executed. In such a case, our shares represented by the CPOs owned by any holder who executes the new trust agreement will be transferred by the CPO Trustee to the new trust created pursuant to such new trust agreement, and new ordinary participation certificates issued under the new trust agreement will be issued by the trustee and delivered to such holder.

**Limitations Affecting CPO Holders**

Each of our shares is entitled to one vote at general shareholders' meetings. Holders of CPOs are not entitled to vote the underlying shares. Voting rights with respect to the underlying shares are exercisable only by the CPO Trustee, which is required to vote all such shares in the same manner as the majority of our shares that are not held in the CPO Trust are voted at the relevant meeting.

231

Table of Contents

Our by–laws prohibit direct or indirect ownership of our shares by non–Mexican nationals. Any acquisition of our shares in violation of such provision would be null and void under Mexican law and such shares would be cancelled and our capital accordingly reduced. Non–Mexican nationals may, however, hold an economic interest in our shares through a neutral investment trust such as the CPO Trust.

232

Table of Contents

## CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS

TO ENSURE COMPLIANCE WITH INTERNAL REVENUE SERVICE CIRCULAR 230, HOLDERS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES IN THIS DOCUMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON BY HOLDERS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON HOLDERS UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

The following is a discussion of the principal U.S. federal income tax consequences of the Tender Offer and exchange for holders of the Old Notes who are U.S. Holders (as defined below). This discussion is based upon the Internal Revenue Code of 1986, as amended (the "Code"), final and proposed Treasury regulations promulgated thereunder, Internal Revenue Service ("IRS") rulings and pronouncements and judicial decisions in effect as of the date of this document, all of which may change, possibly with retroactive effect. This discussion applies only to U.S. Holders (as defined below) that hold the Old Notes, and, if receiving New Notes pursuant to the exchange, will hold the New Notes as capital assets. Holders of Restructured Debt other than Old Notes are urged to contact their own tax advisors regarding the U.S. federal income tax consequences of the exchange of Restructured Debt for the Restructuring Consideration.

This discussion does not address all aspects of U.S. federal income taxation that may be relevant to U.S. Holders in light of their particular circumstances, such as holders to whom special tax treatment applies, including (1) banks, regulated investment companies, real estate investment trusts, insurance companies, employee stock ownership plans, brokers, dealers in securities or currencies, subchapter S corporations, entities treated as partnerships for U.S. federal income tax purposes, and tax exempt organizations, (2) persons who hold Old Notes or who will hold the New Notes as part of a straddle, hedge, conversion transaction or other integrated investment, (3) persons whose functional currency is not the U.S. dollar, (4) persons that use a mark to market method of accounting and (5) persons who, for U.S. federal income tax purposes, are or will be considered as owning 10% or more, directly or by attribution, of the Company. In addition, this discussion does not address alternative minimum taxes or state, local or non-U.S. taxes (other than certain Mexican tax issues). Furthermore, this discussion does not address the tax consequences to Fintech and does not address any aspects of U.S. federal tax law (such as the estate tax, gift tax or the Medicare tax on net investment income) other than U.S. federal income tax law. For purposes of this discussion, we assume that the advances made by Fintech to fund the Tender Offer, followed by the transfer of Old Notes to Fintech and Fintech's subsequent participation in the exchange, is not treated as an acquisition by Fintech of New 2019 Notes and New MCDs for cash.

No opinion of counsel has been sought or obtained with respect to any U.S. tax consequences of the Tender Offer and exchange and no tax opinion is given by this discussion. No rulings or determination letters from the IRS or any other taxing authorities have been obtained or sought with respect to the Tender Offer and exchange, and the description below is not binding upon the IRS or such other taxing authorities. With respect to some of the tax consequences discussed herein, the tax law is unclear. Accordingly, it is possible that the IRS may disagree with the description below of the tax consequences, and there can be no certainty that the IRS would not prevail in any challenge it may decide to make in this regard.

FOR THE FOREGOING REASONS, ALL HOLDERS OF OLD NOTES ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS AS TO THE SPECIFIC TAX CONSEQUENCES (FOREIGN, FEDERAL, STATE, AND LOCAL) OF THE TENDER OFFER AND EXCHANGE TO THEM. THE COMPANY IS NOT MAKING ANY REPRESENTATIONS REGARDING THE PARTICULAR TAX CONSEQUENCES OF THE TENDER OFFER AND EXCHANGE AS TO ANY SPECIFIC HOLDER, NOR IS THE COMPANY RENDERING ANY FORM OF LEGAL OPINION AS TO SUCH TAX CONSEQUENCES.

For purposes of this discussion the term "U.S. Holder" means a holder of Old Notes who is a beneficial owner of such instrument and that is, for U.S. federal income tax purposes: (i) an individual who is a citizen or resident of the United States, (ii) a corporation (or any other entity treated as a corporation for U.S. federal income

233

Table of Contents

tax purposes) created or organized in the United States or under the laws of the United States or of any state of the United States or the District of Columbia, (iii) an estate, the income of which is subject to U.S. federal income tax regardless of its source, or (iv) a trust if (A) a court within the United States is able to exercise primary supervision over the administration of the trust and at least one U.S. person has authority to control all substantial decisions of the trust or (B) it has a valid election in effect to be treated as a U.S. person.

**Tax Consequences to U.S. Holders Who Receive Cash for Old Notes Pursuant to the Tender Offer**

A U.S. Holder that receives cash in exchange for Old Notes pursuant to the Tender Offer will recognize gain or loss equal to the difference between the amount realized on the sale of the Old Notes pursuant to the Tender Offer and the U.S. Holder's adjusted basis in the Old Notes tendered. The amount realized will equal the amount of cash received for the tendered Old Notes (other than amounts attributable to accrued but unpaid interest, which will be treated as ordinary taxable income for a U.S. Holder that had not previously included such accrued interest in income). Subject to the discussion below regarding accrued market discount, any such gain or loss will be capital gain or loss, and such capital gain or loss generally will be long–term capital gain or loss if the U.S. Holder held the Old Notes surrendered for more than one year.

A U.S. Holder that acquired Old Notes subsequent to their original issuance with more than a *de minimis* amount of market discount will be subject to the market discount rules under the Code. Under those rules, assuming that a U.S. Holder has made no election to include market discount in income on a current basis, such holder will be required to treat any gain on the tender of the Old Notes as ordinary income to the extent of the market discount accrued to the date of the disposition pursuant to the Tender Offer.

**Tax Consequences to U.S. Holders Who Participate in the Exchange**

*Tax Treatment of U.S. Holders of Old Notes*

The tax consequences to U.S. Holders that own more than one class of Old Notes will be determined separately for each class of Old Notes held. The tax treatment of U.S. Holders that exchange Old Notes for the Restructuring Consideration will depend on whether or not such exchange qualifies as a "recapitalization" under the Code. In general, for an exchange of Old Notes for the Restructuring Consideration to qualify as a recapitalization, the class of Old Notes surrendered must be treated as a "security" for U.S. federal income tax purposes and one or more classes of New Notes received must be treated as either stock or a security. In this regard, the term "security" is not clearly defined under current U.S. federal income tax law. Whether a debt instrument is a security is determined based on all the facts, including the term of the debt instrument, the presence or absence of certain shareholder type rights and certain other factors. Generally, corporate debt instruments with maturities when issued of less than five years are not considered securities while corporate debt instruments with maturities when issued of ten years or more are considered securities. Each of the classes of Old Notes had a term to maturity at original issuance of five years or more. As a result, it may be reasonable to treat each class of Old Notes as a security for U.S. federal income tax purposes. Each class of New Notes will also have a term to maturity of at least five years. In addition, it is possible that the New MCDs could be treated as stock for U.S. federal income tax purposes as described below. It therefore may be reasonable to treat each class of New Notes as a security (or possibly stock in the case of the New MCDs).

If each class of Old Notes and New Notes is a security, the exchange of the Old Notes for the Restructuring Consideration (other than any Restructuring Consideration treated as paid in respect of accrued interest) should qualify as a recapitalization under the Code. If the exchange of Old Notes for the Restructuring Consideration is treated as a recapitalization, a U.S. Holder of Old Notes will not recognize gain on the exchange of such Old Notes for the Restructuring Consideration, except (i) to the extent of any cash and the fair market value of any property received that is not a security or stock or (ii) to the extent any portion of the Restructuring Consideration is treated as payment of accrued interest on the Old Notes as discussed more fully below. If the exchange is a recapitalization, a U.S. Holder of Old Notes will not be permitted to recognize a loss on the exchange of Old Notes for the Restructuring Consideration.

234

Table of Contents

If the exchange is a recapitalization and each class of New Notes is treated as a security (or stock), a U.S. Holder's total tax basis in New Notes received in exchange for a class of Old Notes (other than any such New Notes received in respect of accrued interest) will be equal to that holder's tax basis in such class of Old Notes surrendered pursuant to the exchange increased by the amount of any gain recognized on the exchange and decreased by the amount of any cash and the fair market value of any property that is not a security (or stock) received in the exchange. A U.S. Holder's total basis in the New Notes received in the exchange will be allocated between the New 2019 Notes and the New MCDs received in the exchange according to their relative fair market values. A U.S. Holder's holding period for New Notes received in the exchange (other than any New Notes received in exchange for accrued interest) will include that person's holding period for the Old Notes surrendered in exchange therefor.

A possible characterization of the New MCDs is that they are neither debt nor equity of the Company, but instead are a contractual claim of the holder against the Company. In the event the proper characterization of the New MCDs is as a contractual claim, the New MCDs will be treated as "other property" of the Company rather than as securities. In such case, if the exchange is a recapitalization, a U.S. Holder will recognize gain on the exchange, if any, to the extent of both the cash received and the fair market value of the New MCDs received in the exchange.

If the New MCDs are treated as debt for U.S. federal income tax purposes and the exchange is not treated as a recapitalization because the Old Notes surrendered are not securities or none of the New Notes received are securities, a U.S. Holder will recognize taxable gain (or loss) in an amount equal to the excess (or deficit) of (x) the sum of the issue price of each class of New Notes (other than any New Notes treated as paid in respect of accrued interest) and the amount of any cash received in connection with the exchange less (y) the holder's tax basis in the Old Notes surrendered. See below for a discussion of the determination of the issue price of the New Notes. Subject to the discussion below regarding accrued market discount, any such gain or loss will be capital gain or loss, and such capital gain or loss generally will be long−term capital gain or loss if the U.S. Holder held the Old Notes surrendered for more than one year. If the exchange is not treated as a recapitalization, a U.S. Holder's tax basis in each class of New Notes received pursuant to the exchange (other than any New Notes received in exchange for accrued interest) will be equal to the issue price of those notes and the holding period for the New Notes received (other than any New Notes received in exchange for accrued interest) will begin the day after the exchange.

If the exchange is not treated as a recapitalization, the correct U.S. federal tax characterization of the New MCDs will affect the calculation of the amount realized by a U.S. Holder. If the New MCDs are treated not as debt, but as equity or as other property of the Company, a U.S. Holder will recognize taxable gain (or loss) in an amount equal to the excess (or deficit) of (x) the sum of the issue price of the New 2019 Notes, the fair market value of the New MCDs and any cash received in connection with the exchange less (y) the holder's tax basis in their Old Notes surrendered. Subject to the discussion below regarding accrued market discount, any such gain or loss will be capital gain or loss, and such capital gain or loss generally will be long−term capital gain or loss if the U.S. Holder held the Old Notes surrendered for more than one year. A U.S. Holder's tax basis in the New 2019 Notes received pursuant to the exchange (other than any such notes received in exchange for accrued interest) will be equal to the issue price of those notes and their basis in the New MCDs will equal their fair market value. The holding period for the New Notes received pursuant to the exchange will begin the day after the exchange.

A U.S. Holder that acquired Old Notes subsequent to their original issuance with more than a *de minimis* amount of market discount will be subject to the market discount rules under the Code. Under those rules, assuming that a U.S. Holder has made no election to include market discount in income on a current basis, any gain recognized on the exchange will be characterized as ordinary income to the extent of the accrued market discount as of the date of the exchange. If the exchange of New Notes for Old Notes is treated as a recapitalization, any accrued market discount remaining thereon which has not been recognized as ordinary income should be carried over to the New Notes. See below for a discussion regarding the treatment of market discount.

Under current law, it is uncertain whether the Note Consent Payment will be treated as part of the consideration for Old Notes in the exchange or as a separate fee paid to a U.S. Holder. If the Note Consent Payment is treated as part of the consideration for Old Notes in the exchange, it will be taken into account in determining gain or loss recognized as described in the preceding paragraphs. If the Note Consent Payment is separate income payable to a U.S. Holder, the payment will likely be taxable to the U.S. Holder as ordinary income and will not be treated as part of the amount realized in exchange for Old Notes as described above.

Table of Contents

Under current law, the treatment of the New 2019 Notes Restructuring Fee is unclear. A possible characterization of the fee is that it is part of the consideration for Old Notes in the exchange, and should be taken into account in determining gain or loss recognized as described in the preceding paragraphs. The New 2019 Notes Restructuring Fee could also be treated as part of the Note Consent Payment, and would therefore be part of the consideration for the Old Notes or separate income payable to a U.S. Holder, as described above. Another possible characterization is that some or all of the New 2019 Notes Restructuring Fee should be treated as a payment for pre−issuance accrued interest on the New 2019 Notes. Other characterizations are also conceivable. U.S. Holders should consult their own tax advisors regarding the treatment of the New 2019 Notes Restructuring Fee.

*Tax Treatment of Amounts Received for Accrued Interest*

Notwithstanding the above, a U.S. Holder of Old Notes will be treated as receiving an interest payment to the extent that a portion of the Restructuring Consideration is treated as paid with respect to accrued interest on the Old Notes. Any such amounts will be treated as ordinary taxable income for a U.S. Holder that had not previously included such accrued interest in income. Under current law, it is not clear whether a U.S. Holder that previously included accrued interest in income should recognize an ordinary or capital loss to the extent of accrued interest previously included in income that is not paid in full. A U.S. Holder's tax basis in any New Notes treated as debt that are received in exchange for accrued interest on Old Notes generally will be equal to the issue price of those New Notes, and the holding period of such notes generally will begin on the day after the exchange. Where notes with accrued but unpaid interest are being satisfied for an amount that is less than the principal and accrued interest on the notes, it may be reasonable for a U.S. Holder to treat all amounts received as allocated first to the principal portion of such Old Notes and thereafter to any accrued interest on such notes. However, there is no assurance that such allocation would be respected by the IRS for U.S. federal income tax purposes. Each U.S. Holder of claims is urged to consult its tax advisor regarding the allocation of consideration.

**Tax Consequences of Owning New Notes**

*New 2019 Notes*

If the "issue price" of the New 2019 Notes is less than their "stated redemption price at maturity" by more than a *de minimis* amount (1/4 of 1 percent of a debt instrument's stated redemption price at maturity multiplied by the number of complete years or, in certain cases, weighted average life, to the instrument's stated maturity), the New 2019 Notes will be treated as having original issue discount ("OID").

The issue price of debt instruments issued in a debt for debt exchange depends on whether a substantial amount of the debt instruments received or surrendered are treated as "traded on an established market" within the meaning of the applicable Treasury Regulations. Debt instruments are treated as "traded on an established market" if, among other things, the debt is listed on a national securities exchange registered under section 6 of the Securities Exchange Act of 1934 or if price quotations are readily available from dealers, brokers or traders. If neither debt surrendered nor debt received in an exchange is treated as traded on an established market, the issue price of the debt received will generally equal the principal amount of the debt if the debt provides for adequate interest.

As noted above, if the New 2019 Notes are treated as "traded on an established market," the issue price of the New 2019 Notes would be their fair market value on the date of the exchange. If the New 2019 Notes are not so traded but the Old Notes are, the issue price of the New 2019 Notes would be equal to the fair market value of the Old Notes surrendered in exchange for the New 2019 Notes.

The stated redemption price at maturity of a debt instrument is the sum of all payments due under the instrument other than payments of qualified stated interest. "Qualified stated interest" includes stated interest, calculated as the product of a single fixed rate of interest (or certain qualified floating rates) and the outstanding principal amount of the instrument, that is unconditionally payable in cash or property (other than debt instruments of the issuer) at least annually.

As a portion of the interest on the New 2019 Notes in the first three years of issuance is payable, at the election of the Company, in additional debt of the Company, only the portion of interest required to be paid in cash

236

Table of Contents

at least annually will be treated as qualified stated interest. The portion of the interest on the New 2019 Notes exceeding the amount required to be paid in cash at least annually will not be treated as qualified stated interest. The stated redemption price at maturity of the New 2019 Notes will thus include the remaining portion of interest payable on the notes and all other scheduled payments on the notes. While the issue price of the New 2019 Notes cannot currently be determined, it is anticipated that the stated redemption price at maturity of the New 2019 Notes will exceed the issue price of such notes by more than a *de minimis* amount, with the result that the New 2019 Notes are anticipated to be treated as issued with OID.

A U.S. Holder of a note issued with OID must include such OID as ordinary interest income for U.S. federal income tax purposes as it accrues under a constant yield method in advance of receipt of the cash payments attributable to such income, regardless of such U.S. Holder's regular method of tax accounting and the timing or amount of any actual payments. In general, the amount of OID included in income by a U.S. Holder of a note issued with OID is the sum of the daily portions of OID with respect to the note for each day during the taxable year (or portion of the taxable year) on which the U.S. Holder held the note. The daily portion of OID on any note issued with OID is determined by allocating to each day in an accrual period a ratable portion of the OID allocable to that accrual period. Accrual periods may be of any length and may vary in length over the term of the note, provided that each accrual period is no longer than one year and each scheduled payment of principal or interest occurs either on the final day or first day of an accrual period. The amount of OID allocable to each accrual period generally is equal to the difference between (i) the product of the note's "adjusted issue price" at the beginning of the accrual period and the note's yield to maturity (determined on the basis of compounding at the close of each accrual period and appropriately adjusted to take into account the length of the particular accrual period) and (ii) the amount of any qualified stated interest payments allocable to such accrual period. The "adjusted issue price" of a note issued with OID at the beginning of any accrual period is the sum of the issue price of the note plus the amount of OID allocable to all prior accrual periods minus the amount of any prior payments on the note that were not qualified stated interest payments. Under these rules, U.S. Holders generally will have to include in taxable income increasingly greater amounts of OID in successive accrual periods.

When determining the yield and maturity of a note that, by its terms, provides the issuer (or holder) with an unconditional option or options that, if exercised, require payments to be made on the note under an alternative schedule or schedules, such issuer (or holder) will be deemed to exercise or not exercise an option or combination of options in a manner that, in the case of an issuer, minimizes, or, in the case of a holder, maximizes the yield on the debt instrument. If, contrary to the presumption, the option is, or is not, exercised, then for purposes of calculating OID, the debt instrument is treated as retired and reissued on the date of the change in circumstances for an amount equal to its adjusted issue price on that date.

When calculating the yield and maturity of the New 2019 Notes for purposes of calculating OID accruals, the Company will be deemed to exercise any option that will reduce the yield on the instrument. Here, the Company has the option to pay the interest due on the New 2019 Notes in the first two years in kind and a right to redeem such notes prior to maturity. The deemed exercise of these options will depend on certain factors, including the exact issue price of the New 2019 Notes, which will not be known until after the exchange occurs. As such, it cannot currently be determined when the Company will be deemed to exercise any of its unconditional options. In the event the Company does not exercise an option as expected, the New 2019 Notes will be treated as retired and reissued and the yield and maturity will again be assessed at that time, taking into account any existing options of the Company or holder that will decrease or increase the yield, respectively.

In the event that the New 2019 Notes have an issue price that differs from their face value, certain terms and conditions of the New 2019 Notes, for example the Excess Cash Flow Sweep or a Mandatory Redemption upon an equity offering, could result in the New 2019 Notes being treated as "Contingent Payment Debt Instruments," which are subject to special rules under applicable Treasury regulations governing instruments issued with OID.

***Acquisition Premium, Market Discount and Bond Premium With Respect to New 2019 Notes***

If a U.S. Holder has a tax basis in a New 2019 Note that is more than the issue price of such note but less than or equal to the stated redemption price at maturity of such note, such holder has acquisition premium with

Table of Contents

respect to such note to the extent of that excess, and the holder will not include OID on the new note in income to the extent of the acquisition premium.

A U.S. Holder that has a tax basis in a New 2019 Note that is less than the issue price of the note will be subject to the market discount rules (unless the amount of the excess of the issue price over the basis is less than a specified *de minimis* amount, in which case market discount is considered to be zero). A U.S. Holder may elect (but is not required) to take market discount into income over the remaining life of a note, either on a ratable or economic yield basis. Once made, this election to include market discount in income currently applies to all market discount obligations acquired in or after the first taxable year to which the election applies and may not be revoked without the consent of the IRS. Absent such an election, a U.S. Holder will be required to treat any principal payment on, or any gain recognized on the sale, exchange, redemption, retirement or other disposition of a New 2019 Note as ordinary income to the extent of any accrued market discount that has not previously been included in income at the time of such payment or disposition. In addition, a U.S. Holder may be required to defer, until the maturity date of the note or its earlier disposition, the deduction of all or a portion of the interest expense on any indebtedness incurred or continued to purchase or carry such note.

As discussed above, if the exchange of Old Notes for New Notes is treated as a recapitalization, a U.S. Holder who acquired its Old Notes at a market discount may be required to carry over to the New 2019 Notes that they receive any accrued market discount with respect to the Old Notes to the extent that the accrued market discount was not previously included in income. In that case, a U.S. Holder holding such notes may have all or part of any market discount effectively converted into OID because the issue price of the New 2019 Notes, while not known exactly, is expected to be less than the stated redemption price at maturity of such notes.

If a U.S. Holder has a tax basis in a New 2019 Note that exceeds the note's stated redemption price at maturity, the note has bond premium to the extent of that excess, and the holder will not be required to include OID, if any, on a New 2019 Note in income. A U.S. Holder generally may elect to amortize the premium using the constant yield to maturity method as a reduction of the U.S. Holder's non–OID interest income from the note. Once made, the election to amortize premium on a constant yield to maturity method applies to all debt obligations held or subsequently acquired by the electing U.S. Holder on or after the first day of the first taxable year to which the election applies and may not be revoked without the consent of the IRS. Premium on a note held by a U.S. Holder that does not make such election will decrease the gain or increase the loss otherwise recognized on the sale, exchange, redemption, retirement or other taxable disposition of a note.

*Dispositions of New 2019 Notes*

A U.S. Holder will generally recognize taxable gain or loss upon the sale, exchange, redemption, retirement or other taxable disposition of a note in an amount equal to the difference between the amount realized upon such sale, exchange, redemption, retirement or other taxable disposition (reduced by any amounts attributable to accrued but unpaid qualified stated interest, which will be taxable as ordinary interest income) and such U.S. Holder's adjusted tax basis in the note. A U.S. Holder's adjusted tax basis in a note will generally equal such U.S. Holder's initial investment in the note, (i) increased by the amount of any OID included in the U.S. Holder's gross income with respect to the note (including any amounts of OID included in the U.S. Holder's income as a result of the election to treat all interest as OID, as discussed above) and (ii) reduced by the amount of any payments received with respect to the note that are not payments of qualified stated interest. Such gain or loss will generally be long–term capital gain or loss if the Note is held for more than one year. Certain non–corporate U.S. Holders (including individuals) may be eligible for preferential tax rates in respect of long–term capital gain, which rates currently are scheduled to increase on January 1, 2011. The deductibility of capital losses by U.S. Holders is subject to limitations.

*New MCDs*

The proper characterization for U.S. tax purposes of the New MCDs is unclear. While the New MCDs could be treated as debt convertible into common stock of the Company, they are more likely to be treated as an instrument other than debt for U.S. tax purposes. In that case, the New MCDs could be treated as preferred equity of the Company convertible into common stock, as ordinary common equity of the Company or as a contractual

238

Table of Contents

arrangement between the Company and each holder that is neither debt nor equity. Other characterizations are also conceivable.

The timing, character and source of income recognized by a U.S. Holder could be different depending on the proper characterization of the New MCDs. U.S. Holders should consult their own tax advisors regarding the tax characterization of the New MCDs received in the exchange.

*Mexican Withholding Taxes and Foreign Tax Credits*

Payments on the New Notes may be subject to withholding tax imposed by Mexico. Pursuant to the terms of the New Notes, the Company will be required to pay additional amounts in respect of such withholding so that, subject to certain exceptions, the net amount received by each U.S. Holder will equal the amounts that would have been received in the absence of such withholding. Although not free from doubt, such additional amounts will likely be treated as additional interest or dividend income at the time they are paid by the Company or accrue in accordance with the U.S. Holder's method of accounting for tax purposes.

Subject to numerous limitations, U.S. Holders may receive a foreign tax credit with respect to Mexican withholding taxes imposed on payments made on the New Notes. Any amounts attributable to interest or additional amounts paid in respect of New Notes generally will be treated as foreign source passive income or, in some cases, general category income, for U.S. foreign tax credit limitation purposes.

If any foreign income tax is withheld on the sale or other taxable disposition of a New Note, the amount realized by a U.S. Holder will include the gross amount of the proceeds of that sale or other taxable disposition before deduction of such tax. Capital gain or loss, if any, realized by a U.S. Holder on the sale or other taxable disposition of the notes generally will be treated as U.S.–source gain or loss for U.S. foreign tax credit purposes. Consequently, in the case of a gain from the disposition of a note that is subject to foreign income tax, the U.S. Holder may not be able to benefit from the foreign tax credit for the tax unless the U.S. Holder can apply the credit against U.S. federal income tax payable on other income from foreign sources. Alternatively, the U.S. Holder may take a deduction for the foreign income tax if the U.S. Holder does not elect to claim a foreign tax credit for any foreign income taxes paid during the taxable year.

The foreign tax credit rules are complex, and U.S. Holders should consult their own tax advisors regarding the availability of foreign tax credits or deductions of foreign income taxes based on their particular circumstances.

Non–U.S. Holders

For purposes of the following discussion a "Non–U.S. Holder" means a beneficial owner of notes that is not, for U.S. federal income tax purposes, a U.S. Holder or a partnership (or an entity or arrangement classified as a partnership for such purposes). Subject to the discussion below regarding backup withholding, a Non–U.S. Holder will generally not be subject to U.S. federal income or withholding tax on:

(a)    The cash proceeds received from the sale of an Old Note pursuant to the Tender Offer;

(b)    The exchange of Old Notes for the Restructuring Consideration;

(c)    Interest and any additional amounts paid in respect of the New Notes; or

(d)    Gain realized on the sale, exchange, redemption, retirement or other taxable disposition of the New Notes,

unless, in the case of any payments treated as interest (including OID, amounts constituting yield on the New MCDs and amounts treated as paid in respect of accrued interest), such payments are effectively connected with the conduct by the Non–U.S. Holder of a trade or business in the United States (and, if required by an applicable income tax treaty, attributable to a U.S. permanent establishment) or, in the case of any amounts treated as gain, such gain is

**Table of Contents**

(i) effectively connected with the conduct by the Non−U.S. Holder of a trade or business in the United States (and, if required by an applicable income tax treaty, attributable to a U.S. permanent establishment) or, (ii) in the case of gain realized by an individual Non−U.S. Holder, the Non−U.S. Holder is present in the United States for 183 days or more in the taxable year of the disposition and certain other conditions are met.

**Information Reporting and Backup Withholding**

In general, U.S. tax information reporting requirements may apply to transfers and payments made pursuant to the Tender Offer and the Exchange Offer and Consent Solicitation, payments with respect to the New Notes and the proceeds of sale of such New Notes by holders other than certain exempt persons. Backup withholding of U.S. federal income tax may apply at applicable rates to payments made pursuant to the Tender Offer and exchange, payments with respect to the New Notes and the proceeds of sale of the New Notes, if the holder fails to provide a correct taxpayer identification number or certification of exempt status or, with respect to certain payments, if a holder fails to report in full all interest and dividend income and the IRS notifies the payor of the holder's under reporting. Any amounts withheld under the backup withholding rules from a payment to a holder will generally be allowed as a refund or credit against the holder's federal income tax liability provided the required information is timely furnished to the IRS.

Recently enacted legislation requires certain U.S. Holders to report information with respect to their investment in certain "foreign financial assets" not held through a custodial account with a U.S. financial institution to the IRS. Investors who fail to report required information could become subject to substantial penalties. Prospective investors are encouraged to consult with their own tax advisors regarding the possible implications of this new legislation on the New Notes received in the exchange.

240

Table of Contents

## MATERIAL MEXICAN FEDERAL TAX CONSIDERATIONS

**Certain Mexican Tax Consequences**

The following summary of certain Mexican federal income tax considerations contains a description of certain Mexican federal income tax consequences of the Note Consent Payment and the Tender Offer Consideration and of the payment of interest or disposition of the New Notes, but does not purport to be a comprehensive description of all the tax considerations that may be relevant to a decision of a holder to provide the required consent or to tender Old Notes. This summary does not describe any tax consequences arising under the laws of any state, locality or taxing jurisdiction other than Mexico.

This summary is based on the federal tax laws of Mexico as in effect on the date of this Statement (including the tax treaties described below under "—Tax Treaties"), as well as on the rules and regulations of Mexico available on or before such date and now in effect. All of the foregoing is subject to change, which change could affect the continued validity of this summary. In addition you should be aware that the federal tax laws of Mexico, the tax treaties and the rules and regulations thereunder may have changed at the time of issuance of the New Notes, and such change could affect the continued validity of this summary.

Holders to whom this Statement is addressed and any persons that may acquire the New Notes should consult their own tax advisers as to the Mexican or other tax consequences of tendering their Old Notes for purchase by us or granting their consent, and the ownership and disposition of the New Notes, including the application of the tax considerations discussed below to their particular situations, as well as the application of state, local, foreign or other tax laws.

**Mexican Income Tax Considerations**

The following is a general summary of the principal consequences under the Mexican *Ley del Impuesto sobre la Renta* (the "Mexican Income Tax Law") and the rules and regulations thereof, as currently in effect, of the Tender Offer Consideration, the Note Consent Payment and the purchase, ownership and disposition of the New Notes by a holder that is not a resident of Mexico and that will not hold the New Notes, or a beneficial interest therein, in connection with the conduct of a trade or business through a permanent establishment in Mexico (a "Foreign Holder").

The determination of "tax residency" pursuant to Mexican tax laws is based upon subjective elements, involving the consideration of a number of factors. For purposes of Mexican taxation, individuals are considered residents of Mexico when they have established their place of residence (i.e., home) in Mexico; if an individual has his or her home in Mexico and in another country as well, he or she shall be deemed to be a resident of Mexico if his or her "center of vital interest" is located within Mexican national territory. The center of vital interest of an individual is considered to be located in Mexico if, among other circumstances: (i) more than 50% of his or her total income for the relevant calendar year is derived from Mexican sources; or (ii) the main center of his or her professional activities is located in Mexico. Mexican nationals who filed a change of tax residence to a country or jurisdiction in which his or her income is subject to a preferred tax regime pursuant to the provisions of the Mexican Income Tax Law will be considered Mexican residents for tax purposes during the year notice of such residence change is filed and during the following three years unless such country has a comprehensive tax information exchange treaty in effect with Mexico. Mexican government officials and employees are also Mexican residents for Mexican tax purposes even if their center of vital interest is located outside Mexico. A legal entity is considered a Mexican resident when the main administration of its business or its place of effective management is in Mexico. Unless otherwise proven, a Mexican national is considered a Mexican resident for tax purposes. A Foreign Holder conducting a trade or business through a permanent establishment in Mexico will be required to pay income tax in Mexico on income attributable to such permanent establishment, which could include income from the New Notes.

**Tax Treaties**

Mexico has entered into and is negotiating tax treaties with several countries that may reduce the amount of Mexican withholding tax to which payments of interest of the notes may be subject. Prospective beneficiaries of the

241

Table of Contents

Tender Offer Consideration or the Note Consent Payment and prospective holders of the New Notes should consult their own tax advisors as to the tax consequences and benefits, if any, of such treaties.

**Taxation of Tender Offer Consideration, Consent Payments and Exchange of Notes**

Under Mexican tax law, consent payments made to Foreign Holders of the Old Notes will be considered to qualify as "interest" for Mexican tax purposes, as they will be viewed as a yield under the Old Notes, and therefore the tax treatment described below in "—Note Consent Payment; Payment of Interest, Principal and Premium in Respect of the New Notes" will be applicable to such payments.

Additionally, under Mexican tax law, a positive difference between the value received by us at the time of issuance of the Old Notes and the price at which a holder that is not a resident of Mexico sells such Old Notes to us would be viewed as a capital gain since we will purchase the Old Notes at a discount from their issue price. Capital gains on such sale will not be subject to Mexican taxes.

**Note Consent Payment; Payment of Interest, Principal and Premium in Respect of the New Notes**

Under Mexican tax law, the Note Consent Payment and any payments of interest we make in respect of the New Notes (including payments of principal in excess of the issue price of such New Notes, which, under Mexican law, are deemed to be interest) to a Foreign Holder will be subject to a Mexican withholding tax assessed at a rate of 4.9% if: (i) the New Notes are placed through banks or brokerage houses, or *casas de bolsa*, in a country with which Mexico has entered into a tax treaty for the avoidance of double taxation, which is in effect; (ii) the issuance of the New Notes and a summary of their main features are timely reported to the CNBV; and (iii) the information requirements specified by the Mexican Tax Administration Service, or *Servicio de Administración Tributaria* (the "SAT") under general rules issued from time to time are satisfied. In case such requirements are not met or cease to be met, the applicable withholding tax rate will be 10% and, in such case, if the effective beneficiary of such payments is deemed to have a preferential tax regime (e.g., a person who is not subject to taxation on income in its country of residence or a person whose effective income tax rate is lower than 75% of the Mexican income tax rate, which is currently 30%), the withholding tax will be substantially higher.

Under general regulations published by the SAT currently in effect, the information requirements which must be satisfied are that: (i) we timely file with the SAT certain information relating to us and the issuance of the New Notes; (ii) we timely file with the SAT information on the interest paid and information representing that no party related to us jointly or individually, directly or indirectly, is the effective beneficiary or 5% or more of the aggregate amount of each interest payment on a quarterly basis; and (iii) we maintain records which evidence compliance with items (i) and (ii) above.

Even if the above requirements are met, currently a withholding tax of 30% will apply if the effective beneficiaries of the interest paid on the New Notes, whether directly or indirectly, individually or collectively with related persons, who receive more than 5% of the aggregate amount of such payments on the New Notes are: (i) shareholders who own, directly or indirectly, individually or collectively with related persons, more than 10% of our voting stock; or (ii) entities with more than 20% stock owned, directly or indirectly, individually or collectively with related persons, by us or by persons related to us. For such purposes, under the Mexican Income Tax Law, persons are considered related if one possesses an interest in the business of the other, common interests exist between them or a third person holds an interest in the business or property of both persons.

Under the Mexican Income Tax Law, payments of interest we make on the New Notes to a non–Mexican pension or retirement fund will generally be exempt from Mexican withholding taxes, provided that: (i) the fund is the effective beneficiary of such interest income; (ii) the fund is duly established pursuant to the laws of its country of origin; (iii) the relevant interest income is exempt from taxation in such country; and (iv) the fund is duly registered with the SHCP for such purpose.

If we agree to pay additional amounts to the holders of the New Notes with respect to the Mexican withholding taxes mentioned above, any refunds of such additional amounts will be for our account. See "Description of the New Notes—Additional Amounts").

242

Table of Contents

Holders or beneficial owners of the Old Notes providing their consent and receiving the Note Consent Payment, and holders or beneficial owners of the New Notes, may be requested to provide certain information or documentation necessary to enable us to establish the appropriate Mexican withholding tax rate applicable to such holders or beneficial owners. In the event that the specified information or documentation concerning the holder or beneficial owner, if requested, is not provided on a timely basis, our obligations to pay additional amounts may be limited (as described in "Description of the New Notes—Additional Amounts").

Under the Mexican Income Tax Law, payments of principal we make to a Foreign Holder will not be subject to any Mexican withholding or similar taxes.

**Tender Offer Consideration; Taxation of the Disposition of the Notes**

Under the Mexican Income Tax Law, capital gains resulting from the sale or other disposition of the Old Notes or the New Notes by a Foreign Holder to another Foreign Holder are not taxable in Mexico. For purposes of the above, a positive difference between the value received by us at the time of issuance of the Old Notes and the price at which a holder that is not a resident of Mexico sells such Old Notes to us would constitute a capital gain. As we will purchase the Old Notes at a discount from their original issue price, capital gains on such sale will not be subject to Mexican income taxes. Foreign Holders should consult their tax advisors with respect to the tax consequences on capital gains realized on the disposition of the Old Notes or the New Notes from a Foreign Holder to a Mexican resident or Foreign Holder with a permanent establishment in Mexico.

**Other Mexican Taxes**

A Foreign Holder will not be liable for estate, gift, inheritance or similar taxes with respect to the New Notes held. There are no Mexican stamp, issue, registration or other similar taxes payable by a Foreign Holder with respect to the New Notes.

Table of Contents

## IMPORTANT INFORMATION FOR NON–U.S. HOLDERS

**United Kingdom**

This Statement, any accompanying letter, and any other communications made in connection with the *Concurso* Plan are directed only at persons who (i) are outside the United Kingdom or (ii) have professional experience in matters relating to investments or (iii) are persons falling within Article 49(2)(a) to (d) (high net worth companies, unincorporated associations, etc.) of The Financial Services and Markets Act 2000 (Financial Promotion) Order 2001 (the Financial Promotion Order) (all such persons together being referred to as relevant persons). In the United Kingdom, this Statement and any other communication made with the *Concurso* Plan must not be acted on or relied on by persons who do not meet the above criteria. In the United Kingdom, any investment or investment activity to which this Statement relates is available only to persons who meet those criteria and will be engaged in only with persons who meet the above criteria.

Neither this Statement nor any accompanying letter has been delivered for registration to any Registrar of Companies in the United Kingdom and no prospectus, within the meaning of the Public Offers of Securities Regulations 1995 as amended (the Regulations), has been published or is intended to be published in respect of the *Concurso* Plan. We have not authorized any the Exchange Offer and Consent Solicitation or offer to the public in the United Kingdom within the meaning of the Regulations with respect to the *Concurso* Plan. The Exchange Offer and Consent Solicitation with respect to the *Concurso* Plan is only made in the United Kingdom to persons whose ordinary activities involve them in acquiring, holding, managing or disposing of investments (as principal or agent) for the purposes of their business.

By exchanging your Old Notes or voting for or against the *Concurso* Plan, you will represent, warrant and confirm that you:

- are persons of a kind described in Article 19 or Article 49 of the Financial Promotion Order;

- are persons whose ordinary activities involve them in acquiring, holding, managing or disposing of investments (as principal or agent) for the purposes of their business; and

- expressly invite us to provide information to you and to discuss with you the Exchange Offer and Consent Solicitation and the *Concurso* Plan.

**European Economic Area**

This Statement has been prepared on the basis that the Exchange Offer and Consent Solicitation will be made pursuant to an exemption under Directive 2003/71/EC (the "Prospectus Directive"), as implemented in member states of the European Economic Area ("EEA"), from the requirement to produce a prospectus for the Exchange Offer and Consent Solicitation. Accordingly, any person making or intending to make any the Exchange Offer and Consent Solicitation within the EEA as contemplated in this Statement should only do so in circumstances in which no obligation arises for the Company to produce a prospectus for such the Exchange Offer and Consent Solicitation. The Company has not authorized, and does not authorize, the making of any the Exchange Offer and Consent Solicitation or offer through any financial intermediary.

**Hong Kong Special Administrative Region**

The Exchange Offer and Consent Solicitation will not be made in Hong Kong by means of any document other than (i) in circumstances which do not constitute an offer to the public within the meaning of the Companies Ordinance (Cap. 32, Laws of Hong Kong), or (ii) to "professional investors" within the meaning of the Securities and Futures Ordinance (Cap. 571, Laws of Hong Kong) and any rules made thereunder, or (iii) in other circumstances which do not result in the document being a "prospectus" within the meaning of the Companies Ordinance (Cap. 32, Laws of Hong Kong) and no advertisement, invitation or document relating to the Exchange Offer and Consent Solicitation may be issued or may be in the possession of any person for the purpose of issue (in each case whether in Hong Kong or elsewhere), which is directed at, or the contents of which are likely to be

244

Table of Contents

accessed or read by, the public in Hong Kong (except if permitted to do so under the laws of Hong Kong) other than with respect to persons outside Hong Kong or only to "professional investors" within the meaning of the Securities and Futures Ordinance (Cap. 571, Laws of Hong Kong) and any rules made thereunder.

**Singapore**

This Statement has not been and will not be registered as a prospectus with the Monetary Authority of Singapore. Accordingly, this Statement or any other document or material in connection with the Exchange Offer and Consent Solicitation may not be circulated or distributed, nor may the Exchange Offer and Consent Solicitation be made, whether directly or indirectly, to persons in Singapore other than (1) to an institutional investor under Section 274 of the Securities and Futures Act, Chapter 289 of Singapore (the "SFA"), (2) to a relevant person pursuant to Section 275(1), or any person pursuant to Section 275(1A) of the SFA, and in accordance with the conditions, specified in Section 275 of the SFA or (3) otherwise pursuant to, and in accordance with the conditions of, any other applicable provision of the SFA in each case subject to compliance with conditions set forth in the SFA.

Where New Notes are issued under Section 275 of the SFA to a relevant person which is:

(a)     a corporation (which is not an accredited investor (as defined in Section 4A of the SFA)) the sole business of which is to hold investments and the entire share capital of which is owned by one or more individuals, each of whom is an accredited investor; or

(b)     a trust (where the trustee is not an accredited investor) whose sole purpose is to hold investments and each beneficiary is an accredited investor, shares, debentures and units of shares and debentures of that corporation or the beneficiaries' rights and interest (howsoever described) in that trust shall not be transferred for six months after that corporation or that trust has acquired the New Notes under Section 275 of the SFA except:

(1)     to an institutional investor (for corporations, under Section 274 of the SFA) or to a relevant person or any person pursuant to Section 275(2) of the SFA, or to any person pursuant to an offer that is made on terms that such shares, debentures and units of shares and debentures of that corporation or such rights and interest in that trust are acquired at a consideration of not less than S$200,000 (or its equivalent in a foreign currency) for each transaction, whether such amount is to be paid for in cash or by exchange of securities or other assets, and further for corporations, in accordance with the conditions specified in Section 275 of the SFA;

(2)     where no consideration is given for the transfer; or

(3)     where the transfer is by operation of law.

**Mexico**

The New Notes have not been registered with the National Securities Registry (*Registro Nacional de Valores*) maintained by the Mexican National Banking and Securities Commission (*Comisión Nacional Bancaria y de Valores*, or CNBV), and may not be offered or sold publicly, or otherwise be the subject of brokerage activities in Mexico, except in accordance with Article 8 of the *Ley del Mercado de Valores*, or Mexican Securities Market Law. We will notify the CNBV of the issuance of the New Notes, including their principal characteristics. Such notice will be delivered to the CNBV to comply with a legal requirement and for information purposes only, and the delivery to and the receipt by the CNBV of such notice does not constitute or imply any certification as to the investment quality of the New Notes or of the Company's solvency, liquidity or credit quality or the accuracy or completeness of the information set forth in this Statement. The information contained in this Statement is our exclusive responsibility has not been reviewed or authorized by the CNBV. In making a decision to accept the Exchange Offer and Consent Solicitation, exchange Old Notes and issue a consent hereunder, all holders of

245

Table of Contents

Restructured Debt, including any Mexican investors who may acquire New Notes from time to time, must rely on their own review and examination of the Company.

246

Table of Contents

*CONCURSO* PLAN

RESTRUCTURING AGREEMENT EXECUTED PURSUANT TO ARTICLES 3, 153, 157, 165, 339 AND OTHER APPLICABLE ARTICLES OF THE MEXICAN BANKRUPTCY AND REORGANIZATION LAW (*LEY DE CONCURSOS MERCANTILES*) ENTERED INITIALLY INTO BY AND BETWEEN VITRO, S.A.B. DE C.V. AND THE EXECUTING CREDITORS AND FOR ITS FURTHER SUBSCRIPTION, IN ITS CASE, BY THE ADHERING CREDITORS.

A-1

## INDEX

| | |
|---|---:|
| A N T E C E D E N T S | A–3 |
| R E P R E S E N T A T I O N S | A–4 |
| C L A U S E S | A–6 |
|    **FIRST. DEFINITIONS AND EXHIBITS** | A–6 |
|       **Section 1.01** Defined Terms. | A–6 |
|       **Section 1.02 Rules of Interpretation** | A–9 |
|       **Section 1.03** Exhibits. | A–10 |
|       **Section 1.04** Representation Inclusions. | A–10 |
|    **SECOND. PURPOSE.** | A–10 |
|    **THIRD. TREATMENT OF OPERATING EXPENSES, LABOR COSTS, TAXES AND OTHER INDEBTEDNESS.** | A–10 |
|    **FOURTH. ACKNOWLEDGEMENT OF CLAIMS.** | A–11 |
|    **FIFTH. PAYMENT AND IMPLEMENTATION.** | A–11 |
|       **Section 5.01** Payment. | A–11 |
|       **Section 5.02** Implementation. | A–11 |
|          **Section 5.02.1** Description of the New 2019 Notes. | A–12 |
|          **Section 5.02.2** Description of the New Mandatory Convertible Debentures | A–13 |
|          **Section 5.02.3** Cash Contribution Description | A–13 |
|          **Section 5.02.4** Restructuring Fee Description | A–13 |
|       **Section 5.03** Treatment of Acknowledged Creditors. | A–14 |
|       **Section 5.04** Intercompany Claims; Acceptance of a Less Favorable Treatment. | A–14 |
|       **Section 5.05** Other obligations to consider. | A–14 |
|    **SIXTH. METHOD, DATE AND PLACE OF PAYMENT OF THE CASH PORTION AND THE RESTRUCTURING FEE.** | A–15 |
|    **SEVENTH. CURRENCY.** | A–15 |
|    **EIGHTH. FURTHER DOCUMENTS.** | A–16 |
|    **NINTH. SUBSTITUTION OF PRIOR AGREEMENTS, NOVATION AND EXTINGUISHMENT.** | A–16 |
|    **TENTH. BINDING EFFECT.** | A–16 |
|    **ELEVENTH. ASSIGNMENT OF CLAIMS, SUCCESSORS AND/OR TRANSFEREES.** | A–16 |
|    **TWELFTH. PATRIMONY.** | A–16 |
|    **THIRTEENTH. MANAGEMENT AND SURVEILLANCE.** | A–16 |
|    **FOURTEENTH. CONTINUANCE.** | A–17 |
|    **FIFTEENTH. EQUAL TREATMENT.** | A–17 |
|    **SIXTEENTH. *CONCURSO* PETITION AND PREVIOUS RESTRUCTURING PLAN.** | A–17 |
|    **SEVENTEENTH. NULLITY.** | A–17 |
|    **EIGHTEENTH. APPLICABLE LAW.** | A–17 |
|    **NINETEENTH. JURISDICTION AND VENUE.** | A–17 |
|    **TWENTIETH. HEADINGS.** | A–17 |

Table of Contents

**RESTRUCTURING AGREEMENT (THIS "AGREEMENT" OR "VITRO RESTRUCTURING AGREEMENT") ENTERED INTO BY AND BETWEEN VITRO, S.A.B. DE C.V. ("VITRO"), AND THOSE PERSONS WHOSE NAMES ARE IDENTIFIED IN THE SIGNATURE PAGES OF THIS AGREEMENT ON BEHALF OF THE VITRO CREDITORS (JOINTLY REFERRED TO AS THE "EXECUTING CREDITORS") AND THE CREDITORS WHOSE NAMES WILL BE IDENTIFIED IN THE SIGNATURE PAGES OF THIS AGREEMENT THAT FROM TIME TO TIME MAY BE INCLUDED IN THIS AGREEMENT, SUBJECT TO THE FOLLOWING ANTECEDENTS, REPRESENTATIONS AND CLAUSES:**

ANTECEDENTS

I.      On October 10, 2002, Vitro registered a program for the issuance of medium term stock traded certificates (*certificados bursátiles de mediano plazo*) for a total sum of $2,500,000,000.00 (two billion five hundred million pesos 00/100 Mexican Currency) (the "Vitro 02 Program"). On February 13, 2003, Vitro issued 11,400,000 (eleven million four hundred thousand) stock traded certificates (*certificados bursátiles*) for a total amount of $1,140,000,000.00 (one billion one hundred forty million pesos 00/100 Mexican Currency) pursuant to the Vitro 02 Program (the "Cebures Vitro 03"). The common representative (*representante común*) for the holders of the Cebures Vitro 03 is Scotia Inverlat Casa de Bolsa, Grupo Financiero Scotiabank Inverlat.

II.     On October 22, 2003, Vitro completed an issuance throughout international markets of US$225,000,000.00 (two hundred twenty–five million dollars 00/100 Currency of the United States of America) with 11.75% Senior Notes due on 2013 (the "2013 Notes").

III.    On February 1, 2007, Vitro completed an issuance throughout international markets of US$1,000,000,000.00 (one billion dollars 00/100 Currency of the United States of America), which consisted of US$300,000,000.00 (three hundred million dollars 00/100 currency of the United States of America) with 8.625% Senior Notes due 2012 (the "2012 Notes") and US$700,000,000.00 (seven hundred million dollars 00/100 Currency of the United States of America) with 9.125% Senior Notes due 2017 (the "2017 Notes" and jointly with the 2013 Notes and the 2012 Notes, the "Notes").

IV.     On September 29, 2008, Vitro issued a promissory note in favor of ABN AMRO BANK N.V. (owned at one time by RBS Bank), for US$15,000,000.00 (fifteen million dollars 00/100 Currency of the United States of America) (the "ABN Note").

V.      On July 1, 2008, Vitro registered a program for the issuance of long term stock traded certificates (*certificados bursátiles de largo plazo*) for an amount of up to $1,000,000,000.00 (one billion pesos 00/100 Mexican Currency) (the "Vitro 08 Program"). On July 2, 2008, Vitro issued 4,000,000 (four million) stock traded certificates (*certificados bursátiles*) for $400,000,000.00 (four hundred million pesos 00/100 Mexican Currency) pursuant to the Vitro 08 Program (the "Cebures Vitro 08", and jointly with the Cebures Vitro 03, the "Cebures"). The common representative (*representante común*) of the holders of Cebures Vitro 08 is Banco Invex, S.A., Institución de Banca Múltiple, Invex Grupo Financiero, Fiduciario.

VI.     On September 3, 2010, Vitro entered into, as guarantor for its subsidiaries Vitro Envases Norteamérica, S.A. de C.V., Compañía Vidriera, S.A. de C.V. and Comercializadora Álcali, S.A. de C.V., a Settlement and Debt Acknowledgement Agreement with Fintech Investments Ltd., in its capacity of creditor (the "Settlement Agreement") whereby it secured payment of the total amount of US$189,999,282.00 (one hundred eighty–nine million nine hundred ninety–nine thousand two hundred eighty–two dollars 00/100 Currency of the United States of America) plus interest accrued at 4.25% (four point twenty five percent) up to the maturity date, in favor of Fintech Investments Ltd, and executed as "*aval*" three promissory notes for the aforementioned amount (the "Fintech Notes").

VII.    Vitro has reached an agreement with the Executing Creditors in order to restructure its indebtedness upon the Closing Date (as such term is defined below), pursuant to the following terms and conditions

A–3

**Table of Contents**

provided in this Agreement which will be filed though a *concurso mercantil* proceeding, in any of its modalities pursuant to what is set forth in the LCM (as defined below), including, if necessary, a *concurso mercantil* petition, whereby this Agreement will be attached as a prearranged agreement or a prepackage reorganization agreement.

VIII. Pursuant to Article 339, Section IV, of the Mexican Bankruptcy and Reorganization Law (*Ley de Concursos Mercantiles)* ("LCM"), this Agreement contains the terms and conditions agreed between Vitro and the Executing Creditors for the Vitro indebtedness restructuring; *provided, however*, that Vitro and the Executing Creditors intend for this Agreement to become, once it has been approved by the Judge, a reorganization agreement as set forth in Title V, Sole Chapter of the LCM, in order for this Agreement, once all legal requirements have been satisfied, to be presented by means of the *Conciliador* (as such term is defined below) appointed in the *concurso mercantil* by the Federal Institute of *Concurso Mercantil* Specialists ("IFECOM") pursuant to Article 43, Section IV if the LCM (the "*Conciliador*") before all other creditors which are legally acknowledged by means of the Debt Acknowledgement Judgment (as such term is defined below), pursuant to Article 132 of the LCM (the "Remaining Creditors", and jointly with the Executing Creditors, the "Acknowledged Creditors").

**REPRESENTATIONS**

**I. Vitro represents, under oath and through its representatives, that:**

A. It is a corporation duly incorporated and existing under the Laws of Mexico and that its restructuring of indebtedness which is the purpose of this Agreement, as well as its execution and performance, have been duly authorized by its board of directors through its meeting held on September 24, 2010, pursuant applicable law and regulations.

B. Its representatives have sufficient authority to enter into this Agreement, which has not been revoked or limited in any way as of the date hereof, pursuant to a certified copy of the public instrument attached hereto as **Exhibit "B"**, which shall also form part of this Agreement.

C. It wishes to enter into this Agreement in order to agree on the form, restructuring terms, payment and/or novation conditions, as the case may be, of its indebtedness as set forth herein and that, on the corresponding procedural moment, are confirmed by the Debt Acknowledgement Judgment (as such term is defined below). Furthermore, it wishes that this Agreement, once approved by the Judge, be the restructuring agreement which consummates the Vitro *concurso mercantil* proceeding, pursuant to what is set forth in Articles 166 and 262, Section I and other relative and applicable provisions of the LCM.

D. Pursuant to its accounting records, as of [September] [30], it has (a) non subsidiary direct or indirect credit liabilities which amount to $[•] ([•] pesos 00/100 Mexican Currency), equivalent to US$[•].00 ([•] dollars 00/100 Currency of the Unites States of America), (b) liabilities as a result of the "*aval*" granted in favor of third parties regarding its subsidiaries' obligations which amount to $[•] ([•] pesos 00/100 Mexican Currency), equivalent to US$[•].00 ([•] dollars 00/100 Currency of the United States of America), and (c) direct or indirect subsidiary liabilities, for an amount of $[•] ([•] pesos 00/100 Mexican Currency), equivalent to US$[•].00 ([•] dollars 00/100 Currency of the United States of America) (amounts mentioned in item (c) above will be referred to as "Intercompany Claims").

E. That the liabilities owed to the Executing Creditors represent at least [•]% of the total Vitro liabilities, pursuant to its accounting records.

F. That it is a holding company and as such, its ability to meet its obligations is dependant on the dividends that it receives from its subsidiaries.

G. That it acknowledges the claims of the Executing Creditors and those of the Remaining Creditors, in the amounts, degree and specific characteristics indicated in the creditors and debtors description

**Table of Contents**

which pursuant to Article 20, Section III of the LCM, shall be attached as an exhibit to the *concurso mercantil* petition to be filed.

H.     That it does not owe (i) any claims from those mentioned in Article 224, Section I of the LCM, nor (ii) any claims singularly privileged (as defined in Article 218 of the LCM), nor (iii) any claims with other guarantees and privileges (as defined in Article 219 of the LCM).

I.     That it does not have due tax claims of any kind, including but not limited to, claims related to social security claims.

J.     That the Company has not executed any specific agreements with any of its Acknowledged Creditors with regards to a repayment of indebtedness, contrary to the LCM.

K.     The execution of this Agreement does not violate or breach, or in any way contravene any provisions of its current corporate by–laws nor any law, including without limitation, the LCM.

L.     That the Company is authorized, under the laws of Mexico, to enter into and comply with its obligations set forth in this Agreement, without any other necessary authorizations, aside from those required from *concurso mercantil* proceedings.

M.     That it completely accepts the terms set forth herein and that this Agreement, once approved by the Judge, will provide the terms needed to Consummate the Restructuring (as such term is defined below) on the Closing Date (as such term is defined below).

**II.**     **Each of the Executing Creditors, as well as the Adhering Creditors that execute this Agreement, hereby represents under oath that:**

A.     It is Vitro's creditor as respectively identified under its own signature page under this Agreement.

B.     As for holders of the Notes, it evidences its capacity as a Vitro creditor by means of (i) the certification issued and delivered by The Depository Trust Company ("DTC") to Vitro, whereby the record holders are evidenced and (ii) the duly notarized and apostilled Letter of Transmittal issued and delivered by all of the last beneficial owners of the Notes (or their authorized representatives) which contains a certification regarding its ownership of the Notes regarding the beneficial owner; and (iii) the Letter of Instruction issued by the beneficial owner of the Notes to the corresponding record holder.

C.     As for holders of Cebures, it evidences its capacity as a Vitro creditor by means of (i) a Cebures deposit certificate issued by the S.D. Indeval, Institución para el Depósito de Valores, Sociedad Anónima ("Indeval") and (ii) a Cebures holder's certificate issued by the broker who acts as a custodian for such Cebures.

D.     It wishes to enter into this Agreement in order to agree on the form, terms and conditions of Vitro's payment of indebtedness pursuant to what is set forth herein, which on the corresponding procedural moment, are confirmed by the Debt Acknowledgement Judgment (as such term is defined below). Likewise it wishes that this Agreement, once approved by the Judge, be the restructuring agreement which consummates the Vitro *concurso mercantil*, pursuant to what is set forth in Articles 166 and 262 Section I and other related and applicable articles of the LCM.

E.     At the latest within the term provided in Article 122 Section II of the LCM, it shall request the Acknowledgement of all of its credits before the *Conciliador* which is appointed in Vitro's *concurso mercantil* proceeding.

A–5

**Table of Contents**

F.    Its representatives have the necessary authority to enter into this Agreement, which has not been revoked or limited in any way as of this date,
pursuant to the document which is attached hereto as **Exhibit "C"**, and which shall form part of this Agreement.

**III.    All parties to this Agreement represent, by means of their representative and under oath that:**

A.    They mutually agree to their authority and capacity with which they execute this Agreement, for all necessary legal effects.
    As a consequence of the above, and pursuant to the previous representations, Vitro and the Executing Creditors agree to execute this Agreement pursuant
to what is set forth if the following clauses, and as of this moment request that the *Conciliador* present to the Remaining Creditors this Agreement, which
Vitro and the Executing Creditors propose to the Remaining Creditors for their acceptance and execution, pursuant to what is set forth in Articles 4,
Section I, 132, 146 and 161 of the LCM:

<div align="center">C L A U S E S</div>

**FIRST. DEFINITIONS AND EXHIBITS**
**Section 1.01** Defined Terms.
Unless otherwise set forth in this Agreement, any capitalized term used herein shall have the following meaning:

| *TERM* | *DEFINITION* |
|---|---|
| *2012 Notes* | shall have the meaning ascribed to it in Antecedent III of this Agreement. |
| *2013 Notes* | shall have the meaning ascribed to it in Antecedent II of this Agreement. |
| *2017 Notes* | shall have the meaning ascribed to it in Antecedent III of this Agreement. |
| *ABN Note* | shall have the meaning ascribed to it in Antecedent IV of this Agreement. |
| *Acknowledged Claims* | shall mean the credits which are acknowledged in the Debt Acknowledgement Judgment. |
| *Acknowledged Creditors* | shall mean all creditors which are legally acknowledged pursuant to Article 132 of the LCM by means of a definitive sentence issued by the Judge which rules over the corresponding *concurso mercantil*. |
| *Adhering Creditors* | shall mean all Remaining Creditors that execute this Agreement. |
| *Agreement* | shall mean this Restructuring Agreement, which may be amended from time to time during the *concurso mercantil* proceedings, and once definitively approved by the Judge, shall be converted into the restructuring agreement provided in Title V, Sole Chapter of the LCM. |

<div align="center">A-6</div>

| TERM | DEFINITION |
|---|---|
| *Cash Contribution* | shall mean the cash payment made on the Closing Date, as provided in Section 5.02(c) of this Agreement. |
| *Cebures* | shall have the meaning ascribed to it in Antecedent V of this Agreement. |
| *Cebures Vitro 03* | shall have the meaning ascribed to it in Antecedent I of this Agreement. |
| *Cebures Vitro 08* | shall have the meaning ascribed to it in Antecedent V of this Agreement. |
| *Closing Date* | shall have the meaning ascribed to it in Clause Sixth of this Agreement. |
| *Conciliador* | shall have the meaning ascribed to it in Antecedent VIII of this Agreement. |
| *Consent Payment* | shall have the meaning ascribed to it in the Trust. |
| *Consummate the Restructuring* | shall have the meaning ascribed to it in Clause Sixth of this Agreement. |
| *Debt Acknowledgement Judgment* | shall mean the debt Acknowledgement, degree and order sentence dictated by the Judge pursuant to what is set forth in Article 132 of the LCM. |
| *Description of the Notes* or *DON* | shall mean the Description of the New Notes, pursuant to the document which is attached hereto as **Exhibit "D"** which provides the principal characteristics of the New 2019 Notes and the New Mandatory Convertible Debentures. |
| *Executing Creditors* | shall mean all creditors which are listed in **Exhibit "A"** of this Agreement. |
| *Existing Indebtedness* | shall mean jointly liabilities being restructured by means of this Agreement, which include the Notes, the Cebures, the ABN Note, the Fintech Notes and the Settlement Agreement. |
| *Extended Closing Date* | shall have the meaning ascribed to it in Clause Sixth of this Agreement. |
| *Fintech Notes* | shall have the meaning ascribed to it in Antecedent VI of this Agreement. |
| *Guarantors* | shall mean all Vitro subsidiaries which shall act as guarantors under the New 2019 Notes, which are identified under the definition of Guarantors of Certain Definitions within the Description of the Notes. |
| *IFECOM* | shall have the meaning ascribed to it in Antecedent VIII of this Agreement. |

A-7

| *TERM* | *DEFINITION* |
|---|---|
| *Intercompany Claims* | shall have the meaning ascribed to it in representation I.D. of this Agreement, expressly excluding any Intercompany Claims in the Ordinary Course of Business (as such term is defined in the Description of the Notes). |
| *Issue Date Adjustment* | shall mean the adjustment or increase made by Vitro on the date the New Mandatory Convertible Debentures are issued equal to an annual rate of return of 10.50% (ten point one percent) of US$100,000,000.00 (one hundred million dollars 00/100 Currency of the United States of America) calculated for the period between Value Date and the issuance date of the New Mandatory Convertible Debentures. |
| *Judge* | shall mean the District Judge for Civil and Labor Matters in Monterrey, Nuevo Leon, who shall rule over the Vitro *concurso mercantil* proceeding. |
| *LCM* | shall mean the Mexican Bankruptcy and Reorganization Act (*Ley de Concursos Mercantiles*). |
| *LGTOC* | shall mean the Mexican Law of Credit Transactions and Negotiable Instruments (*Ley General de Títulos y Operaciones de Crédito*). |
| *Mexico* | shall mean the United States of Mexico. |
| *New 2019 Notes* | shall have the meaning ascribed to it in Section 5.02(a) of this Agreement. |
| *New Debt* | shall mean the indebtedness created as a result of the Restructuring Instruments. |
| *New Mandatory Convertible Debentures* | shall have the meaning ascribed to it in Section 5.02(b) of this Agreement. |
| *Notes* | shall have the meaning ascribed to it in Antecedent III of this Agreement. |
| *Remaining Creditors* | shall have the meaning ascribed to it in Antecedent VIII of this Agreement. |
| *Restructuring* | shall have the meaning ascribed to it in Clause Second of this Agreement. |
| *Restructuring Fee* | shall have the meaning ascribed to it in Section 5.02 of this Agreement. |
| *Restructuring Instruments* | shall mean jointly the definitive documentation with regards to the 2019 New Notes and other documentation related to the restructuring of the Existing Indebtedness. |
| *Settlement Agreement* | shall have the meaning ascribed to it in Antecedent VI of this Agreement. |

A-8

Table of Contents

| TERM | DEFINITION |
|---|---|
| *Trust* | shall mean the irrevocable management and payment trust number 986 dated September 8, 2010 created by Vidriera Los Reyes, S.A. de C.V., a direct subsidiary of Vitro, in its capacity of settlor; before Banco Invex, S.A., Institución de Banca Múltiple, Invex Grupo Financiero, fiduciario, in its capacity of trustee. A copy of the Trust is attached hereto as **Exhibit "E"**, which shall form part of this Agreement. |
| *Value Date* | shall mean January 1, 2011. |
| *Visitador* | shall mean the person appointed by the IFECOM which shall determine if Vitro complied with the provisions set forth in Article 10 of the LCM, as well as to confirm if the termination of the credits caused such actions, and shall also suggest the Judge to issue precautionary measures to be issued as considered necessary to protect the restructured assets, pursuant to Article 37 of the LCM. |
| *Vitro* | shall mean Vitro, S.A.B. de C.V. |
| *Vitro 02Program* | shall have the meaning ascribed to it in Antecedent I of this Agreement. |
| *Vitro 08 Program* | shall have the meaning ascribed to it in Antecedent V of this Agreement. |
| *Voting Trust* | shall mean the irrevocable management trust to be created pursuant to section 5.04. A copy of the Voting Trust is attached here to as **Exhibit "G"**, which shall form part of this Agreement. |

**Section 1.02 Rules of Interpretation**

In this Agreement as well as its Exhibits:

I.   the index and headings of the Clauses and Sections are for reference only and shall not affect the interpretation of this Agreement;

II.   references to any document or agreement, including this Agreement, shall include: (a) all exhibits or other documents attached thereto; (b) all documents or agreements issued or executed to substitute such agreements; and (c) any amendments, additional modifications or compilations of such agreements;

III.   "*include*" or "*including*" are deemed to be followed by "*without limitation*";

IV.   a reference to a party includes that party's authorized successors and permitted assigns;

V.   the words "*of this*", "*in this*" and "*under this*" and similar words or phrases, will refer to this Agreement in general and not to a particular provision of this Agreement;

VI.   reference to "*days*" shall mean calendar days;

VII.   words importing the singular include the plural and vice versa;

A-9

Table of Contents

VIII.    references to a Clause, Exhibit or Section are references to a relevant clause or section of, or exhibit to this Agreement, unless otherwise expressly stated; and

IX.    all documents which are attached to this Agreement shall form part this Agreement as if they were fully set forth herein.

**Section 1.03** Exhibits.

The following Exhibits shall form part of this Agreement:

**Exhibit "A"** List of Executing Creditors.
**Exhibit "B"** Public instrument, which contains the power of attorney of the legal representative of Vitro.
**Exhibit "C"** Public instruments which contain the power of attorney of the legal representatives for the Executing Creditors.
**Exhibit "D"** Description of the New Notes, attached in English, accompanied by its Spanish translation.
**Exhibit "E"** Irrevocable Management and Payment Trust Number 986 dated September 8, 2010.
**Exhibit "F"** Form of Cash Contribution and Restructuring Fee.
**Exhibit "G"** Form of Voting Trust.

**Section 1.04** Representation Inclusions.

The parties agree that those representations made by Vitro herein are the main reason for which the Executing Creditors are executing this Agreement.

**SECOND. PURPOSE.**

Pursuant to Articles 1, 48, 157, 166, 262, Section I, and other applicable articles of the LCM, the purpose of this Agreement is, subject to the terms and conditions provided herein and subject to the implementation of the transactions described herein, and subject to the approval of this Agreement by the Judge, that Vitro continues operations, preserves its existence and avoids payment default which may put at risk its viability, as well as other companies with which it maintains a business relation, through the restructuring to which the parties to this Agreement have agreed (the "Restructuring"), which includes the payment, possible capitalization, restructuring and/or novation, as the case may be, of the Acknowledged Claims with the acquittals, forbearances, restructures, grants and/or amendments and/or releases of security interests provided for and subject to the terms herein.

**THIRD. TREATMENT OF OPERATING EXPENSES, LABOR COSTS, TAXES AND OTHER INDEBTEDNESS.**

**Section 3.01** General Operating Expenses.

Vitro will continue to make payment of all direct and indirect labor and tax obligations and operating expenses, on a timely basis, as they become due, and will continue to perform under all of its contractual obligations pursuant to the LCM.

A–10

Table of Contents

**FOURTH. ACKNOWLEDGEMENT OF CLAIMS.**

Vitro hereby acknowledges and accepts to owe to the Executing Creditors and the Remaining Creditors, the claims corresponding to the Existing Indebtedness in the amounts provided under section I.D. of the representations section of this Agreement on the terms and conditions of each of the documents which originated such liabilities and for the principal amount, interest and other accessories, the amount that appears in front of the name of each Executing Creditor in each signature page of this Agreement.

Notwithstanding the foregoing, each of the Executing Creditors is hereby obligated to file, at the latest within in the term set forth in Article 122, Section II of the LCM, before the *Conciliador*, their respective proofs of claim or debt Acknowledgement petitions and to undertake all necessary procedures in that regard.

**FIFTH. PAYMENT AND IMPLEMENTATION.**

**Section 5.01** Payment.

Vitro will pay the corresponding Executing Creditors' as well as the Remaining Creditors' Acknowledged Claims, in the terms set forth herein.

This Agreement, once approved by the Judge shall be extensive to the Remaining Creditors as provided in article 165 of the LCM.

**Section 5.02** Implementation.

The Executing Creditors, Adhering Creditors and Vitro will implement the Restructuring by means of the filing, voting and approval, in each case, of this Agreement pursuant to the LCM, its further recognition and enforcement in the United States of America through the filing and presentment of a Chapter 15 proceeding under the United States Bankruptcy Code, as well as by means of issuance and delivery at the Closing Date to the Acknowledged Creditors of the instruments referred to in subsections (a) and (b) as well as the payments referred to in subsections (c) and (d), as follows:

(a)    pro rata amongst the Acknowledged Creditors, the Notes to be issued by Vitro on the terms and conditions provided under Section 5.02.1 of this Agreement (the "New 2019 Notes");

(b)    pro rata amongst the Acknowledged Creditors, the Mandatory Convertible Debentures to be issued by Vitro on the terms and conditions provided under Section 5.02.2 of this Agreement (the "New Mandatory Convertible Debentures");

(c)    pro rata amongst the Acknowledged Creditors, a cash payment for the remaining US$75,000,000.00 (seventy–five million dollars 00/100 Currency of the United States of America) which are contributed to the Trust, once the Consent Payments have been discounted (the "Cash Contribution"); and

(d)    pro rata cash payment which shall correspond to restructuring fee resulting from the application of the formula provided under Section 5.02.4 of this Agreement (hereinafter, the "Restructuring Fee").

The parties agree that notwithstanding the provisions under this Agreement, creditors under the Intercompany Debt will not receive any instruments or payments described above and that their liabilities will be restructured as provided for in Section 5.04 of this Agreement.

None of the instruments offered by Vitro pursuant to this Agreement and which comprise the New Debt will be registered under the United States Securities Act of 1933, as such has been amended from time to time, based on the exemption provided under Section 3(a)(9) of such law, nor shall they be registered before the National Stock Registry (*Registro Nacional de Valores*) controlled by the Mexican National Securities and

A–11

Table of Contents

Exchange Commission (*Comisión Nacional Bancaria y de Valores*). Therefore, Vitro, as a result of the legal opinion provided by the legal advisors for the Executing Creditors, shall have the right to implement such processes and to request from the Acknowledged Creditors, any such statements and/or certifications which are reasonably considered as necessary or convenient to verify compliance with necessary requirements to apply the corresponding legal exemptions.

**Section 5.02.1** Description of the New 2019 Notes.

The New 2019 Notes shall be issued by Vitro in accordance with the laws of the United States of America on the Closing Date pursuant to the terms and conditions of Section I of the Description of the Notes and the terms and conditions provided for in the corresponding New 2019 Notes indenture.

The New 2019 Notes shall:

I.      have a principal amount of US$850,000,000.00 (eight hundred and fifty million dollars 00/100 Currency of the United States of America);

II.     have a term of eight (8) years following the Value Date;

III.    constitute direct, unconditional and non–subordinated obligations of Vitro, and rank *pari passu* or identical, one on one basis, versus Vitro's non–secured and non–subordinated debt;

IV.     be unconditionally and jointly guaranteed by each of the Guarantors;

V.      have a fixed annual interest rate of 8.0%, payable semiannually in due installments and which may be partially capitalized and paid in kind, by 50% (fifty percent), during the first 3 (three) years following the Value Date, at Vitro's election, subject to the compliance by Vitro with certain conditions set forth in the Description of the Notes;

VI.     not have amortization or principal payments during the first 4 (four) years following the Value Date and, from the fifth year until the seventh year following the Value Date, shall have amortizations or principal payments of US$25,000,000.00 (twenty–five million dollars 00/100 Currency of the United States of America) payable semiannually;

VII.    totally or partially redeemable at Vitro's option, at any time during their term, subject to certain conditions set forth in the Description of the Notes, at a price equal to 100% of their value *plus* interest generated up to the redemption date;

VIII.   be totally or partially mandatorily redeemable, in the event that Vitro (i) performs a stock issuance subject to certain conditions set forth in the Description of the Notes; and (ii) has a cash flow above the amount set forth in the Description of the Notes; and

IX.     be totally mandatorily redeemable, in the event of a change of control in Vitro at a price equal to 101% of its value *plus* interests generated up to the redemption date.

All of the terms and conditions, as well as the customary and regular negative and affirmative covenants for this kind of transaction, including without limitation, any limitations to incur additional debt, limitations on investments and creation of liens or encumbrances, limitations on certain payments, limitations on the sale of assets, limitations of transactions with partners or affiliates, and early termination events under which the New 2019 Notes will be subject, are contained in Section I of the Description of the Notes called New 2019 Notes and in the New 2019 Notes indenture.

The principal amount of the New 2019 Notes may be adjusted, pursuant to what is provided under Section 5.05 of this Agreement.

A–12

Table of Contents

**Section 5.02.2** Description of the New Mandatory Convertible Debentures.

The New Mandatory Convertible Debentures shall be issued by Vitro pursuant to the laws of the Unites States of America, complying with all applicable provisions under the General Law of Credit Transactions and Negotiable Instruments (*Ley General de Títulos y Operaciones de Crédito*), on the Closing Date pursuant to the terms and conditions of Section II of the Description of the Notes and the terms and conditions provided under the New Mandatory Convertible Debentures indenture.

The New Mandatory Convertible Debentures shall:

I.    have a principal amount of US$100,000,000.00 (one hundred million dollars 00/100 Currency of the United States of America) *plus* the Issue Date Adjustment;

II.    have a term of five (5) years following the Value Date;

III.    constitute direct obligations of Vitro, and shall rank *pari passu* or identical, one on one basis, versus Vitro's non–guaranteed debt;

IV.    have an annual fixed interest rate equal to 10.50%, which may be totally capitalized and paid in kind, on an annual basis, during its term;

V.    be mandatorily convertible into shares of Vitro which represent 15% of its corporate capital at the end of its term, in the event that they are not paid in cash at the end of its term or in the absence of mandatory redemptions pursuant to the Description of the Notes;

VI.    be totally or partially redeemable at Vitro's option, at any time during their term, subject to the terms and conditions set forth in the Description of the Notes, at a price equal to 100% of their value (subject to prepayment discounts set forth in the Description of the New Notes) *plus* the interest generated up to the redemption date;

VII.    be totally or partially mandatorily redeemable, in the event that Vitro (i) issues capital stock subject to certain conditions set forth in the Description of the Notes; and (ii) has a cash flow above the amount set forth in the Description of the Notes; and

VIII.    be totally mandatorily redeemable, in the event of a change of control in Vitro at a price equal to 101% of its principal *plus* the interest generated up to the redemption date.

All of the terms and conditions, terms and conversion procedures, as well as the negative and affirmative covenants and early termination events which govern the New Mandatory Convertible Debentures are provided under Section II of the Description of the Notes and in the New Mandatory Convertible Debentures indenture.

The principal amount of the New Mandatory Convertible Debentures and as a consequence the basis for the Issue Date Adjustment calculation may be adjusted, pursuant to what is provided under Section 5.05 of this Agreement.

**Section 5.02.3** Cash Contribution Description.

Vitro shall pay in cash, on the Closing Date, pro–rata, in favor of all Acknowledged Creditors (except for Intercompany Claims), an amount equal to US$75,000,000.00 (seventy–five million dollars 00/100 Currency of the United States of America), which are contributed to the Trust, *minus* the Consent Payment.

**Section 5.02.4** Restructuring Fee Description.

A–13

Table of Contents

Vitro shall pay as a Restructuring Fee on the Closing Date, in the amount equal to the annual interest rate of 8.0% (eight percent) regarding the US$850,000,000.00 (eight hundred and fifty million dollars 00/100 Currency of the United States of America) calculated for the period between the Value Date and the New 2019 Note issuance.

The principal amount used to estimate the Restructuring Fee may be adjusted, pursuant to what is provided under Section 5.05 of this Agreement.

**Section 5.03** Treatment of Acknowledged Creditors.

All Acknowledged Creditors (except for Intercompany Claims) shall receive a pro–rata portion of the New 2019 Notes and the New Mandatory Convertible Debentures as provided under the Description of the Notes, as well as the Cash Contribution and Restructuring Fee.

The parties expressly agree and accept that the terms and conditions set forth herein grant a just, equal and reasonable treatment to all claims of the Acknowledged Creditors.

**Section 5.04** Intercompany Claims; Acceptance of a Less Favorable Treatment.

The holders of Intercompany Claims against Vitro accept that they will receive a less favorable treatment than the rest of the Acknowledged Creditors, since they shall not be entitled to receive any of the instruments and payments set forth in Section 5.02 of this Agreement.

As a substitution to what is set forth above, such creditors accept to receive a note for the amount of their Intercompany Claim, payable within a 9 (nine) year term which shall begin on the date on which the New 2019 Notes and the New Mandatory Convertible Debentures are issued, and shall have a fixed annual interest rate of 2.5% (two point five percent) and shall be payable in one single bullet payment at maturity.

Additionally, no principal or interest payment concerning the Intercompany Claims shall be made prior to payment of principal, interest or any other amounts owed under the New 2019 Notes and the New Mandatory Convertible Debentures.

Vitro and the Guarantors shall create an irrevocable trust agreement (the "Voting Trust") where they shall contribute all of their Intercompany Claims in order to be managed and voted pursuant to what is set forth under such Voting Trust. Such Intercompany Claims shall remain in the Voting Trust for the remainder of the credit term, or 9 (nine) years, which shall begin on the date on which the New 2019 Notes and the New Mandatory Convertible Debentures are issued.

**Section 5.05** Other Obligations to Consider.

Pursuant to what is stated in representation I.F of this Agreement, Vitro is a holding company and it is in its best interest to achieve a comprehensive restructuring of its liabilities and those of its subsidiaries, and Vitro has included, within the economic terms set forth herein, those liabilities of its subsidiary denominated Vitro Envases Norteamérica, S.A. de C.V., which acts as a Guarantor in this Agreement, and currently owes Calyon Credit Agricole CIB ("Calyon"), an amount equal to US$63,383,806.00 (sixty three million three hundred eighty three thousand eight hundred six dollars 00/100 Currency of the United States of America) plus interest and commissions owed for an amount equal to US$3,905,298.00 (three million nine hundred five thousand two hundred ninety eight dollars 00/100 Currency of the United States of America). In the event the terms of this Agreement are accepted by Calyon, Vitro shall assume such debt and will deliver Calyon its proportional share of the New 2019 Notes, the New Mandatory Convertible Debentures, the Restructuring Fee and its Cash Contribution, pursuant to what is set forth in Section 5.02 herein. Furthermore, Calyon shall be considered as an Adhering Creditor for all legal and economic purposes under this Agreement, as of the date in which the Judge approved this Agreement.

Vitro shall grant Calyon with the same term to execute and approve this Agreement as well as to

Table of Contents

accept the benefits bestowed in its favor under this Section 5.05 as the one granted in favor of the Remaining Creditors pursuant to article 161 third paragraph of the LCM.

In the event Calyon does not accept the benefits bestowed in its favor pursuant to this Section 5.05, the corresponding amounts of New 2019 Notes, New Mandatory Convertible Debentures and Restructuring Fee to be delivered and paid to each Acknowledged Creditor shall remain unchanged, pursuant to what is set forth in Section 5.02, and Vitro shall only reduce the amount of New 2019 Notes, New Mandatory Convertible Debentures and Restructuring Fee, in order to deduct such proportional amounts which would have been distributed to Calyon if it had accepted the rights granted in its favor; *provided, however,* that the Cash Contribution available to the Acknowledged Creditors shall remain unchanged pursuant to Section 5.02(c). Furthermore, in the event Calyon does not accept the benefits bestowed in its favor pursuant to Section 5.05, Vitro shall not be in a position to offer Calyon a more favorable treatment regarding payment of its indebtedness than the treatment offered to the Acknowledged Creditors under this Agreement.

**SIXTH. METHOD, DATE AND PLACE OF PAYMENT OF THE CASH PORTION AND THE RESTRUCTURING FEE.**

Vitro shall be obligated to pay the Cash Contribution and the Restructuring Fee, through electronic wire transfer to the account indicated by each one of the Acknowledged Creditors in a written form pursuant to the forms attached hereto as Exhibit F, or before the court through certified or cash checks.

Vitro must pay the Cash Contribution and the Restructuring Fee and shall issue the New Notes and, in general terms consummate the Restructuring ("Consummate the Restructuring") provided for in this Agreement no later than (15) fifteen calendar days following the date in which the publication in the lists of the court where the *concurso mercantil* proceeding is taking place becomes effective, of the resolution issued by the Judge approving this Agreement (notwithstanding existing recourses or appeals pending of resolution), or the immediate following business day in the event case the effective date falls on a non–business day (the "Closing Date"), unless:

a) There is a court order or decree granting the provisional suspension or which legally forbids Vitro from Consummating the Restructuring, as set forth in this Agreement; or

b) There is a recourse or appeal which, if resolved against Vitro, may invalidate this Agreement as approved by the Judge and within the fifteen (15) calendar days following the date on which the resolution approving this Agreement has become effective, the majority of the Acknowledged Creditors vote in favor of extending the Consummation Date, in which case the Closing Date shall be extended to the earlier of (A) the date in which the recourse or appeal is resolved in final and non–amendable form and (B) ten (10) months starting as of the date on which the resolution approving this Agreement becomes effective (in either case, the "Extended Closing Date").

For the avoidance of doubt, in the event that the recourse or appeal mentioned in paragraph (b)(i) is still pending and the majority of the Acknowledged Creditors vote against the extension of the Closing Date, then Vitro shall Consummate the Restructuring no later than the Closing Date notwithstanding such recourse or appeal. Likewise, in the event the majority of the Acknowledged Creditors vote in favor of extending the Closing Date, but such recourse or appeal is not resolved before the Extended Closing Date, then Vitro shall Consummate the Restructuring within five (5) calendar days following the Extended Closing Date or the immediately following business day if such date falls on a non–business day (except in the event that a judicial order or decree has been issued granting the provisional suspension or which legally forbids Vitro from Consummating the Restructuring).

**SEVENTH. CURRENCY.**

According to the last paragraph of Article 159 of the LCM, the claims will subsist in the same currency in which they were originally agreed.

A–15

Table of Contents

**EIGHTH. FURTHER DOCUMENTS.**

The parties agree to take any necessary actions to ratify the terms of this Agreement, once approved by the Judge, and any other agreement derived therefrom, including the Restructuring Instruments, at the latest at the Closing Date.

Vitro shall be obligated to make and cause all of the Guarantors to agree to the terms of this Agreement, once approved by the Judge, and the Restructuring Instruments pursuant to what is set forth in the Description of the Notes, through their signature to the Restructuring Instruments.

**NINTH. SUBSTITUTION OF PRIOR AGREEMENTS, NOVATION AND EXTINGUISHMENT.**

Given the nature of this Agreement and the objectives of the *concurso* proceeding, once this Agreement is approved by the Judge in terms of Article 164 of the LCM, this Agreement and the Restructuring Instruments issued by Vitro thereto, novate, substitute and extinguish the prior obligations, indentures, instruments, documents, agreements and guarantees in which the Acknowledged Claims were stipulated or agreed upon, and also extinguishes the personal guarantees that were granted by third parties and/or Vitro's direct or indirect subsidiaries with respect to the obligations, instruments, documents and agreements from which the Acknowledged Claims arose.

The Acknowledged Creditors shall hereby expressly acknowledge and approve the waiver of the difference between the face amount of the Acknowledged Claims and the New Debt resulting from this Agreement, and, as a consequence of the execution of this Agreement, grant Vitro and its guarantors the fullest release with respect to such original claims, and as of the date of the judicial approval of this Agreement, only the New Debt, in the terms set forth in this Agreement shall survive.

**TENTH. BINDING EFFECT.**

Pursuant to the provisions of the LCM, once this Agreement is approved by the Judge in terms of Article 164 of the LCM, it shall be mandatory to Vitro and to all the Acknowledged Creditors, including those Remaining Creditors who, through absence or explicit rejection, have not executed this Agreement.

**ELEVENTH. ASSIGNMENT OF CLAIMS, SUCCESSORS AND/OR TRANSFEREES.**

The consent granted by the Executing Creditors with regards to this Agreement, as well as by the Adhering Creditors that execute this Agreement, shall be irrevocable and binds any transferee of the same, and any successor and/or assignee of the same from the moment in which this Agreement was executed; therefore, in the event there is any assignment or transfer of the claims of such creditors, the assignees, successors and/or transferees by any cause or title or reason, are bound irrevocably by the terms of this Agreement; *provided, however,* that the Executing Creditors and the Adhering Creditors that execute this Agreement, must ratify this Agreement in the event of amendments or modifications to the Agreement which breach or contravene the terms and conditions set forth herein, or in the event such changes or amendments materially affect any of the Executing Creditors or Adhering Creditors or any of their interests or rights as set forth herein.

**TWELFTH. PATRIMONY.**

In terms of article 2964 of the Federal Civil Code, Vitro responds for the compliance of its obligations under this Agreement with its entire patrimony.

**THIRTEENTH. MANAGEMENT AND SURVEILLANCE.**

During the *concurso mercantil* proceedings, Vitro will continue its ordinary course of business, and shall maintain management and administration of its assets under the surveillance of the court through the

A-16

Table of Contents

*Conciliador*, as well as during the term referred to in Clause Sixth of this Agreement, in which case surveillance will be the responsibility of its corresponding corporate entities.

**FOURTEENTH. CONTINUANCE.**

Vitro agrees that during the *concurso mercantil* proceedings it shall comply with its operational obligations and activities in which it is involved, in order to secure the continuance of its corporate existence.

**FIFTEENTH. EQUAL TREATMENT.**

This Agreement is intended, and shall be always construed in such manner, to provide equal treatment to all the Acknowledged Creditors.

**SIXTEENTH. *CONCURSO* PETITION AND PREVIOUS RESTRUCTURING PLAN.**

The execution of this Agreement by the Executing Creditors implies the execution, acceptance and consent of such Executing Creditors with respect to the *concurso mercantil* petition to be filed by Vitro to be considered as a prepackaged restructuring plan, pursuant to what is set forth in Title Fourteen of the LCM.

Subject to the condition precedent that this Agreement be approved by the Judge pursuant to Article 164 of the LCM, the Executing Creditors and those who execute this Agreement in the future, agree and irrevocably consent to each and every one of the clauses stated herein regarding claims against Vitro which each of them holds and are indicated in the signature pages of this Agreement or the ones which result in their favor in the Debt Acknowledgement Judgment.

**SEVENTEENTH. NULLITY.**

If for any reason any of the clauses of this Agreement is deemed invalid, such circumstance shall only affect that clause and the rest of the terms and conditions herein shall survive in its terms.

**EIGHTEENTH. APPLICABLE LAW.**

This Agreement shall be governed by the LCM and other applicable laws pursuant to Article 8 of the LCM.

**NINETEENTH. JURISDICTION AND VENUE.**

The parties that execute this Agreement and those who agree and consent to its execution in the future pursuant to Articles 161 and 162 of the LCM, agree that construction, compliance and enforcement of this Agreement will be subject to the exclusive jurisdiction of the H. District Judge which shall rule over the Vitro *concurso mercantil* proceeding.

**TWENTIETH. HEADINGS.**

The headings of the clauses of this Agreement are merely for reference and do not affect its content.

This Agreement is signed by Vitro and the Executing Creditors, as well as by the Recognized Creditors that consent to it, on the date which appears on each signature page.

*[REST OF THE PAGE WAS INTENTIONALLY LEFT BLANK]*

A-17

Table of Contents

Signature page of the Vitro Restructuring Agreement.

VITRO, S.A.B. DE C.V.

By:

    Name:
    Title:
    Date:

A-18

Table of Contents

Signature page of the Vitro Restructuring Agreement.
Credit:

    2012 Notes

        Note Number:    [    ]
        Nominal Value:   [    ]

    2013 Notes

        Note Number:    [    ]
        Nominal Value:   [    ]

    2017 Notes

        Note Number:    [    ]
        Nominal Value:   [    ]

    Cebures Vitro 03

        Certificate Number: [    ]
        Nominal Value:   [    ]

    Cebures Vitro 08

        Certificate Number: [    ]
        Nominal Value:   [    ]

Other credits:

    Identification:      [    ]

[Consent granted hereby corresponds to the amount which is acknowledged by means of the Debt Acknowledgement Judgment in favor of the Creditor's name which is indicated below.]

[CREDITOR NAME]

Represented by:

Name:
Title:
Date:

A–19

Table of Contents

## EXHIBIT LIST

| | |
|---|---|
| **Exhibit "A"** | List of Executing Creditors. |
| **Exhibit "B"** | Public instrument which contains the power of attorney of the legal representative of Vitro. |
| **Exhibit "C"** | Public instrument which contains the power of attorney of the legal representatives for the Executing Creditors. |
| **Exhibit "D"** | Description of the Notes, attached in English form, accompanied by its Spanish translation. |
| **Exhibit "E"** | Irrevocable Management and Payment Trust Number 986 dated September 8, 2010. |
| **Exhibit "F"** | Form of Cash Payment and Restructuring Fee. |
| **Exhibit "G"** | Form of Voting Trust. |

A-20

Case 10-47473-dml11   Doc 4-5   Filed 11/18/10   Entered 11/19/10 00:01:24   Desc
Ex. E - part 4   Page 65 of 100

## INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

| Content | Page |
|---|---|
| Independent auditors' report | F–2 |
| Consolidated balance sheets | F–4 |
| Consolidated statements of operations | F–6 |
| Consolidated statement of changes in financial position | F–7 |
| Consolidated statements of cash flows | F–9 |
| Consolidated statements of changes in stockholders' equity | F–11 |
| Notes to consolidated financial statements | F–12 |

F–1

Table of Contents

**Independent Auditors' Report**

To the Board of Directors and Stockholders of Vitro, S.A.B. de C.V.

Garza Garcia, N. L., Mexico

We have audited the accompanying consolidated balance sheets of Vitro, S.A.B. de C.V. and subsidiaries (the Company) as of December 31, 2008 and 2009, and the related consolidated statements of operations and changes in stockholders' equity for each of the three years in the period ended December 31, 2009, the consolidated statement of changes in financial position for the year ended December 31, 2007 and the consolidated statements of cash flows for the years ended December 31, 2008 and 2009. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in Mexico. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement and that they are prepared in accordance with Mexican Financial Reporting Standards. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the financial reporting standards used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

For the years ended December 31, 2008 and 2009, the Company incurred net losses of Ps. 5,682 million and Ps. 754 million, respectively, and one of its business units, which represented 29% of consolidated operating income in 2007 and 11% in 2008, incurred an operating loss in 2009. Additionally, the Company was not in compliance with covenants related to its long-term debt obligations and has received notices of acceleration from its bondholders. As a result, the Company has presented its long-term debt that is currently callable by its creditors as short-term, which has resulted in current liabilities significantly exceeding current assets. As disclosed in Notes 10 and 23 to the accompanying consolidated financial statements, the Company continues to operate normally as it works to achieve its financial restructuring with its creditors. The accompanying financial statements do not include the effects that could result if Company 's plans are unable to be realized.

As disclosed in note 3 a) to the accompanying consolidated financial statements, the Company adopted the following new Mexican Financial Reporting Standards, which impacted its financial position and results of operations; in 2008: NIF B−2, Statement of Cash Flows; NIF B−10, Effects of Inflation; NIF D−3, Employee Benefits and NIF D−4, Income Taxes. In 2009: NIF B−8, Consolidated or Combined Financial Statements; NIF C−8, Intangible Assets and D−8, Share−based Payments.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of Vitro, S.A.B. de C.V. and subsidiaries as of December 31, 2008 and 2009, the results of their operations and changes in their stockholder's equity for each of the three years in the period ended December 31, 2009, as well as changes in their financial position for the year ended December 31, 2007 and their cash flows for the years ended December 31, 2008 and 2009, in conformity with Mexican Financial Reporting Standards.

Our audits also comprehended the translation of the Mexican peso amounts into U.S. dollar amounts and, in our opinion, such translation has been made in conformity with the basis stated in note 2 a). The translation of the financial statement amounts into U.S. dollars and the translation of the financial statements into English have been made solely for the convenience of readers.

Galaz, Yamazaki, Ruiz Urquiza, S.C.

Member of Deloitte Touche Tohmatsu Limited

C.P.C. Jorge Alberto Villarreal González

September 27, 2010

F−2

**Table of Contents**

**Vitro, S.A.B. de C.V. and Subsidiaries**
**Consolidated Balance Sheets**
(Millions of Mexican pesos)

| | December 31, | | Millions of US dollars (Convenience Translation) December 31, |
| --- | --- | --- | --- |
| | **2008** | **2009** | **2009** |
| Assets | | | |
| Cash and cash equivalents | Ps. 1,428 | Ps. 2,616 | US$ 200 |
| Trade receivables, net | 4,301 | 3,201 | 245 |
| Taxes receivable | 589 | 146 | 11 |
| Other receivables | 1,485 | 961 | 74 |
| Inventories, net | 4,178 | 3,172 | 243 |
| Current assets | 11,981 | 10,096 | 773 |
| Investment in associated company | 996 | 886 | 68 |
| Land and buildings, net | 8,051 | 6,774 | 519 |
| Machinery and equipment, net | 7,890 | 8,001 | 612 |
| Construction in progress | 1,332 | 563 | 43 |
| Goodwill | 771 | 721 | 55 |
| Deferred taxes | 3,418 | 4,515 | 346 |
| Other assets | 1,335 | 1,096 | 84 |
| Long−term assets | 23,793 | 22,556 | 1,727 |
| | Ps. 35,774 | Ps. 32,652 | US$ 2,500 |

The accompanying notes are an integral part of these consolidated financial statements.

Hugo A. Lara García
Chief Executive Officer

Claudio L. Del Valle Cabello
Chief Financial and Administrative Officer

F−3

Table of Contents

**Vitro, S.A.B. de C.V. and Subsidiaries**
**Consolidated Balance Sheets**
(Millions of Mexican pesos)

| | December 31, | | Millions of US dollars (Convenience Translation) December 31, |
|---|---|---|---|
| | 2008 | 2009 | 2009 |
| Liabilities | | | |
| Short-term borrowings | Ps.  2,309 | Ps.  1,680 | US$  129 |
| Current maturities of long-term debt | 16,887 | 16,517 | 1,265 |
| Trade payables | 2,356 | 1,595 | 122 |
| Accrued expenses | 589 | 713 | 54 |
| Derivative financial instruments | 3,777 | 3,328 | 255 |
| Interest payable | 735 | 2,428 | 186 |
| Other current liabilities | 2,410 | 1,319 | 101 |
| Current liabilities | 29,063 | 27,580 | 2,112 |
| Long-term debt | 2,866 | 1,904 | 146 |
| Employee benefits | 461 | 66 | 5 |
| Deferred taxes | 11 | | |
| Taxes payable | | 850 | 65 |
| Other long-term liabilities | 265 | 268 | 20 |
| Long-term liabilities | 3,603 | 3,088 | 236 |
| Total liabilities | 32,666 | 30,668 | 2,348 |
| Commitments and contingencies (note 12) | | | |
| Stockholders' equity | | | |
| Capital stock: no par value, 386,857,143 shares issued and outstanding in 2008 and 2009 | 387 | 387 | 30 |
| Restatement of capital stock | 7,245 | 7,245 | 555 |
| Restated capital stock | 7,632 | 7,632 | 585 |
| Treasury stock (40,204,310 in 2008 and 2009) | (547) | (547) | (42) |
| Additional paid-in capital | 1,761 | 1,645 | 126 |
| Translation effects of foreign subsidiaries | 402 | 370 | 28 |
| Accumulated deficit | (7,544) | (8,580) | (657) |
| Controlling interest | 1,704 | 520 | 40 |
| Noncontrolling interest in consolidated subsidiaries | 1,404 | 1,464 | 112 |
| Total stockholders' equity | 3,108 | 1,984 | 152 |
| Total liabilities and stockholders' equity | Ps. 35,774 | Ps. 32,652 | US$  2,500 |

The accompanying notes are an integral part of these consolidated financial statements.

F-4

Table of Contents

**Vitro, S.A.B. de C.V. and Subsidiaries**
**Consolidated Statements of Operations**
(Millions of Mexican pesos, except per share amounts)

| | Year ended December 31, | | | Millions of US dollars (Convenience Translation) December 31 |
| | 2007 | 2008 | 2009 | 2009 |
|---|---|---|---|---|
| Net sales | Ps. $28,591 | Ps. 29,013 | Ps. 23,991 | US$ 1,837 |
| Cost of sales | 20,187 | 21,279 | 17,180 | 1,316 |
| Gross profit | 8,404 | 7,734 | 6,811 | 521 |
| Selling, general and administrative expenses | 5,700 | 6,024 | 5,482 | 420 |
| Operating income | 2,704 | 1,710 | 1,329 | 101 |
| Total comprehensive financing result | 1,660 | 9,077 | 2,366 | 181 |
| Income (loss) after financing cost | 1,044 | (7,367) | (1,037) | (80) |
| Other expenses, net | 869 | 495 | 291 | 22 |
| Equity in earnings (losses) of associated company | | 5 | (24) | (2) |
| Income (loss) before taxes | 175 | (7,857) | (1,352) | (104) |
| Income tax expense (benefit) | 44 | (2,175) | (598) | (47) |
| Net income (loss) for the year | Ps. 131 | Ps (5,682) | Ps (754) | US$ (57) |
| Net noncontrolling interest income | Ps. 144 | Ps. 24 | Ps. 33 | US$ 3 |
| Net controlling interest loss | (13) | (5,706) | (787) | (60) |
| | Ps. 131 | Ps. (5,682) | Ps. (754) | US$ (57) |
| Earnings (losses) per common share (based on weighted average shares outstanding of 341,042,193 for 2007, 342,834,251 for 2008 and 346,652,833 for 2009): | | | | |
| Income (loss) per share | Ps. 0.38 | Ps. (16.57) | Ps. (2.17) | US$ (0.17) |
| Noncontrolling interest income | (0.42) | (0.07) | (0.10) | (0.01) |
| Net controlling interest loss | Ps. (0.04) | Ps. (16.64) | Ps. (2.27) | US$ (0.18) |

The accompanying notes are an integral part of these consolidated financial statements.

F–5

Table of Contents

**Vitro, S.A.B. de C.V. and Subsidiaries**
**Consolidated Statement of Changes in Financial Position**
(Millions of Mexican pesos)

|  | Year ended December 31, 2007 |
|---|---:|
| Operating activities: | |
| Net income from continuing operations | Ps. 131 |
| Add (deduct) non-cash items: | |
| Depreciation and amortization | 1,414 |
| Provision for employee benefits | 261 |
| Early extinguishment of employee benefits | 97 |
| Amortization of debt issuance costs | 170 |
| Loss from sale of subsidiaries and associated companies | 11 |
| Impairment of long-lived assets | 122 |
| Loss from sale of long-lived assets | 47 |
| Mark-to market of derivative financial instruments | 216 |
| Deferred taxes and workers' profit sharing | (351) |
|  | 2,118 |
| Increase in trade receivables | (81) |
| Increase in inventories | (308) |
| Increase in trade payables | 243 |
| Change in other current assets and liabilities | 174 |
| Employee benefits | (472) |
| Net resources generated by operating activities | 1,674 |
| Financing activities: | |
| Proceeds from short-term bank loans | 2,602 |
| Proceeds from long-term bank loans | 14,289 |
| Amortization in real terms of bank loans | (611) |
| Payment of short-term bank loans | (4,864) |
| Payment of long-term bank loans | (9,459) |
| Debt issuance costs | (293) |
| Dividends paid to stockholders of Vitro [(1)] | (136) |
| Dividends paid to noncontrolling interest | (79) |
| Purchase of treasury stock | (1) |
| Other financing activities | 487 |
| Net resources generated by financing activities | 1,935 |
| Investing activities: | |
| Investments in land, buildings, machinery and equipment | (2,695) |
| Proceeds from sale of land, buildings, machinery and equipment | 72 |
| Restricted cash | (88) |

Table of Contents

|  | Year ended December 31, 2007 |
|---|---:|
| Investment in subsidiaries | (181) |
| Proceeds from sale of subsidiaries and associated companies | 37 |
| Other long–term assets | (36) |
| Deferred charges | (302) |
| Net resources used in investing activities | (3,193) |
| Net increase in cash and cash equivalents | 416 |
| Balance at beginning of year | 1,222 |
| Balance at end of year | Ps.   1,638 |

(1)

This dividend is recognized for accounting purposes as a capital reimbursement.

The accompanying notes are an integral part of these consolidated financial statements.

F–7

Table of Contents

**Vitro, S.A.B. de C.V. and Subsidiaries**
**Consolidated Statements of Cash Flows**
(Millions of Mexican pesos)

| | Year ended December 31, | | Millions of US dollars (Convenience Translation) |
| | 2008 | 2009 | 2009 |
|---|---|---|---|
| Operating activities: | | | |
| Loss before income taxes | Ps. (7,857) | Ps. (1,352) | US$ (104) |
| Items related to investing activities: | | | |
| Depreciation and amortization | 1,469 | 1,473 | 113 |
| Gain from sale of long–lived assets | (3) | (209) | (16) |
| Impairment and retirement of long–lived assets | 196 | 207 | 16 |
| Foreign exchange loss | 79 | 6 | 0 |
| Interest income | (58) | (51) | (4) |
| Equity in (income) loss of associated company | (5) | 24 | 2 |
| Items related to financing activities: | | | |
| Amortization of debt issuance costs | 55 | 80 | 6 |
| Derivative financial instruments | 3,766 | 570 | 44 |
| Foreign exchange loss (gain) | 3,655 | (1,177) | (90) |
| Interest expense | 2,092 | 2,750 | 211 |
| Increase (decrease) for: | | | |
| Trade receivables | (101) | 1,049 | 80 |
| Inventories | (19) | 871 | 67 |
| Trade payables | (317) | (587) | (45) |
| Other current assets and liabilities | (93) | 381 | 29 |
| Employee benefits | 88 | (397) | (30) |
| Income taxes (paid) recoverable | (211) | 358 | 27 |
| Net cash provided by operating activities | 2,736 | 3,996 | 306 |
| | | | |
| Investing activities: | | | |
| Investments in machinery and equipment | (1,798) | (1009) | (77) |
| Proceeds from sale of machinery and equipment | 20 | 1,410 | 108 |
| Investment in subsidiaries, net of cash acquired | (63) | (454) | (35) |
| Other assets | 332 | 18 | 1 |
| Deferred charges | (262) | (174) | (13) |
| Interest received | 60 | 54 | 4 |
| Net cash used in investing activities | (1,711) | (155) | (12) |
| | | | |
| Excess cash to be applied to financing activities | 1,025 | 3,841 | 294 |
| | | | |
| Financing activities: | | | |
| Proceeds from (payments of) short–term bank loans | Ps. 1,058 | Ps. (15) | US$ (1) |
| Interest paid | (2,044) | (943) | (72) |
| Dividends paid to stockholders of Vitro, S.A.B. de C.V. [1] | (143) | | |
| Dividends paid to noncontrolling interest | (131) | (14) | (1) |
| Issuance of capital stock to noncontrolling interest | 22 | | |
| Proceeds from long–term bank loans | 1,976 | 1,559 | 119 |
| Payments of long–term bank loans | (1,020) | (2,468) | (189) |
| Sale of treasury stock | 75 | | |
| Debt issuance costs | (63) | (11) | (1) |
| Derivative financial instruments | (1,138) | (824) | (63) |
| Other financing activities | (36) | 5 | 0 |
| Net cash used in financing activities | (1,444) | (2,711) | (208) |

F–8

**Table of Contents**

| | Year ended December 31, | | Millions of US dollars (Convenience Translation) |
|---|---|---|---|
| | **2008** | **2009** | **2009** |
| Net (decrease) increase in cash and cash equivalents | (419) | 1,130 | 86 |
| Adjustment to cash flows due to exchange rate fluctuations | 93 | 1 | 0 |
| Deconsolidation of subsidiary | (105) | | |
| Cash and cash equivalents: | | | |
| At the beginning of year (includes restricted cash of Ps. 526 and Ps. 304 at December 31, 2008 and 2009, respectively) | 2,163 | 1,732 | 133 |
| At the end of year (includes restricted cash of Ps. 304 and Ps. 247 at December 31 2008 and 2009, respectively) | Ps. 1,732 | Ps. 2,863 | US$ 219 |

[1]     This dividend is recognized for accounting purposes as a capital reimbursement.

The accompanying notes are an integral part of these consolidated financial statements.

F—9

Table of Contents

**Vitro, S.A.B. de C.V. and Subsidiaries**
**Consolidated Statements of Changes in Stockholders' Equity**
(Millions of Mexican pesos)

| | Restated capital stock | Treasury stock and additional paid–in capital | Shortfall in restatement of capital | Other reserves[1] | Translation effect of foreign subsidiaries | Retained earnings (accumulated deficit) | Noncontrolling interest | Total Stockholders' equity |
|---|---|---|---|---|---|---|---|---|
| **Balance at January 1, 2007** | Ps. 7,632 | Ps. 1,816 | Ps. (21,090) | Ps. (2,302) | | Ps. 21,418 | Ps. 1,892 | Ps. 9,366 |
| Dividends (Ps. 0.37 per share)[2] | | | | | | (136) | | (136) |
| Decrease in noncontrolling interest | | | | | | | (57) | (57) |
| Purchase of treasury stock | | (1) | | | | | | (1) |
| Comprehensive income | | | (64) | 166 | | (13) | 125 | 214 |
| **Balance at December 31, 2007** | 7,632 | 1,815 | (21,154) | (2,136) | | 21,269 | 1,960 | 9,386 |
| Reclassification for adoption of new Mexican Financial Reporting Standards | | | 21,154 | 2,136 | | (22,964) | | 326 |
| Dividends (Ps. 0.40 per share)[2] | | | | | | (143) | | (143) |
| Decrease in noncontrolling interest | | (676) | | | | | (815) | (1,491) |
| Sale of treasury stock | | 75 | | | | | | 75 |
| Comprehensive loss | | | | | Ps. 402 | (5,706) | 259 | (5,045) |
| **Balance at December 31, 2008** | 7,632 | 1,214 | 0 | 0 | 402 | (7,544) | 1,404 | 3,108 |
| Effect in retained earnings of cancellation of preoperating costs | | | | | | (12) | (1) | (13) |
| Effect of liability related to Mexican Tax Reform | | | | | | (237) | | (237) |
| Increase in noncontrolling interest | | (116) | | | | | 106 | (10) |
| Comprehensive loss | | | | | (32) | (787) | (45) | (864) |
| **Balance at December 31, 2009** | Ps. 7,632 | Ps. 1,098 | Ps. 0 | Ps. 0 | Ps. 370 | Ps. (8,580) | Ps. 1,464 | Ps. 1,984 |

(1)    Includes the initial cumulative effect of deferred tax and the additional minimum liability related to employee benefits.

(2)    This dividend is recognized for accounting purposes as a capital reimbursement.

The accompanying notes are an integral part of these consolidated financial statements.

Table of Contents

Vitro, S.A.B. de C.V. and Subsidiaries
Notes to Consolidated Financial Statements
For the years ended December 31, 2007, 2008 and 2009
*(Millions of Mexican pesos, except per share amounts)*

**1.    Activities of the Company**

Vitro, S.A.B. de C.V. (Vitro or the Company) is a Mexican holding company, and together with its subsidiaries serves multiple product markets, including construction and automotive glass; food and beverage, wine, liquor, cosmetics and pharmaceutical glass containers. Vitro's subsidiaries also produce raw materials and equipment and capital goods for industrial use which are vertically integrated into the Glass Containers business unit.

**2.    Basis of presentation and principles of consolidation**

*a)    Basis of presentation*

The accompanying consolidated financial statements of Vitro and its subsidiaries (the Company) are prepared on the basis of Mexican Financial Reporting Standards (NIFs or MFRS) as of the date of these consolidated financial statements.

The consolidated financial statements and notes as of December 31, 2009 and 2008 and for the years then ended, include balances and transactions denominated in Mexican pesos of different purchasing power, while those as of December 31, 2007 and for the year ended December 31, 2007 are presented in Mexican pesos of purchasing power of December 31, 2007; consequently, they are not comparable.

Additionally, solely for the convenience of users, the consolidated financial statements as of and for the year ended December 31, 2009, have been translated into United States of America (US) dollars at the rate of Ps. 13.0587 per dollar, the rate of exchange determined by the Banco de México (Mexico's Central Bank) as of December 31, 2009. Such arithmetical translation should not be construed as a representation that the peso amounts shown could be converted into US dollars at such rate or at any other rate.

In the consolidated financial statements and these notes, references to pesos or "Ps." correspond to Mexican pesos, and references to dollars or "US$" correspond to dollar of the United States of America (the United States).

*b)    Consolidated subsidiaries*

Those companies and special purpose entities in which Vitro either, directly or indirectly, controls are included in the consolidated financial statements. For those companies in which Vitro has joint control, the proportionate consolidation method is used. This method consists of consolidating on a proportionate basis the assets, liabilities, stockholders' equity and revenues and expenses. All significant intercompany balances and transactions have been eliminated in consolidation.

The investment in associated company is valued under the equity method (see note 20 d).

At December 31, 2009, the main subsidiaries the Company consolidates in each reportable segment and its percentage of share ownership, directly or indirectly, are as follows:

F–11

Table of Contents

| FLAT GLASS | GLASS CONTAINERS | CORPORATE |
|---|---|---|
| Viméxico, S.A. de C.V. (91.80%) | Vitro Envases Norteamérica, S.A. de C.V. (100%) | Vitro Corporativo, S.A. de C.V. (100%) |
| Vidrio y Cristal del Noroeste, S.A. de C.V. (91.80%)(1) | Fabricación de Máquinas, S.A. de C.V. (100%) | Aerovitro, S.A. de C.V.(100%) |
| Vitro Flotado Cubiertas, S.A. de C.V. (91.80%) | Compañía Vidriera, S.A. de C.V. (100%) | Clinica Vitro, A.C.(100%) |
| Vidrio Plano de México, S.A. de C.V. (91.80%) | Vidriera Monterrey, S.A. de C.V. (100%) | American Assets Holding, Co. (100%) |
| Vitro Flex, S.A. de C.V. (91.80%) | Vidriera Guadalajara, S.A. de C.V. (100%) | |
| Cristales Automotrices, S.A. de C.V. (46.81%) | Vidriera Los Reyes, S.A. de C.V. (100%) | |
| Vitro Colombia, S.A. (91.80%) | Vidriera Querétaro, S.A. de C.V. (100%) | |
| Vitro America, LLC. (100%) | Vidriera Toluca, S.A. de C.V. (100%) | |
| Vitro Cristalglass, S.L. (99.29%)(2) | Vitro Packaging, LLC. (100%) | |
| Vitro Chaves Industria de Vidro, S.A. (59.57%) | Vitro Packaging México, S. A. de C.V. (100%) | |
| Vitro Automotriz, S.A. de C.V. (99.92%) | Industria del Álcali, S.A. de C.V. (100%) | |
| Vitro Vidrio y Cristal, S.A. de C.V. (99.99%) | Vidrio Lux, S.A. (100%) | |
| Productos de Valor Agregado en Cristal, S.A. de C.V. (55%) (3) | | |

(1)  In July 2007, Viméxico acquired the remaining 50% of the outstanding shares of Vitro AFG, S.A. de C.V. (Vitro AFG) from AFG Industries Inc. (AFG Industries), in order to assume control and increase its ownership to 100%, subsequently changing its legal name to Vidrio y Cristal del Noroeste, S.A. de C.V. (see note 20 b).

(2)  In July 2008, Viméxico was notified by its partner of its right to exercise the put option related to the sale of its 40% interest in Vitro Cristalglass. The option was officially exercised in August 2008 and beginning in September 2008, Vitro Cristalglass is 100% consolidated (see note 20 c).

(3)  In August 2007, Vitro Vidrio y Cristal, S.A. de C.V. (Vitro VyC) acquired 55% of the outstanding shares of Productos de Valor Agregado en Cristal, S.A. de C.V. (PVA) (see note 20 a).

F–12

Table of Contents

c)    *Translation of financial statements from foreign subsidiaries*

To consolidate financial statements of foreign subsidiaries, the accounting policies of the foreign entity are first converted to MFRS. The financial statements are subsequently translated to Mexican pesos considering the following methodologies:

Beginning in 2008, foreign operations whose functional currency is the same as their local currency translate their financial statements to Mexican pesos (the Company's reporting currency) using the following exchange rates: 1) the closing exchange rate in effect at the balance sheet date for assets and liabilities; 2) historical exchange rates for stockholders' equity, revenues, costs and expenses. Through 2007, the financial statements of foreign subsidiaries that operated independently of the Company recognized the effects of inflation of the country in which they operate and were then translated to Mexican pesos using the closing exchange rate in effect at the balance sheet date. In 2007, 2008 and 2009, translation effects are recorded in stockholders' equity.

Beginning in 2008, foreign operations with a functional currency different from the local currency translate their financial statements from the local currency to the functional currency, using the following exchange rates: 1) the closing exchange rate in effect at the balance sheet date for monetary assets and liabilities; 2) historical exchange rates for non-monetary assets and liabilities and stockholders' equity; and 3) the rate on the date of accrual of revenues, costs and expenses, except those arising from non-monetary items that are translated using the historical exchange rate for the related non-monetary item. Translation effects are recorded within comprehensive financing result. Subsequently, to translate the financial statements from the functional currency to Mexican pesos, the methodology described in the preceding paragraph is used.

Recording and functional currencies of foreign subsidiaries are as follows:

| Companies in: | Recording Currency | Functional Currency |
|---|---|---|
| United States of America | Dollar | Dollar |
| Europe | Euro | Euro |
| Central and South America | Local | Dollar |

d)    *Comprehensive income (loss).* – Represents changes in stockholders' equity during the year, for concepts other than distributions and activity in contributed common stock, and is comprised of the net income (loss) of the year, plus other comprehensive income (loss) items of the same period, which are presented directly in stockholders' equity without affecting the consolidated statements of operations. Other comprehensive income (loss) items consist of the translation effects of foreign subsidiaries and, until 2007, the shortfall in restatement of capital and the additional minimum labor liability adjustment.

e)    *Classification of costs and expenses.* – Costs and expenses presented in the consolidated statements of operations were classified according to their function which allows for the analysis of the Company's gross margin.

f)    *Income from operations.* – The Company continues to present operating income in the statements of operations as it is an important financial indicator within the industry and helps to evaluate the Company's performance. Operating income includes ordinary income and cost of sales as well as operating costs. This presentation is comparable with the one used in the consolidated financial statements as of December 31, 2007 and 2008.

Table of Contents

3.    **Summary of significant accounting policies**

The accompanying consolidated financial statements have been prepared in conformity with MFRS, which require that management make certain estimates and use certain assumptions that affect the amounts reported in the financial statements and their related disclosures; however, actual results may differ from such estimates. The Company's management, upon applying professional judgment, considers that estimates made and assumptions used were adequate under the circumstances. Some of the significant items subject to this estimates and assumptions include the carrying amounts of land, building, machinery and equipment, intangible assets, goodwill, estimates of valuation of account receivables, inventory, deferred income tax assets, valuation of financial instruments and employee benefits liabilities. The significant accounting policies of the Company are as follows:

a)    *Changes in accounting policies*

Beginning January 1, 2008 and 2009, the Company adopted the following new NIF 's; consequently the accompanying consolidated financial statements are not comparable.

**For Fiscal Year 2008**

- *NIF B−2, Statement of cash flows* (NIF B−2) − Supersedes Bulletin B−12, *Statement of changes in financial position*. NIF B−2 permits the presentation of such statement using either the direct or the indirect method; the Company elected the indirect method. The statement of cash flows is presented in nominal pesos. According to NIF B−2, this standard should be recognized prospectively; consequently, the Company presents a consolidated statement of cash flows for the years 2008 and 2009, and consolidated statement of changes in financial position for 2007.

- *NIF B−10, Effects of inflation* (NIF B−10) − Considers two economic environments: a) an inflationary environment, where cumulative inflation over a three−year period is 26% or more, in which case, the effects of inflation need to be recognized, and b) non−inflationary environment, where inflation is less than 26% in the same period, in which case, the effects of inflation may not be recognized in the financial statements. Also, NIF B−10 eliminates the replacement cost and specific index valuation methods and requires that the gain (loss) from monetary position in equity and the cumulative gain (loss) from holding non−monetary assets be reclassified to retained earnings, except for the gain (loss) from holding non−monetary assets that is identified with inventories or fixed assets that have not been realized as of the effective date of this standard. Such amounts should be maintained in stockholders' equity and realized within current earnings of the period in which such assets are depreciated or sold. The Company determined it was impractical to identify the gain (loss) from monetary position in equity and the cumulative gain (loss) from holding non−monetary assets relating to unrealized assets as of January 1, 2008; therefore, on that date, the Company reclassified the entire balance of shortfall in restatement of capital of Ps. 21,154 to retained earnings. NIF B−10 establishes that this accounting change be recognized prospectively.

Since cumulative inflation over the three fiscal years prior to those ended December 31, 2008 and 2009 was 11.56% and 14.34%, respectively, the environment in which the Company operates is no longer inflationary, and the Company discontinued recognition of the effects of inflation in its financial statements beginning January 1, 2008. However, assets, liabilities and stockholders' equity at December 31, 2008 and 2009 include restatement effects recognized through December 31, 2007.

- *NIF D−3, Employee benefits* (NIF D−3) − Incorporates current and deferred statutory employee profit sharing (PTU) as part of its provisions and establishes that deferred PTU must be determined using the asset and liability method established in NIF D−4, *Income Taxes*, instead of only considering temporary differences that arise in the reconciliation between the accounting result and income for PTU purposes. This change did not have effect in the Company's financial position.

Additionally, as of December 31, 2008, NIF D−3 removed the recognition of the additional minimum liability, which resulted in the elimination of Ps. 796, of which Ps. 338 was related to the intangible labor obligation asset and Ps. 458 was related to the additional minimum labor obligation in stockholders' equity.

F−14

Table of Contents

Additionally, Ps. 42 and Ps. 38 were recognized in earnings for the years ended December 31, 2008 and 2009, respectively, for unamortized items as of December 31, 2007.

NIF D−3 also incorporates the career salary concept in the actuarial calculation and limits the amortization period of the following items to the lesser of five years or the employee's remaining labor life:

(i)    The beginning balance of the transition liability for termination and retirement benefits.

(ii)    The beginning balance of prior service costs and plan modifications.

(iii)    The beginning balance of actuarial gains and losses from retirement benefits.

- *NIF D−4, Income taxes* (NIF D−4) − Eliminated the permanent difference concept; clarifies and incorporate certain definitions, and required that the balance of the initial cumulative effect of deferred income taxes of Ps. 1,810 be reclassified to retained earnings.

**For Fiscal Year 2009**

- *NIF B−8, Consolidated or combined financial statements* − Establishes that special purpose entities, over which control is exercised, should be consolidated. Provided certain requirements are met, it allows the option to present stand−alone financial statements of intermediate controlling companies and requires that potential voting rights be considered to analyze whether control exists.

As a result of the analysis performed due to the requirements noted above, the special purposes entities that hold accounts receivable related to the Company's securitization transactions are now included within the consolidated financial statements (see note 10). The condensed amounts and the effect on the balance sheet as of December 31, 2008 resulting from the retrospective application of the standard, as well as comparative presentation as of December 31, 2009 is as follows:

| | December 31, 2008 As Presented | Debit (Credit) | December 31, 2008 As Restated | December 31, 2009 |
|---|---|---|---|---|
| Other receivables | Ps. 1,255 | Ps. 230* | Ps. 1,485 | Ps. 90 |
| Trade receivables | 1,492 | 2,809 | 4,301 | 1,058 |
| Retained undivided interests in securitized receivables | 1,213 | (1,213) | | |
| Short−term borrowings | (1,601) | (708) | (2,309) | (845) |
| Interests payable | (728) | (7) | (735) | (3) |
| Long−term debt | (1,755) | (1,111) | (2,866) | (300) |

\*    Represents restricted cash presented in other accounts receivable.

- *NIF C−8, Intangible assets* — Establishes the following significant amendments:

(i)    The intangible asset concept is redefined, establishing that the separability condition is not the only condition needed to be identified.

(ii)    Establishes that the acquisition cost must be considered in the initial valuation, identifying the cases of an individual business acquisition or internally arising business, and requiring that it be probable that future economic benefits must flow to the entity.

(iii)    Establishes that subsequent disbursements on research and development projects in progress must be recognized as expenses when accrued, if they are part of the research phase, or, as an intangible asset, if they meet the criteria to be recognized as such.

(iv)    The assumption that an intangible asset could not exceed its useful life of twenty years was eliminated.

F−15

Table of Contents

As a result of adopting this NIF in 2009, the unamortized balance as of December 31, 2008 of capitalized preoperating costs of Ps. 13 net of income tax was written off against retained earnings.

- *NIF D−8 Share−based payments* − Eliminates the supplemental condition of International Financial Reporting Standard (IFRS) No. 2, Share−based payments, and establishes the same recognition requirements for share−based payment arrangements. The adoption of this new NIF did not impact the Company's financial position or results of operations, as the Company adopted the requirements of IFRS 2 as of its effective date.

b)   *Changes in accounting estimates*

Due to the sale of certain plots of land of its subsidiaries in December 2009, the Company revised the estimated useful life of the assets built on such land to a maximum of 15 years, which is equivalent to the term in the lease agreement for such plots of land. The Company recognized the change in estimate prospectively, which impacted current period earnings by Ps. 26.

c)   *Recognition of the effects of inflation*

As mentioned in a) above, beginning January 1, 2008, the Company discontinued the recognition of the effects of inflation. Until December 31, 2007, the Company recognized effects of inflation by adjusting its financial statements in terms of pesos with the purchasing power of the date the balance sheets was presented.

Vitro's Mexican subsidiaries previously used the Indice Nacional de Precios al Consumidor (Mexican National Consumer Price Index, or NCPI), published by Banco de Mexico to restate the financial statements. For Vitro's foreign subsidiaries the Consumer Price Index − All Urban Consumers − All Items, Unadjusted (CPI) published by the US Labor Department was previously used to restate the financial statements, and the restated financial statements were translated into Mexican pesos using the applicable exchange rate at the end of the last period presented, except in the case of the Company's subsidiaries located in Spain for which it applied the Price Consumption Index (PCI), published by the National Institute of Statistics of Spain before translation into Mexican pesos using the exchange rate of the Euro of the last period presented.

Through December 31, 2007, such recognition resulted mainly in inflationary gains or losses on non−monetary and monetary items that are presented in the financial statements under the following two captions:

- *Shortfall in restatement of capital* − This item, which is an element of stockholders' equity, represents the accumulated effect of holding nonmonetary assets and the effect of the initial monetary position gain or loss. The cumulative effect of holding nonmonetary assets represents the increase between the specific values of nonmonetary assets in excess of or below the increase attributable to general inflation.

- *Monetary position result* − Monetary position result reflects the result of holding monetary assets and liabilities during periods of inflation. Values stated in current monetary units decrease in purchasing power over time. This means that losses are incurred by holding monetary assets, whereas gains are realized by maintaining monetary liabilities. The net effect is presented in the statements of operations as part of the total comprehensive financing result. For foreign subsidiaries the result from monetary position is calculated using the CPI, except in the case of the Company's subsidiaries located in Spain for which it applies the PCI.

Inflation rates in Mexico for the years ended December 31, 2007, 2008 and 2009, based on the NCPI, are 3.76%, 6.53% and 3.57%, respectively.

F−16

**Table of Contents**

*d)*    *Cash and cash equivalents*

Consist mainly of bank deposits in checking accounts and readily available investments of highly liquid short–term investments. They are valued at the lower of acquisition cost plus accrued yields or estimated net realizable value and are recognized in results of operations as they accrue.

*e)*    *Investments in securities*

According to its intent, from the date of acquisition, the Company classifies its investments in securities instruments in any of the following categories: (1) trading, when the Company intends to trade debt and equity instruments in the short–term, before their maturity, if any. These investments are stated at fair value; any fluctuations in the value of these investments are recognized in current earnings; (2) held–to–maturity, when the Company intends to and is financially capable of holding financial instruments until their maturity. These investments are recognized and maintained at amortized cost; and (3) available–for–sale, investments that include those that are classified neither as trading nor held–to–maturity. These investments are stated at fair value; any unrealized gains and losses resulting from valuation, net of income tax, are recorded as a component of other comprehensive income within stockholders' equity and reclassified to current earnings upon their sale or maturity. The monetary position resulting from the effects of inflation on available–for–sale investment is recorded as a component of other comprehensive income. Fair value is determined using prices quoted in recognized markets. If such instruments are not traded, fair value is determined by applying recognized technical valuation models.

Investments in securities classified as held–to–maturity and available–for–sale are subject to impairment tests. If there is evidence that the reduction in fair value is other than temporary, the impairment is recognized in current earnings.

Financial liabilities derived from the issuance of debt instruments are recorded at the value of the obligations they represent. Any expenses, premiums and discounts related to the issuance of debt financial instruments are amortized over the life of the instruments.

*f)*    *Derivative financial instruments*

In addition to market, credit and liquidity risks, the Company is exposed to risks such as: natural gas prices, interest rates and foreign exchange currency fluctuations between the peso/US dollar and peso/euro.

The Company has a policy for its derivative financial instruments (DFI) operations, which sets forth the guidelines for the analysis, negotiation, authorization, contracting, operating, monitoring and recording DFI, in order to analyze the risk exposure to financial markets, commodities and fluctuations in the economic and financial variables.

For the risk strategies and the surveillance regarding the compliance of the chosen risk, there is a Risk Committee which acts in compliance with the policy, and which is comprised by various Company officials.

The Company states all derivatives at fair value in the balance sheet, regardless of the purpose for holding them. The recognition of the changes in the fair value of derivative instruments that are designated as a hedge for accounting purposes depends on if they are fair value hedges or cash flow hedges.

Fair value is determined using prices quoted in recognized markets. If such instruments are not traded, fair value is determined by applying recognized technical valuation models.

When derivatives are entered into to hedge risks, and such derivatives meet all hedging requirements, their designation is documented describing the transaction's objective, characteristics, accounting treatment and how the ineffectiveness of the instrument will be measured.

Changes in the fair value of derivative instruments designated as hedges for accounting purposes are recognized as follows: (1) for fair value hedges, changes in both the derivative instrument and the hedged item are recognized in current earnings; (2) for cash flow hedges, changes in the derivative instrument are

F–17

Table of Contents

temporarily recognized as a component of other comprehensive income and then reclassified to current earnings when affected by the hedged item. Any ineffective portion of the change in fair value is immediately recognized in current earnings, within total comprehensive financing result.

The Company's derivative financial instruments have not been designated as hedges for accounting purposes. Changes in fair value of such derivative instruments are recognized in current earnings as a component of total comprehensive financing result.

The Company reviews all contracts entered into to identify embedded derivatives that should be segregated from the host contract for purposes of valuation and recognition. When an embedded derivative is identified and the host contract has not been stated at fair value and adequate elements for its valuation exist, the embedded derivative is segregated from the host contract and stated at fair value. Initial valuation and changes in the fair value of the embedded derivatives at the closing of each period are recognized in current earnings.

g)    *Inventories and cost of sales*

Inventories are stated at the average purchase price or at the average production price, without exceeding net realizable value. Cost of sales is determined by applying such average amounts when the inventories are utilized or sold at the time of the sale. Through December 31, 2007, cost of sales was previously restated using replacement cost or the latest production cost at the time of the sale.

h)    *Investment in associated company*

Investment in associated company in which the Company holds 49.7% of its capital stock is valued using the equity method of accounting.

i)    *Land, buildings, machinery and equipment*

Expenditures for land, buildings, machinery and equipment, including major maintenance activities and improvements that extend useful lives, are capitalized and beginning on January 1, 2008, are recorded at acquisition cost. Balances arising from acquisitions made through December 31, 2007 were restated for the effects of inflation by applying factors derived from the NCPI through that date. The initial balance to apply the NCPI was the net replacement value of the Company's long−lived asset as of December 31, 1996. For machinery and equipment purchased in a foreign country, the restatement was based on the inflation index mentioned above and the exchange rate at the end of each period.

Beginning on January 1, 2007, the carrying value of qualifying assets includes the capitalization of total comprehensive financing result (CFR).

Depreciation is calculated using the straight−line method based on the remaining estimated useful lives of the related assets. Depreciation begins in the month in which the asset is placed in service. The estimated useful lives of the assets are as follows:

|  | Years |
|---|---|
| Buildings | 15 to 50 |
| Machinery and equipment | 3 to 30 |

Maintenance and repair expenses are recorded as costs and expenses in the period incurred.

j)    *Other assets*

Other assets primarily include debt issuance costs and the capitalized software costs. They are recorded at acquisition value and, until December 31, 2007, were restated using factors derived from the NCPI. The debt issuance costs are amortized over the term of the related financial liability and capitalized software is amortized over a period of 80 months, which is its expected useful life.

F−18

**Table of Contents**

k)  *Impairment of long−lived assets in use*

The Company reviews the carrying amounts of long−lived assets in use when an impairment indicator suggests that such amounts might not be recoverable, considering the greater of the present value of future net cash flows or the net sales price. Impairment is recorded when the carrying amounts exceed the greater of the amounts mentioned above. The impairment indicators considered for these purposes are, among others, the operating losses or negative cash flows in the period if they are combined with a history or projection of losses, depreciation and amortization charged to results, which in percentage terms in relation to revenues are substantially higher than that of previous years, obsolescence, reduction in the demand for the products manufactured, competition and other legal and economic factors.

l)  *Provisions*

Provisions are recognized for current obligations that result from a past event, that are probable to result in the use of economic resources, and can be reasonably estimated.

m)  *Goodwill*

Goodwill represents the excess of cost over fair value of subsidiaries as of the date of acquisition and at least once a year is subject to impairment tests. Through December 31, 2007 it was restated using the NCPI. The Company recognizes goodwill corresponding to the controlling interest and beginning in 2009, the noncontrolling interest.

n)  *Employee benefits*

Direct employee benefits are calculated based on the services rendered by employees, considering their most recent salaries. The liability is recognized as it accrues.

Seniority premiums, pension plans and severance payments are recognized as costs over the expected service period of employees and are calculated by independent actuaries using the projected unit credit method, using nominal interest rates beginning in 2008 and real (inflation−adjusted) interest rates through 2007.

o)  *Share−based payment plans*

The Company has historically utilized equity incentive plans that permit the Company to grant stock options and nonvested shares (equity awards) to certain employees and directors of the Company. The Company recognizes the fair value of equity awards computed at the award's grant date over the period in which the requisite service is rendered.

p)  *Foreign currency balances and transactions*

Foreign currency transactions are recorded at the applicable exchange rate in effect at the transaction date. Monetary assets and liabilities denominated in foreign currency are translated into Mexican pesos at the applicable exchange rate in effect at the balance sheet date. Exchange fluctuations are recorded as a component of net comprehensive financing cost in the consolidated statements of operations.

q)  *Revenue recognition*

Revenues and related costs are recognized in the period in which risks and rewards of ownership of the inventories are transferred to customers, which generally coincides with the shipment of products to customers in satisfaction of orders.

r)  *Statutory employee profit sharing (PTU)*

Statutory employee profit sharing is recorded in the results of the year in which it is incurred and presented under other income and expenses in the accompanying consolidated statement of operations. Beginning in 2008 deferred PTU is derived from temporary differences that resulted from comparing the accounting and

F−19

Table of Contents

tax basis of assets and liabilities and, through 2007, resulted from comparing the accounting result and income for PTU purposes. Deferred PTU is recognized only when it can be reasonably assumed that such difference will generate a liability or benefit, and there is no indication that circumstances will change in such a way that the liabilities will not be paid or benefits will not be realized.

s) *Income taxes*

Income taxes, which calculated as the higher of regular income tax (ISR) or the Business Flat Tax (IETU) are recorded in the results of the year they are incurred. To recognize deferred income taxes, based on its financial projections, the Company determines whether it expects to incur ISR or IETU and accordingly recognizes deferred taxes based on the tax it expects to pay. Deferred taxes are calculated by applying the corresponding tax rate to the applicable temporary differences resulting from comparing the accounting and tax bases of assets and liabilities and including, if any, future benefits from tax loss carryforwards and certain tax credits. Deferred tax assets are recorded only when there is a high probability of recovery.

Tax on assets (IMPAC), prevailing until 2007, that were expected to be recoverable are recorded as an advance payment of ISR and presented in the balance sheet increasing the deferred ISR asset.

t) *Earnings (loss) per share*

Basic earnings (loss) per common share are calculated by dividing consolidated net income (loss) for the controlling interest by the weighted average number of shares outstanding during the year. Diluted earnings per share are determined by adjusting consolidated net income and common shares on the assumption that the entity's commitments to issue or exchange its own shares would be realized. Diluted earnings per share is not presented for periods in which the effect of including common stock equivalents is anti–dilutive or periods in which the Company records a net loss from continuing operations as was the case in 2008 and 2009. In 2007 diluted earnings per share was not presented as it is the same as basic earnings per share.

u) *Foreign subsidiaries as economic hedges*

The Company's management designated some liabilities as economic hedges of their foreign subsidiaries. The resulting exchange rate fluctuation is presented in the shortfall in restatement of capital within stockholders' equity to the extent the net investment in the foreign subsidiary covers the investment. Through December 31, 2007, the result from monetary position is measured using inflation factors from the designated subsidiary's country of origin. The effect related to this hedge for 2007, 2008 and 2009 was a net (loss) gain to comprehensive income, net of income tax, of Ps. (16), Ps. (601) and Ps. 118, respectively.

**4. Trade receivable**

a) *Trade receivables*

Trade receivables are summarized as follows:

| | December 31, | |
| --- | --- | --- |
| | **2008** | **2009** |
| Trade receivables[1] | Ps. 4,713 | Ps. 3,571 |
| Allowance for doubtful accounts and other discounts | (412) | (370) |
| | Ps. 4,301 | Ps. 3,201 |

[1] Trade receivables include balances of Ps. 2,850 and Ps. 1,609 as of December 31, 2008 and 2009, respectively, which serve as collateral as part of the Company's accounts receivable securitization facilities. Although the related trusts in which they are held are included in the Company's consolidated financial statements, they are legally independent (see Note 3 a).

Table of Contents

*b)*    *Other receivables:*

Other receivables include Ps. 298 and Ps. 218 of restricted cash as of December 31, 2008 and 2009, respectively. This amount includes Ps. 230 and Ps. 90 from the Company's account receivable securitization facilities.

**5.    Inventories**

Inventories are summarized as follows:

|  | December 31, | |
|---|---|---|
|  | **2008** | **2009** |
| Semi–finished and finished products | Ps.  2,892 | Ps.  2,120 |
| Raw materials | 699 | 474 |
| Packaging materials | 86 | 74 |
| Spare parts | 296 | 243 |
| Refractory | 85 | 94 |
| Merchandise in transit and other | 241 | 318 |
|  | 4,299 | 3,323 |
| Less allowance for obsolescence and slow moving parts | 121 | 151 |
|  | Ps.  4,178 | Ps.  3,172 |

As of December 31, 2009, inventory of Ps. 237 has been provided as a guarantee for certain of the Company's short–term financing transactions.

**6.    Land, buildings, machinery and equipment**
    *a)*    *Land, buildings, machinery and equipment are summarized as follows:*

|  | December 31, | |
|---|---|---|
|  | **2008** | **2009** |
| Land | Ps.  3,278 | Ps.  2,351 |
| Buildings | 10,801 | 10,589 |
| Less: Accumulated depreciation | 6,028 | 6,166 |
|  | Ps.  8,051 | Ps.  6,774 |
| Machinery and equipment | Ps. 24,734 | Ps. 25,399 |
| Less: Accumulated depreciation | 16,844 | 17,398 |
|  | Ps.  7,890 | Ps.  8,001 |

*b)*    In 2007, 2008 and 2009, the Company capitalized CFR of Ps. 10, Ps. 474 and Ps. 3 respectively, directly attributable to the acquisition of qualifying assets.

*c)*    *Sale of real estate*

In December 2006, Vitro sold real estate located in Mexico City for US$100 million, 80% payable on the date of sale and the remainder payable on the delivery date of the property.

F–21

Table of Contents

Vitro guaranteed up to US$80 million in favor of the purchaser payable in the event that the property was not delivered to the purchaser prior to December 2009. As of December 31, 2008, the Company fulfilled all the requirements demanded under the contract. In 2009 the Company received US$5 million and as of the issuance date of these consolidated financial statements is seeking legal remedies for payment of the remaining amount (see note 23 e).

On December 15, 2009, the Company sold, through a trust, seven real estate properties, on which some of its manufacturing facilities are located, receiving US$75 million in the transaction, and has entered into a 15–year lease agreement that allows the Company to continue using such assets. The Company has the right to repurchase the title to these real estate assets in exchange for US$126 million in cash.

Additionally, subject to the occurrence of uncertain future events, the buyer of such properties may exercise an option obtained on the same date requiring the Company to obtain the rights over the trust, and to deliver its own shares and/or a sub–holding subsidiary's common shares. The option related to the representative shares of the Company's stockholders equity, would be from the shares that are currently held by the Pension and Stock Option Trusts and the remainder to complete US$75 million would be fulfilled with the delivery of a percentage of the sub–holding subsidiary 's shares, both valued under the terms included in the agreement. The Company has the option to repurchase the sub–holding subsidiary's shares during the next three years following their delivery.

d)   *Fixed assets contributed to a trust*

In November 2008, the Company, through one of its subsidiaries, contributed non–productive real estate assets with a book value of Ps. 1,875 as of December 31, 2008 to a trust created for the sole purpose to sell such assets, if necessary, in order to generate the necessary resources to pay off the principal from a US$100 million line of credit obtained from a financial institution. As of December 31, 2008 and 2009, the proceeds drawn against the loan were US$85 million and US$68 million, respectively (see note 23 f).

**7.   Other assets**

As of December 31, 2008 and 2009, the balance in other assets includes Ps. 808 and Ps. 639, of capitalized software costs, respectively, and Ps. 286 and Ps. 255, of debt issuance costs, respectively, as well as Ps. 6 and Ps. 29 of restricted cash, respectively.

**8.   Derivative financial instruments**

Derivative financial instruments have not been designated as hedges because they do not meet all of the requirements according to MFRS and are therefore classified as trading instruments for accounting purposes.

During 2009, no new derivative financial instruments were purchased. As of December 31, 2009, only those derivative instruments whose purpose is to mitigate the risk of increases in the price of natural gas, which were entered into prior to 2009, remain outstanding, as follows:

| Open derivative financial instruments | Notional MMBTUs* | Period | Fair Value Asset (liability) |
|---|---|---|---|
| Natural gas swaps with Pemex | 8,640,000** | 2010 – 2011** | Ps.  (191) |
| Embedded derivatives identified in supply contracts[1] | | | 2 |
| Total open derivative financial instruments | | | Ps.  (189) |

| | |
|---|---|
| * | Million British Thermal Units. |
| ** | As of December 31, 2009, the Company has hedges for approximately 32% of its estimated consumption at an average price of approximately US$6.80 per MMBTU for 2010 and 19% of its estimated consumption at an average price of approximately US$7.32 per MMBTU for 2011. |
| [1] | Included in other receivables |

Table of Contents

The Company performed a sensitivity analysis to determine its exposure to market risks for derivative financial instruments held as of December 31, 2009. The sensitivity analysis was performed applying valuation models fully accepted for these types of instruments, and considering changes in the underlying value that imply variances of 10% of the reference price. The additional variances affecting the valuation model such as interest rate and exchange rates, for purposes of the analysis, were deemed constant. Before an adverse change of 10% in the reference price, the fair value of the position of the Company's derivative financial instruments would be affected by approximately US$5 million.

The following table discloses the derivative financial instruments the Company unwound in 2008:

| Summary of unwound derivative financial instruments | Value of unwound positions (liability) | |
|---|---|---|
| Natural gas contracts | Ps. | (2,825) |
| Foreign exchange options | | (1,556) |
| Interest rate options | | 133 |
| Total unwound derivative financial instruments | | (4,248) |
| Cash deposited as collateral | | 1,111 |
| Total unwound derivative financial instruments, net | Ps. | (3,137) |

In the fourth quarter of 2008 the Company's management decided to unwind a majority of its open derivative positions that had been adversely affected due to high volatility experienced in the financial markets, which resulted in a significant devaluation between the peso/US dollar and peso/euro parity, as well as a significant reduction in energy prices.

As of December 31, 2008, certain positions have been unwound for approximately US$325 million and have not been paid. The cash deposited with the third parties as collateral related to these positions is approximately US$85 million (not including interest) and for accounting purposes in accordance with MFRS, is presented net of the derivative financial instruments liability as a right of offset exists.

During February and March of 2009, six out of the seven banks that are counterparties with whom the Company and some of its subsidiaries entered into derivative financial instruments (the Counterparties) have filed law suits in the Supreme Court of the State of New York demanding the payment of US$240 million plus interest and other fees related to the unwound derivative instruments.

The Counterparties have requested that a resolution be sought through the courts by filing a motion for summary judgment. This solution was postponed on various occasions beginning in August 2009 (see notes 23 b and 23 c).

9.  **Short−term borrowings**
    At December 31, 2008 and 2009, the short−term borrowings denominated in pesos totaled Ps. 308 and Ps. 786, respectively, and at December 31, 2008 and 2009 denominated in US dollars totaled Ps. 1,359 and Ps. 404, respectively, and denominated in euros totaled Ps. 642 and Ps. 490, respectively. During 2009, the Company's weighted average interest rate for short−term borrowings denominated in pesos, US dollars and euros was 11.05%, 10.09% and 4.08%, respectively.

10. **Long−term debt**
    Long−term debt consists of the following:

| | | December 31, | | | |
|---|---|---|---|---|---|
| | | **2008** | | **2009** | |
| I. | *Foreign Subsidiaries (payable in US dollars):* | | | | |
| | Unsecured debt, floating interest rate based on Fixed Term Deposits (DTF) plus a spread of 6%, principal payable in several installments through 2013. | Ps. | 13 | Ps. | 11 |

F−23

**Table of Contents**

|  |  | December 31, | |
|---|---|---|---|
|  |  | **2008** | **2009** |
|  | Capital lease, with fixed interest rate ranging between 6% and 7.67%, maturing in several installments through 2012. | 12 | 44 |
| II. | *Foreign Subsidiaries (payable in euros):* | | |
|  | Unsecured debt, interest rate based on EURIBOR plus a margin ranging from 1.10% to 1.25%, with different maturity dates up to 2014. | 57 | 44 |
|  | Capital leases, floating interest rate based on EURIBOR, plus a margin ranging from 0.625% to 1.25%, with different maturity dates up to 2014. | 40 | 37 |
|  | Fixed interest rate capital leases ranging from 0.84% to 3.84%, with different maturity dates up to 2010. | 11 | 2 |
| III. | *Vitro and Mexican Subsidiaries (payable in US dollars):* | | |
|  | 11.75% Guaranteed senior unsecured notes due in 2013[1]. | 2,976 | 2,811 |
|  | 8.625% Guaranteed senior unsecured notes due in 2012[1]. | 4,120 | 3,898 |
|  | 9.125% Guaranteed senior unsecured notes due in 2017[1]. | 9,593 | 9,062 |
|  | Secured debt with fixed interest rate of 7.86%, maturing in several installments through 2011 (see note 6 d). | 1,178 | 892 |
|  | Capital lease with fixed interest rate of 10.7494%, maturing in several installments through 2016. | 92 | 79 |
|  | Unsecured debt, floating interest rate based on LIBOR plus 8%, maturing in several installments through 2014. |  | 392 |
|  | Secured borrowing related to the glass container businesses' securitization transactions, guaranteed by trade receivables, fixed interest rate of 10.75%, maturing in 2010. | 263 |  |
|  | Secured borrowing related to the flat glass businesses' securitization transactions, guaranteed by trade receivables, fixed interest rate of 6.5%, maturing in 2010. | 298 |  |
| IV. | *Vitro and Mexican Subsidiaries (payable in Mexican pesos):* | | |
|  | Unsecured medium–term notes, floating interest rate based on 182– day Mexican treasury bonds (CETES) plus a spread of 3.25%, payable in 2009. | 150 | 150 |
|  | Unsecured medium–term notes, floating interest based on TIIE plus a spread of 2.50%, and maturing in 2011. | 400 | 400 |
|  | Secured debt, floating interest rate based on TIIE plus a 4% spread, maturing in several installments through 2014. |  | 299 |

F–24

Table of Contents

| | December 31, | |
|---|---|---|
| | **2008** | **2009** |
| Secured borrowing related to the glass container businesses' securitization transactions, guaranteed by trade receivables, variable interest rate based on TIIE plus a 4% spread, maturing in 2010. | 550 | |
| Secured borrowing related to the flat glass businesses' securitization transactions, guaranteed by trade receivables, variable interest rate based on TIIE plus a 4% spread, maturing in 2014. | | 300 |
| Total long–term debt | 19,753 | 18,421 |
| Less current maturities | 198 | 746 |
| Less reclassification of long–term debt[1] | 16,689 | 15,771 |
| Long–term debt, excluding current maturities of long–term debt | Ps.  2,866 | Ps.  1,904 |

[1]      As of December 31, 2008 and 2009, the Company was in default under the indentures governing the Senior Notes due 2012, 2013 and 2017 for US$300 million, US$216 million and US$700 million, respectively; therefore, Ps. 16,689 and Ps. 15,771, respectively, were reclassified as short–term. As a result, as of December 31, 2008, other contracts of approximately US$81 million with maturity in 2008, entered into default, of which US$52 million were refinanced.

As of December 31, 2009, the interest rates of EURIBOR, CETES, TIIE, LIBOR and DTF were 1.24%, 4.61%, 8.74%, 0.25% and 4.11%, respectively. The schedule of contractual principal payments of long–term debt as of December 31, 2009 is as follows:

| Year ending December 31, | |
|---|---|
| 2011 | Ps.  864 |
| 2012 | 142 |
| 2013 | 139 |
| 2014 | 752 |
| 2015 and thereafter | 7 |
| | Ps.  1,904 |

The Company is continuing discussions with the Counterparties, its bondholders and its creditors to achieve an organized financial restructuring to improve its financial position. The Company maintains its normal operations as it seeks to achieve a restructuring of its indebtedness (see notes 23 a and 23 c). In addition, the Company has adopted cost reduction initiatives throughout its entire organization, while optimizing production capacity according to its actual level of operation. Also, the Company has significantly reduced its capital expenditures for 2009 and future years.

In May 2009 the Company received notification of an executive mercantile trial initiated by Scotia Bank Inverlat, Casa de Bolsa, S.A. de C.V. Grupo Financiero Scotia Inverlat in its capacity as common representative for the holders of Certificados Bursátiles with the ticker symbol "VITRO 03" demanding payment of Ps. 150.3 plus interest. Evidence and pleas were heard during September and October 2009. At that time the court ruled that the plaintiff had wrongfully conducted this proceeding and therefore, the process would have to be handled as an ordinary mercantile trial. In October 2009, the judge made a definitive ruling against Vitro, and sentenced it to pay the disputed amount plus interest, therefore, the Company filed an appeal against this ruling, requesting that the proceedings begin again, to cancel the liens, to reverse the ruling and to pronounce judgment against the plaintiff and order payment of legal expenses. During April 2010, the appeals court granted Vitro its petition and revoked the decision of the lower court and invalidated the proceedings and ordered the parties to begin the case again.

Table of Contents

In July 2009 the Company and other defendant subsidiaries received notification of an executive mercantile lawsuit brought by RBS Bank in its character as creditor demanding the payment of US$15 million plus interest. During September and October 2009 hearings ended on the evidence and pleas. In October 2009 a preliminary ruling was given requiring the Company to pay the principal amount plus ordinary and default interest. On January 18, 2010 the Company appealed this resolution as well as others that were issued in these proceedings where certain evidence was dismissed. In September 2010 the Court of Appeals accepted one of the appeals being revised, because it had merits due to violation of certain defense rights and order to restart the proceeding to gather evidence by the Company, leaving without effects the first instance judgment and the appeal without merits.

**11. Employee benefits**

*a)* The Company has a defined benefit pension plan that covers all its personnel, which consists of a lump sum payment or a monthly pension calculated based on the aggregate of a basic pension, an additional seniority pension and an additional pension for equal or less earnings than the ceiling used for the Mexican Social Security Institute.

The retirement ages are as follows:

- Normal. – Personnel that are 65 years old with 20 or more years of service.

- Advanced. – Personnel that are 60 years old with a minimum of 20 or more years of service, reducing the pension by a percentage point each year before reaching 65 years of age.

- Early. – Personnel that are 50 years old with 10 or more years of service, reducing the pension by a percentage according to the age at the moment of retirement.

- Aggregate of 100. – With the approval of the Technical Committee, personnel whose aggregate age and years of service is 100.

- Deferred. – Personnel who do not accept retirement upon becoming 65 years old lose all the rights to receive a pension from the plan.

This plan also provides seniority premium benefits, which consist of a lump sum payment of 12 days' wage for each year worked, calculated using the most recent salary, not to exceed twice the legal minimum wage established by law, as well as severance payments, which consists of a three month and twenty days wage payment for each year served. The related liability and annual cost of such benefits are calculated by an independent actuary on the basis of formulas defined in the plans using the projected unit credit method.

*b)* The present values of these obligations and the rates used for the calculations are:

| | December 31, | |
|---|---|---|
| | **2008** | **2009** |
| Vested benefit obligation | Ps. 2,514 | Ps. 3,052 |
| Nonvested benefit obligation | 486 | 446 |
| Defined benefit obligation | 3,000 | 3,498 |
| Plan assets at fair value | (684) | (1,140) |
| Unfunded status | 2,316 | 2,358 |
| Unrecognized items: | | |
| Prior service costs and plan amendments | (222) | (163) |
| Unrecognized transition obligation | (138) | (125) |
| Unrecognized actuarial gains and losses | (1,495) | (2,004) |
| Projected net liability | Ps. 461 | Ps. 66 |

F–26

**Table of Contents**

At December 31, 2008 and 2009 the plan assets presented above, includes 53.3 million Vitro shares.

Assumptions

|  | December 31, | |
|---|---|---|
|  | **2008** | **2009** |
| Discount rate | 10.25% | 9.50% |
| Expected rate of return on plan assets | 12.25% | 10.50% |
| Rate of compensation increase | 3.50% | 3.50% |

c)    Net periodic cost consists of:

|  | Year ended December 31, | | |
|---|---|---|---|
|  | **2007** | **2008** | **2009** |
| Service cost | Ps.    96 | Ps.    143 | Ps.    81 |
| Interest cost | 149 | 268 | 287 |
| Amortization of unrecognized prior service costs | 56 | 72 | 68 |
| Actuarial gains and losses | 48 | 177 | 91 |
| Effect of reduction and early liquidation | 97 | | |
| Expected yield on plan assets | (88) | (166) | (82) |
| Net periodic cost | Ps.    358 | Ps.    494 | Ps.    445 |

Certain unrecognized items as of December 31, 2007 are being amortized to results of operations within a maximum period of 5 years or the employee's remaining service life, if less. Through December 31, 2007, these items were amortized to results of operations based on the employee's average remaining labor life. Starting in 2008, unrecognized items incurred from January 1, 2008 are amortized to results of operations based on the employees' average remaining service lives, which is between 10 and 16 years. This change represented a charge to current earnings of Ps. 42 and Ps. 38 in 2008 and 2009, respectively.

d)    Changes in present value of the defined benefit obligation:

|  | Year ended December 31 | |
|---|---|---|
|  | **2008** | **2009** |
| Present value of the defined benefit obligation as of January 1 | Ps.    3,319 | Ps.    3,000 |
| Service cost | 143 | 81 |
| Interest cost | 268 | 287 |
| Benefits paid | (526) | (431) |
| Actuarial (gain) loss | (112) | 561 |
| Deconsolidation of Comegua | (92) | |
| Present value of the defined benefit obligation as of December 31 | Ps.    3,000 | Ps.    3,498 |

e)    Changes in fair value of plan assets:

F—27

Table of Contents

| | Year ended December 31, | |
|---|---|---|
| | 2008 | 2009 |
| Fair value of plan assets as of January 1 | Ps.  1,548 | Ps.  684 |
| Expected return | 166 | 82 |
| Actuarial losses | (912) | (39) |
| Contributions made by the Company | 140 | 774 |
| Benefits paid | (258) | (361) |
| | | |
| Fair value of plan assets as of December 31 | Ps.  684 | Ps.  1,140 |

Classification of plan assets as of December 31, 2009:

| | Expected Yield | Actual Yield |
|---|---|---|
| Capital instruments (Vitro A shares) | 13.00% | 3.00% |
| Other | 8.67% | 4.42% |

The rate of return on the plan assets is determined using a composition of 42% of Vitro's shares and 58% in investments in securities.

**12. Commitments and contingencies**

a)   In October 2000, several subsidiaries of Vitro, which have facilities throughout Monterrey, Mexico and the Mexico City area, entered into a 15−year energy purchase agreement for approximately 90 Megawatts of electricity and 1.3 million tons of steam per year with Tractebel Energía de Monterrey, S. de R.L. de C.V.

b)   The Company has several non−cancelable operating lease agreements for the rent of warehouses and equipment. Rental expense for the years ended December 31, 2007, 2008 and 2009 was Ps. 541, Ps. 646 and Ps. 794, respectively.

Future minimum lease payments under these agreements are as follows:

| | |
|---|---|
| 2010 | Ps.861 |
| 2011 | 809 |
| 2012 | 714 |
| 2013 | 664 |
| 2014 | 620 |
| 2015 and thereafter | 626 |

c)   As part of the disposal of Anchor Glass Containers Corporation (Anchor) in August 1996, in a transaction approved by the U.S. Bankruptcy Court, the Company entered into a term sheet which contemplated an agreement pursuant to which the Company would provide to the Pension Benefit Guaranty Corporation (PBGC), a United States governmental agency that guarantees pensions, a limited guaranty of Anchor's unfunded pension liability. No payments would be made under such a guaranty unless the PBGC terminated any of the covered pension plans, and the guaranty would be payable only to the extent the PBGC could not otherwise recover the unfunded liabilities from the entity that purchased Anchor's assets New Anchor. The amount of the guaranty was originally limited to US$70 million. Under the guaranty, payments would not begin until August 1, 2002, and would then generally be payable in equal semi−annual installments over the following 10 years. Payments would not bear interest. The amount and the term of the guaranty would be proportionally reduced if the pension plans were terminated after January 31, 2002. Beginning February 2002, the guaranty would be reduced by US$7 million semiannually until August 1, 2006, when the guaranty would expire if the plans did not terminate.

F−28

On April 15, 2002, New Anchor filed a pre–negotiated plan of reorganization under Chapter 11 of the U.S. Bankruptcy Code. On August 8, 2002, an amended plan of reorganization was confirmed, pursuant to which the plan resulting from the merger of the covered pension plans was terminated, and the obligations thereunder were assumed by the PBGC in exchange for cash, securities and a commitment of reorganized New Anchor to make certain future payments.

On June 20, 2003, the PBGC wrote to the Company, asserting that the plan had been terminated effective as of July 31, 2002, with an estimated unfunded liability of US$219 million. The PBGC stated that the value of the recovery from New Anchor and reorganized New Anchor amounts to no more than US$122.25 million; it alleged that the recovery that it secured in the bankruptcy was insufficient and that an underfunding in excess of the Company's limited guaranty had occurred. Accordingly, to such letter, the PBGC demanded payments pursuant to the term sheet of US$7 million on or before August 1, 2003 and of US$3.5 million semiannually through August 1, 2011. The Company intends to contest this liability. There are various issues concerning such demand and certain defenses that may be asserted by the Company. Management is currently evaluating these issues and defenses. At this point, it is not possible to reasonably estimate the amounts that will ultimately be payable in response to such demand. When management is able to reasonably estimate those amounts, the Company will establish an appropriate accounting reserve. As of this date, the Company has not established any reserves in connection with such potential liability.

d)   On December 2006, Viméxico (formerly Vitro Plan) concluded at an extraordinary shareholders' meeting to approve the merger of Vitro Plan into Viméxico, which was a creditor of Vitro Plan. As a result of the merger, all assets, rights, liabilities and obligations of Vitro Plan were absorbed by Viméxico. Prior to the merger, Vitro Plan was a direct 65%–owned subsidiary of Vitro and Pilkington Group LTD (Pilkington) owned the remaining 35%. As a result of the merger, Viméxico became a 91.8%–owned subsidiary of Vitro and Pilkington the owner of the remaining 8.2%.

Although the merger became entirely effective once all the respective authorizations were obtained and having prepared all the respective acts, publications and registrations, Pilkington, who voted against such approval, began a legal procedure in January 2007 against the merger. In February 2008 in first instance, in June 2008 in second instance, and finally in February 2009, the protection requested by Pilkington was denied. The Company was notified that the opposing action exercised by Pilkington was declared unprecedented in a final and unappealable sentence with respect to the resolutions approved by the majority at the extraordinary general stockholders' meeting in December 2006. Thus, the foregoing resolutions were confirmed as valid and mandatory for all stockholders, including those dissenting.

However, in the first week of December 2007, the Company was notified of a new complaint filed by Pilkington, claiming the annulment of such extraordinary general stockholders' meeting. This position goes against the claims sustained in the first trial and was filed after Pilkington specifically desisted from this action after the first trial. Accordingly, Vitro also expects to obtain a favorable resolution from this claim. In this proceeding all evidence and allegations were submitted and the Company is awaiting the final ruling.

e)   On June 23, 2008, the Company initiated litigation against Banamex, S.A., Institución de Banca Múltiple, a subsidiary of Grupo Financiero Banamex, S.A. and Citigroup, requesting the court to declare null and void the acquisition and ownership of any of Vitro's common shares due to a violation of its by–laws.

According to the Company's by–laws, no foreign individual or legal entity or Mexican company without a foreign exclusion clause may own or acquire Vitro shares. Such by–laws also specify that in the event this restriction is violated, the holding or acquisition shall be null, and the Company shall not recognize the acquirer as an owner, nor can the latter exercise corporate or economic rights inherent to the shares.

A cautionary measure was granted by the court to freeze the approximate 53.6 million shares that are subject to this procedure while the trial is resolved in a final sentence, and the Securities Depository Institute (Indeval) has been requested to comply with such measure, nonetheless it was not possible to implement.

Table of Contents

In January 2010 a district judge ruled in favor of Banamex. Vitro is contesting the irregular purchase of these shares amounting to 14.9% of its common stock outstanding. The Company has submitted its appeal in a timely and correct manner to this sentence issued by a lower court.

On August 18, 2010, the Appeals Court issued a resolution denying the recourse presented by Vitro opposing the decision issued by the lower court. At this time, Vitro is preparing to present a final appeal through an "Amparo" against the decision issued by the Appeals Court.

**13. Foreign currency operations**

   *a)*   At December 31, 2009, the foreign currency denominated assets and liabilities of the Company's Mexican subsidiaries consist of the following:

|  | Millions of dollars | Mexican pesos |
|---|---|---|
| Monetary assets | US$ 227 | Ps. 2,969 |
| Inventories | 16 | 209 |
| Fixed assets | 194 | 2,533 |
| Monetary liabilities | 1,817 | 23,729 |

   *b)*   Foreign currency operations of the Company's Mexican subsidiaries for the year ended December 31, 2009, consisted of the following:

|  | Millions of dollars | Mexican pesos |
|---|---|---|
| Exports | US$ 484 | Ps. 6,568 |
| Imports | 183 | 2,487 |
| Interest expense, net | 159 | 2,158 |

   *c)*   The condensed financial information of the principal foreign subsidiaries of the Company at December 31, 2009, consisted of the following:

|  | United States | Central and South America | Europe |
|---|---|---|---|
| Net sales | Ps. 6,834 | Ps. 624 | Ps.1,506 |
| Operating income (loss) | (148) | 96 | (190) |
| Total assets | 1,948 | 718 | 2,525 |
| Total liabilities | 875 | 188 | 1,317 |
| Capital expenditures | 82 | 8 | 10 |

   *d)*   The exchange rates of the Mexican peso against the US dollar and the Euro, used for purposes of the Company's consolidated financial statements at the following dates were:

|  | US dollar | Euro |
|---|---|---|
| December 31, 2007 | Ps.10.8662 | Ps.15.9526 |
| December 31, 2008 | 13.8325 | 19.2534 |
| December 31, 2009 | 13.0587 | 19.5789 |

On September 27, 2010, the exchange rate was Ps. 12.5168 per US dollar and Ps. 16.8539 per Euro.

F−30

Table of Contents
**14. Stockholders' equity**

    *a)*   The capital stock of the Company consists of 386,857,143, ordinary, nominative, fully paid common shares, without par value, at December 31, 2008 and 2009.

    *b)*   The Company maintains an Employee Stock Option Plan established in March 1998 (the Plan). The Plan specifies the amount of shares, time and initial exercise price. The vesting period of the options is five years and the life of such options is 10 years.

         The following table summarizes the activity relating to the Plan:

| Options | 2000 | 2001 | 1998* | 2002 | Total Outstanding |
|---|---|---|---|---|---|
| Options granted | 4,851,900 | 3,204,800 | 940,950 | 3,941,950 | |
| Options cancelled or exercised at December 31, 2009 | 3,986,950 | 2,827,950 | 478,050 | 3,208,150 | |
| Options outstanding at December 31, 2009 | 864,950 | 376,850 | 462,900 | 733,800 | 2,438,500 |
| Exercise price | Ps.  11.00 | Ps.  8.27 | Ps.  13.00 | Ps.  7.53 | |

    *                                                              During the year 2001, the Company modified the price of the 940,950 options granted in 1998 and its maturity date to 2011.

The closing price of the Company's shares on the BMV on December 31, 2009 was Ps. 8.24.

         The estimated fair value of the options was made on the grant date using the Black–Scholes option–pricing model.

    *c)*   At December 31, 2008 and 2009, the Company held 40,204,310 of treasury shares, which includes 11,739,741 and 39,758,810 shares held by the Stock Option Trust (see note 14 b) at December 31, 2008 and 2009, respectively.

    *d)*   Retained earnings include the statutory legal reserve. Mexican General Corporate Law requires that at least 5% of net income of the year be transferred to the legal reserve until the reserve equals 20% of capital stock at par value (historical pesos). The legal reserve may be capitalized but may not be distributed unless the entity is dissolved. The legal reserve must be replenished if it is reduced for any reason. At December 31, 2008 and 2009, the legal reserve, in historical pesos, was Ps. 72.

    *e)*   Stockholders' equity, except restated paid–in capital and tax retained earnings, will be subject to income tax at the rate in effect when a dividend is distributed. Any tax paid on such distribution may be credited against annual and estimated income taxes of the year in which the tax on dividends is paid and the following two fiscal years.

         At December 31, 2009, the majority interest stockholders' equity tax account, corresponding to the contributed capital account and the net tax income account was Ps. 2,513 and Ps. 2,375, respectively.

    *f)*   Dividends declared and paid:

Table of Contents

| Stockholders' meeting date | Dividend Amount | | | Payment Date |
|---|---|---|---|---|
| | Nominal Value | | Restated Value | |
| March 28, 2007 | Ps. 133 | Ps. | 136* | April 2007 |
| April 17, 2008 | 143 | | 143 | May 2008 |

\*          This amount is restated for inflationary effect until December 31, 2007.

During 2009 no dividends were paid.

g)     Noncontrolling interest in consolidated subsidiaries consists of the following:

| | December 31 | |
|---|---|---|
| | 2008 | 2009 |
| Capital stock | Ps. 457 | Ps. 443 |
| Paid in capital | 616 | 736 |
| Translation effects of foreign subsidiaries | 235 | 155 |
| Retained earnings | 96 | 130 |
| | Ps. 1,404 | Ps. 1,464 |

h)     Controlling interest consists of the following:

| | December 31, 2009 | | |
|---|---|---|---|
| | Value | Restatement* | Value |
| Capital stock | Ps. 387 | Ps. 7,245 | Ps. 7,632 |
| Treasury stock | (223) | (324) | (547) |
| Paid-in capital | 355 | 1,290 | 1,645 |
| Translation effects of foreign subsidiaries | 370 | | 370 |
| (Accumulated deficit) retained earnings | (11,144) | 2,564 | (8,580) |
| | Ps. (10,255) | Ps. 10,775 | Ps. 520 |

\*          Amounts are restated for inflationary effect until December 31, 2007.

**15.    Total comprehensive financing result**

The following represents a summary of the Company's total comprehensive financing result for the periods presented:

F–32

Table of Contents

| | Year ended December 31, | | |
|---|---|---|---|
| | 2007 | 2008 | 2009 |
| Interest expense on debt denominated in US dollars | Ps. 1,698 | Ps. 1,703 | Ps. 1,847 |
| Interest expense on debt denominated in pesos | 130 | 157 | 300 |
| Interest income | (175) | (58) | (51) |
| Derivative financial instruments | 201 | 3,766 | 570 |
| Exchange loss (gain) | 94 | 3,222 | (976) |
| Gain from monetary position | (471) | | |
| Other financing expenses, net | 183 | 287 | 676 |
| | Ps. 1,660 | Ps. 9,077 | Ps. 2,366 |

**16.  Other expenses (income), net**

The following represents a summary of the Company's other expenses (income), net for the periods presented:

| | Year ended December 31, | | |
|---|---|---|---|
| | 2007 | 2008 | 2009 |
| Restructuring charges | Ps. 7 | Ps. 185 | Ps. 265 |
| Impairment of long–lived assets | 122 | 196 | 207 |
| (Gain) loss from sale of long–lived assets | 47 | (3) | (209) |
| (Gain) loss from sale of subsidiaries | 11 | | |
| Early extinguishment of employee retirement obligations | 97 | 69 | |
| Fees and costs for extinguishment of debt | 488 | | 7 |
| Statutory employee profit sharing | 54 | 10 | 13 |
| Other | 43 | 38 | 8 |
| | Ps. 869 | Ps. 495 | Ps. 291 |

**17.  Tax loss carryforwards**

At December 31, 2009, tax loss carryforwards consist of the following:

| | Tax loss carryforwards | |
|---|---|---|
| Expiration Year | Controlling interest | Noncontrolling interest |
| 2010 | Ps. 106 | Ps. 4 |
| 2011 | 280 | 1 |
| 2012 | 466 | 1 |
| 2013 | 156 | |
| 2014 | 421 | |
| 2015 | 132 | |
| 2016 | 266 | 1 |
| 2017 | 111 | |
| 2018 | 962 | 59 |
| 2019 | 1,601 | 51 |
| | Ps. 4,501 | Ps. 117 |

F–33

Table of Contents

18.   **Income and asset taxes**

   *a)*   In accordance with the Mexican tax law, the Company in 2008 and 2009 is subject to ISR and IETU. Until 2007, the Company was subject to ISR and IMPAC.

        ISR.− The Company pays ISR, together with subsidiaries on a consolidated basis in proportion to Vitro's voting interest in its Mexican subsidiaries. The ISR rate is 28% for 2007, 2008 and 2009, and, based on changes to the ISR Law on December 7, 2009, will be 30% for 2010 to 2012, 29% for 2013 and 28% for 2014 and subsequent years.

        The foreign subsidiaries calculate their ISR based on the individual results of each subsidiary pursuant to the specific tax regimes in each country.

        Within the amendments to the ISR Law of 2009, to become effective beginning in 2010, states that: a) ISR relating to tax consolidation benefits obtained from 1999 through 2004 should be paid in installments beginning in 2010 through 2015, and b) ISR relating to tax benefits obtained in the 2005 tax consolidation and thereafter, should be paid during the sixth through the tenth year after that in which the benefit was obtained. Payment of ISR in connection with tax consolidation benefits obtained from 1982 (tax consolidation starting year) through 1998 may be required in those cases provided by law.

        The effects in the financial information, resulting from the approval of changes to the ISR Law related to the consolidation regime resulted in a decrease in shareholders' equity within retained earnings of $237, an increase of $564 in deferred tax assets and $85 in recoverable taxes, and an increase in taxes payable of $886 (including $36 payable in the short term).

        IETU.− On January 1, 2008, the IETU went into effect. IETU applies to the sale of goods, the provision of independent services and the granting of use or enjoyment of goods, according to the terms of the IETU law, less certain authorized deductions. Revenues, as well as deductions and certain tax credits, are determined based on cash flows generated beginning January 1, 2008. The IETU law establishes that the IETU rate will be 16.5% in 2008, 17.0% in 2009, and 17.5% in 2010 and subsequently. Similarly, the IMPAC Law was repealed upon enactment of the IETU Law, however, under certain circumstances, IMPAC paid in the ten years prior to the year in which ISR is paid, may be refunded, according to the terms of the law. In addition, as opposed to ISR which allows for fiscal consolidation, companies that expect to incur IETU must file individual returns.

        Based on its financial projections and according to INIF 8, *Effects of the Business Flat Tax*, the Company determined that it will basically pay ISR. Therefore, it only recognizes deferred ISR.

        IMPAC.− Through 2007, the Company paid tax on assets on a consolidated basis in proportion to Vitro's voting interest in its Mexican subsidiaries. In 2007, IMPAC was calculated by applying 1.25% to the value of the assets of the year, without deducting any debt amounts.

   *b)*   The income and asset tax expense (benefit) included in the Company's results are:

|  | Year ended December 31, | | |
|  | 2007 | 2008 | 2009 |
|---|---|---|---|
| Current | Ps.  395 | Ps.   123 | Ps.   (3) |
| Deferred | (145) | (2,298) | (595) |
|  | 250 | (2,175) | (598) |
| Asset tax | (206) |  |  |
|  | Ps.   44 | Ps.(2,175) | Ps.(598) |

F–34

Table of Contents

c)    Net deferred tax assets presented in the consolidated balance sheets consist of the following:

| | December 31, | |
| --- | --- | --- |
| | 2008 | 2009 |
| Allowance for doubtful accounts | Ps.    42 | Ps.    125 |
| Reserve for employee benefits | 231 | 286 |
| Tax loss carryforwards | 1,201 | 2,550 |
| Intangible asset | 667 | 700 |
| Fixed assets | (18) | (27) |
| Derivative financial instruments | 1,441 | 984 |
| Inventories | 35 | 51 |
| Other | 407 | 185 |
| Total | 4,006 | 4,854 |
| Valuation allowance | (599) | (339) |
| | Ps.  3,407 | Ps.  4,515 |

| | December 31, | |
| --- | --- | --- |
| | 2008 | 2009 |
| Balance: | | |
| Deferred tax assets | Ps.  3,418 | Ps.  4,515 |
| Deferred tax liabilities | (11) | |
| | Ps.  3,407 | Ps.  4,515 |

d)    Following is a reconciliation between the Company's effective income tax rate and the statutory rate:

| | Year ended December 31, | | |
| --- | --- | --- | --- |
| | 2007 | 2008 | 2009 |
| Effective income tax rate | 25% | 28% | 44% |
| Asset tax presented as income tax | 120 | | |
| Intangible asset | (28) | (2) | |
| Sale of subsidiaries | 8 | | |
| Foreign subsidiaries | (5) | (3) | (6) |
| Effect of inflation | (2) | 4 | 7 |
| Effect of reduction in statutory rate on deferred ISR | | | (1) |
| Valuation allowance | (15) | 4 | (20) |
| Nondeductible expenses | (10) | | 4 |
| Other | (65) | (3) | |
| Statutory income tax rate | 28% | 28% | 28% |

**Table of Contents**

    *e)*    The deferred income tax effect, reduced from the movements in stockholders' equity for insufficiency in restated stockholders' equity, the effect of cancelling preoperating costs, the equity effect of the additional labor liability as well as from the exchange loss capitalized in the translation effect of foreign subsidiaries is presented as follows:

| | Year ended December 31, | | |
|---|---|---|---|
| Income tax effect of: | 2007 | 2008 | 2009 |
| Shortfall in restatement of capital: | Ps.    119 | | |
| Minimum labor liability | (126) | | |
| Effect of cancelling preoperating costs | | | Ps.    6 |
| Translation effects of foreign subsidiaries | | Ps.    234 | (44) |
| | Ps.    (7) | Ps.    234 | Ps.    (38) |

**19.    Related party transactions**

The transactions with related parties, carried out in the ordinary course of business, were as follows:

    *a)*    *Arrangements with respect to real estate.* – On certain occasions, until October 2008, the Company used real estate owned by relatives of certain directors and senior managers to meet with customers, suppliers or for other business purposes. The Company paid an annual fee for the right to use these properties for a specified number of days per year. Additionally, it had agreed to pay maintenance and operating costs. In 2007 and 2008, the aggregate amounts paid as annual fees were approximately Ps. 10, and Ps. 8, respectively.

    *b)*    *Goods sold.* – The Company sells flat glass products and glass containers to certain companies whose shareholders are directors and senior managers. In 2007, 2008 and 2009, the aggregate amount of these sales was Ps. 69, Ps. 71 and Ps. 56, respectively.

    Empresas Comegua, S.A., an associated company, sells glass containers to Cervecería Centroamericana and to Cervecería de Costa Rica, its noncontrolling interest. In 2007, 2008 and 2009, the aggregate amount of these sales was US$9 million, US$20 million and US$12 million, respectively.

    *c)*    *Purchase of supermarket coupons.* – The Company purchases supermarket coupons for its employees at a supermarket store in which one member of its board of directors is a shareholder. In 2008 and 2009, the amount of these purchases was Ps. 80 and Ps. 90, respectively.

    *d)*    *Sale of real estate.* – In 2007, a member of the Company's Board of Directors, purchased an unused parcel of real estate from one of its subsidiaries. The price of the real estate was US$5.4 million. The Company received several offers for the property and such member of the Board made the highest offer. The transaction was approved by the Company's Audit Committee in accordance with its charter at the time.

    *e)*    *Compensation.* – For the years ended December 31, 2007, 2008 and 2009, the aggregate compensation the Company paid to its directors and senior managers was approximately Ps. 273, Ps. 183 and Ps. 229, respectively. This amount includes fees, salaries, the use of certain assets and services, variable compensation and retirement benefits.

**20.    Business dispositions and acquisitions**

    *a)*    *Acquisition of 55% of the shares of PVA.* – In August 2007, Vitro VyC acquired 55% of the outstanding shares of PVA, a company dedicated to the installation of value added crystal products for Ps. 110. As a